# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VALENCIA M. MCCLATCHEY,                )
                                       )
            Plaintiff,                 )
                                       )
        v.                             )        Civil Action No. 05-145J
                                       )
THE ASSOCIATED PRESS,                  )
                                       )
            Defendant                  )
                                       )

## MEMORANDUM OF THE ASSOCIATED PRESS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

Robert Penchina (*Pro Hac Vice*)
230 Park Avenue, Suite 1160
New York, NY 10169
(212) 850-6100
(212) 850-6299 (Fax)

Gayle C. Sproul (I.D. No. 38833)
Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778
(215) 988-9750 (Fax)

*Attorneys for The Associated Press*

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF MATERIAL FACTS .......................................................................... 2

ARGUMENT .................................................................................................................... 8

I.     AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING
       PLAINTIFF'S CLAIM FOR DIRECT COPYRIGHT INFRINGEMENT ............. 9

       A.    AP's Use Was For a Proper Purpose .......................................................... 10

       B.    Plaintiff's Photograph Was a Published Historical Work ........................... 12

       C.    The Amount Used Was Reasonable in View of the Purpose of the Use ..... 13

       D.    AP's Use Did Not Supplant the Market for the Work ................................ 14

       E.    The Balance of the Factors Demonstrates Fair Use Was Made .................. 16

II.    AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING
       PLAINTIFF'S CLAIMS FOR SECONDARY COPYRIGHT LIABILITY .......... 16

       A     The Record Provides No Basis to Find Contributory Infringement ............ 17

       B.    The Record Provides No Basis to Find Vicarious Infringement ................ 18

III.   AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING
       PLAINTIFF'S DMCA CLAIMS ............................................................................ 19

       A     AP Did Not Distribute False Copyright Management Information ............. 19

       B     AP Did Not Remove Copyright Management Information ......................... 21

             1.    AP Did Not Remove Any Copyright Notice ................................... 21

             2.    Even if the Photograph Contained a Textual Copyright
                   Notice, That Notice Does Not Qualify as CMI ............................. 21

             3.    Even if Plaintiff's Textual Copyright Notice Qualifies
                   as CMI, AP Did Not Intend to Aid Infringement .......................... 22

IV.    AP IS ENTITLED TO SUMMARY JUDGMENT ON DAMAGES ISSUES .......... 23

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

### CASES

*Baraban v. Time Warner, Inc.,*
    2000 WL 358375 (S.D.N.Y. 2000) ........................................................ 11

*Bly v. Banbury Books, Inc.,*
    638 F. Supp. 983 (E.D. Pa. 1986) ................................................ 23, 24

*Bouchat v. Champion Products, Inc.,*
    327 F. Supp. 2d 537 (D. Md. 2003) ...................................................... 25

*Branch v. Ogilvy & Mather, Inc.,*
    772 F. Supp. 1359 (S.D.N.Y. 1991) ..................................................... 24

*Bridgeport Music, Inc. v. Diamond Time, Ltd.,*
    371 F.3d 883 (6th Cir. 2004) ............................................................... 16

*Brought to Life Music, Inc. v. MCA Records, Inc.,*
    2003 WL 296561 (S.D.N.Y. 2003) ....................................................... 18

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) .................................................................... 10, 14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................. 8

*Video Pipeline, Inc. v. Buena Vista Home Entm't Inc.,*
    342 F.3d 191 (3d Cir. 2003) ................................................................ 11

*Daley v. Firetree, Ltd.,*
    2006 WL 148879 (M.D. Pa. 2006) ...................................................... 24

*Digital Filing Sys., L.L.C. v. Agarwal,*
    2005 WL 1702954 (E.D. Mich. 2005) ................................................. 24

*Gordon v. Nextel Commc'ns,*
    345 F.3d 922 (6th Cir. 2003) ............................................................... 22

*Haberman v. Hustler Magazine,*
    626 F. Supp. 201 (D. Mass. 1986) ...................................................... 15

*Hustler Magazine Inc. v. Moral Majority Inc.,*
    796 F.2d 1148 (9th Cir. 1986) .............................................................. 9

*IQ Group, Ltd. v. Wiesner Publ'g, LLC,*
    409 F. Supp. 2d 587 (D.N.J. 2006) ..................................................... 22

*Kelly v Arriba Soft Corp* ,
   336 F 3d 811 (9th Cir. 2003) ............................................................. 11, 12, 13, 14

*L A News Serv v CBS Broad , Inc* ,
   305 F 3d 924 (9th Cir.) ..................................................................... 12

*Livnat v Lavi* ,
   1998 WL 43221 (S.D.N.Y. 1998) ....................................................... 18

*Marvullo v Gruner & Jahr* ,
   105 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................................ 18

*Mathieson v Associated Press* ,
   1992 WL 164447 (S.D.N.Y. 1992) ........................................... 11, 13, 14, 17

*Mattel, Inc. v Walking Mtn. Prods* ,
   353 F.3d 792 (9th Cir. 2003) ................................................. 12, 13, 14, 15

*Maxtone-Graham v Burtchaell* ,
   803 F.2d 1253 (2d Cir. 1986) ............................................................. 9

*Metro-Goldwyn-Mayer Studios Inc v Grokster, Ltd* ,
   125 S. Ct. 2764 (2005) ..................................................................... 17

*Metzke v May Dep't Stores Co* ,
   878 F. Supp. 756 (W.D. Pa. 1995) ..................................................... 19

*Monotype Imaging, Inc v Bitstream, Inc* ,
   376 F. Supp. 2d 877 (N.D. Ill. 2005) .................................................. 23

*Nunez v Caribbean Int'l News Corp.* ,
   235 F.3d 18 (1st Cir. 2000) ..................................................... 10, 13, 14

*Parker v Google, Inc* ,
   2006 WL 680916 (E.D. Pa. 2006) ............................................ 16, 18, 19

*Perfect 10 v Google, Inc* ,
   416 F. Supp. 2d 828 (C.D. Cal. 2006) ................................................ 17

*Schiffer Publ'g, Ltd v Chronicle Books, LLC* ,
   2004 WL 2583817 (E.D. Pa. 2004) ........................................ 12, 19, 20, 21

*Schuchart & Assocs v Solo Serve Corp* ,
   1983 WL 1147 (W.D. Tex. 1983) ....................................................... 18

*West v City of New York* ,
   1985 WL 202 (S.D.N.Y. 1985) .......................................................... 12

iii

*World Wrestling Fed'n Entm't Inc v Big Dog Holdings, Inc* ,
    280 F. Supp. 2d 413 (W.D. Pa. 2003) ........................................................9, 11

## STATUTES

17 U.S.C. § 107 .....................................................................................9, 10, 11,14

17 U.S.C. § 504 ................................................................................................23

17 U.S.C. § 1201 .........................................................................................21, 22

17 U.S.C. § 1202 ....................................................................................19, 21, 22

Fed. R. Civ. P. 56 .............................................................................................1

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Defendant The Associated Press ("AP") in support of its motion under Fed. R. Civ. P. 56 for summary judgment dismissing all of the claims against it.

On September 11, 2001, the unthinkable happened as terrorists attacked the United States. Among the tragic events, Flight 93 crashed in Shanksville, Pennsylvania while passengers struggled to regain control of the aircraft from the hijackers. Moments after the crash, plaintiff Val McClatchey took a photograph from her front porch showing the cloud of smoke rising from the crash above the pastoral setting.

At a memorial service held on the site of the crash on the one-year anniversary of the tragedy, Ms. McClatchey introduced herself to an AP reporter covering the event, identified herself as the person who took that photograph, and interested the reporter in doing a story about her and her photograph. Ms. McClatchey provided to AP a "copy of the photograph to use in connection with the proposed article." (Compl. ¶ 14). On September 12, 2002, AP ran the report, which it headlined "Woman who captured searing Flight 93 image struggles a year later." The AP report included both text and a copy of her photograph and discussed the photograph and how Ms. McClatchey's life had changed following her snapping the photo. More than a year later, Ms. McClatchey for the first time complained to AP about its use of the photograph. This suit and multimillion dollar demands followed.

AP ran the photograph with the understanding that Ms McClatchey had given consent for it to do so. Even if there was a misunderstanding about whether AP had Ms. McClatchey's consent, her copyright infringement claim should be dismissed because AP's use of the photo was privileged as a non-infringing fair use. Similarly, Plaintiff's claims for contributory and vicarious copyright infringement fail because no infringing uses of the photograph were made by

the third parties who received the photo from AP, AP had no ability to control or supervise any

third party's use of the photo, and AP did not intend to induce infringement. Likewise,

Plaintiff's claims under the Digital Millennium Copyright Act ("DMCA") lack merit because AP

did not distribute false copyright information, the photo provided to AP did not contain a

copyright notice, and in any event a mere copyright notice is not the type of information

protected by the DMCA. For the reasons that follow, Plaintiff's claims against AP are without

merit, and AP respectfully urges that its summary judgment motion be granted in all respects.

## STATEMENT OF MATERIAL FACTS

AP is a not-for-profit mutual news cooperative that collects and distributes news to its

members and subscribers, including newspapers, magazines, radio and television broadcasters,

and electronic news publishers. (Ake Decl. ¶ 2). Subscribers do not pay fees based upon their

receipt or use of any particular items provided as part of AP's news service. (*Id.* ¶ 5). Rather,

they pay an assessment to AP calculated to cover AP's actual cost of providing the service. (*Id.*).

Within seconds after the tragic crash of Flight 93 in Shanksville, Pennsylvania, Val

McClatchey snapped a photograph from her front porch in nearby Stoystown. (McClatchey Dep.

4, 7). That photograph depicts a large plume of smoke from the crash ascending over the barns

and fields visible from her porch. (*Id.* at 7). The photograph, which Ms. McClatchey entitled the

"End of Serenity," attracted attention from the FBI in connection with its investigation of the

crash, as well as from various newspapers, magazines and broadcasters who published the

photograph with Ms. McClatchey's consent. (*E.g.*, Compl. ¶ 10; McClatchey Dep. 8, 17, 73-74,

90, Ex. 27, Ex. 28). An enlarged copy of the photograph "became part of the permanent display

for the Smithsonian." (McClatchey Dep. 48).

Ms. McClatchey rightfully is proud of her photograph. (*Id.* at 86-87). She "enjoy[s]

sharing the photo" and the attention it has generated for her. (*Id.* at 41). She was excited "[t]o

2

see it actually in print for other people to see." (*Id.* at 76). In fact, Ms. McClatchey felt that "[i]t's an honor to be able to share it with others," (*id.* at 49), and it was "an honor that [publishers] would ask that my photo be part of their articles or sharing it with the public." (*Id.* at 49, Ex. 4). In short, Ms. McClatchey's view with respect to the photograph's publication was "the more it is seen the better." (*Id.* at 98, Ex. 25)

Accordingly, when publications "told a story that I [Ms. McClatchey] agreed with" (*id.* at 12), or if she "judged [a proposed report] to be a story [she] wanted to be told," Ms. McClatchey would allow the publisher to use her photograph "without a fee." (*Id.* at 17; *see also, e.g.*, *id.* at 12, 13-14, 53, 73; Pl. Admis. 14). To be sure, Ms. McClatchey did indeed charge a fee of $250 or $350 for use of her photograph by some publishers, but she charged no fees to a variety of publications, Internet sites, broadcasters and others who told stories that had been "approved by me [Ms. McClatchey]" and that she wanted to be told. (McClatchey Dep. 12, 17; Pl. Admis. 14).

In addition to consenting to publication of her photograph, Ms. McClatchey also distributed copies of it, sometimes for free. For example, "if people stop in [her] office," and ask for the photo she "most likely will not charge them." (McClatchey Dep. 18). Likewise, she provides a copy "as a souvenir" to "everyone that has come to [her] house" and wanted one. (*Id.* at 15). Ms. McClatchey also has sold hundreds of copies of the photograph at "$20 each" (*id.* at 18, 37), the proceeds of which she contributed to the Todd Beamer Foundation. (*Id.* at 18) Generally, the sales of the photo just "trickle in," but pick up when there is news coverage "about the memorial or Flight 93." (*Id.* at 18-19)

On the one year anniversary of the crash of Flight 93, Ms. McClatchey attended a memorial service held at the crash site and noticed the "press badge" worn by AP reporter Charles Sheehan, who was covering the event. (*Id.* at 25-26) She approached Mr. Sheehan

3

(Sheehan Dep. 13) and introduced herself as the person who "had taken that photo."

(McClatchey Dep. 25; *see also* Pl. Admis. 2). Ms. McClatchey told Mr. Sheehan about "how

things have changed in the past year" (McClatchey Dep. 25), and Mr. Sheehan decided to write a

report about "how things had been in the past year in the area, and with us [the McClatcheys]

personally, since [she] had taken the photo." (*Id.* at 26; *see also* Sheehan Dep. 14). Mr. Sheehan

interviewed Ms. McClatchey at the crash site for about ten minutes, and completed the interview

by telephone later that day. (Sheehan Dep. 16-18)

That same day, AP photographer Gene Puskar went to Ms. McClatchey's house to obtain

a photograph for AP to use in connection with the story being written by Mr. Sheehan, and Ms.

McClatchey understood that was why Mr. Puskar had come to see her. (McClatchey Dep. 28-29;

Puskar Dep. 14, 36-37). Ms. McClatchey showed her personal copy of her photograph to Mr.

Puskar, and he took a picture of her picture. (Puskar Dep. 12-14, 25, 36-37). Ms. McClatchey's

personal copy of the photograph "does not have any copyright notice or title" on it. (McClatchey

Dep. 21; *see also id.* at 20, 22; Sheehan Dep. 51; Pl. Admis. 8). When photographing Ms.

McClatchey's photograph, Mr. Puskar did not capture the entire image but, in effect, cropped

portions around the edges to fit the aspect ratio of Mr. Puskar's camera and to suit his eye.

(Puskar Dep. 20-24; Def. Admis. 19-22). Because no title or copyright notice appeared on Ms.

McClatchey's photograph (McClatchey Dep. 20-22), the "cropping" done by Mr. Puskar could

not remove any such title or notice.

After taking the photograph, Mr. Puskar wrote a caption to accompany the image, and

transmitted the photograph and caption to the AP photo department. (Puskar Dep. 46; Ake Dep.

38). The caption stated:

> This image of the smoke cloud left by United Flight 93 after it
> crashed in a field in Shanksville, Pa., on September 11, 2001 was

4

taken by Val McClatchey from the porch of her nearby home. (AP
Photo/File/Val McClatchey)

(Ake Decl. Ex. B)  Once transmitted into AP's system, the photograph was identified by the

photo identification number "GJP101," which identifies that specific photo. (*Id* ¶ 14, Ex. B;

Ake Dep. 31-32).  In addition, the "meta data" that accompanied the photo in AP's system, and

which accompanied the photo whenever it was provided to anyone by AP, identified the

photograph as a "handout image," meaning that the work was not original to AP but provided to

AP by a third party. (*Id* ¶ 7, Ex. B; Ake Dep. 8, 32; Gerberich Dep. 54-55).  The meta data also

contained the following restrictions in the "Special Instructions" field: "No Sales" and "Wide

World Photos Out." (Ake Decl. Ex. B).  These restrictions meant that the photograph could not

be sold or used for commercial purposes, and would not be available to Wide World Photos, the

AP unit involved in selling prints of photographs and licensing photos for use other than by AP

members. (*Id* ¶¶ 10, 11, 14; Ake Dep. 28-29; Gerberich Dep. 50-53).

Ms. McClatchey fully intended and understood "that Mr. Sheehan would be writing

something for publication by the AP based on [her] conversations with him," and that the

photograph taken by Mr. Puskar was for publication with Mr. Sheehan's report. (McClatchey

Dep. 28).  As Ms. McClatchey testified, the report written by Mr. Sheehan was "the article that I

[Ms. McClatchey] had agreed to." (*Id* at 30).  Mr. Sheehan "asked the questions" and "I [Ms.

McClatchey] approved them." (*Id* at 40).  The report "told an accurate story" and was the "type

of story which [Ms. McClatchey] approves[s] in connection with using [her] photo." (*Id*.).

On September 12, 2002, AP distributed to its members its report entitled "Woman who

captured Flight 93 image struggles a year later." (Ake Decl. ¶ 13, Ex. A).  The report included

the text written by Mr. Sheehan and a cropped copy of Ms. McClatchey's photograph which was

integral to the report. (*Id*.)  The report told the story of how Ms. McClatchey took the

5

photograph and how the "time and date recorded on the image . . . marked the beginning of a tumultuous year for McClatchey." (*Id.*) It related that the photograph "brought news crews to the front door and a limited amount of fame to McClatchey." (*Id.*) The report discussed health problems experienced by Ms. McClatchey after having created the photograph, the collapse of her husband's business and that the "images McClatchey said she sold for $250 to $350 have not done much to help the couple financially." (*Id.*) It also reported that residents of the region to whom Ms. McClatchey provided copies of her photograph "have insisted on paying cash to cover costs of printing, and McClatchey said she has donated almost all of that money to the Todd M. Beamer Foundation." (*Id.*)

As the photograph was central to AP's report, AP distributed its copy of the photograph in connection with the report. (*Id.* ¶ 13, Ex. A, Ex. B) The text of the report was transmitted via AP's Basic service, as are all textual reports, and the photograph was transmitted as part of PhotoStream, as are all photos intended to accompany particular news stories. (*Id.* ¶¶ 12, 13) Beneath the headline of the text portion of the report was the instruction, known as a "slug," "AP Photo GJP101," which identified AP's copy of Ms. McClatchey's photograph and indicated to newspapers receiving the item that the photo was to accompany that text. (*Id.* ¶¶ 12, 14, Ex. A; Ake Dep. 31-32).[1]

AP provides thousands of news reports and hundreds of photographs to its subscribers each day. (Ake Decl. ¶¶ 3, 4) It has neither the need nor ability to determine which of the news items it distributes, if any, get picked up and published by any of its members or subscribers. (*Id.* ¶ 5; Ake Dep. 36-37) The record here reflects that *The Progress*, a newspaper serving

---

[1] AP's standard practice is to identify to subscribers which photographs are transmitted to accompany a particular text item by referring to the photo's designating number, such as GJP101, in the "slug" of the text item. (Ake Decl. ¶ 12; Ake Dep. 31-32).

Clearfield, Curwensville, Philipsburg and Moshannon Valley, Pennsylvania, carried AP's report about Ms. McClatchey and her photograph, including both the text portion of AP's report and AP's copy of Ms. McClatchey's photograph. (McClatchey Dep. Ex 1) The record also shows that on September 13, 2002, *The Tribune-Democrat* of Johnstown, Pennsylvania published just the text of AP's report, although it substituted its own headline and did not run AP's photo.[2] Instead, it published a photograph of its own, bearing a photo credit to itself, of Ms McClatchey inside her house holding a copy of her photograph and the camera she used to snap it (Compl. Ex. C)[3] The record does not show publication of AP's report—with or without a copy of the photograph at issue—anywhere else.

When AP distributes photographs as part of its PhotoStream service, the photographs automatically become part of AP's digital photo archive (the "PhotoArchive"). (Ake Decl. ¶ 9; Gerberich Decl. ¶ 2) The PhotoArchive is accessible to those members and subscribers of AP who subscribe to particular services of AP such as PhotoStream, pursuant to which access to the PhotoArchive is granted (Ake Decl. ¶ 9). Upon AP's transmission of its report about Ms. McClatchey and her photograph, AP's copy of the photograph automatically became archived in the PhotoArchive. (*Id.* ¶ 13; Gerberich Decl. ¶ 3) The archived image carried "the most severe restrictions [AP] can put on an image." (Gerberich Dep. 54). Accordingly, customers who

---

[2] *The Tribune-Democrat* titled its report "Photo brought fame, not fortune for woman." (Compl. Ex. C)

[3] On September 11, 2002, *The Tribune-Democrat* ran another story about Ms. McClatchey written by its own writer, and this story was accompanied by a photograph credited to photographer Dave Lloyd of *The Tribune-Democrat*. (McClatchey Dep. Ex. 2). Mr Lloyd's photo showed Ms McClatchey holding her photo and her camera, and depicted a portion of her living room. (*Id.*). The photo that *The Tribune-Democrat* used with AP's report was not supplied by AP but was a cropped version of Mr. Lloyd's photograph. (*Compare* Compl. Ex. C, *with* McClatchey Dep. Ex. 2).

generally obtain access to the PhotoArchive through AP services such as Wide World Photos, could not access AP's copy of the photo in the PhotoArchive. (Ake Decl. ¶¶ 11, 14).

AP's copy of Ms. McClatchey's photograph was removed from the PhotoArchive on November 4, 2003, following AP's receipt of an inquiry from Ms. McClatchey's attorneys. (Gerberich Decl. ¶ 4; Penchina Decl. Ex. K; Galt Dep. Ex. 19) Only three entities, AOL, Canadian Press and the Huntsville Times accessed and downloaded the photo during the entire time the photograph was present in the PhotoArchive. (Gerberich Decl. ¶¶ 5-7, Ex. A). Only a single use of the image appears anywhere in the record: a thumbnail reproduction made by AOL, that appeared on AOL's web site under the words "AOL News," and beside the headline "New Theory on Flight 93 As Revolt Began, Data Shows Hijacker Crashed on Purpose." (Compl. ¶ 20, Ex. D). No other use of the photograph traceable to AP is evidenced in the record.

Following AP's publication of its copy of the photograph and the temporary presence of the photo in the PhotoArchive, Ms. McClatchey continued to make the photograph available for publication, both for free and on a fee basis. (Pl. Admis. 20, 21). Among the entities who licensed the photo from and paid licensing fees to Ms. McClatchey were U.S. News & World Report and Philadelphia Newspapers, Inc., notwithstanding that each is a member and subscriber of AP to whom AP provided the photograph, and who had access to the photo in AP's PhotoArchive. (McClatchey Dep. Ex. 12; Ake Decl. ¶ 21; Penchina Decl. Ex. B, C, D).

### ARGUMENT

It is axiomatic that summary judgment should be granted when the record reflects there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Review of the undisputed evidence here leads to a single conclusion: all of Plaintiff's claims should be dismissed.

8

## I.   AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM FOR DIRECT COPYRIGHT INFRINGEMENT

AP firmly believes it had Plaintiff's express or implied consent to use her photograph in the manner that it did. Even absent her consent, however, the record makes clear that AP's use was non-infringing under the doctrine of "fair use."[4]

Not every unauthorized use of a copyrighted work amounts to infringement. The doctrine of "fair use," codified at 17 U.S.C. § 107, is a "recogni[tion] that when a second author uses another's protected expression in a creative and inventive way, the result may be the advancement of learning rather than the exploitation of the first writer." *Maxtone-Graham v Burtchaell*, 803 F.2d 1253, 1259 (2d Cir. 1986). Fair use acts "as a 'guarantee of breathing space' within the confines of copyright that allows for new transformative works that further the public discourse." *World Wrestling Fed'n*, 280 F. Supp. 2d at 425 (citation omitted). "The doctrine is a means of balancing the need to provide individuals with sufficient incentives to create public works with the public's interest in the dissemination of information." *Hustler Magazine Inc. v Moral Majority Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986). AP's news report is precisely the type of use protected and promoted by the doctrine of fair use.

The Copyright Act expressly provides that, notwithstanding other provisions of the statute, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, [or] *news reporting*, . . . is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). In addition, the statute specifies four factors that must be taken into account to determine whether a particular use is fair:  (i) the purpose of the use; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used; and (iv) the effect of the use on the market for the

---

[4] The determination of fair use is an appropriate issue for resolution on a motion for summary judgment. *E.g., World Wrestling Fed'n Entm't Inc. v Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 424 (W.D. Pa. 2003).

original. *Id.* Application of the statutory factors makes clear that the use AP made of Ms.

McClatchey's work was a quintessential fair use.

### A. **AP's Use Was For a Proper Purpose**

The first factor in the fair use inquiry is "the purpose and character of the use, including

whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C.

§ 107(1). The focus of the first factor is "whether the new work merely 'supersede[s] the

objects' of the original creation or instead adds something new." *Campbell v. Acuff-Rose Music,

Inc.*, 510 U.S. 569, 579 (1994) (citation omitted). "The more 'transformative' the new work, the

less the significance of factors that weigh against fair use, such as use of a commercial nature."

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000). Moreover, "[t]he enquiry

here may be guided by the examples given in the preamble to § 107, looking to whether the use

is for criticism, comment, or news reporting, and the like." *Campbell*, 510 U.S. at 578-79.

AP's use not only was for the statutorily favored purpose of news reporting, but was

transformative, thus mandating that the first factor weigh in favor of fair use. AP did not employ

the photograph simply to illustrate the event depicted in the photograph—for example, reporting

the fact that the hijacked plane had crashed—but the photograph itself was the focus of AP's

report. (Ake Decl. Ex. A.) As one Court of Appeals explained when applying the first factor to

a photograph of a model, the transformative and informational nature of the use

> is confirmed by the newspaper's presentation of various news
> articles and interviews in conjunction with the reproduction. [The
> newspaper] reprinted the pictures not just to entice the buying
> public, but to place its news articles in context; as the district court
> pointed out, "*the pictures were the story*." It would have been
> much more difficult to explain the controversy without
> reproducing the photographs.

*Nunez*, 235 F.3d at 22 (emphasis added, citation omitted). Thus,

> by using the photographs in conjunction with editorial
> commentary, El Vocero did not merely "supersede[ ] the objects of
> the original creation[s]," but instead used the works for "a further
> purpose," giving them a new "meaning or message." It is this
> transformation of the works into news – and not the mere
> newsworthiness of the works themselves – that weighs in favor of
> fair use under the first factor of § 107

*Id* at 23 (citation omitted); *see Kelly v. Arriba Soft Corp*, 336 F.3d 811, 819 (9th Cir. 2003)

("By putting a copy of the photograph in the newspaper, the work was transformed into news,

creating a new meaning or purpose for the work ").

Unquestionably, AP's report built upon the underlying photograph, transforming it with

new meaning and purpose by reporting on the photograph itself as news of interest and

importance to the public, separate from just what was depicted in the photograph. "A critical

inquiry regarding this first fair use factor is whether the second work 'adds something new, with

a further purpose or different character, altering the first with new expression, meaning or

message . . . .'" *World Wrestling Fed'n*, 280 F. Supp. 2d at 426 (citation omitted). AP's report

tells the story of the photographer who created the image, and how the photograph affected the

photographer's life – a story not conveyed by the photograph alone, and an incomplete story

without a depiction of the photograph. *Cf. Video Pipeline, Inc. v. Buena Vista Home Entm't Inc*,

342 F.3d 191, 200 (3d Cir. 2003) ("The movie reviewer does not simply display a scene from the

movie under review but as well provides his or her own commentary and criticism. In so doing,

the critic may add to the copy sufficient 'new expression, message or meaning' to render the use

fair." (citation omitted)). Accordingly, the first factor weighs heavily in favor of fair use. *See,*

*e g, Baraban v. Time Warner, Inc*, 2000 WL 358375, at *4 (S.D.N.Y. 2000) ("[P]hotograph is

an integral part of that commentary," weighing first factor for fair use); *Mathieson v. Associated*

*Press*, 1992 WL 164447, at *3 (S.D.N.Y. 1992) (Use of brochure cover photograph of Oliver

North "demonstrated the degree of North's involvement through North's picture on the cover,

complemented the text of the news story in a usual and customary way. As such, the character

and purpose of AP's use of plaintiffs' photos falls well within the bounds of responsible news

reporting on a matter of legitimate public interest" and is a fair use.).

### B. **Plaintiff's Photograph Was a Published Historical Work**

The second factor requires examination of two issues: whether the original work was

published, and whether it is informational in nature. Works that previously have been published

are more susceptible to fair use than unpublished works. *Kelly*, 336 F.3d at 820; *see, also e.g.*,

*Schiffer Publ'g, Ltd v. Chronicle Books, LLC*, 2004 WL 2583817, at *11 (E.D. Pa. 2004)

("Here, Schiffer has published all the books which contain the photographs at issue, which

militates for fair use.") Ms. McClatchey concedes that her photograph had been published prior

to its use by AP, militating in favor of fair use here as well. (Pl. Admis. 22).

In addition to assessing whether a work was published, the second factor in the fair use

analysis takes into account "that creative works are 'closer to the core of intended copyright

protection' than informational and functional works." *Mattel, Inc. v. Walking Mtn Prods.*, 353

F.3d 792, 803 (9th Cir. 2003) (internal quotation and citation omitted). Like the fact that it was

published, the informational and non-creative nature of Ms. McClatchey's photograph weighs in

favor of fair use. "[W]here, as here, works of scientific or historical character are involved, there

is wide latitude in 'fair use.'" *West v. City of New York*, 1985 WL 202, at *25 (S.D.N.Y. 1985)

In an analogous context addressing a videotape of the beating of Reginald Denny during

riots in Los Angeles, the Ninth Circuit concluded "'[t]he Denny beating tape is informational and

factual and news; each characteristic strongly favors [the user] . . . Although the videotape is

not without creative aspect in that it is the result of [Marika] Tur's skills with a camera, still this

factor makes it a great deal easier to find fair use.'" *L.A. News Serv. v. CBS Broad., Inc.*, 305

F.3d 924, 940 (9th Cir.) (brackets in original) (citation omitted), *amended and superceded on*

*other grounds*, 313 F.3d 1093 (9th Cir. 2002); *see, e.g.*, *Nunez*, 235 F.3d at 23 ("Nunez's pictures could be categorized as either factual or creative: certainly photography is an art form that requires a significant amount of skill; however, the photographs were not artistic representations designed primarily to express Nunez's ideas, emotions or feelings . . ."); *Mathieson*, 1992 WL 164447, at *7 (photograph by professional photographer "is considerably less 'imaginative' or 'creative' than it might have been had plaintiff employed more dramatic artistic effects, which raises the issue as to whether it is sufficiently non-factual to merit special protection") Likewise here, Ms. McClatchey's snapshot of the aftermath of the tragic event, while capturing a significant historic moment, is not creative or artistic but purely factual in nature.

Accordingly, both inquiries under the second statutory factor militate in favor of fair use, weighing the second factor heavily in AP's favor.

### C. **The Amount Used Was Reasonable in View of the Purpose of the Use**

"The third factor in the fair use analysis asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the purpose of copying." *Mattel, Inc.*, 353 F.3d at 803. This factor also weighs in favor of fair use.

AP did not utilize the entirety of Ms. McClatchey's photograph, but an excerpt. (Def. Admis. 19-22) When compared to Ms. McClatchey's actual photo, "all of the road underneath the barn is cropped off," a "road at least 1 to 2 inches" were "cropped off" the left side, and portions of the top and right sides also were "cropped off" on the version published by AP (Puskar Dep. 22). Even if AP published the entirety of Ms. McClatchey's photograph, the third factor would still weigh in favor of fair use. Courts have made clear "that entire verbatim reproductions are justifiable where the purpose of the work differs from the original." *Mattel, Inc.*, 353 F.3d at 803 n.8; *see, e.g.*, *Kelly*, 336 F.3d at 821 ("[A]lthough Arriba did copy each of Kelly's images as a whole, it was reasonable to do so in light of Arriba's use of the images.")

Unlike other copyrightable works, photographs do not easily lend themselves to quotation or other means of being excerpted without destroying the integrity of the original image. Thus, courts routinely find use of photographs in their entirety to be appropriate under the third fair use factor. *See, e.g.*, *Kelly*, 336 F.3d at 821 ("It was necessary for Arriba to copy the entire image to allow users to recognize the image . . ."); *Nunez*, 235 F.3d at 24 (". . . El Vocero admittedly copied the entire picture; however, to copy any less than that would have made the picture useless to the story."); *Mathieson*, 1992 WL 164447, at *8 (Given that the "full reproduction of a copyrighted work [was] in the context of news reporting," the third factor weighed in favor of fair use even considering that "each of the photos on the cover constitutes a single work.").

Here, AP used no more of the photograph than was reasonable in view of AP's reporting about the photograph. Thus, whether AP's use is considered to be just an excerpt or an entire work, the third fair use factor weighs in favor of fair use.

### D. AP's Use Did Not Supplant the Market for the Work

The fourth factor in the fair use analysis concerns the effect of the challenged use upon the market for or value of the copyrighted work. 17 U.S.C. § 107(4). The Supreme Court has made clear that in applying the fourth factor there can be "[n]o 'presumption' or inference of market harm" unless the use at issue is non-transformative and a "mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591. Not only can harm not be presumed, "'[t]he existence of [a] potential market cannot be presumed'" either. *Mattel, Inc.*, 353 F.3d at 805 (citation omitted). Thus, a plaintiff must demonstrate an actual market for her work which has been harmed by a defendant's use.

The record here shows that no normal market for Ms. McClatchey's photograph was harmed by AP's report. Ms. McClatchey sold hard-copy prints of her photograph, before *and* after AP's publication, and her ability to sell and the prices she charged were unaffected.

14

(McClatchey Dep. Ex. 12; Penchina Decl. Exs. C, D; Pl. Admis. 20, 21, 22)   Although AP sells print copies of some photographs in its collection, AP *never* offered or sold copies of Ms. McClatchey's photograph.  (Ake Decl. ¶¶ 10, 11, 18, 19; Gerberich Decl. ¶ 11)   To the contrary, AP withheld access to the photo from Wide World Photos, the AP division that sells copies. (Ake Decl. ¶¶ 11, 14; Ake Dep. 28-29; Gerberich Dep. 50-53)   Moreover, the record contains no evidence that Ms. McClatchey's sale of any copies was deterred by AP's publication; rather, Ms. McClatchey testified her sales increased following news coverage.  (McClatchey Dep. 18-19).

The record also shows no harm to Ms. McClatchey's ability to license her photograph for publication following AP's use.   Significantly, the record demonstrates that there was no market for the specific use made by AP because Ms. McClatchey permitted such uses for free.  (*E.g.*, *id.* at 12, 17, 40-41, 73-74)   For example, in *Haberman v. Hustler Magazine*, the court found the fourth factor to weigh in favor of fair use when *Hustler* magazine published the entirety of an art postcard created by the plaintiff but the plaintiff "testified that he would not object if what he regarded as more reputable journals or newspapers engaged in *Hustler*'s conduct."  626 F. Supp. 201, 214 (D. Mass. 1986).   Here, Ms. McClatchey testified that if she judged a particular news story to be one she "wanted to be told," she would permit publication of the photo without a fee (McClatchey Dep. 17), and she acknowledged that the AP report was one "she would not have a problem with."  (*Id.* at 41)   It was the type of story she "approve[d] in connection with using [her] photo."  (*Id.* at 40)   Thus, no market was disrupted by AP's publication.[5]

---

[5] Conversely, because Ms. McClatchey indicated that she would not permit use of her photo with stories with which she did not agree, such as alternate theories on the crash, there was no actual market for her photo affected by AOL's publication of the photo in connection with its report on such an alternate theory.  (McClatchey Dep. 39 (AOL published the photo "associated with an article stating New Theory on Flight 93, which that [sic] is an article I would not have granted permission to."))   *See, e.g.*, *Mattel, Inc.*, 353 F.3d at 806 (no market harm where "it safe to assume that [plaintiff] will not enter such a market or license others to do so.").

15

In addition, whatever markets for Ms. McClatchey's photographs existed before AP's publication, they continued unaffected after AP's use. Thus, Ms. McClatchey was able to license her photo for publication by news organizations after AP's publication—including to AP members and subscribers such as U.S. News & World Report and Philadelphia Newspapers, Inc.

Accordingly, the fourth factor weighs heavily in favor of fair use.

### E. The Balance of the Factors Demonstrates Fair Use Was Made

Here, AP's publication was for the statutorily favored purpose of news reporting, and each of the statutory factors weigh in favor of finding a fair use. Moreover, the record makes clear that AP's use was transformative of Plaintiffs' work. Therefore, a finding of fair use should be made even if the Court were to find some of the factors to weigh against fair use, or determine that there are factual questions at this stage concerning some of the factors.

Accordingly, Plaintiff's claim for copyright infringement should be dismissed.

## II. AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIMS FOR SECONDARY COPYRIGHT LIABILITY

In her second and third claims, Plaintiff contends that AP should be contributorily or vicariously liable for infringements of her photograph allegedly committed by third parties. However, it is axiomatic that "[t]here can be no contributory infringement without a direct infringement," *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004), and a vicarious infringement claim "must fail" absent "any infringing conduct" by a third party, *Parker v. Google, Inc.*, 2006 WL 680916, at *5 (E.D. Pa. 2006). Here, the record is devoid of evidence of direct infringements committed by persons to whom AP provided its copy of Ms. McClatchey's photograph. The mere possibility that infringing acts were possible is insufficient. Absent demonstrable infringement by a third party, there can be no contributory or vicarious

16

infringement. Furthermore, even if some third party did make an improper usage of the photograph, the record demonstrates that Plaintiff's secondary liability claims still should fail.

### A. The Record Provides No Basis to Find Contributory Infringement

As the Supreme Court explained, "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2776 (2005) ("MGM"). The plaintiff also must show that the defendant knew or had reason to know of the actual third-party infringement. *E.g., Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 853 (C.D. Cal. 2006). Here, the record fails to demonstrate either an intent by AP to induce its members to infringe nor any knowledge possessed by AP of any infringements.

AP included Ms. McClatchey's photograph in its report with the belief that it had her consent, and with the knowledge that it was making fair use of the photograph. (Ake Decl. ¶¶ 15, 16, 18, 22; Ake Dep. 47; Puskar Dep. 14, 33, 36-37). Nothing in the record even suggests AP intended or encouraged its subscribers to use the photograph other than in connection with AP's report or in any way that would not be a fair use. As the Supreme Court instructed, "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement." *MGM*, 125 S. Ct. at 2781 n.12; *see Mathieson*, 1992 WL 164447, at *7 ("To the extent that plaintiff highlights the *potential* and *capability* of AP and/or its customers to use plaintiff's two copyrighted photographs in an infringing manner, the allegations are purely speculative and demonstrate neither a likelihood of actual infringement nor an intent on the part of AP to infringe or to facilitate infringement by others. The Court will infer neither improper acts nor improper purposes from common and legally acceptable practices which defendant and countless other news organizations employ in the normal course of their news reporting activities.")

AP had no knowledge of any particular use of the photograph made by any of AP's members or subscribers, and the record does not reflect otherwise. (Ake Decl. ¶ 18; Ake Dep. 36-37; Gerberich Dep. 77-78.) Indeed, given the vast number of news items and photos distributed by AP, AP has no capability to track which items ultimately get used and, if so, how they get used. (Ake Decl. ¶ 5.) *See Livnat v. Lavi*, 1998 WL 43221, at *3 (S.D.N.Y. 1998) ("one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable"); *Schuchart & Assocs. v. Solo Serve Corp.*, 1983 WL 1147, at *7 (W.D. Tex. 1983) (defendant not liable because it "had no knowledge of the infringing activity until after the copying had occurred").

Stated simply, because the record fails to demonstrate any third-party infringements, any knowledge by AP of infringements or any intent to induce third parties to infringe, Plaintiff's claim for contributory infringement should be dismissed. *E.g., Brought to Life Music, Inc. v. MCA Records, Inc.*, 2003 WL 296561, at *2 (S.D.N.Y. 2003) (dismissing claim where defendant gave third party copyrighted work but did not participate in alleged infringement); *Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) (dismissing claim when defendant gave photos to third party, but did not induce, cause, or materially contribute to infringement).

### B. The Record Provides No Basis to Find Vicarious Infringement

Likewise, the record does not support Plaintiff's claim for vicarious infringement. A defendant is vicariously liable for copyright infringement only "if he enjoys a direct financial benefit from another's infringing activity and has the right and ability to supervise the infringing activity." *Parker*, 2006 WL 680916, at *5. Here, AP neither benefits financially from, nor has the right and ability to supervise, its members' and subscribers' activity.

AP members and subscribers pay assessments to AP calculated to cover AP's costs in providing the news service. (Ake Decl. ¶ 5.) The amounts paid do not vary based on the subject

18

matter of the news materials distributed or whether the member or subscriber actually uses any given content. (*Id.* ¶ 5; Gerberich Decl. ¶ 10) In other words, the subscriber's monthly assessment is the same irrespective of whether a subscriber did or did not use Ms. McClatchey's photograph, and if used, how. (*Id.*) Here, there simply is no link between any third-party infringement (even if one had been identified) and a financial benefit to AP. *See Parker*, 2006 WL 680916, at *5 (dismissing vicarious infringement claim because no relationship between the infringement and "the number of users" and thus no direct financial benefit to defendant).

Nor is there any evidence of any ability by AP to control the publishing activities of its members and subscribers. To the contrary, whether and how to use AP content is a matter of editorial discretion of each publication, a process into which AP does not and cannot intrude. (*Id.* ¶¶ 6, 20). AP simply does not have the right or ability to supervise its members' conduct or publications. *See Metzke v. May Dep't Stores Co.*, 878 F. Supp. 756, 760 (W.D. Pa. 1995) (no vicarious liability where defendant supplied third party with prototype of plaintiff's copyrighted work to be copied, but defendant had no control over the third party).

Accordingly, the undisputed record demonstrates that Plaintiff's vicarious infringement claim cannot succeed and should be dismissed.

### III.    AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S DMCA CLAIMS

In her fourth and fifth claims, Plaintiff contends that AP should be liable for allegedly providing false copyright management information ("CMI") in violation of 17 U.S.C. § 1202(a) and for removing CMI in violation of § 1202(b). Both of these claims fail as a matter of law.

#### A.    AP Did Not Distribute False Copyright Management Information

"Section 1202(a) prohibits knowing falsification of CMI with the intent to aid copyright infringement." *Schiffer Publ'g*, 2004 WL 2583817, at *13. AP neither falsified any CMI nor

harbored any intent to aid copyright infringement. The AP caption distributed with the photograph unambiguously stated that the photo "was taken by Val McClatchey." (Ake Decl Ex B). Furthermore, the meta data accompanying the photo clearly identified "VAL MCCLATCHEY" in the "Photographer" field. (*Id*) AP did not indicate that anyone other than Ms. McClatchey held the copyright in her photo and certainly did not falsely state that it held the copyright. In fact, AP expressly marked the photo as a "handout" that was given to it by a third party. (Ake Decl. ¶ 7, Ex B; Ake Dep. 8, 32; Gerberich Dep. 54-55).

Moreover, there is no evidence in the record from which to conclude that AP at any time intended to aid infringement. As discussed above, AP believed it had Ms. McClatchey's consent to use the photograph with its report, and its use amounted to fair use. *See Schiffer Publ'g*, 2004 WL 2583817, at *13.

Nor can the requisite intent be inferred from the absence of a copyright notice in Ms. McClatchey's name on copies published by AP. Indeed, copies distributed for publication by Ms McClatchey herself do not contain any copyright notice, and copies published with her consent – including the copy published on the web site of Ms McClatchey's own business – do not contain a copyright notice. (*E g*, McClatchey Dep. 20-21, 50, 53-54, 76-77, 101-02, 109, Ex 27, Ex. 28; Penchina Decl Exs. A, E, F, G, H, I, J; Pl. Admis. 3). Thus, one cannot infer an intent to aid infringement based on the lack of copyright notice on AP's copy any more than one can conclude that Ms. McClatchey also intended to facilitate infringement of her own photo.

The record simply is devoid of evidence that AP had a subjective belief to facilitate infringement. Accordingly, AP "could not have committed knowing misconduct as required by the DMCA " *Schiffer Publ'g*, 2004 WL 2583817, at *13.

### B.  AP Did Not Remove Copyright Management Information

"To recover for a violation of § 1202(b), a plaintiff must demonstrate that the defendant intentionally removed or altered CMI knowing, or having reasonable grounds to know, that removal will aid infringement." *Id.* at *14.  AP did not remove any CMI.  Even if the Court were to find that questions of fact remain concerning whether a copyright notice had been removed, Plaintiff's claim nevertheless fails because (i) a copyright notice printed on a hard-copy document is not the type of CMI covered by the DMCA; and (ii) AP did not intentionally remove the notice with knowledge that doing so would aid infringement.

#### 1.  AP Did Not Remove Any Copyright Notice

The record makes clear that Ms. McClatchey's personal copy of her photograph does *not* contain a copyright notice and AP's photographer snapped a photograph of Ms. McClatchey's personal copy of the photo as she held it for the photographer.  (McClatchey Dep. 21; Pl. Admis. 8; Puskar Dep. 12-14.)  Because the copy AP photographed did not itself contain a copyright notice, AP's reproduction would not have one either.  *See Schiffer*, 2004 WL 2583817, at *13 (entering judgment against plaintiffs where "[t]he individual photographs, which are the subjects of this action, did not contain any copyright management information whatsoever, either on or near the images themselves").

#### 2.  Even if the Photograph Contained a Textual Copyright Notice, That Notice Does Not Qualify as CMI

Plaintiff claims she provided AP with a hard-copy printout of her photograph containing a copyright notice printed on the lower portion of it, which she contends AP omitted when publishing the photograph.  Assuming *arguendo* the truth of these contentions, Plaintiff's DMCA claim fails because a printed copyright notice is not CMI within the meaning of the DMCA.

As another court in the Third Circuit recently explained, "Congress intended the DMCA to apply to 'electronic commerce' and the 'electronic marketplace' . . . [and] viewed §§ 1201 and

21

1202 together as preventing circumvention of the 'technological measures' referred to in §

1201." *IQ Group, Ltd v. Wiesner Publ'g, LLC*, 409 F. Supp. 2d 587, 596 (D.N.J. 2006)

(citations omitted). Thus, the DMCA covers "automated systems which protect and manage

copyrights. The systems themselves are protected by § 1201 and the copyright information used

in the functioning of the systems is protected in § 1202." *Id.* at 597.

In *IQ Group*, the court found that because the information allegedly removed "did not

function as a component of an automated copyright protection or management system, it does

not fall within the definition of 'copyright management information' in 17 U.S.C. § 1202(c)."

*Id.* at 598. Thus, the court granted summary judgment dismissing the plaintiff's DMCA claim.

The result should be no different here. Plaintiff alleges only that AP failed to reproduce a

copyright notice that was printed on hard-copy printouts that plaintiff distributed. Even if this

assertion is correct, there is no evidence that this copyright notice was part of any automated

protection and management system, and thus Plaintiff's DMCA claims cannot succeed.

### 3. Even if Plaintiff's Textual Copyright Notice Qualifies as CMI, AP Did Not Intend to Aid Infringement

Even assuming AP neglected to reproduce a copyright notice, the record contains *no*

evidence AP did so intentionally, or with knowledge that doing so would aid infringement.

AP believed it had permission to use the work and had no reason to know that omission

of the copyright notice would facilitate or conceal any infringement. (Ake Decl. ¶¶ 15, 18, 22;

Ake Dep. 39, 43, 47; Puskar Dep. 14, 33, 36-37.) Because the record contains no evidence

demonstrating that AP had the requisite state of mind, Plaintiff's DMCA claim fails as a matter

of law. *See Gordon v. Nextel Commc'ns*, 345 F.3d 922, 927 (6th Cir. 2003) (affirming summary

judgment where plaintiff did not proffer evidence that defendant "had any reason to know that

the removal would facilitate or conceal an infringement" and defendant offered evidence that it

thought it had permission to use the work); *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F.

Supp. 2d 877, 893 (N.D. Ill. 2005) (holding that defendant is not liable because "there is no

evidence that [it] knowingly or intentionally contributed" to any infringement).

## IV.    AP IS ENTITLED TO SUMMARY JUDGEMENT ON DAMAGES ISSUES

In the event the Court declines to dismiss Plaintiff's claims at this time, as AP

respectfully urges should be done, we respectfully request the Court to grant summary judgment

to AP in connection with the following damages issues. Plaintiff seeks statutory damages (i)

enhanced to the maximum of $150,000 based on allegations that AP committed willful

infringement, and (ii) multiplied by the possible number of subscribers to AP who may have

utilized the image distributed by AP. However, the record demonstrates that AP acted with

innocent intent, entitling it to a reduction rather than enhancement of the range of permissible

statutory damages, and did not act willfully. Moreover, as a matter of law, the Copyright Act

permits plaintiffs to recover, at most, a single award of statutory damages for multiple

infringements of any one work.

Section 504(c)(2) of the Copyright Act permits a court to "increase the award of statutory

damages to a sum of not more than $150,000" based upon a finding of willful infringement, and

to "reduce the award of statutory damages to a sum of not less than $200" based upon a finding

of innocent infringement. Because the record demonstrates that AP acted innocently and not

willfully within the meaning of 17 U.S.C. § 504, summary judgment should be entered in AP's

favor on the issues of willfulness and innocence.

"Neither the [Copyright] Act nor its legislative history defines willfulness. However,

commentators and courts have defined willfulness under the Copyright Act as, 'with knowledge

that the defendant's conduct constitutes infringement.'" *Bly v. Banbury Books, Inc.*, 638 F.

Supp. 983, 986 (E.D. Pa 1986) (citation omitted). "This seems to mean, then, that one who has

been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes." *Digital Filing Sys., L.L.C v. Agarwal*, 2005 WL 1702954, at * 2 (E.D Mich. 2005) (internal quotation and citation omitted)

The record is devoid of any evidence from which to infer that AP knew its conduct was infringing. To the contrary, the record confirms AP believed Ms. McClatchey had consented to its publication of her photograph (Compl. ¶ 14, Ake Decl. ¶¶ 15, 18, 22; Ake Dep. 39; Puskar Dep. 36-37), and, in any event, its use was a fair use, (Ake Decl. ¶¶ 16, 22) Stated simply, because "[p]laintiff has submitted no direct evidence that defendant knew its conduct constituted copyright infringement," there is no genuine of material fact and "plaintiff has not met [her] burden of establishing that defendant's infringement was willful." *Bly*, 638 F. Supp. at 986-87

To establish innocent intent and thereby be entitled to a reduced range of permissible statutory damages, a "defendant must prove that it did not know and should not have known that its conduct constituted infringement." *Branch v. Ogilvy & Mather, Inc.*, 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991). Once again there is not evidence in the record to controvert AP's belief that its publication of Ms. McClatchey's photograph was permissible. (*E.g.*, Ake Decl. ¶¶ 15, 16, 18, 22; Ake Dep. 39, 43, 47; Puskar Dep. 14, 33, 36-37). Accordingly, summary judgment should be granted in AP's favor on the issue that any infringement was innocently done

Moreover, Plaintiff may not recover more than a single award of statutory damages even if Plaintiff could demonstrate infringement—which she has not. The Copyright Act is clear – a plaintiff may recover only "*one award* of statutory damages *for each work* proved to be infringed." *Daley v. Firetree, Ltd.*, 2006 WL 148879, at *7 (M.D. Pa. 2006) (emphasis added). Section 504(c)(1) permits "an award of statutory damages *for all infringements* involved in the action, *with respect to any one work,* for which any one infringer is liable individually, or *for*

24

*which any two or more infringers are liable* jointly and severally " (Emphasis added). Thus, in *Bouchat v. Champion Products, Inc.*, 327 F. Supp. 2d 537, 553 (D. Md. 2003), the court concluded that the Plaintiff would be "entitled to a single statutory damage award for which the primary infringer NFLP would be jointly liable with the derivative infringers." In that case, the court found that more than 350 separate parties made infringing uses of a copyrighted work after receiving it from the defendant. Despite the number of infringing acts, because only one infringed work was involved, the plaintiff was limited to a single award.

The result should be no different here. Because there is only a single work alleged to have been infringed, summary judgment limiting plaintiff to, at most, a single award of statutory damages should be granted in the event the Court declines to dismiss Plaintiff's complaint.

## CONCLUSION

For the foregoing reasons, AP respectfully requests that the Court grant its motion for summary judgment, dismiss each of Plaintiffs' claims, and enter judgment in favor AP.

Dated: May 15, 2006

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

_____/s/ Robert Penchina_____

Robert Penchina (*Pro Hac Vice*)
230 Park Avenue, Suite 1160
New York, NY 10169
(212) 850-6100
(212) 850-6299 (Fax)

Gayle C. Sproul (I.D. No. 38833)
Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778
(215) 988-9750 (Fax)

*Attorneys for The Associated Press*