IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VALENCIA M. MCCLATCHEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-145J |
| v. ) | |
| ) | |
| THE ASSOCIATED PRESS, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT'S STATEMENT OF UNDISPUTED
## MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Western District of Pennsylvania, Defendant The Associated Press ("AP"), hereby submits, in support of its motion for summary judgment dismissing the complaint filed by Plaintiff Valencia M. McClatchey ("McClatchey"), the following statement of undisputed material facts:

1.  AP is a not-for-profit mutual news cooperative. Its activities include the collection of news from its members and through its own reporting, and the distribution of news to its members and subscribers. (Ake Dep. 19; Ake Decl. ¶ 2).

2.  AP's members primarily are newspapers, but also include news magazines, radio and television broadcasters and electronic news publishers. (Ake Decl. ¶ 2).

3.  AP's textual reports are distributed to AP members by AP's Basic Service. (Ake Decl. ¶ 3).

4.  AP's news photos are provided to AP members who subscribe to AP's PhotoStream service. (Ake Decl. ¶ 4; Ake Dep. 18-19; Gerberich Dep. 80-81).

5. On September 12, 2002, there were approximately 1,150 domestic and 800 foreign subscribers to PhotoStream. (Ake Decl. ¶ 4).

6. AP provides thousands of news reports to its subscribers each day (Ake Decl. ¶ 3)

7. AP currently provides upwards of 2,500 photographs per day via PhotoStream and, since the year 2000, has provided at least 500 photographs via PhotoStream each day. (Ake Decl. ¶ 4).

8. When AP distributes photographs as part of its PhotoStream service, the photographs automatically become part of AP's digital photograph archive (the "PhotoArchive"). (Ake Decl. ¶ 9; Ake Dep. 30; Gerberich Decl. ¶ 2; Gerberich Dep. 32, 44-45).

9. Before transmitting a digital photograph to AP, AP photographers add a caption relating to the photograph, as well as various "metadata" that accompanies the photograph. (Ake Decl. ¶ 8.)

10. The "metadata" includes, among other things, the name of the person who created the image, the date the image was created, any restrictions on the use of the photograph, the source of the photograph (such as whether it was provided as a handout or created by staff). Other information automatically is generated by the system and included in the "metadata," such as an identification number for the photograph. (Ake Decl. ¶ 8.)

11. The "metadata" travels with and accompanies photographs transmitted by AP or retained in AP's systems. (Ake Decl. ¶ 8.)

2

12. AP's standard practice is to identify to subscribers which photographs are transmitted to accompany a particular textual report by referring to the photo's designating number in the "slug" of the textual report. (Ake Decl. ¶ 12; Ake Dep. 31-32).

13. The PhotoArchive is accessible to those members and subscribers of AP who subscribe to particular services of AP such as PhotoStream, pursuant to which access to the PhotoArchive is granted. (Ake Decl. ¶ 9; Def. Admis. 9).

14. AP has neither the need nor ability to determine which of the news items, including news photos, it distributes, if any, are published by any of its members or subscribers. (Ake Decl. ¶ 5; Ake Dep. 36-37).

15. Whether and how to use AP content – including AP textual reports and photos – is a matter of editorial discretion left to each of AP's members and subscribers. (Ake Decl. ¶¶ 6, 20).

16. AP does not control the publishing activities of its members and subscribers. (Ake Decl. ¶ 20).

17. AP cannot and does not intrude into the editorial discretion of its members and subscribers with respect to whether and how to use AP content, including AP textual reports and photos. (Ake Decl. ¶¶ 6, 20).

18. Subscribers to AP services do not pay fees based upon their receipt or use of any particular items provided as part of the news service. (Ake Decl. ¶¶ 5, 19; Gerberich Decl. ¶ 10).

19. Subscribers to AP services, such as PhotoStream, pay an assessment to AP calculated to cover AP's actual cost of providing the news service. (Ake Decl. ¶¶ 5, 19).

20. AP members who have access to the PhotoArchive do not pay fees based on the nature or content of the photographs therein, or on whether the photograph ultimately is published by the person who downloaded it. (Gerberich Decl. ¶ 10).

21. Within seconds after the tragic crash of Flight 93 in Shanksville, Pennsylvania on September 11, 2001, McClatchey took a photograph from her front porch in nearby Stoystown. (McClatchey Dep. 4, 7).

22. McClatchey titled the photograph "End of Serenity" (hereinafter the "Photograph"). (Compl ¶ 10; McClatchey Dep. 90).

23. The Photograph depicts a large plume of smoke from the crash ascending over the barns and fields visible from McClatchey's porch. (McClatchey Dep. 7).

24. The FBI took custody of the original digital image of the Photograph. (Compl ¶ 10).

25. Various newspapers, magazines and broadcasters have published the Photograph with McClatchey's consent. (Pl. Admis. 22; McClatchey Dep. 8, 17, 73-74, 76-77, 100, Ex. 27, Ex. 28; Penchina Decl. Exs E, F, G, H, I, J).

26. Prior to any use of the Photograph by the AP, the Photograph had been published. (Pl. Admis. 22).

4

27. An enlarged copy of the Photograph "became part of the permanent display for the Smithsonian." (McClatchey Dep. 48).

28. McClatchey is proud of the Photograph (McClatchey Dep. 86-87), and is excited "[t]o see it actually in print for other people to see," (McClatchey Dep. 76)

29. McClatchey "enjoy[s] sharing the photo" and the attention it has generated for her. (McClatchey Dep. 41).

30. For McClatchey, it is "an honor that [publishers] would ask that my photo be part of their articles or sharing it with the public," (McClatchey Dep. 49; *see also id.* Ex. 4), and she feels that "[i]t's an honor to be able to share it with others," (McClatchey Dep. 49).

31. McClatchey's view with respect to the publication of the Photograph is "the more it is seen the better." (McClatchey Dep. 98; *see also id.* Ex. 25).

32. McClatchey charged a fee of $250 or $350 for use of her Photograph by some publishers, but she charged no fees to a variety of publications, Internet sites, broadcasters and others who told stories that had been "approved by me [McClatchey]" and that she wanted to be told. (Pl. Admis. 14; McClatchey Dep. 12, 17; *see also, e.g.*, McClatchey Dep. 73-74).

33. When news publications "told a story that [McClatchey] agreed with" (McClatchey Dep. 12), or if she "had judged [a proposed report] to be a story [she] wanted to be told," McClatchey would allow the publisher to use the Photograph "without a fee." (McClatchey Dep. 17; *see also id.* 12, 13-14, 53, 74; Pl. Admis. 14).

34. McClatchey "donates the copy [of the Photograph] free of charge for use by non-commercial organizations and entities." (Compl. ¶ 12; *see also* McClatchey Dep. 12).

35. "[I]f people stop in [McClatchey's] office" and ask for the Photograph, she "most likely will not charge them." (McClatchey Dep. 18).

36. McClatchey provides a copy of the Photograph "as a souvenir" to "everyone that has come to [her] house" and wanted one. (McClatchey Dep. 15).

37. McClatchey has sold hundreds of copies of the Photograph for "$20 each" (McClatchey Dep. 18, 37), the proceeds of which she contributed to the Todd Beamer Foundation. (McClatchey Dep. 18).

38. The sales of the Photograph generally "trickle in," but pick up when there is news coverage "about the memorial or Flight 93." (McClatchey Dep. 18-19).

39. McClatchey does not permit use of the Photograph with stories with which she does not agree, such as those stories that set forth alternate theories on the crash of Flight 93. (McClatchey Dep. 39).

40. McClatchey has distributed copies of the Photograph for publication that do not contain any copyright notice. (McClatchey Dep. 20-21, 50, 53-54, 73, 75, 76-77, 101-02, 109; *see also* Pl. Admis. 3).

41. Copies of the Photograph that do not contain copyright notices have been published with McClatchey's consent. (*E.g.*, McClatchey Dep. 20-21, 100-02, 109, Ex. 27, Ex. 28; Penchina Decl. Exs. E, F, G, H, I, J).

42  The copy of the Photograph that appears on the website of McClatchey's business does not contain a copyright notice on it. (Penchina Decl. Ex. A).

43. McClatchey's personal copy of the Photograph "does not have any copyright notice or title" on it. (McClatchey Dep. 21; *see also id* at 20, 22; Sheehan Dep. 51; Pl. Admis. 8).

44. On the first anniversary of the crash of Flight 93, McClatchey attended a memorial service held at the crash site. (McClatchey Dep. 25).

45  At the memorial service, McClatchey noticed the "press badge" worn by AP reporter Charles Sheehan who was covering the event. (McClatchey Dep. 26)

46. McClatchey approached Sheehan (Sheehan Dep. 13), and introduced herself as the person who "had taken that photo." (McClatchey Dep. 25; *see also* Pl. Admis. 2).

47. McClatchey told Sheehan about "how things have changed in the past year" (McClatchey Dep. 25), and Sheehan decided to write a report about "how things had been in the past year in the area, and with [the McClatcheys] personally, since [she] had taken the photo," (McClatchey Dep. 26; *see also* Sheehan Dep. 14).

48. Sheehan interviewed McClatchey at the crash site for about ten minutes, and completed the interview by telephone later that day. (Sheehan Dep. 16-18).

49. McClatchey fully intended and understood "that Mr. Sheehan would be writing something for publication by the AP based on [her] conversations with him." (McClatchey Dep. 28)

7

50. McClatchey provided to AP a "copy of the photograph to use in connection with the proposed article." (Compl. ¶ 14; *see also* Def. Interrog. Resp. 11).

51. On the same day Sheehan interviewed McClatchey, AP photographer Gene Puskar went to McClatchey's house to obtain a photograph for AP to use in connection with the article being written by Sheehan, and McClatchey understood that was why Puskar had come to see her. (McClatchey Dep. 28-29; Puskar Dep. 14, 36-37; Pl. Admis. 10; Def. Interrog. Resp. 4).

52. McClatchey showed her personal copy of the Photograph to Puskar, and he took a picture of the Photograph. (Puskar Dep. 12-14, 36-37; Def. Interrog. Resp. 11).

53. When photographing McClatchey's personal copy of the Photograph, Puskar did not capture the entirety of the image in the Photograph. (Puskar Dep. 20-24; Def. Admis. 19-22).

54. When photographing the Photograph, Puskar cropped portions from around the edges. (Puskar Dep. 21-24).

55. When compared to McClatchey's personal copy of the Photograph, "all of the road underneath the barn is cropped off," the "road and at least 1 to 2 inches" were "cropped off" the left side, and portions of the top and right sides also were "cropped off." (Puskar Dep. 22).

56. McClatchey fully intended and understood that the photograph taken by Puskar was for publication with Sheehan's report. (McClatchey Dep. 28; *see also* Puskar Dep. 36-37).

8

57.  Puskar wrote a caption to accompany his photograph of the Photograph, and transmitted his photograph and caption to the AP photo department. (Puskar Dep. 46; Ake Dep. 38; Def Interrog. Resp. 4).

58.  AP's caption for its copy of the Photograph stated:

> This image of the smoke cloud left by United Flight 93 after it crashed in a field in Shanksville, Pa., on September 11, 2001 was taken by Val McClatchey from the porch of her nearby home. (AP Photo/File/Val McClatchey)

(Ake Decl. Ex. B).

59.  There was no copyright notice on the copy of McClatchey's Photograph received by AP. AP did not remove any copyright notice from the image. (Ake Decl. ¶ 17).

60.  In the AP's system, Puskar's photograph was identified by the photograph identification number "GJP101," which identifies that specific photograph. (Ake Decl. ¶ 14, Ex. B; Ake Dep. 31-32; Gerberich Dep. 57).

61.  The "meta data" that accompanies Puskar's photograph in AP's system, and which accompanies the photograph whenever it is provided to anyone by AP, identified the photograph as a "handout image," meaning that the work was not original to AP but provided to AP by a third party. (Ake Decl. ¶ 7, Ex. B; Ake Dep. 8, 32; Gerberich Dep. 54-55).

62.  The "meta data" also contains the following restrictions in the "Special Instructions" field: "No Sales" and "Wide World Photos Out," (Ake Decl. Ex B), which means that the photograph could not be sold or used for commercial purposes, and is not available to Wide World Photos, the AP unit involved in selling prints of photographs and licensing photos

9

for use other than by AP members, (Ake Decl. ¶¶ 10, 11, 14; Ake Dep. 28-29; Gerberich Dep 50-53).

63. The "meta data" identifies "VAL MCCLATCHEY" in the "Photographer" field. (Ake Decl. Ex. B)

64. The "meta data" does not indicate that anyone other than McClatchey holds the copyright to the Photograph. (Ake Decl. Ex. B).

65. The "meta data's" notations "HO" and "no sales" indicate that "AP does not own this image." (Ake Decl. ¶¶ 7, 10; *see also* Gerberich Dep. 55).

66. On September 12, 2002, AP distributed a news report entitled "Woman who captured searing Flight 93 image struggles a year later" about Ms. McClatchey and the photograph she had created (hereinafter the "Report"). The Report included text written by Sheehan and a copy of the Photograph made by Puskar. (Ake Decl. ¶ 13, Ex. A; Gerberich Decl. ¶ 3; Sheehan Dep. 4)

67. The Report was "the article that [McClatchey] had agreed to." (McClatchey Dep. 30).

68. The Report was one McClatchey "would not have a problem with." (McClatchey Dep. at 41). It "told an accurate story" and was the "type of story which [McClatchey] approves[s] in connection with using [her] photo." (McClatchey Dep. 40).

69. Sheehan "asked the questions," and McClatchey "approved them." (McClatchey Dep. 40).

10

70. The Report recounted how McClatchey took the Photograph and how the "time and date recorded on the image . . . marked the beginning of a tumultuous year for McClatchey." (Ake Decl. Ex. A).

71. The Report related that the Photograph "brought news crews to the front door and a limited amount of fame to McClatchey." (Ake Decl. Ex. A).

72. The Report discussed health problems experienced by McClatchey after having taken the Photograph, the collapse of her husband's business and that the "images McClatchey said she sold for $250 to $350 have not done much to help the couple financially." (Ake Decl. Ex. A).

73. The Report also reported that residents of the region to whom McClatchey provided copies of the Photograph "have insisted on paying cash to cover costs of printing, and McClatchey said she has donated almost all of that money to the Todd M. Beamer Foundation." (Ake Decl. Ex. A).

74. AP distributed its copy of the Photograph in connection with the Report. (Ake Decl. ¶ 13, Ex. A, Ex. B).

75. AP used its copy of the Photograph with the understanding that McClatchey had given consent for it to do so. (Ake Decl. ¶¶ 15, 18, 22; Ake Dep. 39, 43, 47; Puskar Dep. 14, 33, 36-37; Def. Admis. 3; Def. Interrog. Resp. 14).

76. AP had no knowledge of infringing uses made by persons to whom AP distributed the Photograph, and AP had no intent to facilitate any infringing acts by anyone. (Ake Decl. ¶¶ 18, 22).

77. AP used its copy of the Photograph in connection with the Report with the understanding that the use was a fair use. (Ake Decl. ¶¶ 16, 22; Def. Interrog. Resp. 14).

78. The text of the Report was transmitted via AP's Basic service, as are all textual reports, and the photograph was transmitted as part of PhotoStream, as are all photos intended to accompany particular news stories. (Ake Decl. ¶¶ 12, 13).

79. Beneath the headline of the text portion of the Report was the instruction, known as a "slug," "AP Photo GJP101," which identified AP's copy of the Photograph and indicated to newspapers receiving the item that that photograph was to accompany that text. (Ake Decl. ¶¶ 12, 14, Ex. A; Ake Dep. 31-32).

80. Upon AP's transmission of the Report, AP's copy of the Photograph automatically became archived in the PhotoArchive. (Ake Decl. ¶ 13; Gerberich Decl. ¶ 3).

81. The archived copy of the Photograph carried "the most severe restrictions [AP] can put on an image," (Gerberich Dep. 54), and customers who generally obtain access to the PhotoArchive through AP services such as Wide World Photos, the AP division that sells copies, could not access AP's copy of the Photograph in the PhotoArchive. (Ake Decl. ¶¶ 11, 14, Ex. B).

82. AP never offered for sale or sold copies of the Photograph. (Ake Decl. ¶¶ 11, 14, 18, 19; Gerberich Decl. ¶ 11; Def. Interrog. Resp. 7).

83. AP did not receive any financial benefit from any use of the Photograph made by persons who received it from AP. (Ake Decl. ¶ 19).

12

84. *The Progress*, a newspaper serving Clearfield, Curwensville, Philipsburg and Moshannon Valley, Pennsylvania, carried the Report, including both the text portion of the Report and AP's copy of the Photograph. (McClatchey Dep. Ex. 1).

85. On September 11, 2002, *The Tribune-Democrat* of Johnstown, Pennsylvania ran a story about McClatchey written by its own writer and accompanied by a photograph credited to photographer Dave Lloyd of *The Tribune-Democrat*. (McClatchey Dep. Ex. 2).

86. Lloyd's photograph showed McClatchey holding the Photograph and her camera, and depicted a portion of her living room. (McClatchey Dep. Ex. 2).

87. On September 13, 2002, *The Tribune-Democrat* published just the text of the AP Report, which ran with the headline "Photo brought fame, not fortune for woman," and the subtitle "Shanksville resident captured horror." (Compl. Ex. C).

88. *The Tribune-Democrat* did not run AP's copy of the Photograph with the text of the AP Report. (*Compare* Compl. Ex. C, *with* Ake Decl. Ex B).

89. *The Tribune-Democrat* published a photograph of its own, bearing a photo credit to itself, of McClatchey inside her house holding a copy of her Photograph and the camera she used to snap it. (Compl. Ex. C).

90. The photograph that *The Tribune-Democrat* used with AP's report was not supplied by AP, but was a cropped version of Lloyd's photograph, which had accompanied the September 11, 2002 article. (*Compare* Compl. Ex. C, *with* McClatchey Dep. Ex. 2).

13

91. Only three entities, AOL, Canadian Press and The Huntsville Times accessed and downloaded AP's copy of the Photograph during the time it was in the PhotoArchive. (Gerberich Decl ¶¶ 5-7, Ex. A)

92. No other people or entities downloaded AP's copy of the Photograph during the entire time it was available in the PhotoArchive (Gerberich Decl. ¶ 6.)

93. AOL reproduced a thumbnail of the Photograph on its web site under the words "AOL News," and beside the headline "New Theory on Flight 93 As Revolt Began, Data Shows Hijacker Crashed on Purpose." (Compl. ¶ 20, Ex. D)

94. McClatchey would not have licensed the Photograph to AOL for use in connection with its report on a "New Theory on Flight 93" had she had the opportunity to do so. (McClatchey Dep. 39).

95. Following AP's publication of its copy of the Photograph and its presence in the PhotoArchive, McClatchey continued to make the Photograph available for publication, both for free and on a fee basis. (Pl. Admis. 20, 21)

96. Among the entities to whom McClatchey licensed the Photograph for a fee after it was published by AP and while the AP copy was present in the PhotoArchive, were Philadelphia Newspapers, Inc. and U.S. News & World Report. (McClatchey Dep Ex. 12; Penchina Decl. Exs. C, D).

97. Both Philadelphia Newspapers, Inc. and U.S. News & World Report are subscribers to AP's PhotoStream service to whom AP provided a copy of the Photograph in

14

connection with the Report, and who had access to the Photograph in AP's PhotoArchive. (Ake Decl. ¶ 21; Penchina Decl. Ex. B.)

98. McClatchey first complained to AP about its use of the Photograph in or around October 2003 through a complaint sent to AOL. (Penchina Decl. Ex. K; Galt Dep. Ex. 19; *see also* Pl. Admis. 7; Ake Decl. ¶ 15).

99. AP does not know or keep track of whether anyone who has access to the PhotoArchive actually publishes or otherwise makes use of any of the photographs downloaded from the PhotoArchive. (Gerberich Decl. ¶ 9)

100. Prior to McClatchey complaining to AOL, AP had no knowledge of any particular use of the Photograph made by any of its members or subscribers, including AOL. (Ake Decl. ¶ 18; Ake Dep. 36-37; Gerberich Dep. 77-78)

101. AP's copy of the Photograph was removed from the PhotoArchive on November 4, 2003. (Gerberich Decl. ¶ 4; Def. Admis. 11, 12).

102. Once the Photograph was removed from the PhotoArchive, AP members and subscribers, and anyone else who may have had access to the PhotoArchive, had no further access to the Photograph. (Gerberich ¶ 4).

Dated: May 15, 2006

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _/s/ Robert Penchina_
    Robert Penchina (*Pro Hac Vice*)
    230 Park Avenue, Suite 1160
    New York, NY 10169
    (212) 850-6100
    (212) 850-6299 (Fax)

    Gayle C. Sproul, I.D. No. 38833
    Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
    2112 Walnut Street, Third Floor
    Philadelphia, Pennsylvania 19103
    (215) 988-9778
    (215) 988-9750 (Fax)

*Attorneys for The Associated Press*