Tab 3

Declaration of J. David Ake

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VALENCIA M. MCCLATCHEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-145J |
| v. ) | |
| ) | |
| THE ASSOCIATED PRESS, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF J. DAVID AKE

J. DAVID AKE, pursuant to 28 U.S.C. § 1746, states:

1.  I am employed as the Deputy Director of Photography, National for The Associated Press ("AP"), defendant in the above-captioned action. I make this declaration upon my own personal knowledge and/or records maintained by AP in the ordinary course of its business. I would be competent to testify to the facts set forth in this Declaration.

2.  AP is a not-for-profit corporation organized under the laws of New York. It operates as a mutual news cooperative engaged in the collection and dissemination of news. AP gathers news through the efforts of its own reporters, photographers and news personnel, and collects news from its members. AP's membership primarily is comprised of daily newspapers, but includes news magazines, television and radio broadcasters, and electronic news publishers.

3.  AP distributes news in a variety of formats. AP's Basic service, which all members receive, provides news in the form of textual reports. AP provides thousands of news reports to its subscribers each day. AP offers numerous additional services that

provide news content in such form as photographs, video, audio and electronic formats, among other things.

4.  Among the news materials distributed by AP are photographs. AP's primary service for providing photographs to members and subscribers is PhotoStream. PhotoStream is a service pursuant to which AP delivers newsphotos via satellite transmission to members and subscribers. AP currently provides upwards of 2,500 photographs per day via PhotoStream and, since the year 2000, has provided at least 500 photographs via PhotoStream each day. On September 12, 2002, there were approximately 1,150 domestic and 800 foreign subscribers to AP's PhotoStream service, including newspapers, broadcasters and electronic publishers.

5.  AP does not undertake to record the number and identity of members or subscribers which use particular news stories or photographs. AP members and subscribers do not pay fees for the receipt or use of particular items which are disseminated as part of AP's news service. Instead, AP's members and subscribers pay assessments calculated to cover the actual cost of providing AP's news service. The amount paid does not vary according to the content, subject or quality of materials provided by AP.

6.  AP does not and cannot require AP members or subscribers to carry any AP-provided news content in their own publications. Once AP delivers news materials to its members and subscribers, it is within the editorial discretion of each member and subscriber to determine which, if any, of the AP content will be included in their publication and, if included, how.

7.  AP employs numerous photographers around the world to obtain newsphotos for distribution by AP. In addition to photographs created by AP photographers, AP gathers and distributes photographs created by its members. Moreover, photographs frequently are provided to AP by third parties, often in connection with that third party's seeking of news coverage. For example, press releases sometimes are accompanied by a photograph, and family members of individuals who are in the news sometimes provide photographs relating to that individual to AP for publication by AP. When a photograph is provided to AP in such a manner, the photograph is designated as a "Handout" or "HO" in AP's system – signifying that the photograph was not created by AP.

8.  By 2002, AP's photo operation was entirely digital. AP photographers in the field utilize digital cameras, and submit the photographs they create to AP by means of digital transmission. Before transmitting a photograph to AP, the photographer is required to add a caption relating to the photograph, as well as various "metadata" that travels with the photograph. The metadata includes such information as the name of the person who created the image, the date the image was created, any restrictions on the use of the photograph, the source of the photograph (such as whether it was provided as a handout or created by staff), and other information. Other information automatically is generated by the system and included in the metadata, such as an identification number for the photograph. The metadata travels with and accompanies photographs transmitted by AP or retained in AP's systems.

9.  When a photograph is transmitted as part of the PhotoStream service, the photograph automatically becomes part of AP's electronic photo archive, known as the

3

"PhotoArchive." The PhotoArchive is accessible by AP and by subscribers to the PhotoStream service. In addition, some but not all of the photographs in the PhotoArchive are accessible to additional publishers and users of photographs to whom access to the PhotoArchive is granted.

10. When a photograph contains the restriction "No Sales" in the "Special Instructions" field of the metadata, it means that the photograph is available for editorial use by AP and its members, but may not be offered for sale to third parties, or used for commercial purposes.

11. Wide World Photos ("WWP") is a division of AP. WWP is in the business of licensing reuse of AP photos, selling prints of AP photos, and licensing AP photos for commercial uses, among other things. WWP also licenses access to AP's PhotoArchive to qualified third parties. When a photograph contains the restriction "Wide World Photos Out" in the Special Instructions field of the metadata, the photograph is unavailable to WWP and its customers, and is not accessible in the PhotoArchive by persons who obtain access thereto from WWP.

12. Frequently, news reports distributed by AP are comprised of both textual and photographic components. However, because AP utilizes different delivery mechanisms for textual and photographic content, the components are not delivered as a single unit. Rather, the text is included as part of the Basic service, and the photograph is included as part of the PhotoStream service. When photographs transmitted by AP are intended to be part of a particular report and/or accompany particular text, AP's practice is to identify the photograph by its identification member in the "slug" of the text. The "slug" is a data field that is part of the text report. AP members and subscribers

4

understand that when a photograph is identified in the slug of a text report, that photograph is part of or intended to accompany that report.

13. On September 12, 2002, AP distributed a news report about plaintiff Val McClatchey, the photograph she had taken from her front porch of the aftermath of the crash of Flight 93, and how her life had changed after she had taken that photograph. AP's news report was comprised of text written by AP reporter Charles Sheehan, and a copy of Ms. McClatchey's photograph that AP photographer Gene Puskar had made by taking a photograph of Ms. McClatchey's photograph. The text portion of the report was transmitted to AP members and subscribers via AP's Basic service. The photographic portion of the report was distributed by AP via PhotoStream to subscribers to the PhotoStream service. When the photograph was distributed via PhotoStream, it automatically became part of the PhotoArchive. Attached as Exhibit A hereto is a true and correct copy of the text of AP's report about Ms. McClatchey and her photograph that AP distributed via its Basic service on September 12, 2002. Attached as Exhibit B hereto is a true and correct copy of a record from AP's files that contains the copy of Ms. McClatchey's photograph in the form in which AP possessed it and distributed it via PhotoStream on September 12, 2002, together with the metadata associated with that image.

14. As shown in Exhibit A, the text report about Ms. McClatchey and her photograph included a "slug" identifying a photograph designated as "AP Photo GJP101" for use with the report. As shown in Exhibit B, AP's copy of Ms. McClatchey's photograph was identified by the designation "GJP101." At all times during which the image shown in Exhibit B was in AP's system, including its transmission by PhotoStream

5

and inclusion in the PhotoArchive, the restrictions "No Sales" and "Wide World Photos Out" appeared in the "Special Instructions" field of the metadata.

15. AP understood and at all times believed that Ms. McClatchey had consented to AP's publication and distribution to its members and subscribers of a copy of her photograph in conjunction with a news report about Ms. McClatchey. AP did not believe, and had no reason to believe, that Ms. McClatchey objected in any way to AP's publication and distribution of its copy of her photograph. The first time AP learned that Ms. McClatchey was dissatisfied in any way or had any objection to any use of her photograph, was nearly two years after AP's publication of her photograph when representatives for Ms. McClatchey complained to AOL and AP about a publication made by AOL. At all times prior to hearing from Ms. McClatchey's representatives, AP believed in good faith that it had Ms. McClatchey's permission to use her photograph in the manner in which it did.

16. It is a common journalistic practice, when publishing news reports about a photographer or artist and their work, to include as part of the report a copy of a particular work discussed in the report. While I understand that there are no hard and fast rules concerning the copyright doctrine of "fair use," AP believes, and at all times relevant to the matters at issue had believed, that the journalistic practice described above generally amounts to a permissible fair use. At the time AP published its copy of Ms. McClatchey's photograph as part of its news report, AP had no reason to believe and did not believe that its use of the photograph in accordance with that common journalistic practice violated any rights of Ms. McClatchey.

6

17. There was no copyrighted notice on the copy of Ms. McClatchey's photograph received by AP. AP did not remove any copyright notice from the image.

18. AP is not aware of any uses of its copy of Ms. McClatchey's photograph made by persons to whom AP provided its copy, other than those brought to AP's attention in the course of this case. AP made the photograph available to its members and subscribers for use in connection with AP's report and in accordance with what it understood to be Ms. McClatchey's consent. AP had no knowledge of infringing uses made by persons to whom AP distributed the photograph, and AP had no intent to facilitate any infringing acts by anyone. AP made the photograph available for news use only, and restricted the photograph from being sold or relicensed. In short AP had no desire or intent to infringe, or allow others to infringe, Ms. McClatchey's copyright.

19. AP did not receive any financial benefit from any use of the photograph made by persons who received it from AP. The photograph was distributed, along with hundreds of other that same day, as part of AP's PhotoStream service. As discussed above, subscribers to PhotoStream pay a monthly assessment to cover AP's costs in providing the service. The amounts paid do not vary based upon the content of the photographs delivered or on whether any use is made of the photographs delivered or on whether any use is made of the photographs once received. Whether or not AP ever possessed or used a copy of Ms. McClatchey's photograph, and whether or not any use of the photograph was subsequently made by persons who received the photograph from AP, simply did not and could not have had any bearing whatsoever on income or revenue to AP. AP has no financial stake whatsoever in any use or potential use of the photograph by persons to whom AP distributed it.

20. Moreover, AP does not control the publishing activities of its members and subscribers. The issue of which if any of the content distributed by AP should be published in a given publication and, if published, in what form and context, is entirely a matter of each publication's editorial discretion into which AP cannot intrude.

21. U.S. News & World Reports and Philadelphia Newspapers, Inc. (the publisher of the Philadelphia Daily News and the Philadelphia Inquirer) both were included among the subscribers to AP's PhotoStream service to whom AP provided its copy of Ms. McClatchey's photograph.

22. In sum, AP believed it had Ms. McClatchey's consent to use her photograph in the manner in which it did. AP believed it had the right to use her photograph in that way, had no intent to infringe her rights, and had no intent for others to infringe her rights. AP had knowledge of any infringing activities, did not encourage infringing activities by others, and did not benefit financially or otherwise as a result of any infringing activity undertaken by anyone.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
May 12, 2006

J. David Ake

# Exhibit A

---
Doc: 00267987 DB: research_d_2002_3 Date: Thu Sep 12 00:08:15 2002

*** Version history. (* = this story, F = final, S = semifinal) ***

dD7M016BO2 09-12-2002 00:08:15*F BC-PA--Sept 11-Flight 93-Image, Bjt:Woman

Copyright 2002 By The Associated Press. All Rights Reserved.
------------------------------------------------------------------
-----
d0487‡papa-
r nbx
pa pabas paol gen
^BC-PA--Sept 11-Flight 93-Image, Bjt,560<
^Woman who captured searing Flight 93 image struggles a year later<
%photo(^AP Photo GJP101<%)
^stfcsrlt<
^By CHARLES SHEEHAN=
^Associated Press Writer=
¶   SHANKSVILLE, Pa. (AP) _ The horror unfolding on Val **McClatchey**'s television the morning of Sept. 11 was just beginning to sink in when a violent blast outside cut the power to her home and blackened the screen.
¶   Running outside, **McClatchey**, 46, captured with a digital camera the moment that the terrorist attacks, once hundreds of miles away, came to this western Pennsylvania town of 245 people.
¶   The time and date recorded on the image, however, marked the beginning of a tumultuous year for **McClatchey**. She came to the crash site, about a mile from her home where she took the picture, to mark the anniversary with thousands of others Wednesday.
¶   "I just felt that this was one of the only places I could kind of blend in and find some anonymity," she said. "It's been chaos since that day."
¶   In the image, which has brought news crews to the front door and a limited amount of fame to **McClatchey**, a sinister black, mushroom-shaped cloud rises from an otherwise peaceful view of a farm with a painted red barn.
¶   United Flight 93 crashed just outside Shanksville shortly after 10 a.m. on Sept. 11. Investigators say passengers aboard the Boeing 757 fought hijackers for control before the airliner crashed upside down in an open field killing all 40 passengers and crew.
¶   The picture is one of the few images of the crash, and within two weeks it had been purchased by major U.S. magazines including U.S. News & World Report, Newsweek, Time magazine and also by several major magazines in Europe.
¶   But ripples from the terrorist attacks had an almost immediate effect on **McClatchey** and her husband, John.
¶   JCM Industries, a sawmill owned and operated by John **McClatchey**

AP00186

with 46 employees, was forced to file for bankruptcy on Sept. 20.
¶ "After the attacks, insurance companies just didn't want to cover companies that did work that's considered risky," John **McClatchey** said. "We had always been able to get insurance, but things changed."
¶ He said the attacks may not have been the sole reason for the collapse of his business, but they played a direct role.
¶ In the year after the attacks, with the sawmill gone, Val **McClatchey**'s health would take a turn for the worse. She would need gallbladder surgery and tumors removed from her kidneys and liver.
¶ "We're struggling," she said. "My husband got a job brokering pallets. I took real estate classes and got my license, but it's been hard."
¶ The images **McClatchey** said she sold for $250 to $350 have not done much to help the couple financially.
¶ Some residents of the region who wanted copies of the image have insisted on paying cash to cover costs of printing, and **McClatchey** said she has donated almost all of that money to the Todd M. Beamer Foundation, a fund named after one of the passengers aboard Flight 93 that aids children affected by the terrorist attacks.
¶ But the **McClatcheys** say they are waiting to see what next year will bring, and they remain optimistic.
¶ "It depends on how things go with the bankruptcy, but I know we are stronger people now than we were a year ago," she said. "This whole town is, but I think we're ready for a break."

# Exhibit B

| LG AP A PA GJP101 FILE SEPT 11 **DO NOT USE** |
|---|

Actions..



FILE--This image of the smoke cloud left by United Flight 93 after it crashed in a field in Shanksville, Pa., on September 11, 2001, was taken by Val McClatchey from the porch of her nearby home. (AP Photo/FILE/Val McClatchey)

| Slug | LG AP A PA GJP101 FILE SEPT 11 **DO NOT USE** |
|---|---|
| Location | SHANKSVILLE, Pennsylvania United States |
| Special Instructions | NO SALES, SEPT. 11, 2001 FILE PHOTO, WIDE WORLD PHOTOS OUT |
| Corrections | DO NOT RETRANSMIT. AP NO LONGER HAS RIGHTS TO THIS HANDOUT IMAGE. |

| Creation Date | 09/11/2002 00:00:00 | Submit Date | 09/11/2002 20:23:00 |
|---|---|---|---|
| Photographer | VAL MCCLATCHEY Stringer | PLS ImageID | 6755117 |
| Object Name | SEPT 11 FLIGHT 93 IMAGE | Picture Desk ImageID | 40SA5 |
| Credit | Associated Press HO | Committed | Yes (Platter 11) |
| Routing | ALL | Caption Writer | HMB GJP |
| Import Folder | /incoming/L4conversion | Database | Intl_Photos_02 |

AP00185

of 1                                                                                    8/29/2005 4:33 PM