Tab 8

Deposition of Valencia M. McClatchey

Dockets.Justia.com

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA
 2
      VALENCIA M. McCLATCHEY,          )
 3                                     )
                   Plaintiff,          )
 4                                     )
                   vs.                 )
 5                                     )
      THE ASSOCIATED PRESS,            )    Civil Action
 6                                     )    No. 05-145J
                   Defendant.          )
 7

 8

 9

10

11                         - - - -

12          DEPOSITION OF:  VALENCIA M. McCLATCHEY

13                         - - - -

14
                      DATE:    March 14, 2006
15                             Tuesday, 9:30

16
                  LOCATION:    Eckert Seamans Cherin &
17                                Mellott
                               44th Floor - US Steel Tower
18                             Pittsburgh, PA 15219

19                TAKEN BY:    Defendant

20
               REPORTED BY:    Keith G. Shreckengast, RPR
21                             Notary Public
                               AKF Reference No. KS93222
22

23

24                                        ORIGINAL

25
```

```
 1              VALENCIA M. McCLATCHEY,

 2              having been duly sworn,

 3         was examined and testified as follows:

 4                   - - - -

 5                   EXAMINATION

 6                   - - - -

 7   BY MR. PENCHINA:

 8   Q.    Good morning, Ms. McClatchey.

 9   A.    Good morning.

10   Q.    Would you please state your full name for the

11         record?

12   A.    Valencia M. McClatchey.

13   Q.    And would you also please give your address?

14   A.    107 Osage Path, Stoystown, 15634.

15   Q.    Have you ever had your deposition taken before?

16   A.    No.

17   Q.    Just some preliminaries, my name is Robert

18         Penchina, and I am one of the attorneys

19         representing the Associated Press in the

20         lawsuit that you initiated.  I'm going to be

21         asking you a series of questions today.  And I

22         would ask that if you don't understand my

23         question, would you please let me know?

24   A.    I understand.

25   Q.    Are you currently employed?
```



1              years or so?

2    A.    No.

3    Q.    Have you used any others in the last five

4              years?

5    A.    I may have had a stooges -- à stooge@yahoo.com,

6              which may have been seven years ago.

7    Q.    Have you used any E mail addresses for yourself

8              personally that had the words Keystone Camaro

9              Club in them?

10   A.    That would be Keystone Camaro Club through

11             Yahoo.  I am involved -- had been involved with

12             the Camaro Club.

13   Q.    Are you the photographer who took the

14             photograph entitled The End of Serenity?

15   A.    Yes, I am.

16   Q.    Can you describe that photo me?

17   A.    It's a red barn featuring a large plume of

18             smoke rising over the hill.  There is also the

19             gutter up in my right-hand corner, a smaller

20             barn which is now red, but it was a pale yellow

21             in the foreground.  There's also you could see

22             part of my front yard, the road, and the field.

23   Q.    What is the significance of that photo?

24   A.    That was the first photo related to Flight 93.

25             I took it just seconds after the impact.



1   Q.   Have you ever sold or licensed that photo for
2        publication to anyone?
3   A.   Yes, I have.
4   Q.   When was the last time?
5   A.   The last time I licensed the photograph was
6        last week.
7   Q.   Who did you license the photograph to last
8        week?
9   A.   It would be to the Flight 93 Memorial.  It is
10       going solely for their fundraising brochure.
11  Q.   Was there a fee involved with this license?
12  A.   No, there was not.
13  Q.   Other than the license to the Flight 93
14       Memorial, are there any other sales or
15       licensing for publication of this photo in
16       2006?
17  A.   2006, I believe everything had been completed
18       in 2005, prior to.
19  Q.   Can you tell me to whom you licensed or sold
20       the photo for publication in 2005?
21  A.   It would be to Towers Production, Discovery, I
22       believe there would be Brooklapping for the
23       Discovery Channel.  Also 2005 I believe I
24       licensed out to the New York Museum.  And
25       without my records, those are just off the top

 1  Q.   Did WTAE also run it on TV?

 2  A.   Not since the first week of September 11th,

 3       they had with my permission.

 4  Q.   And when they ran it on the internet, that was

 5       subsequent to the first week?

 6  A.   Yes, it would be subsequent.

 7  Q.   Was there a fee involved with WTAE?

 8  A.   No, there was not.

 9  Q.   How do you determine, or how did you determine

10       when to charge a fee and when not to?

11  A.   On the use of the photo.  Basically if it was

12       just for an educational purposes, or a story

13       that I felt that -- basically if they weren't

14       really going to make money from it, if it was

15       educational, then I did not charge a fee.

16  Q.   Was WTAE's use on the internet educational?

17  A.   They told a story that I had agreed with.

18  Q.   So when you use the word educational, you're

19       not using it in the formal sense that it's

20       being used in a school or an educational

21       setting; is that correct?

22  A.   If it tells the story as we know the facts, and

23       if it has been approved by me, it is my right

24       to say who does and who does not get the photo.

25  Q.   Absolutely.  And just to be clear, the reason

```
 1              why I'm asking about educational is not to trip
 2              you up or catch you in anything, but just to
 3              understand how you're using the word.
 4    A.        Okay.
 5    Q.        So to make the record clear, when you said
 6              educational, if I understand your testimony,
 7              you're talking about uses that generally
 8              educate the public and comport with your view
 9              of an appropriate story, but not necessarily
10              limited to an educational setting such as a
11              school?
12    A.        Correct.
13    Q.        Can you think of other examples of uses that
14              you permitted, publication uses that you
15              permitted where you did not charge a fee?
16    A.        I permitted Robert Morris University, St.
17              Francis University, fema.gov, I believe it's
18              Pennsylvania Township publication.  There was
19              one I believe that was of a medical type.  I
20              think that was it.  The Library of Congress,
21              the Smithsonian.
22    Q.        Any others?
23    A.        Other than high school students who asked
24              permission to use the photo for their reports.
25    Q.        In addition to WTAE, were there other news
```

```
 1           outlets that you permitted to use the photo
 2           without a fee?
 3    A.     I had done interviews with other TV media.  I
 4           do not believe they used the photo.  It was all
 5           just a person-to-person interview.
 6    Q.     Do you recall which those were?
 7    A.     With KDKA-TV Pittsburgh, WJAC-TV Johnstown,
 8           Channel 10 Altoona, Fox News.  I believe that
 9           was it.
10    Q.     The ones that you named I think were KDKA-TV?
11    A.     Yes.
12    Q.     WJAC, Channel 10 Altoona, Fox News.  Are there
13           any others?
14    A.     Not that I recall.
15    Q.     And those were instances where the news
16           organization interviewed you?
17    A.     Yes.
18    Q.     How did those news organizations come to
19           interview you?
20    A.     They came to my house after calling to set up
21           an appointment.
22    Q.     Did, in each of these instances for those four
23           stations that you've named, did they make the
24           first contact to you?
25    A.     Yes, they did.
```



```
 1   Q.   And did you provide the photograph to any of
 2        those stations?
 3   A.   I did as a souvenir.  I have done that with
 4        everyone that has come to my house, provided an
 5        8 x 10 photo, copy.
 6   Q.   Did any of those stations show the photo when
 7        they did the story?
 8   A.   No, they did not.
 9   Q.   Did any of them do the story?
10   A.   Yes, they did.
11   Q.   Did all of them do the story?
12   A.   Yes, they did.
13   Q.   In addition to television stations, were you
14        interviewed by any other news organizations?
15   A.   Yes, I was, ABC News, and Fox News from New
16        York.
17   Q.   Any others?
18   A.   No, not that I recall.
19   Q.   Any print publications, any newspapers?
20   A.   I had the Philadelphia news, Tribune Democrat,
21        Tribune Review, Post-Gazette, Washington Post.
22   Q.   And each of those interviewed you in connection
23        with some news story they were doing?
24   A.   Yes, they did, either by phone or in person.
25   Q.   Did the Associated Press interview you?
```



1          permission to use the photo?

2   A.   Yes, I did.

3   Q.   Did you charge a fee to ABC and Fox News in

4          connection with that use?

5   A.   Yes, there was.

6   Q.   What was the fee that you charged to ABC?

7   A.   It was $500.

8   Q.   And what was the fee that you charged to Fox

9          News New York?

10   A.   I'm not sure that I charged a fee for them.

11   Q.   Why is it that you're unsure?  By that I

12         mean --

13   A.   I do not recall.  I don't have a record of

14         charging them.

15   Q.   Is it possible that you didn't charge them?

16   A.   It's possible that I did not charge them.

17   Q.   If you had deemed that the particular use that

18         they were making to be a good story, one that

19         you wanted told, would that be a circumstance

20         in which you would allow them to use it without

21         a fee?

22   A.   If I had judged it to be a story I wanted to be

23         told, yes.

24   Q.   In addition to licensing for use, have you also

25         sold copies of the photograph?



1   A.    Yes, I have.

2   Q.    Tell me about how you sell copies of the

3         photograph.

4   A.    On the Shanksville Memorial news website, we

5         have set up that individuals can make a check

6         out to the Todd Beamer Foundation, they mail it

7         to me and I forward those checks, and I send

8         out an 8 x 10 copy of the photo to those

9         individuals.

10  Q.    In addition to the Shanksville site, are there

11        other ways through which copies of the photo

12        have been sold?

13  A.    I had made it available through Duppstadt's

14        Country Store, and Ida's store in Shanksville.

15  Q.    Anywhere else where the photo was available?

16  A.    Can still mail to me directly and I will sell.

17        And I will also, upon request, if people stop

18        in my office and ask, I most likely will not

19        charge them, as a good will.

20  Q.    Do you have a sense, a rough estimate of how

21        many copies you have sold over the years?

22  A.    An estimate, no.  Quite a few.  In excess of a

23        couple of hundred.

24  Q.    And are you -- are they still selling?

25  A.    Not very much.  They trickle in, maybe two or

1          three in a couple month period.

2    Q.   Over the last five years since the photo has

3          been created, have you noticed any sort of

4          trend in when they sell, when they don't sell?

5    A.   Anytime there is any news about the memorial,

6          or Flight 93, it generates more interest.

7    Q.   What is the format, or the form of the picture

8          itself, that you sell?

9    A.   It is on photo paper that I pick up at Staples

10         or Wal-Mart, I believe it's an 8 1/2 x 11 size,

11         it is as large as I can get it on as an 8 x 10.

12         Prior to printing the actual photo from my

13         copier, from my computer, I put my End of

14         Serenity on the top left corner, and my name

15         and copyright notice on the bottom right.

16   Q.   When you say prior to printing it you put that

17         on, can you describe that for me?

18   A.   I have a program on my computer that I print

19         out the -- on the photo paper, the title, and

20         my copyright notice, and then running it

21         through again and putting the photo.

22   Q.   So if I understand your testimony, it's a two

23         step process, the title and the copyright

24         notice go on first, and then you have at that

25         point a blank photo paper with the name and the

1         copyright notice; is that correct?

2    A.    That is correct.

3    Q.    And then you run that through the printer again

4         and the photo will be printed?

5    A.    Yes.

6    Q.    And the name and copyright notice show through

7         the printing of the photo?

8    A.    Yes, they do.

9    Q.    You said you had a program that adds that; is

10        that correct?

11    A.    I use My Advanced Brochures software.

12    Q.    How long have you had My Advanced Brochures

13        software?

14    A.    Since 2000.

15    Q.    Do you add the name and copyright notice to

16        every print?

17    A.    Yes, I do.

18    Q.    Every single print?

19    A.    The only one that does not have it is my

20        personal, that is in my home.

21    Q.    Was the name and copyright notice on all of the

22        copies that you provided to news organizations?

23    A.    When I have a news organization that has my

24        permission to use, we set up, if they -- if we

25        have an agreement of how it is to be used, it



1   is sent via E mail JPG high resolution that

2   provides a record for me and them as well, that

3   permission has been granted for them to print.

4   If I am giving it as just a souvenir or a

5   memento of their trip, it is standard copy, the

6   End of Serenity, and my copyright notice is on.

7   There are no exceptions.

8 Q. Is the same program that applies the title the

9   program that applies the copyright notice?

10 A. Yes, I write in copyright on the bottom.

11 Q. Do you ever print the photo with just the

12   copyright notice and without the title?

13 A. No, I do not.

14 Q. Do you ever print the photo with the title and

15   not the copyright notice?

16 A. No, I do not.

17 Q. The photo that is in your -- the JPG, does that

18   have any title or copyright notice on it?

19 A. No, it does not.

20 Q. And I think you mentioned your personal copy

21   does not have any copyright notice or title; is

22   that correct?

23 A. Correct.

24 Q. What is your personal copy?

25 A. Same, 8 x 10 that I print out from my computer.

Pittsburgh, PA  Greensburg, PA  Erie, PA
412-261-2323  724-853-7700  814-453-5700

AKF

```
 1              And I have it in a small frame in my office.
 2    Q.    Do you have any personal copies at home?
 3    A.    That is at my office at home.  And I have
 4          copies at my office at Mtn. Lakes, and that
 5          does have the copyright on it.
 6    Q.    So the personal copy at home or in your home
 7          office does not have a title or copyright
 8          notice?
 9    A.    No, it does not.
10    Q.    Do you have multiple copies at home?
11    A.    No, I do not.
12    Q.    And just to clarify, do you currently have
13          multiple copies at home?
14    A.    No, I do not.
15    Q.    Have you ever had multiple personal copies at
16          home?
17    A.    No, I do not.
18    Q.    Going back to licensing fees, how do you decide
19          how much to charge for a particular use?
20    A.    In the first year I did not know what a
21          freelance photographer would be paid.  I
22          basically went with what they offered.  Most of
23          the time that was 150 to possibly $300.
24    Q.    When you said in the first year, when did that
25          change?
```

1  A.    Yes, I did.

2  Q.    Do you recall who that reporter was?

3  A.    His name was Charles Sheehan.

4  Q.    How did you come to talk to Mr. Sheehan?

5  A.    It was the morning of the first anniversary,

6        which would have been September 11th, 2002 at

7        the memorial site.  It was a very cold morning,

8        and Salvation Army was having hot beverages

9        served in trailers.  And I went up and had a

10       cup of coffee, and that's where I met Charles

11       Sheehan.

12 Q.    Did you introduce yourself to Mr. Sheehan?

13 A.    Yes, I did.

14 Q.    Did he approach you first, or did you approach

15       him?

16 A.    We had both been standing, and I said good

17       morning and introduced myself.

18 Q.    Do you remember what you discussed with

19       Mr. Sheehan?

20 A.    I did inform him that I had taken that photo.

21       And we talked about how things have changed in

22       the past year, what a difference a year made

23       basically, conversation.  He asked if he could

24       contact me later, and I gave him my

25       information.

| | | |
|---|---|---|
| 1 | Q. | Did Mr. Sheehan identify himself as a reporter |
| 2 | | for the Associated Press? |
| 3 | A. | He had a press badge on, yes. |
| 4 | Q. | Did you discuss the photo with Mr. Sheehan? |
| 5 | A. | Yes, I had. |
| 6 | Q. | What was it that Mr. Sheehan indicated he would |
| 7 | | contact you about in the future? |
| 8 | A. | He asked if he could do an article regarding |
| 9 | | how things had been in the past year in the |
| 10 | | area, and with us personally, since I had taken |
| 11 | | the photo. |
| 12 | Q. | Did you consent to that? |
| 13 | A. | Yes, I did. |
| 14 | Q. | When you met Mr. Sheehan the first time when |
| 15 | | you were both having coffee, did you have the |
| 16 | | scrapbook with you? |
| 17 | A. | No, I did not. |
| 18 | Q. | Did you have any materials with you? |
| 19 | A. | No, I did not. |
| 20 | Q. | Did Mr. Sheehan subsequently contact you? |
| 21 | A. | Yes, he did later that day. |
| 22 | Q. | Was that in person, by phone, or some other |
| 23 | | way? |
| 24 | A. | It was by telephone. |
| 25 | Q. | And do you remember what you discussed then? |



```
 1              losing, being in bankruptcy at the time.  And
 2              how the area in general has changed.  How we're
 3              all reacting to being thrown into the
 4              spotlight.
 5    Q.        Did you understand that Mr. Sheehan would be
 6              writing something for publication by the AP
 7              based on your conversations with him?
 8    A.        Yes, I did understand that.
 9    Q.        Did you have any further conversations with
10              Mr. Sheehan beyond those that we already
11              discussed?
12    A.        No.
13    Q.        Did you have any conversations with any other
14              representative of the Associated Press?
15    A.        The only other representative of the Associated
16              Press would have been the photographer who was
17              present and took a photo of me holding the
18              photo in my living room.
19    Q.        Where you say the photographer was present, the
20              photographer was present when Mr. Sheehan came
21              to your house?
22    A.        Yes, he was.
23    Q.        Do you have an absolute recollection of
24              Mr. Sheehan and the photographer being present
25              together at your house?
```

```
 1              MR. PENCHINA:  This is the complaint,
 2        counsel.  I'm not going to mark this as an
 3        exhibit.  I'm just going to show it to her for
 4        references.
 5   BY MR. PENCHINA:
 6   Q.   Do you, Ms. McClatchey, recognize the complaint
 7        that was filed?
 8   A.   May I take a look?
 9   Q.   Sure.  And for the record, I'm not going to be
10        asking you any questions about the pleadings, I
11        just wanted to know if this is familiar, and in
12        particular if you can turn to the attachments,
13        one of the attachments to this is a newspaper
14        article.  Do you recall that newspaper article
15        being attached to the complaint?
16   A.   Yes, this is the photo, the article that I had
17        agreed to.
18   Q.   So attached to the complaint is an article, and
19        I think you said that this is the article that
20        you agreed to?
21   A.   This is the article that I had agreed to.  This
22        particular --
23   Q.   And by agreed to meaning this is what Charles
24        Sheehan had interviewed you for?
25   A.   Yes, this is the one.
```



1   Q.   And do you remember when that was?

2   A.   August 8th, 2003.

3   Q.   And did you have someone contact AOL on your

4        behalf at that time?

5   A.   Yes, I did.

6                    - - - -

7        (There was a brief pause in the proceedings.)

8                    - - - -

9   BY MR. PENCHINA:

10  Q.   Now that we've had a little bit of a break, is

11       there any of your prior testimony that you

12       would like to correct?

13  A.   No.

14  Q.   Earlier today I was asking you about selling

15       copies of the photo.  Do you remember that?

16  A.   Yes, I do.

17  Q.   I'm not sure if I asked this question, so

18       forgive me if I'm going over the same ground,

19       how much, or what was the sale price, or what

20       is the sale price when you sell copies of the

21       photo?

22  A.   $20 each, 8 x 10.

23  Q.   So the 8 x 10 copies of the photo that either

24       you sell or that are distributed through the

25       couple of stores that you mentioned would all



1  Q.  Published by different companies to your

2      knowledge?

3  A.  To my knowledge, I don't know.

4  Q.  Do they carry the same content do you know?

5  A.  Pretty much.

6  Q.  Do you know whether the article that AP wrote

7      about you appeared in all of those papers?

8  A.  It did not appear in the Daily American, I know

9      that for sure.  I do not believe it appeared in

10     the Tribune Review either.  I have no knowledge

11     of it.

12 Q.  Why are you suing AP?

13 A.  I became aware that my photo had been dispersed

14     without my knowledge or consent, and I'm trying

15     to protect the integrity of the photo, of where

16     it goes and what articles it is associated

17     with.

18 Q.  What do you mean by it had been dispersed?

19 A.  Well, AOL had used it without my knowledge or

20     consent in an article that I found to be

21     uncomfortable with.  And it was associated with

22     an article stating New Theory on Flight 93,

23     which that is an article that I would not have

24     granted permission to.

25 Q.  The article that stated a New Theory of Flight

```
 1         93?
 2   A.    Yes.
 3   Q.    Was that associated with AP?
 4   A.    I'm not sure.  I know that is what AOL had it.
 5         And that's -- I don't know where else it may
 6         have been.
 7   Q.    Did you read the story that the AP did about
 8         you?
 9   A.    The one that has appeared, yes, I did.
10   Q.    What do you think about the story?
11   A.    They had been there, they asked the questions
12         and I approved them.
13   Q.    Was it an accurate story?
14   A.    For the most part.  Some of my health issues
15         were a little exaggerated, but it was -- it
16         held true.
17   Q.    And is it the type of article or type of story
18         which you approve in connection with using your
19         photo?
20   A.    On the human interest side of me being the
21         photographer, yes.  It told an accurate story.
22   Q.    Is your problem with the Associated Press that
23         they use the photo with that story?
24   A.    No.  My problem is, as I had found out, that it
25         had been distributed to other entities that I
```

```
 1          had no control over where it went.
 2    Q.    So your problem are the uses like AOL?
 3    A.    Correct.
 4    Q.    Is your problem with newspapers that ran the
 5          article as written by the Associated Press with
 6          the photograph?
 7    A.    Which photograph, the one with me holding, I
 8          have no problem with.
 9    Q.    No, the reproduction of your photograph in
10          connection with the AP story, is that something
11          that you have a problem with?
12    A.    If they would have had my permission, I would
13          not have a problem with it.
14    Q.    And it's your testimony that they did not have
15          your permission?
16    A.    It is my testimony that that photo was not to
17          be reproduced.
18    Q.    Do you know anyone named Keith Hodan?
19    A.    No, I do not.
20    Q.    Have you enjoyed the attention that your photo
21          has generated for you?
22    A.    I enjoy sharing the photo, yes.  It's a very
23          integral part of our community.
24    Q.    Ms. McClatchey, I'm going to hand you, or the
25          reporter has handed you a document that has
```



1       picture, and I agreed.

2   Q.  Do you remember the first contact with the

3       folks who took this picture?

4   A.  Most of the contacts were received probably the

5       week before the anniversary, because of my

6       photo being part of the Bearing Witness down at

7       the Smithsonian.

8   Q.  And just for the record, can you tell us what

9       the Bearing Witness at the Smithsonian is?

10  A.  It was -- I had donated the photo to the

11      Smithsonian to be part of their tribute to

12      9/11.  It was called Bearing Witness to

13      September 11th.  They had asked permission to

14      use the photo.  I granted and E mailed a JPG to

15      the Smithsonian, in which case they had

16      enlarged the photo, and it became part of the

17      permanent display for the Smithsonian regarding

18      9/11.

19  Q.  Ms. McClatchey, would you please look at the

20      document the reporter has marked as Exhibit 4,

21      which is a single page with production number

22      MC 0010, and tell me whether Exhibit 4 is

23      familiar to you?

24  A.  That is it.  I remember that.

25  Q.  I'm sorry, I didn't hear, did you say this is

1           familiar to you?

2    A.     Yes, this is an E mail that I would have

3           written.

4    Q.     And this E mail represents your permission to

5           Newsweek to utilize your photograph on their

6           website?

7    A.     Yes.

8    Q.     Was there any other documentation of that, or

9           is this all of the paperwork, and this I mean

10          Exhibit 4?

11   A.     This was all I would have, that I know of.

12   Q.     And in the first line of your E mail, towards

13          the top, it says, among other things:  It's an

14          honor to be able to share it with others.  Do

15          you recall writing that?

16   A.     Yes, I do.

17   Q.     What did you mean by that?

18   A.     When people ask and feel that my photo is

19          worthy of -- to be part of something like that,

20          it is an honor that they would ask that my

21          photo be part of their articles or sharing it

22          with the public.

23   Q.     Ms. McClatchey, the reporter has handed you a

24          document marked as Exhibit 5, which is a 2 page

25          document with production numbers MC 16 and MC

```
 1              17.  Would you please look at it and tell me
 2              whether Exhibit 5 is familiar to you?
 3    A.    May I have a minute to read?
 4    Q.    Please do.
 5    A.    Yes, that is one of my E mails.
 6    Q.    In the address line on the top page of Exhibit
 7              5 it says From, To, Sent, Attach.  Do you see
 8              that?
 9    A.    Yes, I do.
10    Q.    Where it says attach, it says September 11,
11              looks like a comma, .JPG do you see that?
12    A.    Yes, I do.
13    Q.    Do you know what that means?
14    A.    Yes, that is I attached the JPG to Helen for
15              the use in her newspaper article.
16    Q.    And so you sent --
17    A.    With my permission, yes, I sent the photo.
18    Q.    And the photo that you sent was in electronic
19              form, and did not have the title or copyright
20              notice?
21    A.    Correct.
22    Q.    Do you have on your computer the file from
23              which Exhibit 5 was printed?
24    A.    Exhibit 5 meaning my photo?
25    Q.    Exhibit 5 meaning this document that is in
```

```
 1            discussing which outgrew the binder and is now
 2            in the box?
 3    A.      Correct.
 4    Q.      Ms. McClatchey, would you kindly look at the
 5            document the reporter has marked as Exhibit 6,
 6            which is a single page with the production
 7            number MC 19, and tell me whether Exhibit 6 is
 8            familiar to you?
 9    A.      Yes, it is from Paul, a person I had met.
10    Q.      Please remind me who Paul is.
11    A.      Paul is from another TV station, and he was out
12            and asked if he could use the photo.
13    Q.      And I take it Exhibit 6 is the means by which
14            you provided the photo to Paul?
15    A.      Yes, it is.
16    Q.      And Paul is affiliated with WQED-TV?
17    A.      Correct.
18    Q.      Are you aware whether WQED-TV actually used the
19            photo?
20    A.      I do not get WQED-TV, so I would not know.
21    Q.      But you did authorize them to use it?
22    A.      Yes, I did.
23    Q.      Did you charge WQED-TV a fee?
24    A.      I don't believe I did.
25    Q.      And again Exhibit 6 shows that Sept11,.JPG
```

1        attachment. Does that mean that you conveyed

2        that same JPG file to Paul?

3  A.  Yes, it is.

4  Q.  Ms. McClatchey, would you please look at the

5        document the reporter has marked as Exhibit 7,

6        which is a single page with a production number

7        MC 37. And when you've had a chance to look at

8        it, tell me if Exhibit 7 is familiar to you.

9  A.  Yes, it is my authorization working with the

10       Washington Post.

11  Q.  Do you remember writing Exhibit 7?

12  A.  Yes, I do.

13  Q.  What were you trying to convey in terms of the

14       thoughts that you were sharing in the body of

15       the E mail?

16  A.  After speaking with them on the phone, I

17       thought it was -- we had discussed the photo,

18       its content. The way it's represented, and it

19       was kind of a strange way to -- I don't know

20       how to explain, it's beauty -- it's a beautiful

21       photo, but it's got such powerful implications.

22       And we were sharing those thoughts.

23  Q.  Ms. McClatchey, would you kindly look at the

24       document the reporter has marked as Exhibit 8,

25       which is a single page with the production

Pittsburgh, PA
412-261-2323

Greensburg, PA
724-853-7700

Erie, PA
814-453-5700

AKF

```
 1                            - - - -

 2                  (Luncheon recess at 11:55 a.m.  At

 3          12:45 p.m., the deposition was reconvened as

 4          follows):

 5                            - - - -

 6     BY MR. PENCHINA:

 7     Q.   Ms. McClatchey, the reporter has handed you a

 8          document marked Exhibit 14, which is a single

 9          page with the production number MC 68.   Is

10          Exhibit 14 familiar to you?

11     A.   Yes, it is.

12     Q.   What is Exhibit 14?

13     A.   This is a confirmation of me sending a JPG of

14          the September 11 photo to WTAJ-TV.   Allison

15          Sweeney I believe would be the person.

16     Q.   When you say it's a confirmation, do you know

17          whether this is a copy of the document or the

18          E mail that actually transmitted the JPG to

19          her?

20     A.   Yes, it is.

21     Q.   Who is Allison?

22     A.   Allison Sweeney is from the Altoona media, that

23          I had previously identified as someone who had

24          my permission.

25     Q.   Is Altoona media a television station?
```

1  A.  WTAJ-TV, yes, it is.

2  Q.  Do you know whether they used the photo?

3  A.  Yes, they had it on the screen.

4  Q.  Did you see how they used it?

5  A.  No, I did not.  I do not get that.

6  Q.  Do you know whether you charged them a fee in

7      connection with their use?

8  A.  I did not charge them a fee.

9  Q.  And why did you determine not to charge them a

10     fee?

11 A.  It was my choice.  I did not -- it was just a

12     brief story, it was not being publicated as in

13     print.

14 Q.  You did charge some TV uses; is that correct?

15 A.  ABC News, yes, I did.

16 Q.  I understand that it is your choice.  My

17     question is what was it that went into your

18     choice to decide not to charge this particular

19     entity for this particular use?

20 A.  This was just a news report on local stations,

21     and I had not charged.

22 Q.  Ms. McClatchey, the reporter has handed you a

23     document marked Exhibit 15, which is a multi

24     page document with the production numbers MC 78

25     through 80.  Can you please take a look at it

1      and tell me whether Exhibit 15 is familiar to

2      you?

3  A.  This was my conversation with Dave LaBelle from

4      the Post-Gazette who also had my permission to

5      use the photo.

6  Q.  And can you tell me what the Post-Gazette is?

7  A.  The Pittsburgh Post-Gazette, it's a newspaper

8      here in Pittsburgh.

9  Q.  Is it one that you read on a regular basis?

10 A.  No, it is not.

11 Q.  Is the copy of the photo that you provided to

12     the Pittsburgh Post-Gazette, was that in JPG or

13     was that a hard copy?

14 A.  That would be JPG.

15 Q.  Can you please turn to the second page of

16     Exhibit 15, which is the page with MC 79 on the

17     bottom?

18 A.  Yes.

19 Q.  And on the top half of the page appears to be a

20     message from you to Dave LaBelle, do you see

21     that?

22 A.  Yes, I do.

23 Q.  Is that an accurate description, is that what

24     it is?

25 A.  Yes, it is.

1  Q.  About four lines up from your name in that

2      message it says:  It's exciting to have the

3      photo published in Newsweek magazine.  What

4      were you trying to convey with that statement?

5  A.  We had discussed that the photo had been picked

6      up by Newsweek magazine, which would have been

7      the first American Newsweek magazine in

8      December of 2002 -- or 2001, I'm sorry.

9  Q.  When you say the first American Newsweek, what

10     do you mean?

11 A.  The first major American newsprint publication.

12 Q.  Prior to being picked up in Newsweek, it had

13     been published elsewhere, outside of the U.S.?

14 A.  Yes, it has been.

15 Q.  What was exciting about having it published in

16     Newsweek?

17 A.  To see it actually in print for other people to

18     see.

19 Q.  Ms. McClatchey, the reporter has handed you a

20     document marked Exhibit 16, which is a single

21     page with production number MC 56.  Is Exhibit

22     16 familiar to you?

23 A.  Yes, it's from Lim Vannary, she is from LePoint

24     publication in Paris, France.

25 Q.  And again, you provided to this publication a

1    copy of the photo in electronic JPG format?

2 A. Correct.

3 Q. And this was the E mail that conveyed that

4    file?

5 A. This was the -- yes, it is, it's the one that

6    conveyed the file.

7 Q. Would you kindly take a look at the document

8    that the reporter has marked as Exhibit 17,

9    which is a multi page document with production

10    numbers MC 270 through 273. After you've had a

11    moment to look at it, can you tell me whether

12    Exhibit 17 is familiar to you?

13 A. Yes, it is a copy of the article that I cannot

14    understand, it's in French. But it does have

15    my name as being the author of the photo, with

16    my permission.

17 Q. And the photo as it appears on the last page of

18    Exhibit 17, is that the format in which you

19    sent it to Le Point?

20 A. It had been cropped, the gutter had been, but

21    since they had my permission, they can do that.

22 Q. Since they had your permission --

23 A. To use the photo, to zone in on the -- they can

24    use -- I have no problem, if they have my

25    permission.

1        document marked Exhibit 21, which is another

2        document that I have printed out from the

3        internet and I ask you to take a moment and

4        review Exhibit 21 and tell me if that's

5        something familiar to you?

6   A.   Yes, it is.

7   Q.   What is Exhibit 21?

8   A.   It is a post on our Camaro Club website that

9        the Learning Channel is going to be doing a

10       documentary about Flight 93, and I wanted to

11       let them know that it was going to be on so

12       they could watch it.  I would let them know

13       when it was to be aired.  And the FBI said it

14       was the first one, it was documented as being

15       the first photo related to Flight 93, and I had

16       given close friends of mine and associates with

17       the Camaro Club a copy of the Flight 93 photo.

18  Q.   When you say to those who have a copy of it in

19       Exhibit 21, that you're referring to members of

20       the club and other friends to whom you --

21  A.   Yes.

22  Q.    -- shared copies?

23  A.   Yes, that is correct.

24  Q.   And you sent the message, that is Exhibit 21,

25       because you were rightly proud of the use that

1          was being made of your photo; is that correct?

2   A.    Yes.

3                  MS. SZPONDOWSKI:   Objection.

4   Q.    Is that correct?

5   A.    It is correct, I was proud of my photo.

6   Q.    Ms. McClatchey, the reporter has handed you a

7         document marked Exhibit 22, which is a multi

8         page document bearing production numbers AP 2-A

9         through AP 2-D.  Can you please take a look at

10        Exhibit 22 and tell me whether it's familiar to

11        you?

12  A.    This is the letter from my previous attorney

13        that was instigated by -- started the whole

14        process on our inquiry on AOL to find out what

15        had happened, how they had obtained the photo.

16        Discussing, you know, that I did not give them

17        authorization.

18  Q.    Is Exhibit 22 the first time that you or a

19        representative of yours sent a letter to

20        someone to complain about the usage of the

21        photo?

22  A.    Yes.

23  Q.    Or to complain about a usage of the photo?

24  A.    Yes.

25  Q.    What motivated you to take action at the point

1   Q.   Were all of the printouts that you created

2        prior to 2004 or '5, whenever you started the

3        new program, did all of those printouts have

4        this notation?

5   A.   Yes, they did.

6   Q.   In the top left-hand corner of the picture that

7        is Exhibit 22 is the notation End of Serenity,

8        September 11, 2001.  Do you see that?

9   A.   Yes, I do.

10   Q.   Is that the title of the photograph?

11   A.   End of Serenity, yes, it is.

12   Q.   And how, while using the old system prior to

13        2004, or whenever you got the new system, how

14        was that title affixed to the picture?

15   A.   The title affixed to the picture in the same

16        way, I printed it out on the photo paper prior

17        to sending it back through the printer with the

18        photo.

19   Q.   There does not appear to be a copyright notice

20        on this last page of Exhibit 22.  Is there?

21   A.   The copyright has been cut off at the bottom.

22   Q.   Where would the copyright notice have appeared?

23   A.   It would have been -- there should be a road

24        and a piece of grass, which is the front

25        portion of my yard.  That is where I attach the

1   Q.   On the top message, and by that I mean
2        appearing on the top of Exhibit 25, it appears
3        to be an E mail from you to Mr. Morlacci dated
4        November 28, 2001.  Do you see that?
5   A.   Uh-huh.
6   Q.   Is this an E mail from you to Mr. Morlacci?
7   A.   Yes, it is.
8   Q.   What did you mean when you said the more it is
9        seen the better?
10  A.   We had discussed that they see 5 million
11       people, monthly page views, and that I was
12       trying to get the message out, especially about
13       the Todd Beamer Foundation, that people can
14       access it.
15  Q.   Do you know someone named or that uses an
16       E mail address rgkozel?
17  A.   Yes, I do, Gary Kozel.
18  Q.   Who is Gary Kozel?
19  A.   He is a friend of mine.  I had met through the
20       September 11th events.
21  Q.   Would you kindly look at Exhibit 26, which is a
22       document bearing the production number MC 194,
23       and tell me whether that's familiar to you?
24  A.   Yes, it is.
25  Q.   What is Exhibit 26?



100

1   Q.   Ms. McClatchey, would you please take a look

2         at the documents the reporter has marked as

3         Exhibit 27, and these are a multi page exhibit

4         which are screen captures from a video Liberty

5         Bound.  And will you tell me whether Exhibit 27

6         is familiar to you?

7   A.   I know the title Liberty Bound, but I had not

8         seen the video.

9   Q.   What is Liberty Bound?

10  A.   Liberty Bound was to be a documentary that I

11        had given permission for.

12  Q.   Do you know who it was produced by?

13  A.   It was a strange name, Blue Goose or Blue

14        something, Blue Moose Productions.

15  Q.   Do you know whether it has aired?

16  A.   I believe it had -- they were just selling

17        copies, DVDs or so.

18  Q.   Did you say you did not view it?

19  A.   No, I had not viewed it.

20  Q.   Did you provide copies of your photo for use in

21        the Liberty Bound?

22  A.   Yes, I did.

23  Q.   Would you please turn to the second page of

24        Exhibit 27, and is that your photograph?

25  A.   Yes, it is my photograph.



1  Q.  And there is copyright notice or title on that;
2      is that correct?
3  A.  It was sent by JPG, electronic.
4  Q.  Are you familiar with a production The Flight
5      That Fought Back?
6  A.  Yes, I am.
7  Q.  What is The Flight That Fought Back?
8  A.  That came from Brooklapping associated with the
9      Discovery Channel.
10 Q.  Have you seen The Flight That Fought Back?
11 A.  Yes, I did.
12 Q.  Would you please take a look at the documents
13     the reporter has marked as Exhibit 28, which
14     are two pages, which again are screen captures
15     from a video that you all produced in
16     discovery.  Is Exhibit 28 familiar to you?
17 A.  Yes, it is.
18 Q.  Is the photograph on the second page a
19     reproduction of your photograph?
20 A.  Yes, it is.
21 Q.  And just to clarify, by second page I'm
22     referring to the second page of Exhibit 28.
23     Did you again provide a copy of this photo in
24     JPG format?
25 A.  Yes, I did.

1   Q.   So again like the other JPG format, it would

2         not have copyright notices or the title?

3   A.   Correct.

4   Q.   Are you familiar with something called The

5         Shanksville Episodes?

6   A.   The Windsor Park?

7   Q.   Are you familiar with something called Windsor

8         Park Stories?

9   A.   Yes, I am.

10   Q.   What is Windsor Park Stories?

11   A.   It's a series of documents, interviews, done by

12         Tony Mussari and his wife, Kitch.  They came

13         out and spoke to me, interviewed.

14   Q.   Who is Tony Mussari?

15   A.   He is the producer and owner of Windsor Park

16         Stories.

17   Q.   In addition to being the owner of Windsor Park

18         Stories, do you know anything else about Tony

19         Mussari?

20   A.   Other than he's a very nice gentleman and we've

21         gotten along very well.

22   Q.   Is Windsor Park Stories to your knowledge

23         affiliated with any other media project or

24         media entities?

25   A.   No, they are not.

| | | |
|---|---|---|
| 1 | | have a problem if they cropped the photo; is |
| 2 | | that correct? |
| 3 | A. | If they gave -- if I gave them permission to |
| 4 | | use, I gave them a JPG, I don't want them |
| 5 | | cropping my copyright notices. |
| 6 | Q. | And why did you send those individuals who had |
| 7 | | written permission a JPG of your photograph? |
| 8 | A. | So that they would have a clear copy for |
| 9 | | publication. |
| 10 | Q. | And the JPG file had no copyright notice or End |
| 11 | | of Serenity title; is that correct? |
| 12 | A. | That is correct. |
| 13 | Q. | Did you ever give permission to anyone to crop |
| 14 | | off the copyright notice on your photograph? |
| 15 | A. | Crop the copyright, no. |
| 16 | Q. | Do you recall, did anyone from any news |
| 17 | | organization other than the Associated Press |
| 18 | | interview you on September 11th, 2002? |
| 19 | A. | I spoke to someone up at the crash site. I was |
| 20 | | at the crash site, I spoke with Hilda Marcine's |
| 21 | | grandchildren, and I just spoke to a few people |
| 22 | | there, not on record, that I had met through |
| 23 | | previous interviews. |
| 24 | Q. | Who is Hilda Marcine? |
| 25 | A. | Hilda Marcine was one of the victims of Flight |