# Tab 10

## Deposition of Gene J. Puskar

Dockets.Justia.com

1

1     IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA

2

VALENCIA M. McCLATCHEY,              )
3                                             )
              Plaintiff,              )
4                                             )
              vs.                     )
5                                             )
THE ASSOCIATED PRESS,                )      Civil Action
6                                             )      No. 05-145J
              Defendant.             )
7

8

9

10

11                    - - - -

12        DEPOSITION OF:  GENE J. PUSKAR

13                    - - - -

14
                 DATE:    March 15, 2006
15                        Wednesday, 9:30

16
                 LOCATION:   Eckert Seamans Cherin &
17                              Mellott
                              44th Floor - US Steel Tower
18                           Pittsburgh, PA 15219

19              TAKEN BY:   Plaintiff

20
                 REPORTED BY:   Keith G. Shreckengast, RPR
21                              Notary Public
                              AKF Reference No. KS93223

22

23

24                                    CERTIFIED TRANSCRIPT

25



1   Q.   Do you know what photograph did you take of

2        Ms. McClatchey, or photographs did you take of

3        Ms. McClatchey to accompany the article by

4        Charles Sheehan?

5   A.   Took a photograph of her photograph.  That's

6        all I can really recall.

7   Q.   Did you take any photographs of her?

8   A.   You know, I can't really recall whether I did

9        or not.

10  Q.   You said you took a photograph of her

11       photograph.  Her photograph is the photograph

12       that's called End of Serenity with the plume of

13       smoke; is that correct?

14  A.   I don't know what it's called, but it does have

15       a plume of smoke that's purported to be the

16       Flight 93 plane.  Yes.  That's the picture with

17       the red barn?

18  Q.   Yes.  Where did you take the photograph of the

19       photograph?

20  A.   She was holding it for me outside the side door

21       of her house.

22  Q.   She was holding what?

23  A.   Her photograph.

24  Q.   And you took a photograph of that photograph?

25  A.   Correct.



1  Q.  What did you tell her when you were taking the
2      photograph?
3  A.  I don't recall.  What did I tell her when I was
4      taking the photograph?  I don't recall
5      specifically if I would be saying anything to
6      her when I was taking the photograph.
7  Q.  So was she posing by the side door of her house
8      when you were photographing the photograph?
9  A.  Posing, I don't understand what that would
10     mean.  She was holding the photograph by the
11     side of her house.  And I don't know that she
12     was posing, she was holding the photograph.  As
13     an AP photographer, I'm not really supposed to
14     or ethically inclined to set up a picture.
15     Therefore posing a subject -- if I were to
16     photograph you, right now would be a good
17     picture, the way you are.  If you were gussied
18     up and sitting behind your office desk with
19     your yellow pad in front of you, with your
20     glasses in your hand, that would be posing.
21     That's not something I'd be interested in.
22     It's not something that I do as a journalist.
23     It's kind of a documentary thing.  So whether
24     she was posing is -- she wasn't posing for me.
25     We were standing outside her side door like you

```
 1              and I would be standing outside a side door.

 2    Q.    How did you come to meet her at her side door

 3          with the photograph?

 4    A.    She came to the door and greeted me, went back,

 5          got her photo, came back out.

 6    Q.    And what did you say you were there for?

 7    A.    I was there to photograph her for the Charles

 8          Sheehan story, whom she had already been

 9          interviewed by.  And she was welcoming, and

10          brought the picture out, stood there, we

11          talked.  And I took a few snaps and was on my

12          way.

13    Q.    Did you tell her you were going to photograph

14          her photograph and use it in the story?

15    A.    Yes.  She volunteered to give me one.  And I

16          didn't want to be responsible for it.  I said

17          here, I could do it this way, hold the picture,

18          just hold it right there.  I'm assuming, having

19          said that to her, she knew I was taking a

20          picture of her picture.

21    Q.    Your testimony is that you don't know that she

22          knew you were taking a picture of the picture

23          versus taking a picture of her holding the

24          picture; is that correct?

25    A.    No, that's not my testimony.
```

1          earlier as -- I don't think it was noted as a

2          file photo.  So it was -- that's an AP's

3          transmission copy, yes.

4   Q.   And does the photograph in Plaintiff's Exhibit

5          4 represent the photograph that you personally

6          transmitted to the AP?

7   A.   Yes, it does.

8   Q.   So as you look at that photograph now, can you

9          tell me whether or not the photograph you took

10         of Ms. McClatchey's photograph was cropped or

11         altered just to show a portion of the

12         photograph?

13  A.   Yes.  That's not a 35 millimeter frame that's

14        represented there.  So the frame that I shot

15        was a 35 millimeter frame, which would have

16        been longer.  And again, I would need to see my

17        full image, full frame image, but that's not

18        it.

19  Q.   That's not what?

20  A.   That's not the full image that I would have

21        seen in my camera when I copied her image.

22  Q.   Is that the full image you submitted to the

23        Associated Press, Plaintiff's Exhibit 4?

24  A.   Uh-huh.

25  Q.   So regardless of what showed up on your camera,

```
 1            what was transmitted to the Associated Press is
 2            the photograph in Plaintiff's Exhibit 4
 3            correct?
 4   A.       Yes, it is.
 5   Q.       I'm going to hand you what's being marked as
 6            Plaintiff's Exhibit 25.  It's a copy of, color
 7            copy of a photograph.  It's got a title End of
 8            Serenity, September 11, 2001, and in the bottom
 9            right corner it's got Valencia McClatchey
10            copyright 2002, MC 00434.  Do you recognize
11            this photograph?
12   A.       This specific photograph, this copy of that
13            photograph?
14   Q.       Yes.
15   A.       No.
16   Q.       Do you recognize the photograph that's in
17            Plaintiff's Exhibit 25?
18   A.       I recognize the image of the cloud of smoke,
19            yes, I do.
20   Q.       And is that the image that you took your
21            photograph of and submitted to the Associated
22            Press?
23   A.       Yes.
24   Q.       And if you look at your image in Plaintiff's
25            Exhibit 4, and you compare it to the image in
```



| | | |
|---|---|---|
| 1 | | Plaintiff's Exhibit 25, let's start with the |
| 2 | | bottom portion, it appears that all of the road |
| 3 | | underneath the barn is cropped off? |
| 4 | A. | Uh-huh. |
| 5 | Q. | From Plaintiff's Exhibit 4; is that correct? |
| 6 | A. | Uh-huh. |
| 7 | Q. | It also appears that on the left side of the |
| 8 | | photograph that the road and at least 1 to 2 |
| 9 | | inches of Plaintiff's Exhibit 25 is cropped |
| 10 | | off; is that correct? |
| 11 | A. | Yes. |
| 12 | Q. | And if you look at the top, the top right of |
| 13 | | Plaintiff's Exhibit 25 has what appears to be a |
| 14 | | gutter sticking out.  And if you compare the |
| 15 | | top of the photograph in Plaintiff's Exhibit 25 |
| 16 | | to the one in Plaintiff's Exhibit 4 that you |
| 17 | | submitted to the AP, it appears to also be |
| 18 | | cropped off; is that correct? |
| 19 | A. | Yes. |
| 20 | Q. | And then if you look at the right side of |
| 21 | | Plaintiff's Exhibit 25 versus the right side of |
| 22 | | Plaintiff's Exhibit 4, which is the photograph |
| 23 | | you submitted to the AP, it also appears to |
| 24 | | have been cropped off; is that correct? |
| 25 | A. | Yes. |



1    Q.    So the photograph you took of the photograph,

2          of Miss McClatchey's photograph, was cropped on

3          all four sides; is that correct?

4    A.    No.

5    Q.    Could you explain that, please?

6    A.    This photograph in Exhibit 4 is not the

7          photograph I shot of Mrs. McClatchey's -- this

8          does not represent the image as it was cropped

9          when I copied her image.  We're just going to

10         assume for my explanation that this picture you

11         gave me is the picture she held up.

12   Q.    Yes.

13   A.    I shot a picture of this picture with a 35

14         millimeter frame.  This does not represent a 35

15         millimeter frame.  What I shot had more

16         information than this transmitted picture.  It

17         is a 35 millimeter frame, which is 1 1/2 --

18         1 3/4 x 1 1/4 deep, which probably was

19         something like that in my camera, or maybe it

20         was like that in my camera.

21   Q.    If I could stop you so I can clarify, when you

22         say like that, a 35 millimeter camera would

23         have been thinner and longer; is that correct?

24         So the top and the bottom of the photograph

25         would have been cut off a little, and your

```
 1            photograph would have been longer on the sides
 2            than the one that was submitted?
 3    A.      If we were to look at this frame with a 35
 4            millimeter dimension, you would go side to
 5            side, and yes, you would have to come down
 6            either on the top or up from the bottom, or a
 7            little bit of top and bottom to get a 35
 8            millimeter ratio.  Because this is, I am
 9            assuming, an 8 x 10 perspective.  That's my
10            point, this --
11    Q.      And by this you mean Plaintiff's Exhibit 4?
12    A.      Yes.  The transmitted photo in 4 is almost an
13            8 x 10 image perspective.  And so my original
14            file would have had more information on it,
15            that was cropped off.
16    Q.      And what happened to the information in your
17            original file prior to you transferring it to
18            the Associated Press?
19    A.      Nothing, it just -- it's in the original file.
20    Q.      But the file that you transferred was cropped;
21            is that correct?
22    A.      Uh-huh, correct.
23    Q.      The file on your computer may have been larger;
24            is that correct?
25    A.      Correct.
```

```
 1           objected to the AP using her photograph for
 2           means other than in connection with the story?
 3    A.     These are -- no.
 4    Q.     Did Ms. McClatchey say to you you can have my
 5           photograph free of charge and can transmit it
 6           to all the members and subscribers of the
 7           Associated Press?
 8    A.     By standing there holding it, knowing I was an
 9           AP photographer, it's implied to me that she is
10           agreeing to what I'm doing.
11    Q.     Did she say anything to you to that effect,
12           that she was granting --
13    A.     I don't recall.
14    Q.     So Ms. McClatchey did not specifically say
15           anything to the effect of I am granting the AP
16           permission to use my photograph; is that
17           correct?
18    A.     Other than by her actions, no.
19    Q.     And you said you were there to take a
20           photograph, to photograph Ms. McClatchey; is
21           that correct?
22    A.     I said I was there to get pictures to go with
23           Charles' story.
24    Q.     Did you get directions to her house from
25           Charles Sheehan?
```



1    legal conclusions. You are certainly free to

2    give your own personal view.

3 Q. I just want your understanding.

4 A. First of all there was no sign of copyright

5    when I shot the picture. So you're hammering

6    me with copying a copyrighted image. I wasn't

7    aware that I was. And I had a willing woman

8    holding her picture, telling me her story of

9    woe from the past year since this tragedy

10    happened in her backyard. We were talking,

11    heartfelt, about the tragedy, my covering it

12    for ten days, when it happened, my experience

13    at ground zero when it happened. Those are the

14    kind of things that were going on. We were

15    connecting as people. There was no

16    copyright -- there was nothing in this exchange

17    that expressed to me that she didn't know fully

18    well I was there and fully what I was doing.

19    And so I didn't know that the image was

20    copyrighted. And I was there representing the

21    AP to do something that Val McClatchey knew was

22    happening. I didn't sneak up on her. I didn't

23    do this in any way, shape or form to pull the

24    wool over her eyes. She entered into this

25    story with the Associated Press of her own

Pittsburgh, PA
412-261-2323

Greensburg, PA
724-853-7700

Erie, PA
814-453-5700

1           volition.  There was no copyright on the image

2           I photographed.  I had no idea that there was

3           any issue at all with this woman who was

4           standing there willingly participating in doing

5           and understanding what I was doing.

6     Q.    You testified earlier that you didn't know

7           whether or not there was this copyright notice

8           on the photograph?

9     A.    Huh?

10    Q.    You testified earlier that you didn't know

11          whether there was this copyright notice on the

12          photograph; is that correct?

13    A.    I don't know.  You're right.  I don't know.

14    Q.    But can you give me any specifics of this

15          conversation you had with Ms. McClatchey?

16    A.    Yeah, specifically she was depressed, had a

17          very tough year, that's the specifics.

18    Q.    But there was nothing specifically said on your

19          part, or her part, regarding transferring

20          rights to the Associated Press in the

21          photograph; is that correct?

22    A.    That is correct, there were no rights talk at

23          all.

24    Q.    Did she offer you a copy of the photograph as a

25          souvenir?

1    Q.    Who is Dave Tomlin?

2    A.    He is an AP attorney.

3    Q.    Did you speak with anyone else at the

4          Associated Press regarding this lawsuit?

5    A.    No.

6    Q.    If you could you turn to page 4 of Plaintiff's

7          Exhibit 9, the interrogatories, please.  At the

8          top of the page it states:  Gene Puskar, to

9          whom plaintiff presented the photograph at

10         issue in this matter, created a photograph of

11         that photograph, and transmitted his photograph

12         to the AP along with a caption.  Is that an

13         accurate statement?

14   A.    Yes.

15   Q.    So it is accurate that the plaintiff presented

16         the photograph at issue in this matter to you?

17   A.    Presented meaning she held it for me, I would

18         accept that interpretation of presented.  As

19         opposed to giving me one?

20   Q.    Right.

21   A.    I don't buy that.

22   Q.    And I believe your testimony earlier was that

23         you don't recall whether or not you accepted a

24         courtesy copy from Ms. McClatchey; is that

25         correct?