# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VALENCIA M. MCCLATCHEY,       )
                                     )
             Plaintiff,      )
                                     )     Civil Action No. 05-145J
             v.             )
                                     )
THE ASSOCIATED PRESS,         )     **JURY TRIAL DEMANDED**
                                     )
            Defendant.     )
_____)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Douglas M. Hall
Kara L. Szpondowski
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois  60602-4515
Phone: 312-236-0733
Fax: 312-236-3137
*Attorneys for Valencia M. McClatchey*

John E. Hall
Eckert Seamans Cherin & Mellott, LLC
USX Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
Phone:  (412) 566-6000
Fax: (412) 566-6099

## TABLE OF CONTENTS

STATEMENT OF THE CASE ........................................................................................1

INTRODUCTION ........................................................................................................1

STATEMENT OF MATERIAL FACTS ........................................................................3

ARGUMENT ..............................................................................................................7

I.       THE LAW OF SUMMARY JUDGMENT ..........................................................7

II.      THE AP DIRECTLY INFRINGED THE END OF SERENITY PHOTOGRAPH ...........8

III.     AP IS NOT ENTITLED TO SUMMARY JUDGMENT ON FAIR USE AS A
         DEFENSE TO PLAINTIFF'S COUNT I DIRECT INFRINGEMENT CLAIM ...............9

         A.       The AP's Use Was Commercial  And Non-Transformative ................................10

                  i.       The AP's Use Was A Commercial Use ....................................................11

                  ii.      The AP's Use Was Not Transformative ...................................................12

         B.       The End Of Serenity Is Sufficiently Creative ........................................................14

         C.       The AP Copied The Entire Photograph, Or At Least The "Heart" Of The
                  Photograph ................................................................................................15

         D.       The AP's Actions Usurped Ms. McClatchey's Primary Market ..........................17

IV.      AP IS NOT ENTITLED TO SUMMARY JUDGMENT  FOR SECONDARY
         COPYRIGHT LIABILITY ..........................................................................20

         A.       Material Issues of Fact Prevent Summary  Judgment on Contributory Copyright
                  Infringement................................................................................................20

         B.       Material Issues of Fact Prevent Summary Judgment on Vicarious Copyright
                  Infringement................................................................................................22

V.       AP IS NOT ENTITLED TO SUMMARY  JUDGMENT DISMISSING THE
         DMCA CLAIMS ..........................................................................................24

         A.       The AP Distributed False CMI in violation of 17 U.S.C. § 1202(a) ....................24

                  i.       The AP Falsified the CMI, Knowing it was False ....................................24

                  ii.      The AP Distributed the False CMI  With the Intent to Aid
                           Infringement................................................................................................25

B.     AP Removed CMI in Violation of 17 U.S.C. § 1202(b)........................................25

     i.     The AP Intentionally Cropped Off And Removed  Ms. McClatchey's Copyright Information And Title........................................26

     ii.     The Information on the Photograph Constitutes CMI ..............................27

     iii.     The AP Intended to Aid Infringement ........................................................29

VI.     STATUTORY DAMAGES ISSUE.................................................................................30

VII.     CONCLUSION............................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>Baraban</u> v. <u>Time Warner, Inc.</u>,
2000 U.S. Dist. LEXIS 4447 (S.D.N.Y. 2000) ....................................................................14, 16

<u>Strauss</u> v. <u>Hearst Corp.</u>, 8 U.S.P.Q. 2d
1832 (S.D.N.Y. 1988) ........................................................................................................14

<u>Batesville Services, Inc.</u> v. <u>Funeral Depot, Inc.</u>,
2004 U.S. Dist. LEXIS 24336 (S.D. Ind. 2004) ...............................................................16

<u>Campbell</u> v. <u>Acuff-Rose Music, Inc.</u>,
510 U.S. 569 (1994).....................................................................................................9, 16, 17

<u>Castle Rock Entertainment, Inc.</u> v. <u>Carol Publishing Group, Inc.</u>,
150 F.3d 132 (2nd Cir. 1998)........................................................................................14, 17

<u>Folsom</u> v. <u>Marsh</u>,
9 F. Cas. 342 (C.C.D. Mass 1841)................................................................................13, 19

<u>Gershwin Publ'g. Corp.</u> v. <u>Columbia Artists Mgmt, Inc.</u>,
443 F.2d 1159 (2d Cir. 1971)..............................................................................................23

<u>Gordon</u> v. <u>Nextel Communications and Mullen Advert.</u>,
345 F.3d 922 (6th Cir. 2003) .............................................................................................29

<u>Greenberg</u> v. <u>National Geographic Society</u>,
1999 U.S. Dist. LEXIS 13874 (S.D. Fla. 1999)...........................................................15, 16

<u>Haberman</u> v. <u>Hustler Magazine, Inc.</u>,
626 F. Supp. 201 (D. Mass 1986) ......................................................................................17

<u>Harper & Row Publishers, Inc.</u> v. <u>Nation Enterprises</u>,
471 U.S. 539 (1985).......................................................................................9, 10, 16, 18, 19

<u>Hustler Magazine, Inc.</u> v. <u>Moral Majority, Inc.</u>,
796 F.2d 1148 (9th Cir. 1986) .......................................................................................16, 17

<u>IQ Group, Ltd.</u> v. <u>Weisner Pub., LLC</u>,
409 F. Supp. 2d 587 (D.N.J. 2006) ....................................................................................28

<u>Inifinity Broadcase Corp.</u> v. <u>Kirkwood</u>,
150 F.3d 104 (2nd Cir. 1998)............................................................................................16

Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.,
621 F.2d 57 (2nd Cir. 1980)................................................................................................10

Kelly v. Arriba Soft Corp.,
336 F.3d 811 (9th Cir. 2003) .......................................................................................15, 16

L.A. News Serv.,
108 F.3d at 1122-1123 ................................................................................................15, 19

Lish v. Harper's Magazine Found.,
807 F. Supp. 1090 (S.D.N.Y. 1992)............................................................................10, 11

Livnat v. Lavi,
1998 U.S. Dist. LEXIS 917 (S.D.N.Y. 1998) ...................................................................21

Los Angeles News Service v. CBS Broadcasting, Inc.,
305 F.3d 924 (9th Cir. 2002) ............................................................................................13

Mathieson v. Associated Press,
23 U.S.P.Q. 2d 1685 (S.D.N.Y. 1992)...............................................................................15

Maxtone-Graham v. Burtchaell,
803 F.2d 1253 (2nd Cir. 1986)............................................................................................9

Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
125 S. Ct. 2764 (2005).......................................................................................................21

Metro-Goldwyn-Mayer Studios v. Grokster Ltd.,
380 F.3d 1154 (9th Cir. 2004) ...........................................................................................22

Narell v. Freeman,
872 F.2d 907 (9th Cir. 1989) ..............................................................................................9

Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,
166 F.3d 65 (2nd Cir. 1999)...............................................................................................17

Nunez v. Caribbean International News Corp.,
235 F.3d 18 (1st Cir. 2000)..........................................................................................13, 16

Playboy Enters. v. Webbworld, Inc.,
968 F. Supp. 1171 (D. Tex. 1997) ................................................................................22, 23

Psihoyos v. Fuente,
1998 U.S. Dist. LEXIS 9192 (S.D.N.Y. 1998) .................................................................15

Realsongs v. Gulf Broadcasting Corp.,
824 F. Supp. 89 (M.D.La. 1993).............................................................22

Ringgold v. Black Entertainment Television, Inc.,
126 F.3d 70 (2nd Cir. 1997).............................................................12, 19

Robinson v. Random House, Inc.,
877 F. Supp. 830 (S.D.N.Y. 1995).........................................................14

Schiffer Publishing, Ltd. v. Chronicle Books, LLC,
2004 U.S. Dist. LEXIS 23052 (E.D. Pa. 2004) ........................................25

Sega Enters. Ltd. v. Maphia,
857 F. Supp. 679 (N.D. Cal. 1994) .........................................................16

United States Media Corp. v. Edde Entertainment Corp.,
1998 U.S. Dist. LEXIS 10985 (S.D.N.Y. 1998).......................................30

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,
342 F.3d 191 (3d Cir. 2004)...................................................................9

Ward v. Nat'l Geographic Soc'y,
208 F. Supp. 2d 429 (S.D.N.Y. 2002).....................................................24

World Wrestling Federation Entertainment, Inc. v. Big Dog Holdings, Inc.,
280 F. Supp. 2d 413 (W.D. Pa. 2003)........................................................8

## FEDERAL STATUTES

17 U.S.C. § 107................................................................................2, 9, 10

17 U.S.C. § 107(1) ................................................................................10

17 U.S.C. 107(2) ...................................................................................14

17 U.S.C. 107(3) ...................................................................................15

17 U.S.C. 107(4) ...................................................................................17

17 U.S.C. § 1202(a) .........................................................................1, 2, 24

17 U.S.C. § 1202(b) ...............................................................1, 24, 25, 26, 30

Section 1202(b)(2) .................................................................................29

17 U.S.C. 1202(c) ..................................................................................................................28

17 U.S.C. 1202(c)(1) .............................................................................................................28

17 U.S.C. 1202(c)(2) .............................................................................................................28

17 U.S.C. 1202(c)(3) .............................................................................................................28

S. Rep. No. 105-190, at 34-35 (1998) ..................................................................................24

**STATEMENT OF THE CASE**

On February 24, 2005, Valencia McClatchey sued the Associated Press ("AP") on five counts stemming from the AP's unauthorized use of her copyrighted End of Serenity photograph. Count I asserts a claim for direct copyright infringement, Count II asserts a claim for contributory copyright infringement, Count III asserts a claim for vicarious copyright infringement, Count IV asserts a claim for distributing false copyright information in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(a), and Count V asserts a claim for removing copyright management information in violation of the DMCA, 17 U.S.C. § 1202(b).   AP has moved for summary judgment dismissal of all five counts of Plaintiff's Complaint.

Plaintiff Valencia M. McClatchey, by and through her attorneys, hereby submits the following response to AP's motion for summary judgment.

**INTRODUCTION**

This is a case about the largest news-gathering organization in the world (the AP) taking, under false pretenses, without permission, and without compensation, the one-of-a-kind September 11, 2001 copyrighted photograph of an individual photographer (Valencia McClatchey), knowingly cropping off the copyright information, and transmitting the photograph electronically to its roughly 2000 member and subscriber news organizations.   It is undisputed that Ms. McClatchey never gave the Associated Press <u>oral</u> or <u>written</u> permission to use her copyrighted photograph in any capacity.  The AP took a photograph of her photograph, while she was holding it, under the guise of taking a photograph of <u>her</u> holding the photograph to accompany a story AP ran about her life during the one year period after September 11, 2001.

1

The photograph Ms. McClatchey was holding had her copyright information in the bottom right of the photograph, and the title of the photograph, "End of Serenity", in the top left of the photograph. Both the title and the copyright information were removed by the AP prior to the AP's use and distribution of the photograph. Simply put, the AP stole a unique, historical, valuable photograph, without permission, and made widespread use of the photograph for the benefit of its cooperative, for-profit, member and subscriber news organizations.

The AP does not contest that Ms. McClatchey owned and had a valid federal copyright in her End of Serenity photograph when it took her photograph. Although the AP admits taking a photograph of Ms. McClatchey's photograph without oral or written permission, cropping off the perimeter, uploading the copy to its image database, and distributing it to all of its members and subscribers, it argues that such use is protected under the fair use doctrine, as codified by 17 U.S.C. § 107. It is not. The article written by Charles Sheehan about Ms. McClatchey does contain a reference to her "End of Serenity" photograph. However, the AP's use of the photograph far exceeded the Sheehan article, and instead, included the separate and unrestricted distribution of the photograph to the AP's roughly 2000 members and subscribers without any link or reference to the Sheehan article. AP's use, therefore, was in no way protected by the fair use doctrine as it now claims.

Despite overwhelming evidence to the contrary, the AP further disputes Ms. McClatchey's contention that her copyright interest in her End of Serenity photograph has been directly and indirectly infringed. It has. Ms. McClatchey had a valid federal copyright in the End of Serenity photograph which was taken and then used by the AP without her permission. Finally, despite evidence that the AP cropped off the copyright notice on her End of Serenity photograph prior to use and distribution, the AP argues that it has not violated Section 1202 of

the Digital Millennium Copyright Act, which prohibits exactly what took place here, i.e., knowingly removing copyright management information from a photograph and transmitting the photograph to aid infringement.

AP cannot satisfy its burden and meet all of the elements necessary to grant summary judgment. Moreover, there are numerous questions of fact sufficient to deny the AP's motion for summary judgment. Therefore, Plaintiff asks that the Court deny the AP's motion for summary judgment.

## STATEMENT OF MATERIAL FACTS

On the morning of September 11, 2001, Valencia McClatchey looked out her front window in Shanksville, Pennsylvania and saw United Flight 93 crashing into a field near her house. (Pla's SMF ¶ 1). She stepped outside her house as a white mushroom cloud was rising from the crash and took a compelling photograph of the mushroom cloud against a blue sky with a red barn and the rolling hills of Pennsylvania in the foreground. (Pla's SMF ¶ 2; Hall Decl., Exh. 7).

On January 29, 2002, she received federal copyright registration for the photograph, which she titled "End of Serenity." (Pla's SMF ¶ 3). Ms. McClatchey's End of Serenity photograph has garnered widespread national acclaim and has been shown at exhibits and memorials throughout the world, including the Flight 93 Memorial, the Library of Congress, and the Smithsonian Institution. (Pla's SMF ¶ 4).

After taking the photograph, Ms. McClatchey was approached by various news organizations and magazines, including ABC News, Fox News, U.S. News and World Report, the Pittsburgh Post-Gazette, Newsweek, and the Washington Post, all of which asked to license the use of her photograph. (Pla's SMF ¶ 5). Ms. McClatchey generally agreed to license her

photo for a one time use, charging a fee of approximately $250 to $350. (Pla's SMF ¶ 6). Ms. McClatchey was not a professional photographer and did not know how much freelance photographers generally charged for such use. (Pla's SMF ¶ 7). Ms. McClatchey also sold non-commercial, personal use hard copies locally and through the mail for $20, $18 of which she donated to the Todd Beamer Foundation. (Def's SMF ¶ 37; Pla's SMF ¶ 8). The other $2 she used for paper and printing costs. (Pla's SMF ¶ 9).

Ms. McClatchey followed two general rules with respect to distribution of her photograph. First, any hard copy of the End of Serenity photograph that she sold or gave out included her name, the word "copyright," along with the year in the lower right hand corner, and the words "End of Serenity" and "September 11, 2001" in the top left of the photo across the blue sky. (Pla's SMF ¶ 10). Second, she e-mailed a digital file of the photograph to any news entity that she agreed to license the work to, so that it would be the best possible depiction. (Pla's SMF ¶ 11). While the digital copy Ms. McClatchey sent via this fashion did not bear a copyright notice (Pla's SMF ¶ 11), the only entities which received a digital copy (with no copyright notice) were those entities which paid for and/or had <u>written</u> permission from Ms. McClatchey for their limited use. (Pla's SMF ¶ 12). Ms. McClatchey retains one framed copy of the End of Serenity in her home office. (Pla's SMF ¶ 13). All hard copies of the End of Serenity bear her copyright information. (Pla's SMF ¶ 14).

At a ceremony memorializing the one year anniversary of the crash of Flight 93, Ms. McClatchey approached and introduced herself to Charles Sheehan, a reporter for the Associated Press, which is the largest news organization in the world. (Def's SMF ¶¶ 45, 46; Hall Decl., Exh. 3, Def's Rsp to Pla's RFA ¶ 7). Mr. Sheehan decided to write a story about Ms. McClatchey for the Associated Press. (Def's SMF ¶ 47). Sheehan interviewed her and his

resulting story was "a feature story about this lady who took this picture a year before. (Pla's SMF ¶ 15). Later that day, Gene Puskar, an employee and photographer for the Associated Press, went to Ms. McClatchey's home and informed her that he was there "<u>to photograph her</u> for the Charles Sheehan story[.]" (Pla's SMF ¶ 16)(emphasis added). Puskar's assignment was to "take pictures of <u>a woman with a picture</u>." (Pla's SMF ¶ 16). (emphasis added). Ms. McClatchey stood on the side of her with a hard copy of the End of Serenity photograph which bore her copyright information, but instead of taking a picture of Ms. McClatchey with her photograph, Puskar only took a picture of her End of Serenity photograph. (Pla's SMF ¶ 18).

Ms. McClatchey did not give either Puskar or the AP consent to take a photograph of her photograph. (Pla's SMF ¶ 19). Puskar did not ask her permission to use the photograph of her photograph to accompany the Sheehan article, nor did Puskar tell her the AP was also going to transmit her photo to all its members and subscribers. (Pla's SMF ¶ 20). In fact, Puskar admits "there [was] no rights talk at all." (Pla's SMF ¶ 21). Instead of asking Ms. McClatchey for a digital copy of the photograph, Puskar elected to take a photograph of her photograph. (Pla's SMF ¶ 22). Ms. McClatchey did not realize Puskar was doing this – she thought he was taking a picture of her for the Sheehan article, not capturing a photo of her photograph. (Pla's SMF ¶ 22). Ms. McClatchey never gave anyone at the AP either written or oral permission to use the End of Serenity photograph. (Pla's SMF ¶ 19).

Mr. Puskar then cropped the edges off Ms. McClatchey's End of Serenity photograph, omitting the included title and copyright information, and submitted it to the AP. (Pla's SMF ¶ 24). The AP's procedures for such transmission required the editor who received the photograph, i.e., Puskar, to clear all copyright issues. (Pla's SMF ¶ 25). As that editor, and an agent of the AP, it was Mr. Puskar's responsibility to clear any copyright issues, but he failed to

do so.  (Pla's SMF ¶ 26).  Compounding his "oversight", no one at the AP double checked him. (Pla's SMF  ¶ 26).  In fact, Mr. Puskar admits that he "[didn't] know" what rights the AP had in the photograph.  (Pla's SMF  ¶ 27).

Mr. Sheehan's article, and Mr. Puskar's copy of the End of Serenity photograph were then distributed as separate items, at different times, to the AP's roughly 2000 PhotoStream members, including AOL, the Chicago Tribune, and the Washington Post.  (Pla's SMF  ¶ 28). Although the Sheehan article references Ms. McClatchey's photograph, the AP included no requirement or restriction that the photograph be used solely with the article.  (Pla's SMF  ¶ 29). Worse, the caption on the infringing and cropped photograph itself, that Mr. Puskar co-wrote, makes no reference to Mr. Sheehan's article.  (Def's SMF ¶ 58).  In other words, the roughly 2000 news organizations received the photograph free of charge, with no restriction or guidance that the photograph was only to be used in connection with the news article.  Put another way, AP's actions, or lack thereof, gave unfettered and unlimited access to Ms. McClatchey's photograph without any recompense or acknowledgement to her.

Additionally, the "meta data" attached to the photograph falsely indicated that Ms. McClatchey was a "stringer," which is another word for a freelancer.  (Pla's SMF  ¶ 30). Freelance photographers for the AP have contracts with the AP which provides that the AP owns the copyright for any photographs taken for the AP.  (Pla's SMF  ¶ 31).  Therefore, the AP's members and subscribers received the photograph thinking the AP owned the copyright.  The AP admits that this was "incorrect."  (Pla's SMF ¶ 32).

All of the AP's roughly 2000 PhotoStream members and subscribers received a cropped digital copy of Ms. McClatchey's End of Serenity photograph via the AP's distribution on approximately September 11, 2002.  (Pla's SMF  ¶ 33)  After the initial distribution, and once

the photograph was made available to all members and subscribers with access to the PhotoArchive, at least three entities downloaded the photograph again. (Pla's SMF ¶ 34). In approximately August 2003, Ms. McClatchey was informed that her photograph being used on AOL's home page, in connection with a conspiracy story on Flight 93. (Pla's SMF ¶ 35). AOL never sought and Ms. McClatchey has never given AOL permission to use her photograph. (Pla's SMF ¶ 36). Shortly thereafter, Ms. McClatchey contacted AOL, learned AOL received access to the image from the AP, and requested that the AP remove her photograph from their database. (Pla's SMF ¶ 37). She later found additional unauthorized and infringing uses of her photograph in newspapers, such as the Washington Post and Philadelphia Daily News, magazines, and in connection with several Flight 93 conspiracy web sites. (Pla's SMF ¶ 38). Ms. McClatchey initially licensed the Washington Post for a limited use of her photograph. After receiving a copy from the AP, the Washington Post again used her photograph, but failed to pay a license fee. (Pla's SMF ¶ 39).

After Ms. McClatchey notified the AP of its unauthorized use, the AP did not inform its members and subscribers that it had no rights to the photograph or that they should destroy any copies of it. (Pla's SMF ¶ 40). Indeed, to this day the AP has not done this. (Pla's SMF ¶ 41). In fact, the only thing the AP did was to restrict access to Ms. McClatchey's photograph in its PhotoArchive on approximately November 3, 2004. (Pla's SMF ¶ 42).

## ARGUMENT

## I.    THE LAW OF SUMMARY JUDGMENT

Plaintiff need only show that there are sufficient disputed facts to permit a reasonable jury to find infringement of its patent. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Plaintiff is entitled to have all doubts and evidentiary conflicts resolved in its favor.

7

Palumbo v. Don-Joy Co., 762 F.2d 969, 973 (Fed. Cir. 1985)(overruled on other grounds).  The Court must draw all inferences in a light most favorable to the non-movant Plaintiff.  Martin v. Barber, 755 F.2d 1564, 1566 (Fed. Cir. 1985).  All of Plaintiff's evidence must be accepted as true.  Anderson, 477 U.S. at 255.  Even doubts about the presence or absence of a factual issue must be resolved in favor of Plaintiff.  Howes v. Medical Components, Inc., 814 F.2d 638, 643 (Fed. Cir. 1987); Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1320 (Fed. Cir. 2003).

**II.    THE AP DIRECTLY INFRINGED
        THE END OF SERENITY PHOTOGRAPH**

Copyright infringement requires (1) ownership of a copyright and (2) copying of the copyrighted material by the defendant.  World Wrestling Federation Entertainment, Inc. v. Big Dog Holdings, Inc., 280 F.Supp.2d 413, 424 (W.D. Pa. 2003).  The AP has never alleged that Ms. McClatchey does not own the copyright to her End of Serenity photograph.  Furthermore, the AP has admitted that it took a photograph of Ms. McClatchey's End of Serenity photograph and transmitted it to its PhotoStream members and subscribers.  (Hall Decl., Exh. 3, Def's Rsp to Pla's RFA ¶¶ 4, 6, 16, 17).  And, the AP did so without consent from McClatchey.  In fact, the AP's entire brief, including the declarations of Ake and Gerberich, are devoid of any direct evidence that McClatchey gave the AP her consent to use her End of Serenity photograph.  Merely concluding that the AP had consent (as Ake does) is insufficient.  (See Ake Decl., at ¶ 22).  Copyright infringement in this case is undisputed.  The AP's only defense to Plaintiff's Count I direct infringement claim is that its unjustified use was a fair use under the Copyright Act.  It was not.

III.   **AP IS NOT ENTITLED TO SUMMARY JUDGMENT ON FAIR USE AS A DEFENSE TO PLAINTIFF'S COUNT I DIRECT INFRINGEMENT CLAIM**

Fair use as a defense to copyright infringement allows someone to "use the copyrighted material in a reasonable manner without [the copyright owner's] consent." Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1254 (2nd Cir. 1986) (emphasis added). It serves as an affirmative defense upon which the alleged infringer, the AP, has the burden of proof. Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 197 (3d Cir. 2004); see also, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 114 S.Ct. 1164, 1177 (1994). Fair use is a mixed question of law and fact, Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985), which means that it "may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion"--but not otherwise. Narell v. Freeman, 872 F.2d 907, 910 (9th Cir. 1989). Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 114 S.Ct. 1164, 1177 (1994). The AP has not met its burden.

The Copyright Act specifies four non-exhaustive factors that may be taken into account to determine whether the fair use defense is applicable: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Meeting one factor alone (or even two or three) is not dispositive; all four factors "are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 578.

The facts show that the AP did not use Ms. McClatchey's End of Serenity photograph in a reasonable manner and, therefore, cannot meet its burden of proof. Specifically, the AP used Ms. McClatchey's photograph (1) in connection with the Sheehan article about Val McClatchey, and (2) as a stand-alone photograph by transmitting the photograph to its roughly 2000 members

and subscribers without any reference or connection to any particular article.   In light of these facts, the AP's fair use defense must fail.  What follows is a specific analysis of the four fair use factors.

### A.    The AP's Use Was Commercial And Non-Transformative

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The AP claims its use of Ms. McClatchey's End of Serenity photograph was news reporting, and, presumably, non-commercial.  While the preamble to Section 107 enumerates certain purposes that are more appropriate for a finding of fair use, including news reporting, it does so only to provide examples and not to create a presumption that all news articles are fair use.  See Harper, 471 U.S. at 561 ("The issue is not what constitutes 'news,' but whether a claim of news reporting is a valid fair use defense to an infringement of copyrightable expression.").   Providing unrestricted access to Ms. McClatchey's photograph is not news reporting.

The AP argues that the photograph was of "legitimate public interest," and that, therefore, it falls within the bounds of responsible news reporting.  However, "[t]he fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."  Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc., 621 F.2d 57, 61 (2nd Cir. 1980); see Harper, 471 U.S. at 558 ("In our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression.")  Furthermore, any commercial use, such as is evident here, tends to cut against a fair use defense.  Lish v. Harper's Magazine Found., 807 F.Supp. 1090, 1101 (S.D.N.Y. 1992).

###### i.     The AP's Use Was A Commercial Use

The AP's non-profit status should not be an indicator that its use is not commercial. "[T]he mere fact that [Defendant] is a non-profit organization that operates at a loss does not preclude a finding of 'commercial use'; non-profit organizations enjoy no special immunity from determinations of copyright violation." <u>Lish</u>, 807 F.Supp. at 1101. The AP's objective is to gather and distribute news articles and photographs to its member and subscriber news organizations around the world for a fee. (Def's SMF ¶¶ 1, 18). Its members and subscribers are for-profit entities that certainly have commercial interests, and these entities pay the AP for access to its photographs and news articles. (Def's SMF ¶¶ 2, 18). Indeed, the AP is actually owned by its United States members:

> <u>Question</u>: So the United States members [are] news publications that own the Associated Press are responsible for the debts and liabilities of the Associated Press; is that correct?
>
> <u>Answer</u>: I believe so. Yes.

(Hall Decl., Exh. 16, Galt Dep., p. 10). The AP stands to gain a commercial benefit by distributing the End of Serenity photograph to its for-profit members and subscribers:

> <u>Question</u>: Is it fair to say that The Associated Press allows the news organizations around the world to pool their resources and reduce costs that they would otherwise have to bear alone?
>
> <u>Answer</u>: I mean, I think, yes. That's one way to look at it. It's cost reduction, you know, aggregation of resources. You can have one Associated Press reporter in Afghanistan instead of The New York Times, The Washington Post, The L.A. Times, et cetera, each having a reporter.

(Hall Decl., Exh. 16, Galt Dep., pp. 11-12). In this case, the AP unlawfully took the End of Serenity photograph for no fee and distributed it to all of its members and subscribers, thereby

ensuring that each of those news organizations did not have to pay a separate fee for use of the photograph.

### ii.    The AP's Use Was Not Transformative

The most important inquiry to the first fair use factor is whether the new work is transformative, i.e. "whether the new work merely 'supercede[s] the objects' of the original creation…or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." <u>Ringgold</u> v. <u>Black Entertainment Television, Inc.</u>, 126 F.3d 70, 79 (2nd Cir. 1997).  The AP incorrectly argues that its use of the End of Serenity photograph was transformative, because it "was the focus of AP's report."  This is incorrect; the Sheehan article was about Ms. McClatchey and the events that had transpired in her life since she took the photograph, not about the photograph itself or the crash of Flight 93. (Pla's SMF ¶ 15).  Specifically, the Sheehan article talks about Ms. McClatchey's personal struggles, her bankruptcy, her licensing of the photo to news outlets for a fee, her sale of the photo and the resulting donations to the Todd Beamer Foundation, as well as the effect all these things had on her life in the year after September 11, 2001.  (Hall Decl., Exh. 14).  The article is <u>not</u> about the crash of Flight 93, which is what is depicted in the End of Serenity photograph.

The testimony of Gene Puskar, the photographer sent to Ms. McClatchey's house by the AP confirms this.  Puskar admitted that he was sent to her house to take pictures of <u>her</u> and not the End of Serenity photograph:

> <u>Question:</u>  What was your assignment when you went to Ms. McClatchey's house around the one year anniversary of September 11th?
>
> <u>Answer:</u>  To take pictures of a woman with a picture that showed the crash a year before.

(Hall Decl., Exh. 4, Puskar Dep. at pp. 29-30).

The AP's citation of Nunez v. Caribbean International News Corp., 235 F.3d 18 (1st Cir. 2000) is distinguishable.  Nunez dealt with allegedly pornographic photographs taken of Miss Puerto Rico Universe.  Id. at 21.  Those photographs appeared in a newspaper, along with articles related to the controversy.  Id.  In that case, the story was what was depicted in the photograph, i.e., "the pictures were the story."  Id. at 22.

In the instant case, the Sheehan story was about Ms. McClatchey, not about the crash of Flight 93 which was depicted in her End of Serenity photograph.  The AP's argument that the report would be "an incomplete story without a depiction of the photograph" is wrong.  (Def's Mem p. 11).  It would be an "incomplete story" to publish the report without a picture of the individual who took the photograph, and upon whom the article is focused;  this is exactly what the AP did[1].  Gene Puskar was sent to McClatchey's house to take pictures of her and not the photograph.  (Pla's SMF ¶¶ 16-17).  Just as importantly, the AP distributed the Sheehan article and the McClatchey photograph separately to its members and subscribers with **no restriction** that they use her photograph only in connection with the Sheehan article.  (Pla's SMF ¶¶ 28-29).  In other words, the AP's use of the End of Serenity photograph far exceeded any tenuous connection the photo might have had to the story about Ms. McClatchey.

In order for a use to be considered transformative, "there must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work."  Los Angeles News Service v. CBS Broadcasting, Inc., 305 F.3d 924, 939 (9th Cir. 2002) quoting Folsom v. Marsh, 9 F. Cas. 342, 345 (C.C.D. Mass 1841); see also,

---

[1]    In fact, at least one newspaper did send its own photographer to McClatchey's house to take a picture of her holding the photograph (the same type of picture that Gene Puskar was there to take).  This picture of Ms. McClatchey holding the photograph - and not the End of Serenity photograph - accompanied the Sheehan story in that newspaper.  (Hall Decl., Exh. 14).

13

Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 142 (2nd Cir. 1998) (work is transformative when copyrighted material is "transformed in the creation of new information, new aesthetics, new insights and understandings."). "When the secondary use involves such an untransformed duplication of the original, it has little or no value that does not exist in the original work." Robinson v. Random House, Inc. 877 F.Supp 830, 841 (S.D.N.Y. 1995).

This is what occurred here. Ms. McClatchey's photograph was simply cropped to remove the copyright and duplicated by the AP. (Pla's SMF ¶ 24). The AP added nothing to the photograph nor created anything new. It simply copied the photograph, omitting the copyright information and then used it for the same purpose as Ms. McClatchey's past practice – to distribute to news and broadcast organizations for a fee. The AP's use merely supersedes the original work. Therefore, the AP's use of the photograph was commercial and non-transformative; the first fair use factor weighs in favor of Ms. McClatchey.

**B.      The End Of Serenity Is Sufficiently Creative**

The second fair use factor to consider is "the nature of the copyrighted work." 17 U.S.C. 107(2). The AP argues that because End of Serenity was previously published and informational in nature, that this factor weighs in their favor. Ms. McClatchey does not dispute that her photograph has been published before - by entities that had received her permission or paid for a limited use license.

Legal authority demonstrates that for photographs such as Ms. McClatchey's, the second factor generally weighs in favor of the photographer. "Although photographs are often 'factual or informational in nature,' the art of photography has generally been deemed sufficiently creative to make the second fair use factor weigh in favor of photographer-plaintiffs." Baraban v. Time Warner, Inc., 2000 U.S. Dist. LEXIS 4447, *11 (S.D.N.Y. 2000) quoting Strauss v.

Hearst Corp., 8 U.S.P.Q.2d 1832, 1836 (S.D.N.Y. 1988); Kelly v. Arriba Soft Corp., 336 F.3d 811, 820 (9th Cir. 2003) (weighing second factor in favor of photographer); Greenberg v. National Geographic Society, 1999 U.S. Dist. LEXIS 13874, *27-28 (S.D. Fla. 1999) (weighing second factor in favor of photographer); Psihoyos v. Fuente, 1998 U.S. Dist. LEXIS 9192, * (S.D.N.Y. 1998) (weighing second factor in favor of photographer); Mathieson v. Associated Press, 23 U.S.P.Q.2d 1685, 1691 (S.D.N.Y. 1992) (weighing second factor in favor of photographer).

In sharp contrast, L.A. News Serv. v. CBS Broadcasting, Inc., 305 F.3d 924 (9th Cir. 1997), the main case cited by the AP, dealt with a videotape of an event shortly after the event happened, and the allegedly infringing use involved a story directly about the information contained in the video. That is not the case here. The AP's use and distribution of the photograph far exceeded any connection to the event depicted in the photograph - the crash of Flight 93.

Moreover, Ms. McClatchey's photograph has been honored through awards and exhibits, and is on permanent display at the Smithsonian, which further indicates that it is "sufficiently creative." (Pla's SMF ¶ 4). The second fair use factor also weighs in favor of Ms. McClatchey.

## C.    The AP Copied The Entire Photograph, Or At Least The "Heart" Of The Photograph

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. 107(3). Here, the AP argues that because it cropped the sides, top, and bottom of Ms. McClatchey's photograph, that it only used an excerpt of the photograph. (Def's Mem p. 13). Plaintiff agrees that the photograph was cropped - to remove the copyright management information and title of the photograph.

However, the resulting photo was not merely an excerpt as the AP used the entire relevant portion of the photograph, including the mushroom cloud and the barn.  (Hall Decl., Exh. 6).

In analyzing this factor, both the quantity and the quality and importance of the material used must be considered.  Campbell, 510 U.S. at 587; see Harper, 471 U.S. at 564-565 (taking approximately 300 words out of a memoir weighed against fair use because what was taken "was essentially the heart of the book.").  While "wholesale copying does not preclude fair use per se," copying an entire work "militates against a finding of fair use." Hustler, 796 F.2d at 1155.  In general, an infringing use does not constitute fair use if the entire work is reproduced.  Inifinity Broadcase Corp. v. Kirkwood, 150 F.3d 104, 109 (2nd Cir. 1998); Sega Enters. Ltd. v. Maphia, 857 F.Supp. 679, 687 (N.D. Cal. 1994).  Here, the AP copied the entire work, and distributed the entire relevant portion of the End of Serenity photograph--the mushroom cloud and barn--while only cropping off Ms. McClatchey's copyright management information.  This was clearly not a fair use.

"[T]he mere fact that the photo depicts a newsworthy item does not justify copying it entirely without permission." Psihoyo, 1998 U.S. Dist. LEXIS 9192 at *13; see also Greenberg, 1999 U.S. Dist. LEXIS 13874 at *31 (finding against fair use on the third factor, where "[t]he reprint…though cropped, is a substantial portion of Plaintiffs' copyrighted photograph."); Batesville Services, Inc. v. Funeral Depot, Inc., 2004 U.S. Dist. LEXIS 24336, *25 (S.D. Ind. 2004) (copying photographs as a whole weighs against fair use.)  Furthermore, in cases where courts have found copying an entire photograph to be reasonable, the facts have vastly differed compared with those in the instant case.  See Baraban, 2000 U.S. Dist. LEXIS 4447 at *13 (photograph shrunk to less than one quarter of its original size and in black and white); Kelly v. Arriba Soft Corp., 336 F.3d 811, (9th Cir. 2003) (copying thumbnails of photographs); Nunez,

235 F.3d at 22 ("the [pornographic] pictures were the story"); <u>Mathieson</u>, 1992 WL 164447, at

*8 (the two photographs at issue were "components of a larger compilation of photos which

constitue[d] a 'single' work").

Despite its arguments to the contrary, the AP used the entire photograph, or at least the

"heart" of the photograph.  The third fair use factor weighs in favor of Ms. McClatchey.

### D. The AP's Actions Usurped Ms. McClatchey's Primary Market

The final factor to consider is "the effect of the use upon the potential market for or value

of the copyrighted work."  17 U.S.C. 107(4).  Key to the fourth factor is "whether unrestricted

and widespread conduct of the sort engaged in by the defendant…would result in a substantially

adverse impact on the potential market for the original."  <u>Campbell</u>, 510 U.S. at 590.  The

concern is "whether the secondary use usurps or substitutes for the market of the original work."

<u>Castle Rock</u>, 150 F.3d at 145 ; <u>see</u> <u>Nihon Keizai Shimbun, Inc.</u> v. <u>Comline Business Data, Inc.</u>,

166 F.3d 65, 73 (2nd Cir. 1999); <u>compare</u> <u>with</u> <u>Haberman</u> v. <u>Hustler Magazine</u>, Inc., 626 F.Supp.

201 (D. Mass 1986) (art postcards versus their depiction in an adult magazine are not the same

market).

To determine "whether the use has harmed the work's value or market, courts have

focused on whether the infringing use: (1) tends to diminish or prejudice the potential sale of the

work; or (2) tends to interfere with the marketability of the work; or (3) fulfills the demand for

the original work."  <u>Hustler</u>, 796 F.2d at 1155-1156 (internal citations omitted).

The AP's distribution of the End of Serenity photograph fulfills all three <u>Hustler</u> tests.

While the AP argues that it never sold copies of Ms. McClatchey's photograph, (Def's SMF

¶82), Ms. McClatchey never accused the AP of doing so.  Instead, the AP fails to acknowledge

that it distributed Ms. McClatchey's photograph to roughly 2000 of its members and subscribers,

including AOL, the Washington Post, and the Chicago Tribune, the very news entities which may have an interest in publishing Ms. McClatchey's photograph pursuant to a license fee.

This is evidenced by the fact that at least AOL and the Washington Post used the photograph without paying Ms. McClatchey a fee. The Washington Post use is illustrative of the effect of the AP's use and distribution on the market for Ms. McClatchey's photo. The Washington Post initially paid Ms. McClatchey for a first, one-time use of her photograph (prior to receiving the photograph from the AP). (Pla's SMF ¶ 39). Then, after receiving it from the AP, the Washington Post made a second published use of the photograph, this time without paying a fee or taking a license from Ms. McClatchey. (Pla's SMF ¶ 39). This is direct evidence of a causal connection between the AP's infringement and a loss of revenue. The AP has not met its burden - because it cannot - of showing that this damage would have occurred had there been no taking. The Supreme Court stated in <u>Harper</u>,

> Once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, **the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking**.

<u>Harper</u>, 471 U.S. at 567 (emphasis added).

Because of AP's actions, its members and subscribers no longer have to go through Ms. McClatchey to license the photograph; they already have the photograph from the AP. To this day, the AP has taken no steps to remove the digital copy of the End of Serenity photograph from the roughly 2000 news organizations world-wide that it was transmitted to. (Pla's SMF ¶ 41). Thus, the AP's unauthorized usage has impacted Ms. McClatchey's <u>entire</u> primary market. The AP admits that it transmitted the photograph to virtually every large media outlet in the United States, and many others abroad:

> Question:  Within the news outlet market, is it fair to say that the members and subscribers of The Associated Press make up the majority of the news outlet market?
>
> Answer:  A good portion.  Yes.

(Hall Decl., Exh. 9, Gerberich Dep., p. 122).  Furthermore, the AP, a potential licensee itself, used the photograph for free.  (See L.A. News Serv., 108 F.3d at 1122-1123 (Defendant's position as a potential licensee of plaintiff's product indicated that defendant's use of plaintiff's works for free would destroy plaintiff's original and primary market).

Ms. McClatchey has previously established that such a market for her photograph exists, given the number of news organizations, individuals, and magazines she has licensed or sold the photograph to, including ABC News, Fox News, U.S. News and World Report, the Pittsburgh Post-Gazette, Newsweek, and the Washington Post[2].  (Pla's SMF ¶ 5).  Moreover, Ms. McClatchey doesn't need to show a decline in the number of licensing requests for her photo to establish harm.  Psihoyo at *14; Ringgold, 126 F.3d at 81.

The fair use doctrine has always precluded a use that "supersedes the use of the original." Harper, 471 U.S. at 5509, citing Folsom, 9 F. Cas. at 344-345.  That is precisely what the AP did. Furthermore, if the AP's actions were permitted by others, it would continue to destroy the potential market for Ms. McClatchey's photograph.  Therefore, the final fair use factor weighs in favor of Ms. McClatchey.

---

[2]    The AP's own Internet Website provides further evidence of the market for the McClatchey photograph. On its Website, the AP sells historical photographs for personal use.  Two examples are (1) a photograph of the Marines raising the US Flag on Iwo Jima during WWII, which sells for over $3,000 per copy, and (2) a photograph of a plane hitting the World Trade Center in New York City on 09-11-01, which sells for over $1,000 per copy. (Hall Decl., Exh. 17).  McClatchey's End of Serenity photo is in a comparable market as the World Trade Center photo, and Gene Puskar in his deposition made a direct comparison between McClatchey's photo and the Iwo Jima photo.  (Hall Decl., Exh. 4, Puskar Dep. at pp. 58-59).

Because all four fair use factors weigh in favor of Ms. McClatchey, she respectfully requests the Court to deny the AP's motion for summary judgment for dismissal of Count I direct copyright infringement.

## IV.    AP IS NOT ENTITLED TO SUMMARY JUDGMENT FOR SECONDARY COPYRIGHT LIABILITY

Inexplicably, the AP insists that the record is "devoid of evidence of direct infringements committed by persons to whom the AP provided its copy of Ms. McClatchey's photograph." This is simply not true.  AOL used the photograph in approximately early August 2003.  (Hall Decl., Exh. 12).  A letter written by AOL's attorney to Ms. McClatchey's attorney states "[t]he only manner in which AOL could have had access to the photo described in your letter was through an agreement between AOL and the Associated Press ("AP")".  (Hall Decl., Exh. 12). Furthermore, another document produced by the AP shows users who downloaded the image after the initial transmission, including AOL.  (Hall Decl., Exh. 11).  Both the Washington Post and The Philadelphia Daily News (both PhotoStream subscribers) also used the photograph without Ms. McClatchey's permission.  (Pla's SMF ¶ 38).

Therefore, AP's assertion that there is no evidence of direct infringement by a third party is baseless.  There is sufficient evidence in the record to show that at least AOL and the Washington Post directly infringed Ms. McClatchey's copyright.  The fact that the AP conveniently chooses not to track the uses of the photograph after distribution is not a valid defense.

### A.    Material Issues of Fact Prevent Summary Judgment on Contributory Copyright Infringement

Liability for contributory copyright infringement requires (1) direct infringement by a primary party; and (2) inducement or materially contributes to the infringing contact; and (3)

defendant knows or has reason to know of the direct infringement.  Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 125 S. Ct. 2764, 2776 (2005).

The AP's actions support that (1) there was intent by it to induce its members to infringe and (2) that it had the requisite knowledge.  Gene Puskar's deposition testimony alone makes clear that he never asked Ms. McClatchey if the AP had permission to use her photograph. (Pla's SMF ¶¶ 20-21).  Mr. Puskar was the AP representative responsible for getting her permission, and no one else at the AP ever spoke with Ms. McClatchey regarding use of her photograph.  (Pla's SMF ¶¶ 20-21).  Ms. McClatchey never gave the AP permission to use the photograph.  (Pla's SMF ¶ 19).  The AP simply used her photograph and transmitted it to its PhotoStream members and subscribers, and then put it in its PhotoArchive.  No evidence supports the AP's contention that it believed it had Ms. McClatchey's permission, especially when no one from the AP even inquired about such permission.

The AP's actions allowed additional direct infringers (i.e. AOL, Washington Post, The Philadelphia Daily News, and untold others) to infringe Ms. McClatchey's copyright.  The AP is in the business of collecting and distributing information to its members and subscribers, for the precise purpose that the members and subscribers are to use the information.  These same members make up the AP.  "The authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer."  Livnat v. Lavi, 1998 U.S. Dist. LEXIS 917, *9 (S.D.N.Y. 1998).  By providing its members and subscribers with the infringing photograph and encouraging them to use the photographs it provides, the AP provided the direct assistance necessary for its members and subscribers to infringe.  Furthermore, the AP did not insist that its members use the photograph only in connection with the article about Ms. McClatchey.  (Pla's SMF ¶ 29).

As to the AP's knowledge, the AP's claim that it did not know or have reason to know that its members or subscribers may download and/or use the End of Serenity photograph after it was distributed by the AP is simply untenable.  Whether the AP knew its members' and subscribers' use would "infringe" Ms. McClatchey's copyright by doing so rests entirely on the AP's mistaken, and unsupported, "belief" that it had Ms. McClatchey's permission to distribute the photograph.  Therefore, the AP is not entitled to summary judgment on Count II contributory infringement.

B. **Material Issues of Fact Prevent Summary Judgment on Vicarious Copyright Infringement**

Three elements are required to prove a defendant is vicariously liable for copyright infringement: (1) direct infringement by a primary party, (2) a direct financial benefit to the defendant, and (3) the right and ability to supervise the infringers. Metro-Goldwyn-Mayer Studios v. Grokster Ltd., 380 F.3d 1154, 1164 (9th Cir. 2004).

The AP enjoys a direct financial benefit from its use and distribution of Ms. McClatchey's photograph.  Regardless, the "direct financial interest" need only be tied to the operation as a whole, not exclusively to the infringement. See Playboy Enters. v. Webbworld, Inc., 968 F. Supp. 1171, 1177 (D. Tex. 1997); Realsongs v. Gulf Broadcasting Corp., 824 F. Supp. 89 (M.D.La. 1993).  Although the fees the AP charges to its members and subscribers, all of which are for-profit entities with commercial interests, are not based on the content that member or subscriber uses, those fees provide a direct financial benefit to the AP.  Members and subscribers pay these fees to have access to the AP's articles and photographs.  Further, the AP is actually owned by those same United States members.

The AP has the right and ability to supervise its members and subscribers based on the Agreements and Terms of Use it forces them to accept.  For example, the AP PhotoStream

Agreement provides that "All such photos are solely for publication in the Member's news columns"; "AP will install and maintain an AP Server at Member"; "All PhotoStream news photos remain the property of AP"; "Member will promptly furnish to AP news pictures originating in its normal news protection area."  (Hall Decl., Exh. 18).  This Agreement indicates that the AP has at least some control over its members and subscribers.  Furthermore, access to the PhotoArchive leads to more terms:  "Only U.S. members and World Services subscribers of The Associated Press in good standing…"; "A member or subscriber's license to use images from the Photo Archive expires immediately upon termination or suspension of the AP contract." (Hall Decl., Exh. 19).  If a member must be in "good standing" or if a member's license may be "terminated" or "suspended," there is at least some control and supervision occurring by the AP. (Hall Decl., Exh. 19).

"The only relevant question regarding the element of control is whether defendants had the right and ability to control what occurred on the…website."  Playboy, 968 F. Supp. at 1177. A party with the ability to supervise or control infringing activity cannot avoid liability by failing to exercise such supervision or control.  See Gershwin Publ'g. Corp. v. Columbia Artists Mgmt, Inc., 443 F.2d 1159, 1161 (2d Cir. 1971) (The "failure to police the conduct of the primary infringer" is sufficient for the imposition of vicarious liability.)  If, indeed, the AP believed it had Ms. McClatchey's permission to use the photograph only in connection with the article, it had the responsibility (and indeed, the capability) to inform its members and subscribers about this limitation.  No such message or restriction was ever relayed, and no message exists on the meta-data of the photograph in the AP's database which makes this restriction clear.  (Pla's SMF ¶ 29). Therefore, the AP is not entitled to summary judgment on Count III vicarious infringement.

## V.    AP IS NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING THE DMCA CLAIMS

### A.    The AP Distributed False CMI in violation of 17 U.S.C. § 1202(a)

Section 1202(a) of the Digital Millennium Copyright Act ("DMCA") prohibits knowing falsification of copyright management information ("CMI") with the intent to aid copyright infringement.  To recover for a violation of § 1202(a), a plaintiff must prove that the defendant who falsifies CMI knows that the CMI is false, and that the defendant provides, distributes, or imports the false CMI with the intent to aid infringement. 17 U.S.C. § 1202(a); see also S. Rep. No. 105-190, at 34-35 (1998); Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002).  There is overwhelming evidence supporting all the elements of a section 1202(a) violation by the AP.

### i.    The AP Falsified the CMI, Knowing it was False

The AP has confused giving photo credit with distributing false copyright information.  Although the AP caption states that the photograph was taken by Ms. McClatchey, AP's PhotoStream Agreement (to which all members/subscribers who received the Photograph are parties) states the following:  "All PhotoStream newsphotos remain the property of AP and when reproduced must carry a credit:  'Associated Press Photo' or 'AP Photo.'"  (Hall Decl., Exh. 18).  There is no requirement that Ms. McClatchey be listed as the copyright owner, nor that she be given any credit.  The Agreement indicates that the Photograph was the "property" of the AP – not the "property" of Ms. McClatchey.  Furthermore, the meta-data attached to the Photograph identified Ms. McClatchey as a "stringer," or freelance photographer.   (Pla's SMF ¶ 30).  Freelancers have contracts with the AP, and the AP owns the copyright to those photographs.  (Pla's SMF ¶ 31).  Nothing in the meta-data shows that anyone other than the AP owned the copyright to the photograph.  The "cropped" photograph submitted by Mr. Puskar falsely

indicated that the AP owned the copyright to the End of Serenity photograph.  Worse, the cropped photo intentionally omitted Ms. McClatchey's copyright management information.

### ii.     The AP Distributed the False CMI With the Intent to Aid Infringement

The AP also argues that it did not intend to aid infringement when it distributed the photograph to its members and subscribers.  However, the nature of the AP's business to distribute photographs for reproduction and use by its members and subscribers belies such a claim.  Similar to the AP's other arguments, it relies on its belief that it had Ms. McClatchey's consent to use the Photograph, even though Gene Puskar, the photographer who spoke with Ms. McClatchey testified that the use of the photograph was never even discussed.  (Pla's SMF ¶¶ 20-21).  Puskar, acting as an agent and editor for the AP, never even asked Ms. McClatchey whether or not the AP could distribute the Photograph to all of its members and subscribers. (Pla's SMF ¶¶ 20, 21, and 27).  Regardless, if the AP knew, or should have known, it was using the photograph without Ms. McClatchey's permission, it is impossible that by distributing the photograph it did not intend to aid infringement.

### B.     AP Removed CMI in Violation of 17 U.S.C. § 1202(b)

Section 1202(b) of the DMCA prohibits the intentional removal or alteration of CMI with reasonable grounds to know the removal or alteration will aid infringement.  To recover for a violation of § 1202(b), a plaintiff must demonstrate that the defendant intentionally removed or altered CMI knowing, or having reasonable grounds to know, that the removal will aid infringement. 17 U.S.C. § 1202(b).  The defendant must remove copyright management information from the "body" of, or area around, plaintiff's work itself.  Schiffer Publishing, Ltd. v. Chronicle Books, LLC, 2004 U.S. Dist. LEXIS 23052 (E.D. Pa. 2004).

### i.     The AP Intentionally Cropped Off And Removed
### Ms. McClatchey's Copyright Information And Title

Section 1202(b) specifically prohibits exactly what the AP did here - removing CMI from the body of an image and transfer it digitally.  The AP admits that it cropped off portions of the top, bottom, left, and right of the McClatchey End of Serenity photograph.  (Hall Decl., Exh. 3, Def's Rsp to Pla's RFA ¶¶19-22).  At his deposition, Mr. Puskar repeatedly stated that he "did not recall" whether the picture he photographed had a copyright notice on it. (Pla's SMF ¶ 43).  Ms. McClatchey remembers specifically that she had the photograph with the CMI on it when Mr. Puskar was taking pictures outside her home.  (Hall Decl., Exh. 5, McClatchey Dec. at ¶¶ 1,2, and 4).  Therefore, Ms. McClatchey's testimony is unrefuted in this case[3].  Every photograph printed by Ms. McClatchey, other than her personal copy which remains in her office, has the title of the photograph in the upper left, and Ms. McClatchey's name and the date on the bottom right. (Pla's SMF ¶ 10).

 After taking the photograph of Ms. McClatchey's End of Serenity photograph, which bore her copyright information and title, it is undisputed that Mr. Puskar cropped the top, bottom, and sides off the photograph, which resulted in the removal of Ms. McClatchey's CMI.  (Hall Decl., Exh. 3, Def's Rsp to Pla's RFA ¶¶19-22).  It is undisputed that Mr. Puskar provided the AP with a cropped photograph that did not include McClatchey's CMI.  (Id.).  The following depicts the manner in which the End of Serenity photograph was altered to remove CMI:

---

[3]     It must be noted that despite having ample opportunity at her deposition, AP's counsel avoided asking even one single question of Ms. McClatchey regarding Gene Puskar taking a picture of her photograph outside her house.



The top photograph is the End of Serenity photograph that Mr. Puskar photographed, including the CMI (Valencia McClatchey, copyright 2002; "End of Serenity" September 11, 2001). (Hall Decl., Exh. 7). The bottom left photograph shows how Gene Puskar removed the CMI through cropping. The bottom right photograph shows what was submitted to the AP by Gene Puskar. (For a larger representation, see Hall Decl., Exh. 22). Hall Declaration, Exhibit 6 shows the actual submitted image with the CMI removed by cropping that was submitted by Gene Puskar to the AP.

### ii.     The Information on the Photograph Constitutes CMI

The AP contends that Ms. McClatchey's notice does not qualify as copyright management information ("CMI") because the "AP failed to reproduce a copyright notice that was printed on hard-copy printouts that plaintiff distributed." (Def's Mem p. 22). However, Ms.

McClatchey is not arguing that the AP "failed to reproduce," but rather that it <u>was</u> reproduced in the digital photograph taken by Mr. Puskar, and was removed by Mr. Puskar.

"Copyright management information" can fall under eight separate categories, including "(1) The title and other information identifying the work, including the information set forth on a notice of copyright. (2) The name of, and other identifying information about, the author of a work. (3) The name of, and other identifying information about the copyright owner of the work, including the information set forth on the notice of copyright." 17 U.S.C. 1202(c). Ms. McClatchey provided her name and the date in the lower right hand corner of the photograph, and the title of the photograph in the upper left, in the area of blue sky. Her name is sufficient information to fall under 17 U.S.C. 1202(c)(2) or 17 U.S.C. 1202(c)(3). The title is sufficient information to fall under 17 U.S.C. 1202(c)(1).

The DMCA protects "copyright management performed by the technological measures of automated systems." <u>IQ Group, Ltd.</u> v. <u>Weisner Pub., LLC</u>, 409 F.Supp.2d 587, 597 (D.N.J. 2006). "The purpose of CMI is to facilitate licensing of copyright for use on the Internet, and to discourage piracy." <u>Id.</u> at 596, <u>quoting</u> S.Rep. No. 105-190 (1998). "Under the bill, CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and director. <u>CMI need not be in digital form</u>, but CMI in digital form is expressly included." <u>Id.</u> (Emphasis added). The AP argues that Ms. McClatchey's two step process was not an automated copyright protection or management system. Nonsense. Ms. McClatchey's process for marking her pictures is unquestionably a copyright protection system, and indeed was instituted by her to protect her copyrighted photograph and to discourage piracy.

### iii.    The AP Intended to Aid Infringement

Section 1202(b)(2) requires that, "No person shall…distribute…copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law[.]"  Thus, the AP must possess actual knowledge of the unauthorized change.  See Gordon v. Nextel Communications and Mullen Advert., 345 F.3d 922, 926 (6th Cir. 2003).  The AP contends that actual knowledge is absent because it believed it had permission to use the photograph.  (Def's Mem p. 22).  However, whether the AP had Ms. McClatchey's consent to use the photograph, which it certainly did not, is irrelevant – it must have merely had knowledge that the copyright management information was removed.

In Gordon, the "personnel believed that the poster had been cleared for use in television commercials."  Id.  Unlike Gordon, there is evidence in the record here to contradict that the AP believed it had Ms. McClatchey's permission.  Gene Puskar, who was acting for and on behalf of the AP, testified in his deposition that no discussion was had regarding permission.  (Pla's SMF ¶ 20-21).  He, along with Charles Sheehan, are the only persons from the AP who spoke with Ms. McClatchey about the photograph.  (Pla's SMF ¶ 21).  It is difficult to see how the AP believed it had permission to use the photograph when it never even asked or brought it up.  Furthermore, it is undisputed that the photograph was cropped along the bottom, top, and sides, effectively removing the copyright information.  (Pla's SMF ¶ 24).  Mr. Puskar, who did the cropping, would have had knowledge that the copyright management information was removed.  In addition, Charles Sheehan testified that Ms. McClatchey showed him her End of Serenity photograph notebook which contained her federal copyright certificate.  (Hall Decl., Exh.'s 5 and 20).

Furthermore, the AP states that it "had no reason to know that omission of the copyright notice would facilitate or conceal any infringement." This is just plain wrong. The AP removed Ms. McClatchey's CMI and then transmitted it to roughly 2000 members and subscribers. By doing so, the AP was (falsely) representing to its members and subscribers that they had the right to use the photograph - which a number of them did.

There can be no conclusion other than that the AP's removal of the CMI from McClatchey's photograph directly facilitated, concealed, and aided the infringement of McClatchey's copyright in violation of section 1202(b) of the DMCA.

## VI.    STATUTORY DAMAGES ISSUE

If ever there was a case for increased statutory damages it is this one; the largest news organization in the world takes, under false pretenses, the one-of-a-kind photograph of an individual photographer, removes the CMI, and distributes it without permission to roughly 2000 news organizations around the globe. Nonetheless, the AP argues that Ms. McClatchey's is not entitled to increased statutory damages based on the willfulness of its actions. Willfulness depends upon whether the defendant had actual or constructive knowledge that its conduct was infringing. United States Media Corp. v. Edde Entertainment Corp., 1998 U.S. Dist. LEXIS 10985, *61 (S.D.N.Y. 1998). Therefore, Ms. McClatchey need not show that the AP actually knew that its conduct was infringing. See id. Ms. McClatchey may justify a willfulness finding on the basis that the AP acted with "reckless disregard for the copyright holder's rights." Id.

The AP is an experienced news organization. Nonetheless, Mr. Puskar testified that he never discussed rights with Ms. McClatchey. (Pla's SMF ¶ 21). And when questioned under oath, Puskar testified that he "didn't know" whether the AP had any rights in her photograph. (Pla's SMF ¶ 27). No one at the AP followed up with Ms. McClatchey to find out whether this was true. (Pla's SMF ¶ 26). In short, the AP deliberately operated in a manner to avoid the

necessity of paying for a license from Ms. McClatchey, and acted with "reckless disregard for [her] rights" by then distributing the photograph to its members and subscribers for their own use without her permission.

**VII.    CONCLUSION**

At a minimum, material issues of fact prevent the grant of summary judgment at this time. AP has failed to meet its burden with respect to its motion for summary judgment. All fair use factors weigh in favor of Ms. McClatchey. Both the secondary liability and DMCA counts turn on whether the AP believed it had Ms. McClatchey's permission to use the photograph. The AP has not produced any written or oral evidence that it had permission to use Ms. McClatchey's photograph, because it did not. The only individual who actually spoke with Ms. McClatchey regarding use of her photograph, Mr. Puskar, never even raised the issue of permission with her. Therefore, Ms. McClatchey respectfully requests that this Court deny the AP's Motion for Summary Judgment on all counts.

Respectfully submitted,

s/Douglas M. Hall
Douglas M. Hall
Kara L. Szpondowski
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602-4515
Phone: 312-236-0733
Fax: 312-236-3137
*Attorneys for Valencia M. McClatchey*

John E. Hall
Eckert Seamans Cherin & Mellott, LLC
USX Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
Phone: (412) 566-6000
Fax: (412) 566-6099

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served upon the below listed parties on this 19th day of June, 2006:

**By ECF:**           Gayle C. Sproul
                      Levine Sullivan Koch & Schultz, LLP
                      2112 Walnut St., 3rd Floor
                      Philadelphia, PA 19013
                      Phone:  (215) 988-9778

**By ECF:**           Robert Penchina
                      Levine Sullivan Koch & Schultz, LLP
                      230 Park Avenue
                      Suite 1160
                      New York, NY 10169
                      Phone:  (212) 850-6100
                      Fax:  (212) 850-6299


                      s/Douglas M. Hall

32