# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VALENCIA M. MCCLATCHEY,      )
                             )
               Plaintiff,     )
                             )     Civil Action No. 05-145J
               v.            )
                             )
THE ASSOCIATED PRESS,        )     **JURY TRIAL DEMANDED**
                             )
            Defendant.    )
_____)

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff objects to Defendant's Statement of Material Facts ("SMF") on the following grounds:

Plaintiff objects to paragraphs 70, 71, 72, 73, 87, and 93 of Defendant's SMF to the extent that the statements in these paragraphs refer to, rely on, are supported by, or paraphrase newspaper articles. The assertions defendant makes based on these documents are not "facts" that can properly substantiate defendant's motion for summary judgment. Under Federal Rule of Civil Procedure 56(c), defendant's motion for summary judgment may be based only on "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," and under Local Rule 56.1, defendant's statement of facts must include "references to the record" to support the statement. None of the categories of documents set forth in Fed. R. Civ. P. 56(c) that can properly support a summary judgment motion includes newspaper articles.  It is inappropriate for defendant to rely on such documents because they contain hearsay statements rather than facts. Fed. R. Evid. 801(c) (hearsay defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). As

Dockets.Justia.com

hearsay, the documents are not admissible evidence of the truthfulness of their contents. See Fed. R. Evid. 802 (hearsay not admissible except in circumstances not applicable here); Carter v. District of Columbia, 795 F.2d 116, 128 (D.C. Cir. 1986) ("The specific accounts of allegations contained in newspaper articles were themselves of no probative value"). Because the assertions in these paragraphs do not constitute statements of "fact," no response to them by plaintiff is required. See Fed. R. Civ. P. 56(c) (requiring defendant to identify controverted material "facts"). Moreover, no response regarding the truth of the matters asserted in these documents is required, and none will therefore be offered.

Plaintiff objects to paragraphs 24, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 40, 41, 42, 85, 86, 87, 88, 89, and 90 of Defendant's SMF on the ground that the alleged facts in these paragraphs, whether or not true, are not material to the resolution of defendant's motion for summary judgment in this copyright case. See Local Rule 56.1 (requiring a statement of "material" facts). "Material facts" are those facts which, under the governing substantive law, "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 492 (D.C. Cir. 1998); see also Fed. R. Evid. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"). None of the purported facts in these paragraphs has any bearing on the outcome of this suit under applicable law. Since Defendant must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to those paragraphs by Plaintiff is required.

Plaintiff objects to paragraphs 72 and 73 of Defendant's SMF to the extent that these paragraphs contain defendant's characterization and description of the cited documents (such as

newspaper articles), which speak for themselves and to which no response is necessary. The Court is

respectfully referred to the cited documents for a true and accurate statement of their contents.

Plaintiff objects to paragraphs 16, 76, 77, and 83 of Defendant's SMF on the ground that they

are not facts, but legal conclusions related to the central copyright claims in the lawsuit. Since

Defendant must identify genuine issues only with respect to material facts, Fed. R. Civ. P. 56(c), (f);

Local Rule 56.1, no response to those paragraphs by Plaintiff is required.

## PLAINTIFF'S RESPONSES

1.      AP is not –for-profit mutual news cooperative. Its activities include the collection of
news from its members and through its own reporting, and the distribution of news to its members
and subscribers. (Ake Dep. 19; Ake Decl. ¶ 2).

**Response:**

Admitted that the AP is a news cooperative that is owned by its for-profit members. (Hall Decl.,

Exh. 16, Galt Dep. pp., 10-12; Hall Decl., Exh. 9, Gerberich Dep., p. 91).

2.      AP's members primarily are newspaper, but also include news magazines, radio and
television broadcasters and electronic news publishers. (Ake Decl ¶ 2)

**Response:**

Admitted.

3.      AP's textual reports are distributed to AP members by AP's Basic Service. (Ake
Decl. ¶ 3)

**Response:**

Admitted.

4.      AP's news photos are provided to AP members who subscribe to AP's PhotoStream
service (Ake Decl. ¶ 4: Ake Dep. 18-19; Gerberich Dep. 80-81)

**Response:**

Admitted that the news photos are provided separately from the textual reports via the AP's

PhotoStream service. (Hall Decl., Exh. 8, Ake Dep., pp. 19, 20).

5.    On September 12, 2002, there were approximately 1,150 domestic and 800 foreign subscribers to PhotoStream.  (Ake Decl. ¶ 4).

**Response:**

Admitted.

6.    AP provides thousands of news reports to its subscribers each day.  (Ake Decl. ¶ 3).

**Response:**

Plaintiff has insufficient knowledge to admit or deny this statement, therefore denied.

7.    AP currently provides upwards of 2,500 photographs per day via PhotoStream and, since the year 2000, has provided at least 500 photographs via PhotoStream each day.  (Ake Decl ¶ 4).

**Response:**

Plaintiff has insufficient knowledge to admit or deny this statement, therefore denied.

8.    When AP distributes photographs as part of its PhotoStream service, the photographs automatically become part of AP's digital photograph archive (the "PhotoArchive").  (Ake Decl. ¶ 9; Ake Dep. 30; Gerberich Decl. ¶ 2; Gerberich Dep. 32, 44-45).

**Response:**

Admitted.

9.    Before transmitting a digital photograph to AP, AP photographers add a caption relating to the photograph, as well as various "metadata" that accompanies the photograph.  (Ake Decl. ¶ 8).

**Response:**

Admitted.

10.    The "metadata" includes, among other things, the name of the person who created the image, the date the image was created, any restrictions on the use of the photograph, the source of the photograph (such as whether it was provided as a handout or created by staff).   Other information automatically is generated by the system and included in the "metadata, " such as an identification number for the photograph.  (Ake Decl ¶ 8).

**Response:**

Admitted.

11.     The "metadata" travels with and accompanies photographs transmitted by AP or retained in AP's systems.  (Ake Decl. ¶ 8).

**Response:**

Admitted.

12.     AP's standard practice is to identify to subscribers which photographs are transmitted to accompany a particular textual report by referring to the photo's designating number in the "slug" of the textual report (Ake Decl. ¶ 12; Ake Dep. 31-32).

**Response:**

Denied that the photograph transmission has any identification of a textual report that it belongs to.

(Hall Decl., Exh. 8, Ake Dep., pp. 40-43).  Otherwise, admitted.

13.     The PhotoArchive is accessible to those members and subscribers of AP who subscribe to particular services of AP such as PhotoStream, pursuant to which access to the PhotoArchive is granted.  (Ake Decl. ¶ 9; Def Admis. 9).

**Response:**

Admitted.

14.     AP has neither the need nor ability to determine which of the news items, including news photos, it distributes, if any, are published by any of its members or subscribers (Ake Decl. ¶ 5; Ake Dep. 36-37).

**Response:**

Denied that the AP does not have the ability to determine which items are published by its members

and subscribers.  (Hall Decl., Exh. 9, Gerberich Dep., pp. 31, 91; Hall Decl., Exh. 16, Galt Dep., pp.

10-12).  Admitted that the AP does not track such information.

15.     Whether and how to use AP content – including AP textual reports and photos is matter of editorial discretion left to each of AP's members and subscribers.  (Ake Decl. ¶¶6, 20).

**Response:**

Admitted that the AP is owned by its members and therefore the decisions on how and where to use

AP content is known to the AP, otherwise denied.  (Hall Decl., Exh. 16, Galt Dep., pp. 10-12; Hall

Decl., Exh. 9, Gerberich Dep., p. 91).

.     16.     AP does not control the publishing activities of its members and subscribers (Ake
Decl ¶ 20).

**Response:**

Plaintiff objects to defendant's assertion that it "does not control" on the ground that this is a

legal issue related to vicarious infringement, to which no response is required.  In addition, the AP is

owned by the very members it purports to have no control over, therefore, denied.  (Hall Decl., Exh.

16, Galt Dep., pp. 10-12; Hall Decl., Exh. 9, Gerberich Dep., p. 91).

17.     AP cannot and does not intrude into the editorial discretion of its members and
subscribers with respect to whether and how to use AP content, including AP textual reports and
photos.  (Ake Decl ¶¶6, 20).

**Response:**

Denied.  The AP is owned by its members and therefore the decisions on how and where to use AP

content is known to the AP.  (Hall Decl., Exh. 16, Galt Dep., pp. 10-12; Hall Decl., Exh. 9,

Gerberich Dep., p. 91).

18.     Subscribers to AP services do not pay fees based upon their receipt or use of any
particular items provided as part of the news service.  (Ake Decl. ¶¶5, 19; Gerberich Decl. ¶ 10).

**Response:**

Admitted.

19.     Subscribers to AP services, such as PhotoStream, pay an assessment to AP calculated
to cover AP's actual cost of providing the news service.  (Ake Decl. ¶¶ 5, 19).

**Response:**

Admitted only to the extent that the members and subscribers to the AP services pay a fee, otherwise

denied.

20.    AP members who have access to the PhotoArchive do not pay fees based on the nature or content of the photographs therein, or on whether the photograph ultimately is published by the person who downloaded it  (Gerberich Decl. ¶ 10).

**Response:**

Admitted.

21.    Within seconds after the tragic crash of Flight 93 in Shanksville, Pennsylvania on September 11, 2001, McClatchey took a photograph from her front porch in nearby Stroystown (McClatchey Dep 4, 7).

**Response:**

Admitted.

22.    McClatchey titled the photograph "End of Serenity" (hereinafter the "Photograph") (Compl ¶ 10; McClatchey Dep 90).

**Response:**

Admitted.

23.    The Photograph depicts a large plume of smoke from the crash ascending over the barns and fields visible from McClatchey's porch.  (McClatchey Dep. 7).

**Response:**

Admitted.

24.    The FBI took custody of the original digital image of the Photograph.  (Compl ¶ 10)

**Response:**

Admitted.

25.    Various newspapers, magazines and broadcasters have published the Photograph with McClatchey's consent  (Pl.Admis 22; McClatchey Dep. 8, 17, 73-74, 76-77, 100, Ex. 27, Ex. 28; Penchina Decl. Exs E, F, G, H, I, J).

**Response:**

Admitted.

26.     Prior to any use of the Photograph by the AP, the Photograph had been published. (Pl. Admis. 22).

**Response:**

Admitted.

27.     An enlarged copy of the Photograph "became part of the permanent display for the Smithsonian." (McClatchey Dep. 48).

**Response:**

Admitted.

28.     McClatchey is proud of the Photograph (McClatchey Dep 86-87), and is excited "[t]o see it actually in print for other people to see," (McClatchey Dep. 76)

**Response:**

Admitted.

29.     McClatchey "enjoy[s] sharing the photo" and the attention it has generated for her. (McClatchey Dep 41).

**Response:**

Plaintiff admits that she "enjoy[s] sharing the photo," (Hall Decl., Exh. 2, McClatchey Dep., p. 41, ll. 20-23), otherwise denied.  There is no support on page 41 of her deposition that she enjoys "the attention it has generated for her," as Defendant has inferred.  The entire quote states, "[i] enjoy sharing the photo, yes.  It's a very integral part of our community." (Hall Decl., Exh. 2, McClatchey Dep., p. 41, ll. 20-23).

30.     For McClatchey, it is "an honor that [publishers] would ask that my photo be part of their articles or sharing it with the public," (McClatchey Dep 49; see also id. Ex. 4), and she feels that "[i]t's an honor to be able to share it with others," (McClatchey Dep. 49).

**Response:**

8

Admitted that Ms. McClatchey made the above statements regarding Newsweek, which paid for a limited use license for the photograph. (Hall Decl., Exh. 2, McClatchey Dep., p. 49).

31.    McClatchey's view with respect to the publication of the Photograph is "the more it is seen the better." (McClatchey Dep. 98; *see also id*. Ex. 25).

**Response:**

Admitted that McClatchey "was trying to get the message out, especially about the Todd Beamer Foundation[.]" (Hall Decl., Exh. 2, McClatchey Dep., p. 98, ll. 8-14.)

32.    McClatchey charged a fee of $250 or $350 for use of her Photograph by some publishers, but she charged no fees to a variety of publications, Internet sites, broadcasters and others who told stories that had been "approved by me [McClatchey]" and that she wanted to be told. (Pl. Admis. 14; McClatchey Dep. 12, 17; *see also*, e g, McClatchey Dep 73-74).

**Response:**

Admitted that Ms. McClatchey charged a fee, including $250 or $350, for use of her Photograph to some publishers, and that she charged no fees to certain publications, Internet sites, broadcasters and others, otherwise denied. Ms. McClatchey looked at a variety of factors to determine whether or not to charge a fee for use of her Photograph. (Hall Decl., Exh. 2, McClatchey Dep., p. 12, ll. 9-16; p. 12, ll. 9-16; p. 13, ll. 13-24; p. 74, ll. 8-21.)

33.    When news publications "told a story that [McClatchey] agreed with" (McClatchey Dep. 12), or if she "had judged [a proposed report] to be a story [she] wanted to be told, "McClatchey would allow the publishers to use the Photograph "without a fee." (McClatchey Dep. 17; *see also id* 12, 13-14, 53, 74; Pl. Admis. 14).

**Response:**

Denied. Ms. McClatchey looked at a variety of factors to determine whether or not to charge a fee for use of her Photograph, and in most cases did charge a fee. (Hall Decl., Exh. 2, McClatchey Dep., p. 12, ll. 9-16; p. 13, ll. 13-24; p. 74, ll. 8-21.)

34.    McClatchey "donates the copy [of the Photograph] free of charge for use by non-commercial organizations and entities." (Compl. ¶ 12; *see also* McClatchey Dep 12).

**Response:**

Admitted.

35.     "[I]f people stop in [McClatchey's] office" and ask for the Photograph, she "most likely will not charge them."  (McClatchey Dep 18).

**Response:**

Admitted that Ms. McClatchey would provide a personal use copy of the photograph with her title

and copyright information embedded on the face of the photograph.  (Hall Decl., Exh. 2,

McClatchey Dep., p. 18).

36.     McClatchey provides a copy of the Photograph "as a souvenir" to everyone that has come to [her] house" and wanted one.  (McClatchey Dep. 15).

**Response:**

Admitted that McClatchey would provide a personal use copy of the photograph with her title and

copyright information embedded on the face of the photograph.  (Hall Decl., Exh. 2, McClatchey

Dep., p. 15)

37.     McClatchey has sold hundreds of copies of the Photograph for "$20 each" (McClatchey Dep. 18, 37), the proceeds of which she contributed to the Todd Beamer Foundation, (McClatchey Dep. 18).

**Response:**

Admitted that McClatchey has sold hundreds of personal use copies of the Photograph for "$20

each" (Hall Decl., Exh. 2, McClatchey Dep., p. 18, 37), the proceeds of which she contributed to the

Todd Beamer Foundation, (Hall Decl., Exh. 2, McClatchey Dep., p. 18).

38.     The sales of the Photograph generally "trickle in," but pick up when there is news coverage "about the memorial of Flight 93."  (McClatchey Dep. 18-19).

**Response:**

Admitted.

      39.    McClatchey does not permit use of the Photograph with stories with which she does not agree, such as those stories that set forth alternate theories on the crash of Flight 93. (McClatchey Dep 39).

**Response:**

Admitted.

      40.    McClatchey has distributed copies of the Photograph for publication that do not contain any copyright notice  (McClatchey Dep. 20-21, 50, 53-54, 73, 75, 76-77, 101-02, 109; *see also* Pl. Admis. 3).

**Response:**

Admitted that any news entity that she agreed to license the work to, she e-mailed a digital file of the

photograph so that it would be the best possible depiction.  (Hall Decl., Exh. 2, McClatchey Dep., p.

20, ll. 21-25; p. 21, ll. 1-7; p. 109, ll. 6-12).  The digital copy did not bear a copyright notice.  (Hall

Decl., Exh. 2, McClatchey Dep., p. 109, ll. 6-12).

      41.    Copies of the Photograph that do not contain notices have been published with McClatchey's consent.  (E g., McClatchey Dep 20-21, 100-02, 109, Ex. 27, Ex 28; Penchina Decl. Exs. E, F, G, H, I, J)

**Response:**

Admitted that any news entity that she agreed to license the work to, she e-mailed a digital file of the

photograph so that it would be the best possible depiction.  (Hall Decl., Exh. 2, McClatchey Dep., p.

20, ll. 21-25; p. 21, ll. 1-7; p. 109, ll. 6-12).  The digital copy did not bear a copyright notice.  (Hall

Decl., Exh. 2, McClatchey Dep., p. 109, ll. 6-12).

      42.    The copy of the Photograph that appears on the website of McClatchey's business does not contain a copyright notice on it.  (Penchina Decl. Ex. A).

**Response:**

Denied.  (Penchina Decl.. Ex. A).

43.    McClatchey's personal copy of the Photograph "does not have any copyright notice or title" on it.  (McClatchey Dep 21; *see also id* at 20, 22; Sheehan Dep. 51; Pl. Admis. 8).

**Response:**

Admitted.

44.    On the first anniversary of the crash of Flight 93, McClatchey attended a memorial service held at the crash site.  (McClatchey Dep. 25).

**Response:**

Admitted.

45.    At the memorial service, McClatchey noticed the "press badge" worn by AP reporter Charles Sheehan who was covering the event.  (McClatchey Dep 26.)

**Response:**

Admitted.

46.    McClatchey approached Sheehan (Sheehan Dep. 13), and introduced herself as the person who "had taken that photo."  (McClatchey Dep. 25; *see also* Pl Admis. 2).

**Response:**

Admitted.

47.    McClatchey told Sheehan about "how things have changed in the past year" (McClatchey Dep. 25), and Sheehan decided to write a report about "how things had been in the past year in the area, and with [the McClatchey] personally, since [she] had taken the photo," (McClatchey Dep. 26; *see also* Sheehan Dep 14).

**Response:**

Admitted that Sheehan wrote a story about "how things had been in the past year in the area, and with [the McClatchey] personally, since [she] had taken the photo," (Hall Decl., Exh. 2, McClatchey Dep., p. 26; Hall Decl., Exh. 20, Sheehan Dep., p. 14).

48.    Sheehan interviewed McClatchey at the crash site for about ten minutes, and

completed the interview by telephone later that day.  (Sheehan Dep. 16-18).

**<u>Response:</u>**

Admitted.

49.     McClatchey fully intended and understood "that Mr. Sheehan would be writing something for publication by the AP based on [her] conversations with him."  (McClatchey Dep. 28).

**<u>Response:</u>**

Admitted.

50.     McClatchey provided to AP a "copy of the photograph to use in connection with the proposed article."  (Compl. ¶14; *see also* Def Interrog. Resp. 11).

**<u>Response:</u>**

Denied.  On the contrary, there was never any discussion of McClatchey providing a photograph to

the AP for use in conjunction with the story.  Gene Puskar took a photograph of the End of Serenity

photograph, removed the copyright information, and submitted it to the AP without Ms.

McClatchey's knowledge or consent.  (Hall Decl., Exh. 4, Puskar Dep., p. 15, ll. 4-9; p. 37, ll. 24-25;

p. 38, ll. 1-9; Hall Decl., Exh. 20, Sheehan Dep., p. 32, ll. 18-24).

51.     On the same day Sheehan interviewed McClatchey, AP photographer Gene Puskar went to McClatchey's house to obtain a photograph for AP to use in connection with the article being written by Sheehan, and McClatchey understood that was why Puskar had come to see her.  (McClatchey Dep. 28-29; Puskar Dep. 14, 36-37; Pl. Admis. 10 Def. Interog. Resp.4).

**<u>Response:</u>**

Admitted that Gene Puskar, an employee and photographer for the Associated Press, went to Ms.

McClatchey's home and informed her that he was there "to photograph her for the Charles Sheehan

story[.]"  (Hall Decl., Exh. 4, Puskar Dep., p. 11, ll. 8-14; p. 14, ll. 6-12; p. 35, ll. 11-19).

52.     McClatchey showed her personal copy of the Photograph to Puskar, and he took a picture of the Photograph.  (Puskar Dep. 12-14, 36-37; Def. Interrog. Resp. 11).

**<u>Response:</u>**

Denied.  McClatchey showed Mr. Puskar a hard copy of the photograph with her copyright information on it.  McClatchey at all times thought that Puskar was taking a picture of her and not the photograph.  (Hall Decl., Exh. 4, Puskar Dep., p. 18-19; pp. 36-37; Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 1, 2, 4).

53.    When photographing McClatchey's personal copy of the Photograph, Puskar did not capture the entirety of the image in the Photograph (Puskar Dep. 20-24; Def Admis. 19-22).

**Response:**

Denied that Mr. Puskar photographed her framed, personal copy of the Photograph.  Admitted that Mr. Puskar cropped off the top, left, right, and bottom portion of the photograph, including the copyright information, prior to submitting it to the AP.  (Hall Decl., Exh. 4, Puskar Dep., p. 18-19, 22; pp. 36-37; Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 1, 2; Hall Decl., Exh. 3, ¶¶19-22 ).

54.    When photographing the Photograph, Puskar cropped portions from around the edges. (Puskar Dep. 21-24).

**Response:**

Admitted.

55.    When compared to McClathey's personal copy of the Photograph, "all of the road underneath the barn is cropped off," the "road and at least 1 to 2 inches" were "cropped off" the left side, and portions of the top and right sides also were "cropped off."  (Puskar Dep 22).

**Response:**

Admitted that Mr. Puskar cropped off the top, left, right, and bottom portion of the photograph, including the copyright information, prior to submitting it to the AP.  (Hall Decl., Exh. 4, Puskar Dep., pp. 18-19; pp. 36-37; Hall Decl., Exh. 3, ¶¶19-22.)

56.    McClatchey fully intended and understood that the photograph taken by Puskar was for publication with Sheehan's report.  (McClatchey Dep. 28; *see also* Puskar Dep. 36-37).

**Response:**

Denied.  On the contrary, Ms. McClatchey never knew that Mr. Puskar was even taking a picture of her photograph, or that he would be submitting the picture of the photograph to the AP.  (Hall Decl., Exh. 2, McClatchey Dep., p. 29, ll. 2-8; Hall Decl., Exh. 4, Puskar Dep. p. 11, ll. 8-14; p. 14, ll. 6-12; p. 29, ll. 22-25; p. 30, ll. 1-4.)  Ms. McClatchey understood that a photograph of her would be used to accompany the story written about her.  (Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 1-6).

57.    Puskar wrote a caption to accompany his photograph of the Photograph, and transmitted his photograph and caption to the AP photo department.  (Puskar Dep. 46; Ake Dep. 38; Def Interrog. Resp. 4).

**Response:**

Admitted.

58.    AP's caption for its copy of the Photograph stated:

> This image of the smoke cloud left by United Flight 93 after it crashed in a field in Shanksville, Pa, on September 11, 2001 was taken by Val McClatchey from the porch of her nearby home.  (AP Photo/File/Val McClatchey).

(Ake Decl Ex. B).

**Response:**

Admitted.

59.    There was no copyright notice on the copy of McClatchey's Photograph received by AP.  AP did not remove any copyright notice from the image.  (Ake Decl. ¶ 17).

**Response:**

Denied.  On the contrary, Mr. Puskar cropped off the copyright notice from McClatchey's photograph prior to transmission to the AP.  (Hall Decl., Exh. 4, Puskar Dep., pp. 18-19; pp. 36-37, p. 24, ll. 20-22; Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 1, 2, 4).

60.    In the AP's system, Puskar's  photograph was identified by the photograph identification number "GJP101," which identifies that specific photograph.  (Ake Decl. ¶ 14, Ex. B; Ake Dep. 31-32; Gerberich Dep 57).

**Response:**

Admitted.

61.    The "meta data" that accompanies Puskar's photograph in AP's system, and which accompanies the photograph whenever it is provided to anyone by AP, identified the photograph as a "handout image," meaning that the work was not original to AP but provided to AP by a third party (Ake Decl. ¶ 7, Ex B; Ake Dep. 8, 32; Gerberich Dep 54-55).

**Response:**

Admitted only to the extent that the "meta data" identified the photograph as a handout image,

otherwise denied.  Ms. McClatchey was identified as a freelance photographer which indicates that

the AP owns all copyrights in the photograph.  (Hall Decl., Exh. 8, Ake Dep. pp. 23, 32).

62.    The "meta data" also contains the following restrictions in the "Special Instructions: field: "No Sales" and "Wide World Photos Out," (Ake Decl. Ex. B), which means that the photograph could not be sold or used for commercial purposes, and is not available to Wide World Photos, the AP unit involved in selling prints of photographs and licensing photos for use other than by AP members, (Ake Decl. ¶¶ 10, 11, 14; Ake Dep. 28-29; Gerberich Dep 50-53).

**Response:**

Denied.  "No Sales" and "Wide World Photos Out" only restrict sales, but do <u>not</u> restrict use for

commercial purposes.  (Hall Decl., Exh. 8, Ake Dep. pp. 28-29; Hall Decl. Exh. 9, Gerberich Dep.

pp. 50-51).

63.    The "meta data" identifies "VAL MCCLATCHEY" in the "Photographer" field. (AkeDecl Ex. B).

**Response:**

Admitted that Ms. McClatchey was identified as a freelance photographer which indicates that the

AP owns all copyrights in the photograph. (Hall Decl., Exh. 8, Ake Dep. pp. 23, 32).

64.    The "meta data" does not indicate that anyone other than McClatchey holds the copyright to the Photograph.  (Ake Decl Ex. B).

**Response:**

Denied.  (Hall Decl., Exh. 8, Ake Dep. p. 23, ll. 6-13; p. 32, ll. 8-12; p. 33, ll. 9-14.)  On the

contrary, Ms. McClatchey was identified as a freelance photographer which indicates that the AP

owns all copyrights in the photograph. (Hall Decl., Exh. 8, Ake Dep. pp. 23, 32).

65.     The "meta data's" notations "HO" and "no sales" indicate that "AP does not own this
image."  (Ake Decl ¶¶ 7, 10; *see also* Gerberich Dep. 55).

**Response:**

Admitted only to the extent that the "meta data" had indications for "HO" and "no sales", otherwise

denied.  Ms. McClatchey was identified as a freelance photographer which indicates that the AP

owns all copyrights in the photograph.  (Hall Decl., Exh. 8, Ake Dep. pp. 23, 32).

66.     On September 12, 2002, AP distributed a news report entitled "Women who captured
seating Flight 93 image struggles a year later" about Ms. McClatchey and the photograph she had
created (hereinafter the "Report").  The Report included text written by Sheehan and a copy of the
Photograph made by Puskar  (Ake Decl. ¶ 13, Ex. A; Gerberich Decl. ¶ 3; Sheehan Dep.4).

**Response:**

Admitted only to the extent that the AP distributed a textual news report entitled "Women who

captured seating Flight 93 image struggles a year later" about Ms. McClatchey and her struggles,

otherwise denied.  Specifically, the Photograph and the news report were not distributed together.

(Hall Decl., Exh. 9, Ake Dep. p. 40, ll. 21-24; p. 41, ll. 1-10).

67.     The Report was "the article that [McClatchey] had agreed to" (McClatchey Dep 30).

**Response:**

Admitted that Ms. McClatchey agreed to the AP doing a story about her, otherwise denied that she

had any input into the content of the story.

68.     The Report was one McClatchey "would not have a problem with." (McClatchey Dep
at 41).  It "told an accurate story" and was the "type of story which [McClatchey] approves[s] in
connection with using [her] photo." (McClatchey Dep 40).

**Response:**

Denied. (Hall Decl., Exh. 2, McClatchey Dep. p. 40, ll. 13-25; p. 40, ll. 1-17). On the contrary, Ms. McClatchey's permission or consent was never sought by the AP to use her photograph in connection with the story. In addition, Ms. McClatchey's permission or consent was never sought for the AP's further use of the photograph which was made by them sending the transmitting a digital copy of the photograph to all of their members and subscribers without any reference to the textual story. (Hall Decl., Exh. 2, McClatchey Dep. p. 110; Hall Decl., Exh. 4, Puskar Dep. pp. 32, 33, 37, 57; Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 3, 6).

     69.    Sheehan "asked the questions," and McClatchey "approved them." (McClatchey Dep 40).

**<u>Response:</u>**

Admitted that Ms. McClatchey felt the story told "an accurate story." (Hall Decl., Exh. 2, McClatchey Dep., p. 40).

     70.    The Report recounted how McClatchey took the Photograph and how the "time and date recorded on the image….marked the beginning of a tumultuous year for McClatchey" (Ake Decl. Ex A).

**<u>Response:</u>**

Plaintiff does not dispute that this paragraph generally describes portions of the cited newspaper article about Ms. McClatchey.

     71.    The Report related that the Photograph "brought news crews to the front door and a limited amount of fame to McClatchey." (Ake Decl. Ex A).

**Response:**

Plaintiff does not dispute that this paragraph generally describes portions of the cited newspaper

article about Ms. McClatchey.

72.    The Report discussed health problems experienced by McClatchey after having taken the Photograph, the collapse of her husband's business and that the "images McClatchey said she sold for $250 to $350 have not done much to help the couple financially" (Ake Decl. Ex A).

**Response:**

Plaintiff does not dispute that this paragraph generally describes portions of the cited newspaper

article about Ms. McClatchey.

73.    The Report also reported that residents of the region to whom McClatchey provided copies of the Photograph "have insisted on paying cash to cover costs of printing, and McClatchey said she has donated almost all of that money to the Todd M. Beamer Foundation." (Ake Decl.Ex.A).

**Response:**

Plaintiff does not dispute that this paragraph generally describes portions of the cited newspaper

article about Ms. McClatchey.

74.    AP distributed its copy of the Photograph in connection with the Report.  (Ake Decl. ¶ 13, Ex A, Ex B).

**Response:**

Denied.  On the contrary, the Photograph was distributed separately from the Report.  (Ake Decl

¶13; Hall Decl., Exh. 8, Ake Dep. p. 40, ll. 21-24; p. 41, ll. 1-10).

75.    AP used its copy of the Photograph with the understanding that McClatchey had given consent for it to do so.  (Ake Decl. ¶¶ 15, 18, 22; Ake Dep. 39, 43, 47; Puskar Dep. 14, 33, 36-37; Def. Admis. 3; Def. Interrog. Resp. 14).

**Response:**

Denied.  On the contrary, the AP used the photograph knowing it was copyrighted and knowing that

it did not have oral or written permission to use the photograph. (Hall Decl., Exh. 4, Puskar Dep., p.

57, ll. 13-19; p. 32, ll. 20-25; p. 33, ll. 1-3; p. 37, ll. 18-23).  None of the cited evidence shows any written or oral percussion being given by McClatchey.

76.    AP had no knowledge of infringing uses made by persons to whom AP distributed the Photograph, and AP had no intent to facilitate any infringing acts by anyone.  (Ake Decl. ¶¶ 18, 22).

**Response:**

Denied.  On the contrary, the AP used the photograph knowing it was copyrighted and knowing that it did not have oral or written permission to use the photograph.  (Hall Decl., Exh. 4, Puskar Dep., p. 57, ll. 13-19; p. 32, ll. 20-25; p. 33, ll. 1-3; p. 37, ll. 18-23).

77.    AP used its copy of the Photograph in connection with the Report with the understanding that the use was a fair use.  (Ake Decl. ¶¶ 16, 22; Def. Interrog. Resp 14).

**Response:**

Plaintiff objects to defendant's assertion that its use was "fair use" on the ground that the issue of fair use is a legal issue, to which no response is required.  Denied.  On the contrary, Ms. McClatchey's permission or consent was never sought by the AP to use her photograph in connection with the story.  In addition, Ms. McClatchey's permission or consent was never sought for the AP's further use of the photograph which was made by them sending the transmitting a digital copy of the photograph to all of their members and subscribers without any reference to the textual story.  (Hall Decl., Exh. 2, McClatchey Dep. p. 110; Hall Decl., Exh. 4, Puskar Dep. pp. 32, 33, 37, 57; Hall Decl., Exh. 5,  McClatchey Decl. ¶¶ 3, 6).

78.    The text of the Report was transmitted via AP's Basic service, as are all textual reports, and the photograph was transmitted as part of PhotoStream, as are all photos intended to accompany particular news strories.  (Ake Decl. ¶¶ 12, 13).

**Response:**

Admitted that the text of the Report and the photograph were distributed separately.  (Ake Decl. ¶13; Hall Decl., Exh. 8, Ake Dep., p. 40, ll. 21-24; p. 41, ll. 1-10).

79.     Beneath the headline of the text portion of the Report was the instruction, known as a "slug," "AP Photo GJP101," which identified AP's copy of the Photograph and indicated to newspapers receiving the item that that photograph was to accompany that text  (Ake Decl. ¶¶ 12, 14, Ex. A; Ake Dep 31-32).

**Response:**

Admitted that the textual Report included the entry "AP Photo GJP 101," otherwise denied.  (Hall Decl., Exh. 8, Ake Dep. pp. 42, 45; Hall Decl., Exh. 9, Gerberich Dep., pp. 112-114).

80.     Upon AP's transmission of the Report, AP's copy of the Photograph automatically became archived in the PhotoArchive.  (Ake Decl. ¶ 13; Gerberich Decl. ¶ 3).

**Response:**

Admitted.

81.     The archived copy of the Photograph carried "the most severe restrictions [AP] can put on an image," (Gerberich Dep. 54), and customers who generally obtain access to the PhotoArchive through AP services such as Wide World Photos, the AP division that sells copies, could not access AP's copy of the Photograph in the PhotoArchive.  (Ake Decl. ¶¶ 11,14, Ex B).

**Response:**

Admitted that the archived copy of the photograph including restrictions on the sale of the photograph but not the use of the photograph for commercial purposes.  (Hall Decl., Exh. 8, Ake Dep. pp. 42, 45; Hall Decl., Exh. 9, Gerberich Dep. pp. 112-114).

82.     AP never offered for sale or sold copies of the Photograph.  (Ake Decl. ¶¶ 11,14, 18, 19; Gerberich Decl. ¶ 11; Def. Interrog. Resp 7).

**Response:**

Admitted.

83.     AP did not receive any financial benefit from any use of the Photograph made by persons who received it from AP.  (Ake Decl. ¶ 19).

**Response:**

Denied.  On the contrary, the AP provided this photograph free of charge to its members and

subscribers who are also the owners of the AP, and who pay fees to the AP for the use of its

photographs.  (Hall Decl., Exh. 8, Gerberich Dep., pp. 77, 91; Hall Decl., Exh. 16, Galt Dep., pp. 10-12).

84.     *The Progress*, a newspaper serving Clearfield, Curwensville, Philipsburg and Moshannon Valley, Pennsylvania, carried the Report, including both the text portion of the Report and AP's copy of the Photograph.  (McClatchey Dep. Ex. 1).

**Response:**

Admitted.

85.     On September 11, 2002, *The Tribune-Democrat* of Johnstown, Pennsylvania ran a story about McClatchey written by its own writer and accompanied by a photograph credited to photographer Dave Lloyd of *The Tribune-Democrat*.  (McClatchey Dep. Ex 2).

**Response:**

Admitted.

86.     Lloyd's photograph showed McClatchey holding the Photograph and her camera, and depicted a portion of her living room.  (McClatchey Dep. Ex 2).

**Response:**

Admitted.

87.     On September 13, 2002, *The Tribune-Democrat* published just the text of the AP Report, which ran with the headline "Photo brought fame, not fortune for woman," and the subtitle "Shanksville resident captured horror."  (Compl. Ex. C).

**Response:**

Admitted.

88.     *The Tribune-Democrat* did not run AP's copy of the Photograph with the text of the AP Report (*Compare* Compl Ex C, *with* Ake Decl. Ex B).

**Response:**

Admitted, because the Article was about Ms. McClatchey, and not the photograph.

89.    *The Tribune-Democrat* published a photograph of its own, bearing a photo credit to itself, of McClatchey inside her house holding a copy of her Photograph and the camera she used to snap it (Compl Ex C).

**<u>Response:</u>**

Admitted, because the Article was about Ms. McClatchey, and not the photograph..

90.    The photograph that *The Tribune-Democrat* used with AP's report was not supplied by AP, but was not supplied by AP, but was cropped version of Lloyd's photograph, which had accompanied the September 11, 2002 article.  (Compare Compl Ex. C, with McClatchey Dep Ex 2).

**<u>Response:</u>**

Plaintiff does not have sufficient information to admit or deny this statement, therefore, denied.

91.    Only three entities, AOL, Canadian Press and The Huntsville Times accessed and downloaded AP's copy of the Photograph during the time it was in the PhotoArchive. (Gerberich Decl ¶¶ 5-7, Ex A).

**<u>Response:</u>**

Admitted only to the extent that three entities received a digital copy of the photograph from the

PhotoArchive, (in addition to the roughly 2000 members and subscribers which received a digital

transmission of the photo from the AP).

92.    No other people or entities downloaded AP's copy of the Photograph during the entire time it was available in the PhotoArchive.  (Gerberich Decl. ¶ 6).

**<u>Response:</u>**

Plaintiff does not have sufficient information to admit or deny this statement, therefore, denied.

93.    AOL reproduced a thumbnail of the Photograph on its web site under the words "AOL News," and beside the headline "New Theory on Flight 93 As Revolt Began, Data Shows Hijacker Crashed on Purpose."  (Compl. ¶ 20, Ex. D).

**<u>Response:</u>**

Denied.  AOL reproduced the entire photograph on its home page beside the headline "New Theory

on Flight 93 As Revolt Began, Data Shows Hijacker Crashed on Purpose."  (Hall Decl., Exh. 1,

Exhibit D).

94.     McClatchey would not have licensed the Photograph to AOL for use in connection with its report on a "New Theory on Flight 93" had she had the opportunity to do so.  (McClatchey Dep. 39).

**<u>Response:</u>**

Admitted.

95.     Following AP's publication of its copy of the Photograph and its presence in the PhotoArchive, McClatchey continued to make the Photograph available for publication, both for free and on a fee basis.  (Pl. Admis. 20, 21)

**<u>Response:</u>**

Admitted.

96.     Among the entities to whom McClatchey licensed the Photograph for a fee after it was published by AP and while the AP copy was present in the PhotoArchive, were Philadelphia Newspapers, Inc. and U.S. News & World Report.  (McClatchey Dep Ex 12; Penchina Decl. Exs. C. D).

**<u>Response:</u>**

Denied.  On the contrary, McClatchey testified that she never gave written permission to the

Philadelphia Newspapers, Inc. to use the photograph.  (Hall Decl., Exh. 2, McClatchey Dep., p. 42).

97.     Both Philadelphia Newspaper, Inc. and US. News & World Report are subscribers to AP's PhotoStream service to whom AP provided a copy of the Photograph in connection with the Report, and who had access to the Photograph in AP's PhotoArchive  (Ake Decl ¶ 21; Penchina Decl Ex. B).

**<u>Response:</u>**

Plaintiff does not have sufficient information to admit or deny this statement, therefore, denied

98.     McClatchey first complained to AP about its use of the Photograph on or around October 2003 through a complaint sent to AOL.  (Penchina Dec. Ex. K; Galt Dep Ex. 19; see also Pl. Admis 7; Ake Decl. ¶ 15).

**<u>Response:</u>**

Admitted.

99.     AP does not know or keep track of whether anyone who has access to the PhotoArchive actually publishes or otherwise makes use of any of the photographs downloaded from

the PhotoArchive.  (Gerberich Decl. ¶ 9).

**Response:**

Plaintiff does not have sufficient information to admit or deny this statement, therefore denied

100.    Prior to McClatchey complaining to AOL, AP had no knowledge of any particular use of the Photograph made by any of its members of subscribers, including AOL.  (Ake Decl ¶ 18; Ake Dep. 36-37; Gerberich Dep 77-78).

**Response:**

Denied.  The AP is owned by its members and subscribers so it has personal knowledge of any and all uses of the photographs by its members and subscribers.  (Hall Decl., Exh. 16, Galt Dep., pp. 10-12; Hall Decl., Exh. 9, Gerberich Dep., p. 91).

101.    AP's copy of the Photograph was removed from the PhotoArchive on November 4, 2003  (Gerberich Decl. ¶ 4; Def Admis. 11, 12).

**Response:**

Denied.  Gerberich testified that the photograph was not removed from the PhotoArchive until November, 2004.  (Hall Decl., Exh. 9, Gerberich Dep., p. 22, l. 24; p. 23, ll. 1-8; p. 26, ll. 20-23, p. 123, ll. 11-19; Hall Decl., Exh. 13).

102.    Once the Photograph was removed from the PhotoArchive, AP members and subscribers, and anyone else who may have had access to the PhotoArchive, had no further access to the Photograph.  (Gerberich ¶ 4).

**Response:**

Denied.  On the contrary, the AP did not inform its members and subscribers who received a digital copy of the photograph that it had no rights to the photograph and that they should destroy any copies of it.  (Hall Decl., Exh. 9, Gerberich Dep., p. 24; ll. 16-23; Hall Decl., Exh. 9, Ake Dep., p. 35).

Respectfully submitted,

25

s/Douglas M. Hall                 
Douglas M. Hall
Kara L. Szpondowski
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois  60602-4515
Phone: 312-236-0733
Fax: 312-236-3137
*Attorneys for Valencia M. McClatchey*

John E. Hall
Eckert Seamans Cherin & Mellott, LLC
USX Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
Phone:  (412) 566-6000
Fax: (412) 566-6099

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that a true copy of the foregoing **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS** was served upon the below listed parties on this 19th day of June 2006.

**By ECF:**                  Gayle C. Sproul
                           Levine Sullivan Koch & Schultz, LLP
                           2112 Walnut St., 3rd Floor
                           Philadelphia, PA 19013
                           Phone:  (215) 988-9778

**By ECF:**                  Robert Penchina
                           Levine Sullivan Koch & Schultz, LLP
                           230 Park Avenue
                           Suite 1160
                           New York, NY 10169
                           Phone:  (212) 850-6100
                           Fax:  (212) 850-6299

                          s/Douglas M. Hall_____