1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA
2

VALENCIA M. McCLATCHEY,              )
3                                    )
              Plaintiff,             )
4                                    )
              vs.                    )
5                                    )
THE ASSOCIATED PRESS,                )    Civil Action
6                                    )    No. 05-145J
              Defendant.             )
7

8

9

10

11                        - - - -

12       DEPOSITION OF:  VALENCIA M. McCLATCHEY

13                        - - - -

14
                   DATE:    March 14, 2006
15                          Tuesday, 9:30

16
               LOCATION:    Eckert Seamans Cherin &
17                             Mellott
                            44th Floor - US Steel Tower
18                          Pittsburgh, PA 15219

19             TAKEN BY:    Defendant

20
            REPORTED BY:    Keith G. Shreckengast, RPR
21                          Notary Public
                            AKF Reference No. KS93222
22

23

24                            CERTIFIED TRANSCRIPT

25                              EXHIBIT

                                   2

4

1              VALENCIA M. McCLATCHEY,

2              having been duly sworn,

3        was examined and testified as follows:

4                    - - - -

5                   EXAMINATION

6                    - - - -

7    BY MR. PENCHINA:

8    Q.    Good morning, Ms. McClatchey.

9    A.    Good morning.

10   Q.    Would you please state your full name for the

11         record?

12   A.    Valencia M. McClatchey.

13   Q.    And would you also please give your address?

14   A.    107 Osage Path, Stoystown, 15634.

15   Q.    Have you ever had your deposition taken before?

16   A.    No.

17   Q.    Just some preliminaries, my name is Robert

18         Penchina, and I am one of the attorneys

19         representing the Associated Press in the

20         lawsuit that you initiated.  I'm going to be

21         asking you a series of questions today.  And I

22         would ask that if you don't understand my

23         question, would you please let me know?

24   A.    I understand.

25   Q.    Are you currently employed?

1       years or so?

2   A.  No.

3   Q.  Have you used any others in the last five

4       years?

5   A.  I may have had a stooges -- a stooge@yahoo.com,

6       which may have been seven years ago.

7   Q.  Have you used any E mail addresses for yourself

8       personally that had the words Keystone Camaro

9       Club in them?

10  A.  That would be Keystone Camaro Club through

11      Yahoo.  I am involved -- had been involved with

12      the Camaro Club.

13  Q.  Are you the photographer who took the

14      photograph entitled The End of Serenity?

15  A.  Yes, I am.

16  Q.  Can you describe that photo me?

17  A.  It's a red barn featuring a large plume of

18      smoke rising over the hill.  There is also the

19      gutter up in my right-hand corner, a smaller

20      barn which is now red, but it was a pale yellow

21      in the foreground.  There's also you could see

22      part of my front yard, the road, and the field.

23  Q.  What is the significance of that photo?

24  A.  That was the first photo related to Flight 93.

25      I took it just seconds after the impact.

8

1  Q.  Have you ever sold or licensed that photo for

2      publication to anyone?

3  A.  Yes, I have.

4  Q.  When was the last time?

5  A.  The last time I licensed the photograph was

6      last week.

7  Q.  Who did you license the photograph to last

8      week?

9  A.  It would be to the Flight 93 Memorial.  It is

10     going solely for their fundraising brochure.

11 Q.  Was there a fee involved with this license?

12 A.  No, there was not.

13 Q.  Other than the license to the Flight 93

14     Memorial, are there any other sales or

15     licensing for publication of this photo in

16     2006?

17 A.  2006, I believe everything had been completed

18     in 2005, prior to.

19 Q.  Can you tell me to whom you licensed or sold

20     the photo for publication in 2005?

21 A.  It would be to Towers Production, Discovery, I

22     believe there would be Brooklapping for the

23     Discovery Channel.  Also 2005 I believe I

24     licensed out to the New York Museum.  And

25     without my records, those are just off the top

1    Q.    Did WTAE also run it on TV?

2    A.    Not since the first week of September 11th,

3          they had with my permission.

4    Q.    And when they ran it on the internet, that was

5          subsequent to the first week?

6    A.    Yes, it would be subsequent.

7    Q.    Was there a fee involved with WTAE?

8    A.    No, there was not.

9    Q.    How do you determine, or how did you determine

10         when to charge a fee and when not to?

11   A.    On the use of the photo.  Basically if it was

12         just for an educational purposes, or a story

13         that I felt that -- basically if they weren't

14         really going to make money from it, if it was

15         educational, then I did not charge a fee.

16   Q.    Was WTAE's use on the internet educational?

17   A.    They told a story that I had agreed with.

18   Q.    So when you use the word educational, you're

19         not using it in the formal sense that it's

20         being used in a school or an educational

21         setting; is that correct?

22   A.    If it tells the story as we know the facts, and

23         if it has been approved by me, it is my right

24         to say who does and who does not get the photo.

25   Q.    Absolutely.  And just to be clear, the reason

| | | |
|---|---|---|
| 1 | | why I'm asking about educational is not to trip |
| 2 | | you up or catch you in anything, but just to |
| 3 | | understand how you're using the word. |
| 4 | A. | Okay. |
| 5 | Q. | So to make the record clear, when you said |
| 6 | | educational, if I understand your testimony, |
| 7 | | you're talking about uses that generally |
| 8 | | educate the public and comport with your view |
| 9 | | of an appropriate story, but not necessarily |
| 10 | | limited to an educational setting such as a |
| 11 | | school? |
| 12 | A. | Correct. |
| 13 | Q. | Can you think of other examples of uses that |
| 14 | | you permitted, publication uses that you |
| 15 | | permitted where you did not charge a fee? |
| 16 | A. | I permitted Robert Morris University, St. |
| 17 | | Francis University, fema.gov, I believe it's |
| 18 | | Pennsylvania Township publication.  There was |
| 19 | | one I believe that was of a medical type.  I |
| 20 | | think that was it.  The Library of Congress, |
| 21 | | the Smithsonian. |
| 22 | Q. | Any others? |
| 23 | A. | Other than high school students who asked |
| 24 | | permission to use the photo for their reports. |
| 25 | Q. | In addition to WTAE, were there other news |

1    Q.    And did you provide the photograph to any of

2          those stations?

3    A.    I did as a souvenir.  I have done that with

4          everyone that has come to my house, provided an

5          8 x 10 photo, copy.

6    Q.    Did any of those stations show the photo when

7          they did the story?

8    A.    No, they did not.

9    Q.    Did any of them do the story?

10   A.    Yes, they did.

11   Q.    Did all of them do the story?

12   A.    Yes, they did.

13   Q.    In addition to television stations, were you

14         interviewed by any other news organizations?

15   A.    Yes, I was, ABC News, and Fox News from New

16         York.

17   Q.    Any others?

18   A.    No, not that I recall.

19   Q.    Any print publications, any newspapers?

20   A.    I had the Philadelphia news, Tribune Democrat,

21         Tribune Review, Post-Gazette, Washington Post.

22   Q.    And each of those interviewed you in connection

23         with some news story they were doing?

24   A.    Yes, they did, either by phone or in person.

25   Q.    Did the Associated Press interview you?

1  A.    On September 11th, 2002, yes.

2  Q.    Are there any other press organizations that

3        interviewed you?

4  A.    No, not that I'm aware of.  Not that have not

5        been identified, other than the publications.

6  Q.    Can you tell me whether, among all of the news

7        organizations and publications that interviewed

8        you, whether you permitted any of them to use

9        the photo without charging them a fee?

10 A.    You mean the -- Can you repeat the question?

11 Q.    Sure, I'd be happy to.  I think before we got

12       into specific stations I had been asking you

13       about how you determine when to charge a fee

14       and when not to.

15 A.    Okay.

16 Q.    Do you remember that?

17 A.    Yes, I remember that.

18 Q.    When you were interviewed by all of these

19       stations and publications, did any of these

20       stations or publications request permission to

21       use the photo in connection with the interview

22       that they were doing?

23 A.    ABC News did, yes.  And Fox News from New York

24       did, yes.

25 Q.    Did you give ABC and Fox News from New York

| | | |
|---|---|---|
| 1 | | permission to use the photo? |
| 2 | A. | Yes, I did. |
| 3 | Q. | Did you charge a fee to ABC and Fox News in |
| 4 | | connection with that use? |
| 5 | A. | Yes, there was. |
| 6 | Q. | What was the fee that you charged to ABC? |
| 7 | A. | It was $500. |
| 8 | Q. | And what was the fee that you charged to Fox |
| 9 | | News New York? |
| 10 | A. | I'm not sure that I charged a fee for them. |
| 11 | Q. | Why is it that you're unsure?  By that I |
| 12 | | mean -- |
| 13 | A. | I do not recall.  I don't have a record of |
| 14 | | charging them. |
| 15 | Q. | Is it possible that you didn't charge them? |
| 16 | A. | It's possible that I did not charge them. |
| 17 | Q. | If you had deemed that the particular use that |
| 18 | | they were making to be a good story, one that |
| 19 | | you wanted told, would that be a circumstance |
| 20 | | in which you would allow them to use it without |
| 21 | | a fee? |
| 22 | A. | If I had judged it to be a story I wanted to be |
| 23 | | told, yes. |
| 24 | Q. | In addition to licensing for use, have you also |
| 25 | | sold copies of the photograph? |

18

1    A.    Yes, I have.

2    Q.    Tell me about how you sell copies of the

3          photograph.

4    A.    On the Shanksville Memorial news website, we

5          have set up that individuals can make a check

6          out to the Todd Beamer Foundation, they mail it

7          to me and I forward those checks, and I send

8          out an 8 x 10 copy of the photo to those

9          individuals.

10   Q.    In addition to the Shanksville site, are there

11         other ways through which copies of the photo

12         have been sold?

13   A.    I had made it available through Duppstadt's

14         Country Store, and Ida's store in Shanksville.

15   Q.    Anywhere else where the photo was available?

16   A.    Can still mail to me directly and I will sell.

17         And I will also, upon request, if people stop

18         in my office and ask, I most likely will not

19         charge them, as a good will.

20   Q.    Do you have a sense, a rough estimate of how

21         many copies you have sold over the years?

22   A.    An estimate, no.  Quite a few.  In excess of a

23         couple of hundred.

24   Q.    And are you -- are they still selling?

25   A.    Not very much.  They trickle in, maybe two or

1        three in a couple month period.

2    Q.   Over the last five years since the photo has

3        been created, have you noticed any sort of

4        trend in when they sell, when they don't sell?

5    A.   Anytime there is any news about the memorial,

6        or Flight 93, it generates more interest.

7    Q.   What is the format, or the form of the picture

8        itself, that you sell?

9    A.   It is on photo paper that I pick up at Staples

10       or Wal-Mart, I believe it's an 8 1/2 x 11 size,

11       it is as large as I can get it on as an 8 x 10.

12       Prior to printing the actual photo from my

13       copier, from my computer, I put my End of

14       Serenity on the top left corner, and my name

15       and copyright notice on the bottom right.

16   Q.   When you say prior to printing it you put that

17       on, can you describe that for me?

18   A.   I have a program on my computer that I print

19       out the -- on the photo paper, the title, and

20       my copyright notice, and then running it

21       through again and putting the photo.

22   Q.   So if I understand your testimony, it's a two

23       step process, the title and the copyright

24       notice go on first, and then you have at that

25       point a blank photo paper with the name and the

1        copyright notice; is that correct?

2   A.   That is correct.

3   Q.   And then you run that through the printer again

4        and the photo will be printed?

5   A.   Yes.

6   Q.   And the name and copyright notice show through

7        the printing of the photo?

8   A.   Yes, they do.

9   Q.   You said you had a program that adds that; is

10       that correct?

11  A.   I use My Advanced Brochures software.

12  Q.   How long have you had My Advanced Brochures

13       software?

14  A.   Since 2000.

15  Q.   Do you add the name and copyright notice to

16       every print?

17  A.   Yes, I do.

18  Q.   Every single print?

19  A.   The only one that does not have it is my

20       personal, that is in my home.

21  Q.   Was the name and copyright notice on all of the

22       copies that you provided to news organizations?

23  A.   When I have a news organization that has my

24       permission to use, we set up, if they -- if we

25       have an agreement of how it is to be used, it

Pittsburgh, PA
412-261-2323

Greensburg, PA
724-853-7700

Erie, PA
814-453-5700

AKF

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | is sent via E mail JPG high resolution that                  |
| 2  |    | provides a record for me and them as well, that              |
| 3  |    | permission has been granted for them to print.               |
| 4  |    | If I am giving it as just a souvenir or a                    |
| 5  |    | memento of their trip, it is standard copy, the              |
| 6  |    | End of Serenity, and my copyright notice is on.              |
| 7  |    | There are no exceptions.                                     |
| 8  | Q. | Is the same program that applies the title the               |
| 9  |    | program that applies the copyright notice?                   |
| 10 | A. | Yes, I write in copyright on the bottom.                     |
| 11 | Q. | Do you ever print the photo with just the                    |
| 12 |    | copyright notice and without the title?                      |
| 13 | A. | No, I do not.                                                |
| 14 | Q. | Do you ever print the photo with the title and               |
| 15 |    | not the copyright notice?                                    |
| 16 | A. | No, I do not.                                                |
| 17 | Q. | The photo that is in your -- the JPG, does that              |
| 18 |    | have any title or copyright notice on it?                    |
| 19 | A. | No, it does not.                                             |
| 20 | Q. | And I think you mentioned your personal copy                 |
| 21 |    | does not have any copyright notice or title; is              |
| 22 |    | that correct?                                                |
| 23 | A. | Correct.                                                     |
| 24 | Q. | What is your personal copy?                                  |
| 25 | A. | Same, 8 x 10 that I print out from my computer.              |

1          And I have it in a small frame in my office.

2   Q.   Do you have any personal copies at home?

3   A.   That is at my office at home.  And I have

4          copies at my office at Mtn. Lakes, and that

5          does have the copyright on it.

6   Q.   So the personal copy at home or in your home

7          office does not have a title or copyright

8          notice?

9   A.   No, it does not.

10   Q.   Do you have multiple copies at home?

11   A.   No, I do not.

12   Q.   And just to clarify, do you currently have

13          multiple copies at home?

14   A.   No, I do not.

15   Q.   Have you ever had multiple personal copies at

16          home?

17   A.   No, I do not.

18   Q.   Going back to licensing fees, how do you decide

19          how much to charge for a particular use?

20   A.   In the first year I did not know what a

21          freelance photographer would be paid.  I

22          basically went with what they offered.  Most of

23          the time that was 150 to possibly $300.

24   Q.   When you said in the first year, when did that

25          change?

1   A.   I had been in touch with a freelance

2        photographer, and asked him the guidelines, for

3        which he explained to me that a quarter page or

4        less would be worth $250 for a freelance

5        photographer.

6   Q.   When was that, that he explained that to you?

7   A.   That would be sometime in 2002.

8   Q.   Do you recall when in 2002?

9   A.   No, I do not.

10  Q.   What's the name of that photographer?

11  A.   Scott Goldsmith.

12  Q.   Do you keep a scrapbook relating to the photo?

13  A.   I had at the time a three ring binder that I

14       held all of the publications in plastic

15       sleeves.

16  Q.   When you say at the time, what do you mean?

17  A.   It has since outgrown and the binder had fallen

18       apart.

19  Q.   When was the last time that everything fit in

20       the binder and you were still using the binder?

21  A.   2003 or so.

22  Q.   And now do you still keep something equivalent

23       to a scrapbook?

24  A.   I keep everything in a box.

25  Q.   Where do you get all of the material that

1    A.    Yes, I did.

2    Q.    Do you recall who that reporter was?

3    A.    His name was Charles Sheehan.

4    Q.    How did you come to talk to Mr. Sheehan?

5    A.    It was the morning of the first anniversary,

6          which would have been September 11th, 2002 at

7          the memorial site.  It was a very cold morning,

8          and Salvation Army was having hot beverages

9          served in trailers.  And I went up and had a

10         cup of coffee, and that's where I met Charles

11         Sheehan.

12   Q.    Did you introduce yourself to Mr. Sheehan?

13   A.    Yes, I did.

14   Q.    Did he approach you first, or did you approach

15         him?

16   A.    We had both been standing, and I said good

17         morning and introduced myself.

18   Q.    Do you remember what you discussed with

19         Mr. Sheehan?

20   A.    I did inform him that I had taken that photo.

21         And we talked about how things have changed in

22         the past year, what a difference a year made

23         basically, conversation.  He asked if he could

24         contact me later, and I gave him my

25         information.

1   Q.   Did Mr. Sheehan identify himself as a reporter

2         for the Associated Press?

3   A.   He had a press badge on, yes.

4   Q.   Did you discuss the photo with Mr. Sheehan?

5   A.   Yes, I had.

6   Q.   What was it that Mr. Sheehan indicated he would

7         contact you about in the future?

8   A.   He asked if he could do an article regarding

9         how things had been in the past year in the

10       area, and with us personally, since I had taken

11       the photo.

12   Q.   Did you consent to that?

13   A.   Yes, I did.

14   Q.   When you met Mr. Sheehan the first time when

15       you were both having coffee, did you have the

16       scrapbook with you?

17   A.   No, I did not.

18   Q.   Did you have any materials with you?

19   A.   No, I did not.

20   Q.   Did Mr. Sheehan subsequently contact you?

21   A.   Yes, he did later that day.

22   Q.   Was that in person, by phone, or some other

23       way?

24   A.   It was by telephone.

25   Q.   And do you remember what you discussed then?

1   A.   We discussed the changes, how 9/11 had affected

2        myself and my family since 9/11, my health

3        issues.  My husband and I were in the process

4        of losing our company.  It was partially 9/11

5        related, due to the insurance issues.  And he

6        asked if he could come out and make a personal,

7        and continue the interview in person.

8   Q.   And did he come out in person?

9   A.   Yes, he did.

10  Q.   When did he come out in person?

11  A.   It would be later that afternoon.

12  Q.   So let me just see if I understand, it was the

13       same day that you met Mr. Sheehan at the event,

14       he then called you later that day and you spoke

15       by telephone, and then he came out that

16       afternoon?

17  A.   Yes.

18  Q.   What did you discuss when he came out?

19  A.   We discussed my publications.  I had my

20       scrapbook on the coffee table, as I usually do.

21       Most people wish to see the publications.  We

22       discussed where it had been, the kind of fee,

23       and the fact I was currently having health

24       issues.  And also conducted an interview

25       with -- about my husband's business, about us

1      losing, being in bankruptcy at the time.  And

2      how the area in general has changed.  How we're

3      all reacting to being thrown into the

4      spotlight.

5   Q.  Did you understand that Mr. Sheehan would be

6      writing something for publication by the AP

7      based on your conversations with him?

8   A.  Yes, I did understand that.

9   Q.  Did you have any further conversations with

10     Mr. Sheehan beyond those that we already

11     discussed?

12  A.  No.

13  Q.  Did you have any conversations with any other

14     representative of the Associated Press?

15  A.  The only other representative of the Associated

16     Press would have been the photographer who was

17     present and took a photo of me holding the

18     photo in my living room.

19  Q.  Where you say the photographer was present, the

20     photographer was present when Mr. Sheehan came

21     to your house?

22  A.  Yes, he was.

23  Q.  Do you have an absolute recollection of

24     Mr. Sheehan and the photographer being present

25     together at your house?

1    A.    Yes, I do.

2    Q.    Why did you or what did you understand the

3          photographer to be doing and why was he

4          present?

5    A.    He was taking a photo of me holding my photo,

6          and the camera that I took the photo with, I

7          was sitting on my sofa, in relation to the

8          article.

9    Q.    Are you familiar with the complaint in this

10         action?

11   A.    Can you explain what you mean?

12   Q.    Sure, you are the plaintiff in a case against

13         the Associated Press.

14   A.    Yes, I am.

15   Q.    Is that correct?

16   A.    That is correct.

17   Q.    And as plaintiff, are you aware that a document

18         called a complaint was filed to initiate the

19         action?

20   A.    I understand that.

21   Q.    And are you aware that there were attachments

22         to the complaint when it was filed, and those

23         attachments included some pictures and certain

24         other things, do you recall that?

25   A.    I'm not sure what you mean.

1        a problem?

2  A.    Because I had assumed that it was the exact

3        same photo and same article.  It wasn't until I

4        started to pursue action against AP, when I was

5        looking for every article that I could find.

6  Q.    When was that?

7  A.    That would have been in 2003.  I started

8        looking August of 2003.

9  Q.    In August of 2003 you started looking

10       specifically for AP, or generally for uses of

11       your photo?

12  A.    General.

13  Q.    And what did you find generally when you

14       started looking?

15  A.    I found that one.  I had been notified that it

16       had been reused by the Washington Post.  I was

17       aware that the Chicago Tribune had used it.

18       And it had been on the home site -- home page

19       of AOL for two days.  That is the time that I

20       realized that there may be a problem.

21  Q.    When did you realize it had been used by the

22       Washington Post?

23  A.    I would have to look at the record.  I have an

24       E mail.  It would have been I believe in 2004

25       that that had been used.

1   Q.    How did you become aware that it had been used

2          in the Washington Post?

3   A.    I have a friend who via E mail from -- he also

4          has a residence in Washington, stated that he

5          had seen my photo in publication in the Post,

6          and made me aware of it.

7   Q.    Did you license the Washington Post to use your

8          photo?

9   A.    I had, for a one time use.  And it became the

10        cover of one of their publications.  I was paid

11        $300.  They reissued, and again I was paid.  On

12        the third time I was not.  It was used without

13        my knowledge or consent.

14   Q.    How did you become aware that the photo was

15        used on AOL?

16   A.    I walked into the office when I was at Coldwell

17        Banker.  I am not an AOL subscriber.  One of my

18        fellow agents happened to be on duty, and had

19        it online right there.  And he said Val, here

20        is your photo, front and center.  And I had a

21        very surprised reaction, since I had not

22        agreed, not licensed for its use.

23   Q.    Was the AOL photo the first one that caught

24        your attention that there might be a problem?

25   A.    Yes.

1    Q.    And do you remember when that was?

2    A.    August 8th, 2003.

3    Q.    And did you have someone contact AOL on your

4          behalf at that time?

5    A.    Yes, I did.

6                         - - - -

7          (There was a brief pause in the proceedings.)

8                         - - - -

9    BY MR. PENCHINA:

10   Q.    Now that we've had a little bit of a break, is

11         there any of your prior testimony that you

12         would like to correct?

13   A.    No.

14   Q.    Earlier today I was asking you about selling

15         copies of the photo.  Do you remember that?

16   A.    Yes, I do.

17   Q.    I'm not sure if I asked this question, so

18         forgive me if I'm going over the same ground,

19         how much, or what was the sale price, or what

20         is the sale price when you sell copies of the

21         photo?

22   A.    $20 each, 8 x 10.

23   Q.    So the 8 x 10 copies of the photo that either

24         you sell or that are distributed through the

25         couple of stores that you mentioned would all

1   Q.    Published by different companies to your

2           knowledge?

3   A.    To my knowledge, I don't know.

4   Q.    Do they carry the same content do you know?

5   A.    Pretty much.

6   Q.    Do you know whether the article that AP wrote

7           about you appeared in all of those papers?

8   A.    It did not appear in the Daily American, I know

9           that for sure.  I do not believe it appeared in

10          the Tribune Review either.  I have no knowledge

11          of it.

12  Q.    Why are you suing AP?

13  A.    I became aware that my photo had been dispersed

14         without my knowledge or consent, and I'm trying

15         to protect the integrity of the photo, of where

16         it goes and what articles it is associated

17         with.

18  Q.    What do you mean by it had been dispersed?

19  A.    Well, AOL had used it without my knowledge or

20         consent in an article that I found to be

21         uncomfortable with.  And it was associated with

22         an article stating New Theory on Flight 93,

23         which that is an article that I would not have

24         granted permission to.

25  Q.    The article that stated a New Theory of Flight

1          93?

2    A.    Yes.

3    Q.    Was that associated with AP?

4    A.    I'm not sure.  I know that is what AOL had it.

5          And that's -- I don't know where else it may

6          have been.

7    Q.    Did you read the story that the AP did about

8          you?

9    A.    The one that has appeared, yes, I did.

10   Q.    What do you think about the story?

11   A.    They had been there, they asked the questions

12         and I approved them.

13   Q.    Was it an accurate story?

14   A.    For the most part.  Some of my health issues

15         were a little exaggerated, but it was -- it

16         held true.

17   Q.    And is it the type of article or type of story

18         which you approve in connection with using your

19         photo?

20   A.    On the human interest side of me being the

21         photographer, yes.  It told an accurate story.

22   Q.    Is your problem with the Associated Press that

23         they use the photo with that story?

24   A.    No.  My problem is, as I had found out, that it

25         had been distributed to other entities that I

1       had no control over where it went.

2   Q.    So your problem are the uses like AOL?

3   A.    Correct.

4   Q.    Is your problem with newspapers that ran the

5       article as written by the Associated Press with

6       the photograph?

7   A.    Which photograph, the one with me holding, I

8       have no problem with.

9   Q.    No, the reproduction of your photograph in

10      connection with the AP story, is that something

11      that you have a problem with?

12  A.    If they would have had my permission, I would

13      not have a problem with it.

14  Q.    And it's your testimony that they did not have

15      your permission?

16  A.    It is my testimony that that photo was not to

17      be reproduced.

18  Q.    Do you know anyone named Keith Hodan?

19  A.    No, I do not.

20  Q.    Have you enjoyed the attention that your photo

21      has generated for you?

22  A.    I enjoy sharing the photo, yes.  It's a very

23      integral part of our community.

24  Q.    Ms. McClatchey, I'm going to hand you, or the

25      reporter has handed you a document that has

1        been marked as Exhibit 1, which is a single

2        page and has the production number MC 00199.

3        Can you tell me whether Exhibit 1 is familiar

4        to you?

5   A.   This is the article that my husband's niece had

6        shared with me that the photo had appeared.

7        This is the one I thought was the same article.

8   Q.   When did you first see Exhibit 1?

9   A.   Not until after I had initially started

10       pursuing the infringement.

11  Q.   Which infringement were you pursuing?

12  A.   At the time I was initially going, looking with

13       AOL, on -- it wasn't until then that my

14       attorney had contacted the AOL attorneys and

15       found that it was the AP who distributed the

16       photo.

17  Q.   They found that AP had distributed the photo to

18       AOL?

19  A.   Yes, that is my understanding.

20  Q.   And when you say your attorney, you do not mean

21       the attorney who is present here today, do you?

22  A.   Correct.

23  Q.   Who was the attorney?

24  A.   David Oberdick.

25  Q.   Ms. McClatchey, the reporter has handed you the

1        picture, and I agreed.

2    Q.    Do you remember the first contact with the

3          folks who took this picture?

4    A.    Most of the contacts were received probably the

5          week before the anniversary, because of my

6          photo being part of the Bearing Witness down at

7          the Smithsonian.

8    Q.    And just for the record, can you tell us what

9          the Bearing Witness at the Smithsonian is?

10   A.    It was -- I had donated the photo to the

11         Smithsonian to be part of their tribute to

12         9/11.  It was called Bearing Witness to

13         September 11th.  They had asked permission to

14         use the photo.  I granted and E mailed a JPG to

15         the Smithsonian, in which case they had

16         enlarged the photo, and it became part of the

17         permanent display for the Smithsonian regarding

18         9/11.

19   Q.    Ms. McClatchey, would you please look at the

20         document the reporter has marked as Exhibit 4,

21         which is a single page with production number

22         MC 0010, and tell me whether Exhibit 4 is

23         familiar to you?

24   A.    That is it.  I remember that.

25   Q.    I'm sorry, I didn't hear, did you say this is

1          familiar to you?

2  A.    Yes, this is an E mail that I would have

3          written.

4  Q.    And this E mail represents your permission to

5          Newsweek to utilize your photograph on their

6          website?

7  A.    Yes.

8  Q.    Was there any other documentation of that, or

9          is this all of the paperwork, and this I mean

10        Exhibit 4?

11  A.    This was all I would have, that I know of.

12  Q.    And in the first line of your E mail, towards

13        the top, it says, among other things:  It's an

14        honor to be able to share it with others.  Do

15        you recall writing that?

16  A.    Yes, I do.

17  Q.    What did you mean by that?

18  A.    When people ask and feel that my photo is

19        worthy of -- to be part of something like that,

20        it is an honor that they would ask that my

21        photo be part of their articles or sharing it

22        with the public.

23  Q.    Ms. McClatchey, the reporter has handed you a

24        document marked as Exhibit 5, which is a 2 page

25        document with production numbers MC 16 and MC

1       17.   Would you please look at it and tell me

2             whether Exhibit 5 is familiar to you?

3    A.    May I have a minute to read?

4    Q.    Please do.

5    A.    Yes, that is one of my E mails.

6    Q.    In the address line on the top page of Exhibit

7             5 it says From, To, Sent, Attach.  Do you see

8             that?

9    A.    Yes, I do.

10   Q.    Where it says attach, it says September 11,

11            looks like a comma,.JPG do you see that?

12   A.    Yes, I do.

13   Q.    Do you know what that means?

14   A.    Yes, that is I attached the JPG to Helen for

15            the use in her newspaper article.

16   Q.    And so you sent --

17   A.    With my permission, yes, I sent the photo.

18   Q.    And the photo that you sent was in electronic

19            form, and did not have the title or copyright

20            notice?

21   A.    Correct.

22   Q.    Do you have on your computer the file from

23            which Exhibit 5 was printed?

24   A.    Exhibit 5 meaning my photo?

25   Q.    Exhibit 5 meaning this document that is in

 1             discussing which outgrew the binder and is now

 2             in the box?

 3   A.       Correct.

 4   Q.       Ms. McClatchey, would you kindly look at the

 5             document the reporter has marked as Exhibit 6,

 6             which is a single page with the production

 7             number MC 19, and tell me whether Exhibit 6 is

 8             familiar to you?

 9   A.       Yes, it is from Paul, a person I had met.

10   Q.       Please remind me who Paul is.

11   A.       Paul is from another TV station, and he was out

12             and asked if he could use the photo.

13   Q.       And I take it Exhibit 6 is the means by which

14             you provided the photo to Paul?

15   A.       Yes, it is.

16   Q.       And Paul is affiliated with WQED-TV?

17   A.       Correct.

18   Q.       Are you aware whether WQED-TV actually used the

19             photo?

20   A.       I do not get WQED-TV, so I would not know.

21   Q.       But you did authorize them to use it?

22   A.       Yes, I did.

23   Q.       Did you charge WQED-TV a fee?

24   A.       I don't believe I did.

25   Q.       And again Exhibit 6 shows that Sept11,.JPG

1      attachment.  Does that mean that you conveyed

2      that same JPG file to Paul?

3  A.    Yes, it is.

4  Q.    Ms. McClatchey, would you please look at the

5      document the reporter has marked as Exhibit 7,

6      which is a single page with a production number

7      MC 37.  And when you've had a chance to look at

8      it, tell me if Exhibit 7 is familiar to you.

9  A.    Yes, it is my authorization working with the

10     Washington Post.

11  Q.    Do you remember writing Exhibit 7?

12  A.    Yes, I do.

13  Q.    What were you trying to convey in terms of the

14     thoughts that you were sharing in the body of

15     the E mail?

16  A.    After speaking with them on the phone, I

17     thought it was -- we had discussed the photo,

18     its content.  The way it's represented, and it

19     was kind of a strange way to -- I don't know

20     how to explain, it's beauty -- it's a beautiful

21     photo, but it's got such powerful implications.

22     And we were sharing those thoughts.

23  Q.    Ms. McClatchey, would you kindly look at the

24     document the reporter has marked as Exhibit 8,

25     which is a single page with the production

1        which is a two page document bearing MC 188 and

2        189, which appears to be some sort of

3        communication from U.S. News.  Is Exhibit 12

4        familiar to you?

5  A.    Yes, it is.

6  Q.    What is Exhibit 12?

7  A.    This is confirmation when they had sent me a

8        check for payment on the U.S. News report that

9        they had done.

10  Q.    Do you know when Exhibit 11 was created?

11        There's no date on it.  Is that something that

12        you recall?

13  A.    That would have -- may have been FAX'ed to him.

14        I'm not sure.

15  Q.    Do you know --

16  A.    That would have been sometime October,

17        November, I'm not sure.

18  Q.    And also based on the date on the second page

19        of Exhibit 12, which invoice date is

20        11-13-2002, does that give you any indication

21        of when the photo might have been used by U.S.

22        News?

23  A.    It may have been used prior to.  It is not

24        uncommon for me to go on the honor system and

25        send it prior to being paid.

1   A.    Yes, it is familiar.

2   Q.    What is Exhibit 13?

3   A.    I was looking to find out, I had looked in my

4         pursuit of seeing unauthorized use of my photo,

5         that a Paul Thompson had done a timeline on a

6         website, and he did not have my permission to

7         use the photo.  It was used, and I wanted to

8         know where, why, and have it removed.

9   Q.    Was it removed?

10  A.    Yes, it was.  To my knowledge it was removed.

11  Q.    Exhibit 13 appears to be conveying your consent

12        to use the photo in the timeline.

13  A.    If they would have asked prior to, and

14        explained to me, I would not have a problem

15        with that, if they had asked prior to.  If they

16        wanted to discuss it, I would have no problems

17        using it for an educational purpose.

18  Q.    But look at the text of the message that you

19        sent that appears on the top half of Exhibit

20        13.  Two lines up from your name the text says:

21        This can be used as record that I fully consent

22        to its use in the timeline of events.  Does

23        that indicate to you that at least at the time

24        that Exhibit 13 was created you were giving

25        consent?

1  A.    That's what I believe I indicated to them.

2  Q.    Going back to Exhibit 13, in the first

3        paragraph of your message you indicate that it

4        has been used without my permission lately.

5  A.    Uh-huh.

6  Q.    What specifically were you referring to?

7  A.    That was right after the discovery of AOL

8        earlier that month, a couple weeks prior to,

9        that it was on AOL without my knowledge or

10       consent.  And I was going through, looking to

11       see who had my permission to use it and who

12       didn't.  I had spoken with a Paul Thompson.  He

13       was discussing doing a timeline, but nothing

14       had been discussed as to using the photo at the

15       time.

16 Q.    As of August 19th, 2003, which is the date that

17       appears in Exhibit 13, in addition to AOL, what

18       other unauthorized uses of the photo were you

19       aware of?

20 A.    That was AOL, and this was one of the first

21       ones that I had come across.

22 Q.    So --

23 A.    This was the early stages of my investigating.

24 Q.    And following up in your later stages of

25       investigating, who, in addition to AOL and the

```
 1              folks with this timeline, made unauthorized

 2              uses of the photo?

 3    A.        I believe Washington Post reused the photo

 4              without my knowledge.

 5    Q.        Anyone else?

 6    A.        Chicago Tribune had done an article.  There is

 7              a conspiracy theorist named Killtown on one of

 8              the websites, that he would not identify

 9              himself after calling me at 10:30 at night,

10              claiming all kinds of crazy things, asked my

11              permission.  And I expressly said do not use my

12              name or photo associated with yours.

13    Q.        Are there any others?

14    A.        Not that I'm aware of.

15    Q.        How did the Chicago Tribune use the photo?

16    A.        I have not seen the article.

17    Q.        Do you have a sense of what the article in the

18              Chicago Tribune was about?

19    A.        I believe it followed the same lines or general

20              information about the new theory that the

21              hijackers brought the plane down.

22    Q.        Do you know when Chicago Tribune made that

23              unauthorized use?

24    A.        I believe it may have been in 2004.  I do not

25              know the exact date.
```

```
1                          - - - -

2                   (Luncheon recess at 11:55 a.m.  At

3          12:45 p.m., the deposition was reconvened as

4          follows):

5                          - - - -

6   BY MR. PENCHINA:

7   Q.    Ms. McClatchey, the reporter has handed you a

8          document marked Exhibit 14, which is a single

9          page with the production number MC 68.  Is

10         Exhibit 14 familiar to you?

11  A.    Yes, it is.

12  Q.    What is Exhibit 14?

13  A.    This is a confirmation of me sending a JPG of

14         the September 11 photo to WTAJ-TV.  Allison

15         Sweeney I believe would be the person.

16  Q.    When you say it's a confirmation, do you know

17         whether this is a copy of the document or the

18         E mail that actually transmitted the JPG to

19         her?

20  A.    Yes, it is.

21  Q.    Who is Allison?

22  A.    Allison Sweeney is from the Altoona media, that

23         I had previously identified as someone who had

24         my permission.

25  Q.    Is Altoona media a television station?
```

1    A.    WTAJ-TV, yes, it is.

2    Q.    Do you know whether they used the photo?

3    A.    Yes, they had it on the screen.

4    Q.    Did you see how they used it?

5    A.    No, I did not.  I do not get that.

6    Q.    Do you know whether you charged them a fee in

7          connection with their use?

8    A.    I did not charge them a fee.

9    Q.    And why did you determine not to charge them a

10         fee?

11   A.    It was my choice.  I did not -- it was just a

12         brief story, it was not being publicated as in

13         print.

14   Q.    You did charge some TV uses; is that correct?

15   A.    ABC News, yes, I did.

16   Q.    I understand that it is your choice.  My

17         question is what was it that went into your

18         choice to decide not to charge this particular

19         entity for this particular use?

20   A.    This was just a news report on local stations,

21         and I had not charged.

22   Q.    Ms. McClatchey, the reporter has handed you a

23         document marked Exhibit 15, which is a multi

24         page document with the production numbers MC 78

25         through 80.  Can you please take a look at it

1       and tell me whether Exhibit 15 is familiar to

2       you?

3   A.  This was my conversation with Dave LaBelle from

4       the Post-Gazette who also had my permission to

5       use the photo.

6   Q.  And can you tell me what the Post-Gazette is?

7   A.  The Pittsburgh Post-Gazette, it's a newspaper

8       here in Pittsburgh.

9   Q.  Is it one that you read on a regular basis?

10  A.  No, it is not.

11  Q.  Is the copy of the photo that you provided to

12      the Pittsburgh Post-Gazette, was that in JPG or

13      was that a hard copy?

14  A.  That would be JPG.

15  Q.  Can you please turn to the second page of

16      Exhibit 15, which is the page with MC 79 on the

17      bottom?

18  A.  Yes.

19  Q.  And on the top half of the page appears to be a

20      message from you to Dave LaBelle, do you see

21      that?

22  A.  Yes, I do.

23  Q.  Is that an accurate description, is that what

24      it is?

25  A.  Yes, it is.

1    Q.    About four lines up from your name in that

2          message it says:  It's exciting to have the

3          photo published in Newsweek magazine.  What

4          were you trying to convey with that statement?

5    A.    We had discussed that the photo had been picked

6          up by Newsweek magazine, which would have been

7          the first American Newsweek magazine in

8          December of 2002 -- or 2001, I'm sorry.

9    Q.    When you say the first American Newsweek, what

10         do you mean?

11   A.    The first major American newsprint publication.

12   Q.    Prior to being picked up in Newsweek, it had

13         been published elsewhere, outside of the U.S.?

14   A.    Yes, it has been.

15   Q.    What was exciting about having it published in

16         Newsweek?

17   A.    To see it actually in print for other people to

18         see.

19   Q.    Ms. McClatchey, the reporter has handed you a

20         document marked Exhibit 16, which is a single

21         page with production number MC 56.  Is Exhibit

22         16 familiar to you?

23   A.    Yes, it's from Lim Vannary, she is from LePoint

24         publication in Paris, France.

25   Q.    And again, you provided to this publication a

1        copy of the photo in electronic JPG format?

2  A.    Correct.

3  Q.    And this was the E mail that conveyed that

4        file?

5  A.    This was the -- yes, it is, it's the one that

6        conveyed the file.

7  Q.    Would you kindly take a look at the document

8        that the reporter has marked as Exhibit 17,

9        which is a multi page document with production

10       numbers MC 270 through 273.  After you've had a

11       moment to look at it, can you tell me whether

12       Exhibit 17 is familiar to you?

13  A.   Yes, it is a copy of the article that I cannot

14       understand, it's in French.  But it does have

15       my name as being the author of the photo, with

16       my permission.

17  Q.   And the photo as it appears on the last page of

18       Exhibit 17, is that the format in which you

19       sent it to Le Point?

20  A.   It had been cropped, the gutter had been, but

21       since they had my permission, they can do that.

22  Q.   Since they had your permission --

23  A.   To use the photo, to zone in on the -- they can

24       use -- I have no problem, if they have my

25       permission.

```
 1   Q.    Is Exhibit 18 part of your collection?

 2   A.    No, it is not.

 3   Q.    When did you license or permit Philadelphia

 4         Daily News to make a use?

 5   A.    It would probably be in either late 2001 or

 6         early 2002, I don't recall.

 7   Q.    It's your testimony that Exhibit 18 is not the

 8         licensed use?

 9   A.    This is not the licensed use.

10   Q.    If you look directly below the photograph in

11         Exhibit 18, there is a notation, relatively

12         small letters, that says VAL MCCLATCHEY/For the

13         Daily News.  Do you see that?

14   A.    Yes, I do.

15   Q.    What does that notation mean to you, if

16         anything?

17   A.    That I had originally provided the Daily News

18         with a copy of the photo.  And they used it

19         again, that I did not know about, and was not

20         made aware of this use.

21   Q.    In addition to being interviewed in connection

22         with the photograph, have you had occasion to

23         be interviewed by the media at other times?

24   A.    I have been interviewed quite a few times, but

25         the media, that was pretty much it, the ones
```

```
1              document marked Exhibit 21, which is another

2              document that I have printed out from the

3              internet and I ask you to take a moment and

4              review Exhibit 21 and tell me if that's

5              something familiar to you?

6      A.      Yes, it is.

7      Q.      What is Exhibit 21?

8      A.      It is a post on our Camaro Club website that

9              the Learning Channel is going to be doing a

10             documentary about Flight 93, and I wanted to

11             let them know that it was going to be on so

12             they could watch it.  I would let them know

13             when it was to be aired.  And the FBI said it

14             was the first one, it was documented as being

15             the first photo related to Flight 93, and I had

16             given close friends of mine and associates with

17             the Camaro Club a copy of the Flight 93 photo.

18     Q.      When you say to those who have a copy of it in

19             Exhibit 21, that you're referring to members of

20             the club and other friends to whom you --

21     A.      Yes.

22     Q.       -- shared copies?

23     A.      Yes, that is correct.

24     Q.      And you sent the message, that is Exhibit 21,

25             because you were rightly proud of the use that
```

1       was being made of your photo; is that correct?

2   A.  Yes.

3                   MS. SZPONDOWSKI:   Objection.

4   Q.  Is that correct?

5   A.  It is correct, I was proud of my photo.

6   Q.  Ms. McClatchey, the reporter has handed you a

7       document marked Exhibit 22, which is a multi

8       page document bearing production numbers AP 2-A

9       through AP 2-D.  Can you please take a look at

10      Exhibit 22 and tell me whether it's familiar to

11      you?

12  A.  This is the letter from my previous attorney

13      that was instigated by -- started the whole

14      process on our inquiry on AOL to find out what

15      had happened, how they had obtained the photo.

16      Discussing, you know, that I did not give them

17      authorization.

18  Q.  Is Exhibit 22 the first time that you or a

19      representative of yours sent a letter to

20      someone to complain about the usage of the

21      photo?

22  A.  Yes.

23  Q.  Or to complain about a usage of the photo?

24  A.  Yes.

25  Q.  What motivated you to take action at the point

1   Q.   Were all of the printouts that you created

2         prior to 2004 or '5, whenever you started the

3         new program, did all of those printouts have

4         this notation?

5   A.   Yes, they did.

6   Q.   In the top left-hand corner of the picture that

7         is Exhibit 22 is the notation End of Serenity,

8         September 11, 2001.  Do you see that?

9   A.   Yes, I do.

10   Q.   Is that the title of the photograph?

11   A.   End of Serenity, yes, it is.

12   Q.   And how, while using the old system prior to

13         2004, or whenever you got the new system, how

14         was that title affixed to the picture?

15   A.   The title affixed to the picture in the same

16         way, I printed it out on the photo paper prior

17         to sending it back through the printer with the

18         photo.

19   Q.   There does not appear to be a copyright notice

20         on this last page of Exhibit 22.  Is there?

21   A.   The copyright has been cut off at the bottom.

22   Q.   Where would the copyright notice have appeared?

23   A.   It would have been -- there should be a road

24         and a piece of grass, which is the front

25         portion of my yard.  That is where I attach the

1    Q.    On the top message, and by that I mean

2          appearing on the top of Exhibit 25, it appears

3          to be an E mail from you to Mr. Morlacci dated

4          November 28, 2001.  Do you see that?

5    A.    Uh-huh.

6    Q.    Is this an E mail from you to Mr. Morlacci?

7    A.    Yes, it is.

8    Q.    What did you mean when you said the more it is

9          seen the better?

10   A.    We had discussed that they see 5 million

11         people, monthly page views, and that I was

12         trying to get the message out, especially about

13         the Todd Beamer Foundation, that people can

14         access it.

15   Q.    Do you know someone named or that uses an

16         E mail address rgkozel?

17   A.    Yes, I do, Gary Kozel.

18   Q.    Who is Gary Kozel?

19   A.    He is a friend of mine.  I had met through the

20         September 11th events.

21   Q.    Would you kindly look at Exhibit 26, which is a

22         document bearing the production number MC 194,

23         and tell me whether that's familiar to you?

24   A.    Yes, it is.

25   Q.    What is Exhibit 26?

1    Q.    Ms. McClatchey, would you please take a look

2         at the documents the reporter has marked as

3         Exhibit 27, and these are a multi page exhibit

4         which are screen captures from a video Liberty

5         Bound. And will you tell me whether Exhibit 27

6         is familiar to you?

7    A.    I know the title Liberty Bound, but I had not

8         seen the video.

9    Q.    What is Liberty Bound?

10    A.    Liberty Bound was to be a documentary that I

11         had given permission for.

12    Q.    Do you know who it was produced by?

13    A.    It was a strange name, Blue Goose or Blue

14         something, Blue Moose Productions.

15    Q.    Do you know whether it has aired?

16    A.    I believe it had -- they were just selling

17         copies, DVDs or so.

18    Q.    Did you say you did not view it?

19    A.    No, I had not viewed it.

20    Q.    Did you provide copies of your photo for use in

21         the Liberty Bound?

22    A.    Yes, I did.

23    Q.    Would you please turn to the second page of

24         Exhibit 27, and is that your photograph?

25    A.    Yes, it is my photograph.

1   Q.   And there is copyright notice or title on that;

2        is that correct?

3   A.   It was sent by JPG, electronic.

4   Q.   Are you familiar with a production The Flight

5        That Fought Back?

6   A.   Yes, I am.

7   Q.   What is The Flight That Fought Back?

8   A.   That came from Brooklapping associated with the

9        Discovery Channel.

10   Q.   Have you seen The Flight That Fought Back?

11   A.   Yes, I did.

12   Q.   Would you please take a look at the documents

13        the reporter has marked as Exhibit 28, which

14        are two pages, which again are screen captures

15        from a video that you all produced in

16        discovery. Is Exhibit 28 familiar to you?

17   A.   Yes, it is.

18   Q.   Is the photograph on the second page a

19        reproduction of your photograph?

20   A.   Yes, it is.

21   Q.   And just to clarify, by second page I'm

22        referring to the second page of Exhibit 28.

23        Did you again provide a copy of this photo in

24        JPG format?

25   A.   Yes, I did.



| | | |
|---|---|---|
| 1 | Q. | So again like the other JPG format, it would |
| 2 | | not have copyright notices or the title? |
| 3 | A. | Correct. |
| 4 | Q. | Are you familiar with something called The |
| 5 | | Shanksville Episodes? |
| 6 | A. | The Windsor Park? |
| 7 | Q. | Are you familiar with something called Windsor |
| 8 | | Park Stories? |
| 9 | A. | Yes, I am. |
| 10 | Q. | What is Windsor Park Stories? |
| 11 | A. | It's a series of documents, interviews, done by |
| 12 | | Tony Mussari and his wife, Kitch.  They came |
| 13 | | out and spoke to me, interviewed. |
| 14 | Q. | Who is Tony Mussari? |
| 15 | A. | He is the producer and owner of Windsor Park |
| 16 | | Stories. |
| 17 | Q. | In addition to being the owner of Windsor Park |
| 18 | | Stories, do you know anything else about Tony |
| 19 | | Mussari? |
| 20 | A. | Other than he's a very nice gentleman and we've |
| 21 | | gotten along very well. |
| 22 | Q. | Is Windsor Park Stories to your knowledge |
| 23 | | affiliated with any other media project or |
| 24 | | media entities? |
| 25 | A. | No, they are not. |

1    have a problem if they cropped the photo; is

2    that correct?

3  A.  If they gave -- if I gave them permission to

4    use, I gave them a JPG, I don't want them

5    cropping my copyright notices.

6  Q.  And why did you send those individuals who had

7    written permission a JPG of your photograph?

8  A.  So that they would have a clear copy for

9    publication.

10  Q.  And the JPG file had no copyright notice or End

11    of Serenity title; is that correct?

12  A.  That is correct.

13  Q.  Did you ever give permission to anyone to crop

14    off the copyright notice on your photograph?

15  A.  Crop the copyright, no.

16  Q.  Do you recall, did anyone from any news

17    organization other than the Associated Press

18    interview you on September 11th, 2002?

19  A.  I spoke to someone up at the crash site.  I was

20    at the crash site, I spoke with Hilda Marcine's

21    grandchildren, and I just spoke to a few people

22    there, not on record, that I had met through

23    previous interviews.

24  Q.  Who is Hilda Marcine?

25  A.  Hilda Marcine was one of the victims of Flight

1          93.

2    Q.    So you were not interviewed by anyone else on

3          that day, other than the AP?

4    A.    No.

5    Q.    And did you give a courtesy copy of your

6          photograph to anyone from the Associated Press

7          during -- or on September 11th, 2002?

8    A.    Yes, I did.

9    Q.    And did that courtesy copy have your copyright

10         notice and your Send of Serenity title on it?

11   A.    Yes, it did.

12   Q.    And did you give the AP permission to

13         distribute your photograph to its members and

14         subscribers?

15   A.    No, I did not.

16   Q.    Not orally?

17   A.    Not orally.

18   Q.    And you didn't give them permission in writing

19         either, did you?

20   A.    No, I did not.

21              MS. SZPONDOWSKI:  I have nothing

22         further.

23              MR. PENCHINA:  Just a few followups

24         to that.

25                       - - - -