1              IN THE UNITED STATES DISTRICT COURT FOR THE
                     WESTERN DISTRICT OF PENNSYLVANIA
2

   VALENCIA M. McCLATCHEY,              )
3                                       )
                 Plaintiff,             )
4                                       )
                 vs.                    )
5                                       )
   THE ASSOCIATED PRESS,                )      Civil Action
6                                       )      No. 05-145J
                 Defendant.             )
7

8

9

10

11                              - - - -

12         DEPOSITION OF:  GENE J. PUSKAR

13                              - - - -

14

                        DATE:   March 15, 2006
15                              Wednesday, 9:30

16

                    LOCATION:   Eckert Seamans Cherin &
17                                 Mellott
                                44th Floor - US Steel Tower
18                              Pittsburgh, PA 15219

19                  TAKEN BY:   Plaintiff

20

                 REPORTED BY:   Keith G. Shreckengast, RPR
21                              Notary Public
                                AKF Reference No. KS93223
22

23

24                                      EXHIBIT

                ORIGINAL                    4
25

1    Q.    Who is she?

2    A.    She's a woman suing the Associated Press for

3          copyright infringement.

4    Q.    Did you know Val McClatchey, did you meet Val

5          McClatchey on September 11, 2002 while covering

6          the events of the crash?

7    A.    I don't remember if that was the day I met her.

8    Q.    Okay.  Did you meet Val McClatchey in and

9          around that date on September 11, 2002?

10   A.    Somewhere around the first anniversary of 9/11,

11         2001, I did have an occasion to photograph

12         Mrs. McClatchey for a Charles Sheehan

13         Associated Press story about her, about her

14         picture.

15   Q.    And do you recall who gave you that assignment

16         to take the photograph associated with the

17         picture, was that the Associated Press?

18   A.    The Associated Press gave me the assignment.  I

19         don't recall who directly told me to go out

20         there.

21   Q.    And do you have a specific recollection whether

22         your photographing of Miss McClatchey for the

23         article by Sheehan took place on September 11,

24         2002?

25   A.    No.

1   Q.    Do you know what photograph did you take of

2          Ms. McClatchey, or photographs did you take of

3          Ms. McClatchey to accompany the article by

4          Charles Sheehan?

5   A.    Took a photograph of her photograph.  That's

6          all I can really recall.

7   Q.    Did you take any photographs of her?

8   A.    You know, I can't really recall whether I did

9          or not.

10  Q.    You said you took a photograph of her

11         photograph.  Her photograph is the photograph

12         that's called End of Serenity with the plume of

13         smoke; is that correct?

14  A.    I don't know what it's called, but it does have

15         a plume of smoke that's purported to be the

16         Flight 93 plane.  Yes.  That's the picture with

17         the red barn?

18  Q.    Yes.  Where did you take the photograph of the

19         photograph?

20  A.    She was holding it for me outside the side door

21         of her house.

22  Q.    She was holding what?

23  A.    Her photograph.

24  Q.    And you took a photograph of that photograph?

25  A.    Correct.

1  Q.    What did you tell her when you were taking the

2        photograph?

3  A.    I don't recall.  What did I tell her when I was

4        taking the photograph?  I don't recall

5        specifically if I would be saying anything to

6        her when I was taking the photograph.

7  Q.    So was she posing by the side door of her house

8        when you were photographing the photograph?

9  A.    Posing, I don't understand what that would

10       mean.  She was holding the photograph by the

11       side of her house.  And I don't know that she

12       was posing, she was holding the photograph.  As

13       an AP photographer, I'm not really supposed to

14       or ethically inclined to set up a picture.

15       Therefore posing a subject -- if I were to

16       photograph you, right now would be a good

17       picture, the way you are.  If you were gussied

18       up and sitting behind your office desk with

19       your yellow pad in front of you, with your

20       glasses in your hand, that would be posing.

21       That's not something I'd be interested in.

22       It's not something that I do as a journalist.

23       It's kind of a documentary thing.  So whether

24       she was posing is -- she wasn't posing for me.

25       We were standing outside her side door like you



1       and I would be standing outside a side door.

2   Q.  How did you come to meet her at her side door

3       with the photograph?

4   A.  She came to the door and greeted me, went back,

5       got her photo, came back out.

6   Q.  And what did you say you were there for?

7   A.  I was there to photograph her for the Charles

8       Sheehan story, whom she had already been

9       interviewed by.  And she was welcoming, and

10      brought the picture out, stood there, we

11      talked.  And I took a few snaps and was on my

12      way.

13  Q.  Did you tell her you were going to photograph

14      her photograph and use it in the story?

15  A.  Yes.  She volunteered to give me one.  And I

16      didn't want to be responsible for it.  I said

17      here, I could do it this way, hold the picture,

18      just hold it right there.  I'm assuming, having

19      said that to her, she knew I was taking a

20      picture of her picture.

21  Q.  Your testimony is that you don't know that she

22      knew you were taking a picture of the picture

23      versus taking a picture of her holding the

24      picture; is that correct?

25  A.  No, that's not my testimony.

1   Q.   So she absolutely knew you were taking a

2        picture of the picture?

3   A.   Yes.

4   Q.   And as an AP photographer, she offers you a

5        hard copy of the picture as you said?

6   A.   Yes.

7   Q.   But you didn't want that, you'd rather have a

8        photograph of a photograph?

9   A.   Yes.

10  Q.   Why is that?

11  A.   I didn't want to be responsible for carrying it

12       back.  I was going to be on assignment for days

13       out there in the fields of Shanksville.  Didn't

14       want it to get damaged, coffee spilt on it,

15       folded and mutilated and spindled, and then

16       having to find an envelope, stick it -- get it

17       back to her.  Didn't want to be responsible for

18       her property.

19  Q.   What side of the house were you standing on?

20  A.   Left side.  Well, I'm not sure how the house is

21       oriented, but the door was on the left side of

22       the building.

23  Q.   Was Mr. Sheehan there?

24  A.   I'm not aware that he was.  He may have been.

25       I don't know, I didn't see him.

1   Q.   Yes.

2   A.   The day is a long day.  First of all, I'm not

3         quite sure what day I was at Mrs. McClatchey's

4         house.  If you would like me to find out, I can

5         leave and go find out.

6   Q.   I just want your best recollection sitting here

7         today.

8   A.   And I'm telling you I don't recall.

9   Q.   Did the photograph you photographed have a

10       copyright notice on it?

11   A.   Not to my recollection.

12   Q.   Did you check?

13   A.   Would I have checked?

14   Q.   Yes.

15   A.   Yes.

16   Q.   And you don't recall whether or not it does, it

17       did, the photograph that you photographed at

18       her house; is that correct?

19   A.   Excuse me?

20   Q.   You do not recall whether the photograph you

21       photographed --

22   A.   I'm hard of hearing, I'm not trying to be

23       obstinate.

24   Q.   That's fine.  You do not recall whether the

25       photograph that you photographed at her house

1       had a copyright notice on it; is that correct?

2  A.   I do not recall whether it had a copyright

3       notice on it.

4  Q.   And when you took the photograph of the

5       photograph, isn't it true that you only

6       photographed a portion of that photograph?

7  A.   I would have to look at the original, and I

8       would have to look at the frame that I have to

9       tell you how true that is.

10  Q.   Let me then hand you what's been previously

11       marked as Plaintiff's Exhibit 2, and ask you if

12       that is a printout and copy of the digital file

13       that you submitted to the Associated Press in

14       connection with this case?

15  A.   Is this the file that I submitted to the AP?

16  Q.   Is that a copy representation of the file you

17       submitted, Plaintiff's Exhibit 2?

18  A.   I don't know.

19  Q.   I'm going to hand you what was previously

20       marked as Plaintiff's Exhibit 4, and ask you if

21       you recognize this?

22  A.   This appears to be a record of the transmission

23       of this photo from our file, which would not

24       have been the original transmission date.  That

25       was -- it's noted as a file photo.  It was sent

1     earlier as -- I don't think it was noted as a

2     file photo.  So it was -- that's an AP's

3     transmission copy, yes.

4  Q.    And does the photograph in Plaintiff's Exhibit

5     4 represent the photograph that you personally

6     transmitted to the AP?

7  A.    Yes, it does.

8  Q.    So as you look at that photograph now, can you

9     tell me whether or not the photograph you took

10    of Ms. McClatchey's photograph was cropped or

11    altered just to show a portion of the

12    photograph?

13  A.    Yes.  That's not a 35 millimeter frame that's

14    represented there.  So the frame that I shot

15    was a 35 millimeter frame, which would have

16    been longer.  And again, I would need to see my

17    full image, full frame image, but that's not

18    it.

19  Q.    That's not what?

20  A.    That's not the full image that I would have

21    seen in my camera when I copied her image.

22  Q.    Is that the full image you submitted to the

23    Associated Press, Plaintiff's Exhibit 4?

24  A.    Uh-huh.

25  Q.    So regardless of what showed up on your camera,

Pittsburgh, PA
412-261-2323

Greensburg, PA
724-853-7700

Erie, PA
814-453-5700

AKF

1         what was transmitted to the Associated Press is

2         the photograph in Plaintiff's Exhibit 4

3         correct?

4    A.    Yes, it is.

5    Q.    I'm going to hand you what's being marked as

6         Plaintiff's Exhibit 25.  It's a copy of, color

7         copy of a photograph.  It's got a title End of

8         Serenity, September 11, 2001, and in the bottom

9         right corner it's got Valencia McClatchey

10        copyright 2002, MC 00434.  Do you recognize

11        this photograph?

12   A.    This specific photograph, this copy of that

13        photograph?

14   Q.    Yes.

15   A.    No.

16   Q.    Do you recognize the photograph that's in

17        Plaintiff's Exhibit 25?

18   A.    I recognize the image of the cloud of smoke,

19        yes, I do.

20   Q.    And is that the image that you took your

21        photograph of and submitted to the Associated

22        Press?

23   A.    Yes.

24   Q.    And if you look at your image in Plaintiff's

25        Exhibit 4, and you compare it to the image in

1            Plaintiff's Exhibit 25, let's start with the

2            bottom portion, it appears that all of the road

3            underneath the barn is cropped off?

4   A.     Uh-huh.

5   Q.     From Plaintiff's Exhibit 4; is that correct?

6   A.     Uh-huh.

7   Q.     It also appears that on the left side of the

8            photograph that the road and at least 1 to 2

9            inches of Plaintiff's Exhibit 25 is cropped

10           off; is that correct?

11   A.     Yes.

12   Q.     And if you look at the top, the top right of

13           Plaintiff's Exhibit 25 has what appears to be a

14           gutter sticking out.  And if you compare the

15           top of the photograph in Plaintiff's Exhibit 25

16           to the one in Plaintiff's Exhibit 4 that you

17           submitted to the AP, it appears to also be

18           cropped off; is that correct?

19   A.     Yes.

20   Q.     And then if you look at the right side of

21           Plaintiff's Exhibit 25 versus the right side of

22           Plaintiff's Exhibit 4, which is the photograph

23           you submitted to the AP, it also appears to

24           have been cropped off; is that correct?

25   A.     Yes.

1   Q.   So the photograph you took of the photograph,

2        of Miss McClatchey's photograph, was cropped on

3        all four sides; is that correct?

4   A.   No.

5   Q.   Could you explain that, please?

6   A.   This photograph in Exhibit 4 is not the

7        photograph I shot of Mrs. McClatchey's -- this

8        does not represent the image as it was cropped

9        when I copied her image.  We're just going to

10       assume for my explanation that this picture you

11       gave me is the picture she held up.

12  Q.   Yes.

13  A.   I shot a picture of this picture with a 35

14       millimeter frame.  This does not represent a 35

15       millimeter frame.  What I shot had more

16       information than this transmitted picture.  It

17       is a 35 millimeter frame, which is 1 1/2 --

18       1 3/4 x 1 1/4 deep, which probably was

19       something like that in my camera, or maybe it

20       was like that in my camera.

21  Q.   If I could stop you so I can clarify, when you

22       say like that, a 35 millimeter camera would

23       have been thinner and longer; is that correct?

24       So the top and the bottom of the photograph

25       would have been cut off a little, and your

1    Q.    How far away from Ms. McClatchey were you when

2          you took the photograph?

3    A.    One foot, two feet, three feet. Within three

4          feet.

5    Q.    Within three feet?

6    A.    Yes.

7    Q.    What type of lens did you use?

8    A.    To shoot a photo like this of a photo the size

9          of hers, probably could have actually shot an

10        80-200 or a 28-85 macro, which would allow you

11        to get in closer.

12    Q.    What time of day was it?

13    A.    Boy, I don't know.

14    Q.    What was the weather conditions at the time?

15    A.    I don't know. I don't remember right now.

16    Q.    Was the sun facing you or behind you?

17    A.    I don't recall.

18    Q.    If it was raining out, you certainly wouldn't

19          have taken the photograph outside; is that

20          correct?

21    A.    It was not raining, because she brought her

22          photo out. And it would have not been good for

23          her photo in the rain.

24    Q.    How many times in your 28 years have you taken

25          a photograph of a photograph and submitted it

1      time.

2   Q.   Did you ask Ms. McClatchey if she had a JPG of

3        her photograph that she could E mail to you?

4   A.   No.

5   Q.   Why not?

6   A.   Why?

7   Q.   I'm asking the questions.  But why did you

8        not --

9   A.   I don't understand the question.

10  Q.   Why did you not ask Ms. McClatchey if she had a

11       JPG of her photograph that she could E mail to

12       you?

13  A.   I had no reason to.

14  Q.   Would you not agree that a JPG of the image

15       would be a much higher quality image than a

16       photograph you took of the image?

17  A.   Absolutely.  Well --

18  Q.   And isn't it true that after you took the

19       photograph, you still had to go home to your

20       computer anyways; is that correct?

21  A.   No.

22  Q.   So you had to take it to a computer, the

23       photograph; is that correct?

24  A.   Yes.

25  Q.   So did that computer have E mail?

1   A.   Yes.

2   Q.   So it would have been easy for Ms. McClatchey

3        to just E mail you a JPG of her photograph

4        instead of having you take a picture, download

5        it and transmit it to the AP; is that correct?

6             MR. PENCHINA:  Objection.  I'm not

7        sure he knows what would have been easy for

8        her.

9             MR. HALL:  I just ask that you

10       eliminate speaking objections.

11            MR. PENCHINA:  That was for me, not

12       for you.  You can respond to his question.

13  A.   Could you repeat the question?

14  BY MR. HALL:

15  Q.   Yes.  Would it not have been easier for

16       Ms. McClatchey just to E MAIL a JPG of the

17       image to you rather than you take a picture of

18       it and download and transmit an inferior

19       quality photo to the AP?

20  A.   I don't know.

21  Q.   Do you have any additional photographs from

22       that day still in your possession?

23  A.   No.

24  Q.   What happened to them?

25  A.   I don't know.

1  Q.   Did you look for them in connection with

2       gathering documents for this case?

3  A.   Yes.

4  Q.   And the only one you found was the JPG of the

5       photograph you took of the photograph?

6  A.   Yes.

7  Q.   If you had known Ms. McClatchey had a JPG of

8       her photograph, would you have asked her for

9       that instead of taking the photograph?

10 A.   I don't know.

11 Q.   Do you not get paid if you don't take the

12      photograph of the photograph?

13 A.   No, that's not true.

14 Q.   So your job was to go there and actually take a

15      photograph, so it would have been preferable

16      for you to have a photograph that you took

17      rather than a JPG just sent from her; is that

18      correct?

19 A.   No, it really didn't concern me one way or

20      another how the AP got the picture.  All I was

21      out there doing was covering an assignment.

22 Q.   What was your assignment when you went to

23      Ms. McClatchey's house around the one year

24      anniversary of September 11th?

25 A.   To take pictures of a woman with a picture that

1        showed the crash a year before.

2   Q.   But you end up taking a picture of the picture,

3        not a picture of the woman; is that correct?

4   A.   From what I recall, yes.

5   Q.   And you didn't ask the woman, or

6        Ms. McClatchey, whether she just had a JPG of

7        the picture; is that correct?

8   A.   I don't recall.

9   Q.   Did you speak with Charles Sheehan prior to

10       going to Ms. McClatchey's house?

11  A.   Yes.

12  Q.   What was that conversation?  Describe that for

13       me, please.

14  A.   I can't recall the specific conversation.  It

15       would have obviously included directions to her

16       house, and a brief description of why I was

17       going to her house, and what -- why we were

18       doing a story about her.

19  Q.   But you don't recall any specifics?  Did he

20       tell you what type of photograph he wanted to

21       accompany his story?

22  A.   No, that's not what reporters would do.

23  Q.   So did Mr. Sheehan describe the content of his

24       story so you could have an understanding of

25       what type of photograph to take?

1        going to Ms. McClatchey's house?

2  A.    No, I discussed where she lived and why I was

3        going there, which is not what his -- I have

4        not seen his article to this day.

5  Q.    But if you're discussing why you were going

6        there, what was that discussion?

7  A.    Woman shot a picture in her backyard of Flight

8        93 crashing.

9  Q.    That was the extent of it?

10  A.    Yes.

11  Q.    And so you went to her house to get the

12        picture; is that correct?

13  A.    Yes.

14  Q.    And you went to the house to get the picture

15        for the AP; is that correct?

16  A.    That's correct.

17  Q.    Did you offer Ms. McClatchey any money for the

18        picture?

19  A.    No.

20  Q.    Did you tell Ms. McClatchey that you would

21        transmit the picture to the AP and then in turn

22        transmit it to all the members and subscribers

23        of the AP?

24  A.    I did not tell her that.

25  Q.    Did you ask Ms. McClatchey whether or not she

1        objected to the AP using her photograph for

2        means other than in connection with the story?

3    A.  These are -- no.

4    Q.  Did Ms. McClatchey say to you you can have my

5        photograph free of charge and can transmit it

6        to all the members and subscribers of the

7        Associated Press?

8    A.  By standing there holding it, knowing I was an

9        AP photographer, it's implied to me that she is

10       agreeing to what I'm doing.

11   Q.  Did she say anything to you to that effect,

12       that she was granting --

13   A.  I don't recall.

14   Q.  So Ms. McClatchey did not specifically say

15       anything to the effect of I am granting the AP

16       permission to use my photograph; is that

17       correct?

18   A.  Other than by her actions, no.

19   Q.  And you said you were there to take a

20       photograph, to photograph Ms. McClatchey; is

21       that correct?

22   A.  I said I was there to get pictures to go with

23       Charles' story.

24   Q.  Did you get directions to her house from

25       Charles Sheehan?

1              that correct?

2      A.      More than that.

3      Q.      If you take a photograph of a copyrighted

4              photograph, is it your understanding, I just

5              want your understanding as you sit there, that

6              that gives you, the photograph taker, rights in

7              that copyrighted photograph?

8      A.      That's a legal question.  But of course that

9              would give me no rights at all.  But I have no

10             rights anyway as a staff photographer.

11     Q.      But you were there on behalf of the Associated

12             Press in Ms. McClatchey's house; is that

13             correct?

14     A.      Correct.

15     Q.      That was a yes?

16     A.      What?

17     Q.      You were at Ms. McClatchey's house on behalf of

18             the Associated Press, correct?

19     A.      Yes.

20     Q.      Your belief is your photograph on behalf of the

21             Associated Press of Ms. McClatchey's

22             copyrighted photograph therefore granted rights

23             to the Associated Press to use the photograph?

24     A.      Well, you're assuming --

25                     MR. PENCHINA:  Objection, calling for

```
 1          legal conclusions.  You are certainly free to

 2          give your own personal view.

 3    Q.    I just want your understanding.

 4    A.    First of all there was no sign of copyright

 5          when I shot the picture.  So you're hammering

 6          me with copying a copyrighted image.  I wasn't

 7          aware that I was.  And I had a willing woman

 8          holding her picture, telling me her story of

 9          woe from the past year since this tragedy

10          happened in her backyard.  We were talking,

11          heartfelt, about the tragedy, my covering it

12          for ten days, when it happened, my experience

13          at ground zero when it happened.  Those are the

14          kind of things that were going on.  We were

15          connecting as people.  There was no

16          copyright -- there was nothing in this exchange

17          that expressed to me that she didn't know fully

18          well I was there and fully what I was doing.

19          And so I didn't know that the image was

20          copyrighted.  And I was there representing the

21          AP to do something that Val McClatchey knew was

22          happening.  I didn't sneak up on her.  I didn't

23          do this in any way, shape or form to pull the

24          wool over her eyes.  She entered into this

25          story with the Associated Press of her own
```

1       volition.  There was no copyright on the image

2       I photographed.  I had no idea that there was

3       any issue at all with this woman who was

4       standing there willingly participating in doing

5       and understanding what I was doing.

6   Q.    You testified earlier that you didn't know

7       whether or not there was this copyright notice

8       on the photograph?

9   A.    Huh?

10   Q.    You testified earlier that you didn't know

11       whether there was this copyright notice on the

12       photograph; is that correct?

13   A.    I don't know.  You're right.  I don't know.

14   Q.    But can you give me any specifics of this

15       conversation you had with Ms. McClatchey?

16   A.    Yeah, specifically she was depressed, had a

17       very tough year, that's the specifics.

18   Q.    But there was nothing specifically said on your

19       part, or her part, regarding transferring

20       rights to the Associated Press in the

21       photograph; is that correct?

22   A.    That is correct, there were no rights talk at

23       all.

24   Q.    Did she offer you a copy of the photograph as a

25       souvenir?

1   A.   I don't recall what her purpose for offering me

2        the photograph was, but she did offer me a

3        photograph.

4   Q.   And your testimony here today is you did not

5        take that photograph from her?

6   A.   I can't recall.  I don't believe I did.

7   Q.   But you certainly don't have the photograph

8        anymore; is that correct?

9   A.   Not that I know of.

10  Q.   Did you search for it in response to your

11       counsel's request?

12  A.   Yes.

13  Q.   And you didn't find it; is that correct?

14  A.   No.  No.

15  Q.   Have you spoken with Charles Sheehan since

16       finding out about the lawsuit?

17  A.   I think I saw him at the mine explosion in West

18       Virginia on January 3rd.

19  Q.   Did you speak to Charles Sheehan about this

20       lawsuit?

21  A.   No.

22  Q.   At any point in time?

23  A.   No.

24  Q.   Other than the fact that you were there on

25       behalf of the Associated Press, at any point in

1    A.    I don't recall.

2    Q.    You don't recall?

3    A.    Huh-uh.

4    Q.    So it might have happened, or you just don't

5          remember?

6    A.    It might have happened or what?

7    Q.    Strike that, I'll ask you another question.  So

8          you don't recall whether or not they asked you

9          what rights do we have in this photograph; is

10         that correct?

11   A.    I don't recall any conversations regarding this

12         photograph.

13   Q.    If an editor at the Associated Press had asked

14         you what rights do we have in the McClatchey

15         photograph you're transmitting, what would you

16         have told them?

17   A.    I would have told them I don't know.

18   Q.    And why is that?

19   A.    Because I didn't.

20   Q.    What is your professional opinion as a

21         photographer for at least 28 years of the

22         photograph taken by Ms. McClatchey?

23   A.    My opinion of it?

24   Q.    Yes.

25   A.    How do you mean that?

1  Q.  What do you think of the photographic value of

2      the photograph that Ms. McClatchey took?

3  A.  I mean there's a lot of things going -- I mean

4      to answer your question, I don't know whether I

5      should speak to the technical, and I can't

6      speak to that, because this is a flimsy copy of

7      I'm sure a much better image.

8      Compositionally --

9  Q.  Let's break it down.  Compositionally what is

10     your professional opinion of the McClatchey

11     photograph?

12  A.  I think it's -- We have a saying in journalism,

13     "F-11 and be there," which implies what this

14     picture means.  This is a mediocre picture at

15     best compositionally, technically and every

16     other way.  What it is is a moment.  "F-11 and

17     be there," she was there at a moment in time.

18     Just like Joe Rosenthal at Iwo Gima, and my

19     friend Ron Edmonds when Reagan was shot.  Just

20     like I was on the sidelines when the Steelers

21     won the Super Bowl, it was F-11 and be there.

22     So this picture is a picture of a moment in

23     time that is like -- it's like Pearl Harbor.

24     It's the day that changed our world and the way

25     we look at it, the way we check on airplanes

1   and the way we look on playgrounds at strangers

2   walking through when our kids are playing.  It

3   was a dawn of a new paranoia in our world.  So

4   for that it's a picture, a picture of that

5   moment.  It's technically not great, it's

6   compositionally pretty boring, but it's a

7   moment.

8   Q.   So it's a moment such as when you said Iwo

9        Gima, such as the marines raising a flag, there

10       happened to be a photographer at that one

11       moment to capture that; is that correct?

12  A.   Uh-huh.

13           MR. PENCHINA:  Let me remind you to

14       say yes or no instead of uh-huh.

15  A.   I'm sorry, yes.

16  Q.   In your two or three days that you were at the

17       one year anniversary of the Flight 93 crash,

18       did you see any other photographs that were

19       taken of the moment of the crash of Flight 93?

20  A.   No.

21  Q.   So the fact that it is the only picture taken

22       of that moment would also increase the value,

23       even if you thought it was a mediocre

24       photograph; is that correct?

25  A.   I don't understand what you mean by value.

```
 1   Q.   In terms of historical photograph, being one of

 2        a kind, that sort of value.

 3   A.   Well, the value is not for me to determine.  I

 4        personally don't know what all there is that

 5        was shot on this event at this moment, or soon

 6        after this moment.  I know we had pictures

 7        given to the AP by a volunteer fireman who was

 8        at ground zero, right back there, moments after

 9        the thing happened, which is another example of

10        how we get pictures from people who aren't AP

11        employees.  But my point is yes, this is a

12        moment.  And my ability to ascertain value is

13        neither here nor there.  I think the fact that

14        I didn't see this picture until a year after

15        the event, and I covered this event probably

16        longer than anybody who was there, or as long

17        as anybody who was there, the fact that it took

18        me a year to see it made we wish I would have

19        had it on September 11th, 2001, then it would

20        have been valuable to me.  A year later it was

21        a feature story about this lady who took this

22        picture a year before.  But as a newsperson,

23        its value would have been a year earlier for

24        me.

25   Q.   Do you have any understanding of what the
```