```
 1
 2      IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3      CIVIL ACTION NO. 05-145J
 4
 5      ------------------------------------------ x
 6      VALENCIA M. McCLATCHEY,
 7                              Plaintiff,
 8           vs.
 9      THE ASSOCIATED PRESS,
10                              Defendant.
11      ------------------------------------------ x
12
13
14           DEPOSITION OF:  J. DAVID AKE
15             January 20, 2006, 9:00 a.m.
16
```

EXHIBIT 8

1   Q.   I understand.
2        Your current position as deputy
3   director of photography national, what's your job
4   description?
5   A.   I'm the lead manager of the U.S. photo
6   operation.
7   Q.   Could you explain to me what that
8   means?
9   A.   It means I direct other managers to --
10  I direct other managers to gather and disseminate
11  photographs for coverage of news in the United
12  States.
13  Q.   How do you gather and disseminate
14  photos for use?
15  A.   Multiple ways.
16  Q.   Can you tell me some of those ways?
17  A.   We have staff photographers,
18  free-lancers, handout pictures.
19  Q.   What's a handout picture?
20  A.   A picture someone supplies to us.
21  Q.   Is that someone supplies it to you
22  without you asking for it?
23  A.   Could be.
24  Q.   In your position as senior photo editor

1  A.   I don't know.  I'd have to see the
2  list.
3  Q.   Well, actually, what's the difference
4  between a member and a subscriber?
5  A.   A member.  Associated Press is a
6  not-for-profit co-op.  Members are members of that
7  co-op.  It was formed 160-some years ago.  They all,
8  newspapers got together, find an economical way to
9  gather news.  Associated Press was formed as that
10 economical way to gather news in the United States.
11 Broadcast entities in the United States, many of
12 them are members of that co-op.  A subscriber would
13 be someone who receives the service but is not a
14 member of the co-op.
15 Q.   So PhotoStream is one service that
16 subscribers and members can --
17 A.   Yes.
18 Q.   What other services are there?
19 A.   I don't know.  I mean, outside of
20 photography, I don't know.
21 Q.   Is PhotoStream the only thing that's
22 used for photography?
23 A.   It's how we deliver it to members and
24 subscribers, yes.

```
 1        Q.    So photographs aren't delivered any
 2   other way to members and subscribers than
 3   PhotoStream?
 4        A.    Very small members can purchase
 5   photographs from our central database. A limited
 6   number of, very nominal fee. These would be very,
 7   very tiny papers that can't afford a PhotoStream,
 8   the full PhotoStream costs.
 9        Q.    How much does PhotoStream cost?
10        A.    I don't -- it's circulation based.
11        Q.    Now, we talked about the staff process.
12   Now, how does the free lance process differ?
13        A.    Freelancers are independent contractors
14   who accept assignments from the AP, specific jobs.
15   The process for getting their pictures is much the
16   same. We will contract them to handle an
17   assignment. They'll review their entire production
18   of assignments. Select the images they think are
19   pertinent. Send them to the desk in either
20   Washington or New York. Editors there, again, will
21   check the caption and decide from there where the
22   photograph goes.
23        Q.    So do freelancers have a type of
24   written contract with the AP?
```

1   of the photographs that they take?
2       A.   I believe it's work-for-hire.
3       Q.   So the AP owns the copyrights on those
4   photographs?
5       A.   Yes.
6       Q.   Is there any provision in the contracts
7   that freelancers have with The Associated Press with
8   regard to the copyright of the photos that they
9   take?
10      A.   Yes.
11      Q.   Does the AP own those copyrights as
12  well?
13      A.   Yes.
14      Q.   So in a handout situation is there
15  usually a contract or a license with the individual
16  or entity that submits their photograph to The
17  Associated Press?
18      A.   Depends on the circumstances.
19      Q.   In what circumstances would there be a
20  license or a contract?
21      A.   It would be -- it would be rare.  I'm
22  not sure I can answer that question.
23      Q.   So generally there's no type of license
24  or contract?

1  somebody in the editorial department saying that AP
2  had the right to distribute the photograph according
3  to how procedure normally works?
4      A.   He would have asked the supplier of the
5  photograph if we may use it.
6      Q.   Are you aware if there were any
7  restrictions on that use?
8      A.   I am not.
9      Q.   I'm going to show you what was marked
10 yesterday as Plaintiff's Exhibit 4.
11          Can you tell me what this document is?
12     A.   It looks to be a printout from a Web
13 browser.
14     Q.   Does this look like something you've
15 seen at The Associated Press?
16     A.   The information on the Web browser
17 looks familiar, yes.
18     Q.   Are you familiar with the various
19 fields that are listed on this exhibit?
20     A.   Yes.
21     Q.   Can you tell me based on looking at
22 this whether there were any restrictions on "The End
23 of Serenity" photograph as far as distribution?
24     A.   Yes.

1   Q.   What are those?
2   A.   No sales.
3   Q.   Can you tell me what that means?
4   A.   It would mean that we as an entity
5 would not sell the picture, license the picture is a
6 better term, to people who are not members and
7 subscribers of the AP.
8   Q.   Is that a standard restriction for a
9 handout photo?
10  A.   Yes.
11  Q.   Any other restrictions?
12  A.   It also says wide world photos out.
13 That's an old term for exactly the same thing.
14  Q.   So wide world photos out means the same
15 thing as no sales?
16  A.   It does.  It's an older term for it.
17  Q.   Any other restrictions that you can
18 see?
19  A.   That's it.
20  Q.   If there were any other restrictions,
21 would they be located on --
22  A.   In the same field, yes.
23  Q.   Special instructions field?
24  A.   Yes.

1  this particular photo goes with this story.
2      Q.   Can you tell from this whether this
3  photograph was associated with a story?
4      A.   I can tell from the story.
5      Q.   What do you mean by that?
6      A.   The story will have a slug on it. Says
7  use picture GJP 101 with this story.
8      Q.   What is under the photographer? It
9  says Val McClatchey, stringer.
10          What does "stringer" mean?
11     A.   Let me make sure I see that. Stringer
12 is a term for freelancers.
13     Q.   Under credit it says Associated just to
14 the left of that?
15     A.   Hmm-hmm.
16     Q.   Associated Press HO?
17     A.   Hmm-hmm.
18     Q.   What does the HO mean?
19     A.   Handout.
20     Q.   So if stringer is a term for
21 freelancers and credits is handout, can you explain?
22     A.   Stringer is incorrect.
23     Q.   Stringer is incorrect?
24     A.   Stringer is incorrect.

```
 1        Q.    Do you know how that would have gotten
 2  entered there?
 3        A.    It's drop-down code.  Probably selected
 4  the wrong code.
 5        Q.    What should the code be there?
 6        A.    HO, handout.
 7        Q.    So it should say Val McClatchey HO?
 8        A.    Handout.  Yes.
 9        Q.    Is stringer used with reference to
10  freelancers.
11              Is there a stringer agreement?
12        A.    It's a free lance agreement.
13        Q.    That's the free lance agreement?
14        A.    Correct.
15        Q.    Do you know when "The End of Serenity"
16  photo became inaccessible in the PhotoArchive?
17        A.    No.
18        Q.    I'm going to show you Plaintiff's 5.
19  Can you tell me what this document is?
20        A.    It looks to be another inkjet printout
21  or laser jet printout.
22        Q.    Are you familiar with what is on this
23  exhibit?
24        A.    Yes.
```

1  move.

2  Q.    So this statement, do not retransmit, would this show up in a photo -- would this PhotoArchive be separate?

5  A.    Yes.

6  Q.    So with that do not retransmit, AP no longer has rights, would that show up in the PhotoArchive version of this photograph also?

9  A.    I don't know.

10 Q.    When this correction was put on legal, do you know if any of the members or subscribers were contacted to let them know not to retransmit this photo or use it in any way?

14 A.    I don't know.

15 Q.    Do you know who would know that?

16 A.    Me.

17 Q.    But you don't know?

18 A.    No. If I don't know.

19 Q.    Would you have any way of finding out?

20 A.    I could check the legal archive.

21 Q.    Could you do that?

22 A.    I don't find record of it.

23 Q.    Down at the bottom it says, "Database, Intl underscore photos, underscore 02."

1        Can you tell me what that means?
2    A.   Just the name of the database the
3 photograph is stored in.
4    Q.   Is the Intl, international?
5    A.   Yes.
6    Q.   Did PhotoStream allow photos to get
7 distributed to people or to all over the world?
8    A.   Yes, they could.
9    Q.   Is there any way of knowing when this
10 photo was transmitted who it was transmitted to?
11    A.   It went to everyone in the United
12 States; outside of the United States is more
13 difficult.
14    Q.   So you don't know if it went to people
15 outside of the United States --
16    A.   That's not my purview.
17    Q.   -- or any entities?
18        Do you know who would be able to tell
19 us?
20    A.   International deputy director
21 photography international.
22    Q.   Is there any way of knowing once a
23 photograph has been distributed which members or
24 subscribers actually use that photograph?

```
 1      Q.   I'll take that as a no.
 2           Are you aware if The Associated Press
 3  has anything in writing from Val McClatchey
 4  regarding the use of her photograph?
 5      A.   I am not.
 6      Q.   Are you aware if there was any type of
 7  verbal agreement between The Associated Press and
 8  Val McClatchey regarding the use of her photograph?
 9      A.   In my conversations with Gene he said
10  he had permission.
11      Q.   He said that Val gave him permission?
12      A.   Hmm-hmm.
13      Q.   Permission to do what?
14      A.   Distribute the photograph to accompany
15  the story.
16      Q.   To accompany the story?
17      A.   Yes.
18      Q.   Going back to, which number is this
19  one, 4?  4.
20           It doesn't say anywhere on here that
21  this use of this photograph is limited to being used
22  with the story, correct?
23      A.   It does not.
24      Q.   Well, if that was what the permission
```

1  was for, then why doesn't it say that?
2      A.   Because on the story it identifies the
3  photograph.  Use this photograph.  On the story slug
4  it says accept photo and this number.  So if you
5  were using the story you would know to look at this
6  photograph.
7      Q.   But if you were just using this
8  photograph, you wouldn't know that you could only
9  use it with the story?
10     A.   That's possible.
11     Q.   How would you know based on --
12     A.   That's not how we operate.  It's not
13 our business practice.
14     Q.   To link a photo with a story?
15     A.   Let me see if I can describe this.
16          It's a giant base of photographs.  So
17 they go in, you pull a story, you then go retrieve
18 the photograph.
19     Q.   What if you just retrieve a photograph?
20     A.   That's a possibility.
21     Q.   Was the photograph transmitted with the
22 story?
23     A.   I don't know.
24     Q.   Do you know who can answer that?

1    A.   Basic practice.  It would be within the
2 ballpark, yes.
3    Q.   What do you mean "within the ballpark?"
4    A.   Within an hour or two the story
5 transmitted, the photograph would move.
6    Q.   Do you know who would know whether or
7 not the story and the photo were transmitted
8 together?
9    A.   I would guess it's probably difficult
10 to tell.
11    Q.   Well, does the AP keep track of what's
12 transmitted?
13    A.   You're looking at it.  Yes.
14    Q.   Well, from this I can't tell what day
15 it was transmitted, what time.
16         Is there any sort of a time log on
17 whether --
18    A.   No.
19    Q.   So the submit date --
20    A.   Is the day it landed in our computer.
21    Q.   Then sometime after that it was
22 transmitted?
23    A.   Yes.
24    Q.   But we don't know how long?

1      A.    No.

2      Q.    Have you seen anywhere this photograph
3  used without the article accompanying it?

4      A.    No.

5      Q.    Would you be surprised if I told you it
6  had been?

7      A.    No.

8      Q.    Why wouldn't you be surprised?

9      A.    Very little surprises me.

10     Q.    I guess what I'm trying to understand,
11  how would your members or subscribers know that they
12  can only use this photograph with the article if
13  indeed that was the permission that was given?

14     A.    If indeed that was the permission that
15  was given, they would know that by -- they would
16  assume that by the story slug.

17     Q.    But if these, if the photograph and the
18  article were transmitted separately, and they only
19  received and they saw the photograph, they would
20  have no way to connect the photograph to the
21  article?

22     A.    Correct.

23     Q.    Unless they came through the article
24  first, correct?

1   A.   Correct.

2   Q.   Did Gene tell you anything else that
3   happened when he was at Val McClatchey's house for
4   the interview and the photo?

5   A.   No, no.

6   Q.   He just said that she gave him
7   permission to use the photograph in relation to the
8   story?

9   A.   Correct.

10              MR. PENCHINA:  Just going to
11      remind you to wait for her to finish.  And
12      say yes/no.

13              MS. SZPONDOWSKI:  It's hard.

14  Q.   Did he mention anything to you about
15  her giving him the photo just for his own personal
16  benefit?

17  A.   No.

18  Q.   What would you say the customer base
19  would be for "The End of Serenity" photograph?

20  A.   I couldn't.

21  Q.   You couldn't?

22  A.   I couldn't.

23  Q.   Are you a photographer?

24  A.   Yes.  Used to be.

1  organizations that now don't have to pay her $250 to
2  use her photograph?
3      A.    I think when AP transmitted the
4  photograph to accompany the story.
5      Q.    But, again, there's no restriction on
6  the photograph that it must be used with the story?
7      A.    There is no restriction.  Correct.
8      Q.    Did The Associated Press' members or
9  subscribers make any profit by using the AP's
10 photos?
11     A.    I can't answer that question.
12     Q.    Do you have any idea how many
13 photographs the AP distributed on September 11, 2001
14 relating to the terrorist attacks?
15     A.    No.  It would be in the thousands.
16     Q.    Do you know how many were related to
17 Flight 93?
18     A.    No.
19     Q.    If a photograph is received from a
20 handout photograph and it has a copyright notice on
21 it and it's transmitted to the electronic file desk,
22 what happens with that copyright notice?
23     Does it remain there?
24     A.    Yes.

1          MS. SZPONDOWSKI: Why don't we
2    just take a break for a minute.
3               (Short recess.)
4    BY MS. SZPONDOWSKI:
5         Q.   We were talking before the break about
6    if there's a copyright on a photograph that's
7    submitted to the AP or copyright notice. And you
8    testified, I believe, that that would remain on the
9    photograph, correct?
10        A.   Hmm-hmm.
11        Q.   So it would never be removed?
12        A.   No.
13        Q.   By the AP?
14        A.   No.
15        Q.   Does the editorial department ever
16   verify with a handout entity or individual that
17   permission was given to distribute the photograph?
18        A.   Yes.
19        Q.   In what circumstances?
20        A.   If you were not the photographer
21   involved, if we get the photograph, if we get a
22   photograph, if we get the photograph from someone
23   who is not the original photographer.
24        Q.   So in the case of "The End of Serenity"

1  photograph, the photograph was received by Gene
2  Puskar.
3      A.   Hmm-hmm.
4      Q.   So should the editorial department have
5  contacted Val McClatchey?
6      A.   By "editorial," Gene Puskar is a member
7  of the editorial department.
8      Q.   So by him speaking with Ms. McClatchey
9  that was --
10     A.   Hmm-hmm.
11     Q.   -- so he doesn't have anyone above him
12 or anything who would have verified?
13     A.   No.
14     Q.   Again, he stated that Ms. McClatchey
15 had given him permission to use the photograph in
16 connection with the article?
17     A.   He told me he got permission from Val
18 McClatchey to use the photograph.  Yes.
19     Q.   In connection with the article?
20     A.   Yes.
21              (Associated Press license
22         agreement marked Plaintiff's Exhibit 20 for
23         identification as of this date.)
24     Q.   I'm going to mark Plaintiff's Exhibit