44 of 74 DOCUMENTS

JERRY GREENBERG and IDAZ GREENBERG, Plaintiffs, vs. NATIONAL
GEOGRAPHIC SOCIETY, NATIONAL GEOGRAPHIC ENTERPRISES, INC.,
and MINDSCAPE, INC., Defendants.

CASE NO. 97-3924-CIV-LENARD/TURNOFF

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
FLORIDA, MIAMI DIVISION

*1999 U.S. Dist. LEXIS 13874; 12 Fla. L. Weekly Fed. D 421*

June 8, 1999, Decided
June 8, 1999, Filed

**DISPOSITION:** [*1] Plaintiffs' Motion for Summary Judgment on Liability for Counts I and II, filed September 30, 1998 GRANTED.

**COUNSEL:** For JERRY GREENBERG, IDAZ GREENBERG, plaintiffs: Norman Davis, David Andrew Aronberg, Steel Hector & Davis, Miami, FL.

For NATIONAL GEOGRAPHIC SOCIETY, NATIONAL GEOGRAPHIC ENTERPRISES, INC., defendants: Edward Soto, Valerie Greenberg Itkoff, Weil Gotshal & Manges, Miami, FL.

For NATIONAL GEOGRAPHIC SOCIETY, NATIONAL GEOGRAPHIC ENTERPRISES, INC., defendants: Edward Soto.

**JUDGES:** JOAN A. LENARD, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOAN A. LENARD

**OPINION:**

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AS TO COUNT I AND COUNT II**

THIS CAUSE is before the Court on Plaintiffs' Motion for Summary Judgment on Liability for Counts I and II, filed September 30, 1998. The Court, having considered the motion, response, and otherwise advised in the premises, finds as follows.

**I. Introduction**

Plaintiff Jerry Greenberg is a professional photographer who has had a successful career photographing underwater marine wildlife, including undersea fishes, and plants. His photographs have appeared in numerous magazines, books, and submersible "field guides, [*2] " published in Life, Sports Illustrated, Reader's Digest books, Stern, Leica Magazine, and Paris Match. (See J. Greenberg Aff. & Ex. A.) Jerry Greenberg and his wife, Idaz Greenberg, maintain a business known as Seahawk Press that produces books, field guides, posters, and other products.

One of the Greenbergs' books is The Living Reef, published originally in 1972 and revised in 1979. The book features photographs by Jerry Greenberg and illustrations by Idaz Greenberg, (see Pls.'s Mem. Supp. Mot. Summ. J., Ex. A & Attach. 1.), and was first copyright registered in 1972, (see id. at Ex. F & Attach. 1).

In 1962, Mr. Greenberg began an affiliation with the Defendant National Geographic Society ("the Society") that resulted in the use of scores of photographs taken by Mr. Greenberg and published in various issues of the Society's monthly magazine. One such photograph, showing an undersea scuba-diver, was originally published in the Society's monthly magazine in January, 1962. (See Id., Ex. A, P 17.) On December 18, 1985, the Society assigned copyright to the photograph to Mr. Greenberg, (see id., Ex. A, Attach. 2), and the copyright was renewed in 1989, (see [*3] id., Ex. A, Attach. 3).

**A. The GeoPack Project**

In 1994, the Society entered into a licensing arrangement with Educational Insights, Inc., a for-profit California-based company. (See id., Ex. B.) The agreement between the Society and Educational Insights called for the creation of a product entitled World

**EXHIBIT**
21(B)

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

Oceans and Seas, otherwise referred to as "the GeoPack." (See id., Ex. C.) Plaintiffs allege that Defendants improperly copied and incorporated into the GeoPack five of the six photographs at issue, through the illustrations of Walter Cutler, the work-for-hire illustrator for the GeoPack project. The photographs and drawings at issue from the GeoPack product are:

(1) A photograph of a redband parrotfish, which appears both on the cover of The Living Reef and also on page 49. Cutler's drawing of a redband parrotfish appears in the top-center of the GeoPack product.

(2) Two photographs of stoplight parrotfish, which appear on page 50 of The Living Reef. Mr. Cutler's drawing of a stoplight parrotfish, allegedly copied from the photograph on the left side of page 50, appears on the bottom-left of the GeoPack product, where it bears the number "8." Mr. Cutler's [*4] preliminary sketch of this drawing bears the annotation "Page 5, L. Reef." n1

(3) A photograph of a green moray, which appears on pages 83-84 of The Living Reef. Mr. Cutler's drawing of a green moray appears in the bottom-left corner of the GeoPack product, where it bears the number "6." Mr. Cutler's preliminary sketch of this drawing bears the annotation "Page 84, The Living Reef."

(4) A photograph of a diver, body aligned in a vertical position, that appears on page 17 of The Living Reef. Mr. Cutler's drawing of a vertical diver appears in the top-center of the GeoPack product.

(5) A photograph of a male diver, body aligned horizontally, that appears on page 74 of The Living Reef. Mr. Cutler's drawing of a horizontal diver appears in the top-center of the GeoPack product.

(6) A photograph of a sea fan, reprinted in a promotional poster for the Society's Jason Project. The sea fan photograph was initially published in the July, 1990 issue of National Geographic's monthly magazine. Subsequently, the Society assigned its copyright interest in this photograph to Jerry Greenberg. In the promotional poster, Plaintiffs allege the same photograph is shown in modified form, [*5] "flopped" and "cropped."

n1 Upon deposition, Mr. Cutler stated that page 5 has no relevance, that page 50 "has relevance" to his drawing, and that his annotation "must be" an error, in which a zero was simply left off inadvertently. (See Cutler Dep. at 50-51.)

Plaintiffs seek summary judgment on Counts I and II of the Amended Complaint, arguing that no genuine issue of material fact remains on the issue of copyright infringement of these six photographs.

## II. Standard of Review

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)*. The entry of summary judgment is appropriate on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The Supreme Court explained [*6] the summary judgment standard as follows:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

"Courts have been willing to grant summary judgment in infringement cases when it is clear that the moving party is entitled to judgment as a matter of law." *Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994)* (citations omitted). Summary judgment can be upheld where "the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue." *Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992)*; [*7] see also *Beal, 20 F.3d at 460* ("We keep in mind the practical difficulty of drawing a bright line between idea and expression and recognize that a genuine issue of material fact would preclude summary judgment.") (internal citation omitted).

## III. Analysis

Plaintiffs claim the Defendants' use of copyrighted material violates the Copyright Act of 1976, *17 U.S.C. § 101* et seq. Defendants respond first by arguing the images contained in their products do not violate any copyright of Plaintiffs, and second, Defendants argue that

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

even if these images reflect copyrighted material, this use constitutes "fair use" and is not otherwise actionable.

## A. Copyright Infringement

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications v. Rural Tel. Serv., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)*. "When called upon to adjudicate a copyright dispute, a court must compare the works in question." *Beal, 20 F.3d at 456* (citation omitted). Plaintiffs' ownership of [*8] valid copyrights in these six photographs is not in dispute, n2 the critical issue is whether Defendants' products copy original elements of Plaintiffs' photographs.

> n2 Plaintiffs have submitted photocopies of certificates of copyright registration, certificates of renewal registration, and letters of assignment of copyrights from Defendant National Geographic. (See Pls.' Mem. Supp. Summ. J., Ex. A.) The Court finds these documents establish valid copyrights over the images. Further, Defendants concede Plaintiffs ownership of valid copyrights. (See, e.g., Defs.' Mem. Opp'n. Summ. J. at 6.) ("It is uncontroverted that Plaintiffs' copyright extends to the whole of their photographs of a redband parrotfish, a stoplight parrotfish and a moray eel in their natural habitats.")

To establish improper copying, a plaintiff "is first required to show that the defendant had access to the plaintiffs' work, [and] second, the plaintiff must show that the defendant's work is substantially similar to the plaintiffs' [*9] protected expression." *Beal, 20 F.3d at 459* (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 & n.11 (11th Cir. 1982))*. Both access and substantial similarity must be established.

The Court finds the Defendants had access to each of the six photographs at issue in this action. Plaintiffs have established through record evidence that those photographs printed in The Living Reef and the photograph of the sea fan published in Defendant's magazine, were both in the illustrator's possession and also referenced by the illustrator while the allegedly infringing products were produced. (See, e.g., Cutler Dep. 25-60; Greenberg Aff. PP 8-12.) Walter Cutler, the illustrator hired by the Society, both owned a copy of and referred to Plaintiffs' book, The Living Reef, while working on the drawings for the GeoPack project. n3 Cutler admitted ownership of the book upon deposition, and the draft sketches submitted to the Society contain references to page numbers in

The Living Reef. Therefore, the Court finds that Cutler referenced The Living Reef photographs while preparing his artwork. This finding is further supported [*10] by certain pencil sketches that Cutler provided to the Society, containing annotations noting that particular fish were sketched from specific pages of The Living Reef. (See Cutler Dep. 53.) Cutler apparently included these annotations so that the Society's editor or others at the Society could "look [the sketches] up and verify that [the artwork] was accurately done." (Id.) Furthermore, Jerry Greenberg's photograph of a sea fan had originally been published in the July 1990 issue of Defendant National Geographic's magazine, (Wheeler Decl. P 5), and Plaintiffs have established that Defendants had access to these materials when the illustrations were produced. Therefore, the Court finds that Defendants had access to each of the copyrighted works at issue. See 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright § 13.02*[B], at 13-23 (1994) (discussing access and collecting cases).

> n3 As Mr. Cutler explained:
>
> Q: Do you have any books on fishes?
> A: Yes. . . .
> Q: Would you take a look at what's now been marked as Exhibit 2 [The Living Reef] . . .
> Q: Will you tell me if you have seen that book before?
> A: Yes.
> Q: Do you have a copy of your own?
> A: I did have.
> Q: When did you have it?
> A: When I was doing this project.

(Cutler Dep. at 24.) Mr. Cutler also stated that he referred to specific photographs when preparing his drawings.

> Q: Okay. Now would you take a look at page 50 for me in The Living Reef. You used that photograph as a reference, is that correct?
> A: Uh-huh.
> Q: How did you use it?
> A: Sitting in front of me with other books away. . . .

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

Q: How did that photograph serve as a reference for you?

A: I had a -- this fish in profile and I had to change it because I was asked to -- all the fish were going in one direction, or in one profile, and Lyle felt that it needed something else. So I saw this and changed the low -- the position of the fish that I had drawn to -- to be in this position.

(Cutler Dep. at 51-52.) Similarly:

Q: You mentioned a while ago that there's a fish up there in the top center of the product that does not appear on the sketch. Do you know why that fish was added?

A: To cover the information underneath it.

Q: And who -- did someone tell you to do that or you just simply did that on your own?

A: It was discussed. Lyle and I discussed it as a problem here.

Q: Had that particular fish already been in the -- in the artwork somewhere else or did you simply go find it and add it?

A: It was added.

Q: How did you happen to select that particular fish?

A: Pretty.

Q: Would you take a look at the book The Living Reef?

A: Uh-huh.

Q: On the cover, is there a similar fish on the cover of that book?

A: Yes.

Q: Did that have any bearing on your selection of the fish to use to place in that spot?

A: I'm sure it did.

(Cutler Dep. at 60-61.)

[*11]

However, "even convincing proof of access does not do away with the necessity of finding similarity." *Beal, 20 F.3d at 460* (citation omitted). "Substantial similarity exists where an average lay observer would recognize

the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982)* (internal quotations and citations omitted). "[Where defendant] concedes access . . . [the court] must evaluate the images side-by-side to determine if they are substantially similar." *Leigh v. Warner Bros., 10 F. Supp. 2d 1371, 1375 (S.D. Ga. 1998).*

Defendants correctly state that "depictions of the physical features of fish" are not copyrightable. (Defs.' Mem. Opp'n Summ. J. at 6.) "The substantial similarity required for infringement, therefore, must be substantial similarity of expression, not substantial similarity of ideas." *Original Appalachian Artworks, Inc., 684 F.2d at 829 n.11* ("We caution trial courts not to be swayed in an infringement action by the fact that two works embody similar or even identical ideas."); see also [*12] *Beal, 20 F.3d at 460* ("In evaluating claims of substantial similarity, courts have examined different aspects of the work in question.").

Courts have long recognized that photographs can qualify as original and copyrightable expressions of noncopyrightable subject matter. As explained by the Second Circuit:

elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved. . . . [Plaintiff's] inventive efforts in posing the group for the photograph, taking the picture, and printing [the picture] suffices to meet the original work of art criteria. . . . [These variables constitute Plaintiff's] unique expression of the subject matter captured in the photograph . . .

*Rogers, 960 F.2d at 307* (citations omitted). See also *Leigh, 10 F. Supp. 2d at 1376* ("the copyrightable elements include the photographer's selection of background, lights, shading, positioning of subject, and timing").

As explained by Jerry Greenberg, numerous variables contribute to the originality of his photographs:

9. [*13] . . . each image represents a definitive moment in time, consisting of innumerable variables, when the shutter of the camera is tripped. The underwater photographer operates in an alien and fluid environment, where neither the pho-

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

tographer nor the fish is tethered. In order to track a moving fish in the frame of the camera, the photographer is constantly following it, so that the snap of a shutter captures a specific and unique perspective of the fish. In my long experience, it has been impossible to duplicate photographs when the fish and the photographer are moving, even when the shutter of the camera is firing at the fastest possible rate.

10. A photograph of a fish is defined and determined by such things as locating the fish, having a particular lens and film available, the position of the photographer vis-a-vis the fish, the movement of the fish as the picture is framed, and the light available, natural or flashed. Additionally, because fish tend to be constantly in motion, a fish's posture, attitude, turns, and activity contribute to the originality of a photograph. . . .

11. A photograph of a particular fish also can be unique because of the lens chosen: for close-up, for [*14] distance, or for a distorted effect as produced by a 'fish-eye' or curved wide-angle lens. . . .

(Greenberg Aff. PP 9-11.) The Court has examined the photographs and finds that each contain considerable artistic elements that allow for a finding of originality under the Copyright Act. n4

n4 The Society's former Director of Photography, Robert Gilka, apparently concurs:

[Jerry Greenberg's] statements regarding the originality of photographs of fishes are correct. In more than two decades of reviewing and assessing photographs for the National Geographic Society, I never saw any underwater photograph of a fish that was identical to any other underwater photograph of a fish. The variables involved -- in the fish, in the equipment used, and in the shifting underwater environment itself -- are so numerous that each photograph is original.

(Pls.' Mem. Supp. Summ. J., Ex. E P 6.)

The Court has conducted a side-by-side visual comparison of Walter Cutler's drawings and Plaintiffs' photographs. [*15] n5 The Court refers the parties to Exhibit D of Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment. In this exhibit, the drawings and the photographs are juxtaposed, both side-by-side, and also with the aid of plastic overlays. The Court has carefully considered the Defendants' discussion of the differences between the allegedly infringing drawings and Plaintiffs' photographs, and also the Plaintiffs' explanation of the original expressive elements of his photographs. As explained below, the Court finds substantial similarity between Walter Cutler's drawings and Plaintiffs' copyrighted photographs.

n5 The Court finds the sea fan photograph has been reprinted in the Jason Project poster. Though "flopped" and "cropped," the photograph has been reprinted and Jerry Greenberg's name even appears in a by-line underneath the image. The Court finds the substantial similarity standard is not applicable where, as here, the photograph has been reprinted.

**1. Redband Parrotfish, Stoplight Parrotfish,** [*16] **and Green Moray**

Examination of these three photographs and the corresponding drawings demonstrates that "an average lay observer would recognize the alleged copies as having been appropriated." *Original Appalachian Artworks, Inc., 684 F.2d at 829* (internal quotations and citations omitted). Upon analysis of Mr. Cutler's Redband Parrotfish, Stoplight Parrotfish, and Green Moray drawings, the Court specifically finds that the "accused [drawings are] so substantially similar to the copyrighted work[s] that reasonable jurors could not differ on this issue." *Rogers, 960 F.2d at 307.*

In his affidavit, Jerry Greenberg described certain original elements contained in these photographs:

14. [My] photograph of a Redband Parrotfish . . . shows a "supermale" . . . sometimes called a terminal-phase male. Most adult-phase male and female redbands share a common color and pattern. However, an occasional large specimen, after functioning as a female, turns into a sex-reversed supermale. This evolution creates a functioning male of superior size and different color, pattern and body

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

shape. The photograph of the supermale in "The Living Reef" is also [*17] unique because of the "barrel" distortion cause by the 17mm semi-fisheye Takumar lens used.

15. The Stoplight Parrotfish . . . is a supermale, which undergoes the same metamorphosis . . . The differences between the two phases of the Stoplight Parrotfish are so striking that each phase, although it is the same fish, had separate names until recently. Those astonishing differences may be seen in "The Living Reef" on page 50, where the two are juxtaposed and where the total difference of color and pattern can be seen. The supermale has a much larger head, with the eyes set back considerably. Its tail has long trailing rays.

16. [My] photograph of a Green Moray. Like the snakes they resemble, morays are extremely flexible. Morays tend to be secretive, hiding in crevices and under coral ledges. They are nocturnal, feeding mostly at night. The moray in my photograph has emerged almost halfway from its lair. The distinctive thrust upward, its outward gaze, and the graceful, undulating dorsal fin make it unique. . . .

(Greenberg PP 14-16.) Defendants do not dispute the unique characteristics of Plaintiffs' photographs. Instead, Defendants argue that Mr. Cutler's drawings are appreciably [*18] different, and that "any similarity . . . results from the fact that both [sets of] works depict the same subject matter." n6 (Defs.' Mem. Opp'n Summ. J. at 6.) For example, in discussing the alleged differences between Mr. Cutler's drawing of the redband parrotfish and Plaintiffs' photograph, Defendants assert:

Most obviously, the two fish are colored very differently. Generally, the colors in the Cutler drawings are much brighter. In particular, the fins, mouth and eye of the [Cutler] fish are red, whereas these same body parts are orange on the Greenberg fish. Additionally, the various colors of the redband parrotfish in the Greenberg photograph tend to blend into each other. The gill shown on the [Cutler] fish is well-defined as compared to the gill in the Greenberg photograph. The fish in the

Greenberg photograph has a much more defined skin texture -- similar to chicken wire -- as compared to the impressionistic rendition of scales in the [Cutler] fish. These are just some of the differences between the two fish that preclude a finding of near identity or substantial similarity.

Id. at 7-8.) The Court disagrees with Defendants' assertions that the [*19] drawing and the photograph are substantially different. Instead, upon careful review of both the drawing and the photograph the Court concludes that any minute differences in the two constitute only "small changes," see Rogers, 960 F.2d at 308, and finds that "no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated." Id. at 308. Thus, having found substantial similarity, the Court concludes that "small changes here and there made by the copier are unavailing." Id. In sum, the differences between Plaintiffs' photographs, and Mr. Cutler's drawings, are both insubstantial and insufficient to negate the Court's finding of substantial similarity.

n6 Defendants also argue that "because Plaintiffs' claim deals with creatures in nature . . . they must prove near identity between the works." Defendants cite two cases for this proposition: Designer's View, Inc. v. Publix Super Markets, Inc., 764 F. Supp. 1473, 1478 (S.D. Fla. 1991), and Jungle Rags, Inc. v. Rainbow Graphics Inc., 1993 U.S. Dist. LEXIS 20203, 29 U.S.P.Q.2D (BNA) 1704, 1708 (M.D. Fla. 1993). The Court finds that Defendants have misread the holdings of these cases, and that the "near-identity" rule does not apply to this case.

[*20]

## 2. Vertical Diver

The Court finds substantial similarity between Mr. Cutler's drawing, depicting a vertical diver, and Plaintiffs' photograph. A photographer's efforts to pose and position his subject can constitute an original, expressive element that can be copyrighted. See Rogers, 960 F.2d at 307; see also Leigh, 10 F. Supp. 2d at 1376. Greenberg explained his effort to outfit his son with scuba equipment when the photograph was first planned, and described how the unique equipment contributed to the overall look of this photograph:

[This is] a photograph of our son taken when he was 11 years old. He was too small for ready-made equipment. I had to

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

rig a unique miniature double-tank scuba outfit for him. The half-empty tanks are floating upward because there was no room for a crotch-strap to secure them. He is using a single-hose regulator. His wetsuit is too large, allowing a bubble to form at his back above the weight belt that cinches it.

(Greenberg Aff. P 18.)

Defendants do not dispute the unique characteristics of this photograph. Indeed, Defendants admit that "[Mr. Cutler] was specifically instructed to make his [*21] divers look like children." (Defs.' Mem. Opp'n Summ. J. at 12.) Instead, Defendants refer to details, such as the color of the suits, and the length of the air bubble trail, to distinguish Mr. Cutler's drawing from Plaintiffs' photograph. n7 The Court finds that Defendants' proffered differences constitute "small changes" which are unavailing as a defense against substantial similarity. See *Rogers, 960 F.2d at 308.*

n7 For example, Defendants assert that "the fins of Mr. Cutler's girl diver have more curve to them, flow, more action than the fins of the Greenberg's boy diver." (See Defs.' Mem. Opp'n Summ. J. at 9) (internal quotations omitted). Contrary to Defendants' assertions, neither the difference in gender between Mr. Cutler's drawings of the "boy diver" and the "girl diver," nor other alleged differences with the photographs, are unmistakably clear.

### 3. The Horizontal Diver

Plaintiffs' photograph, found on pages 73-74 of The Living Reef, shows an adult male diver, circled [*22] by a school of fish. Mr. Cutler's drawing shows a child diver, likely a boy, with his body similarly aligned in a horizontal position, but does not show a circle of fish. Defendants argue that the photograph focuses not on the diver, but on a large school of fish swimming between the photographer and the diver. (See Defs.' Mem. Opp'n Summ. J. at 16.) Jerry Greenberg has not provided the Court with an explanation of his original efforts in taking this photograph.

Examining Plaintiffs' photograph and Mr. Cutler's drawing side-by-side (see Pls.' Mem. Supp. Summ. J. Ex. DS.), the Court finds that "an average lay observer would recognized the alleged copy as having been appropriated." *Original Appalachian Artworks, Inc., 684 F.2d at 829.* The Court specifically finds that the positions of the

divers, in Plaintiffs' photograph and in Mr. Cutler's drawing are identical -- including the angle and position of both hands, the amount of flex in the knees, the position of the divers' swimming fins, and the angle and portion shown of the dive masks. See *Rogers, 960 F.2d at 307* ("Elements of originality in a photograph may include posing the subjects"); [*23] see also *Leigh, 10 F. Supp. 2d at 1376* ("copyrightable elements include . . . positioning of subject"). Based on this identity of body positions, the Court finds substantial similarity between Plaintiffs' photograph and Mr. Cutler's drawing. Therefore, the Court finds that Defendants improperly copied Plaintiffs' photograph of a diver, shown with his body in a horizontal position.

### B. Defense of Fair Use

Defendants argue that even if substantial similarity is found, no liability follows because these products qualify as "fair use." Where a finding of "fair use" is made, otherwise infringing copies are permitted. See *Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)* ("Fair use is a mixed question of law and fact."). As explained by the Copyright Act itself, "The fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." *17 U.S.C. § 107.* The Copyright Act goes on to list four nonexclusive factors to be considered [*24] when determining whether the fair use doctrine applies:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

*17 U.S.C. § 107.* After consideration of the facts of this case, the Court concludes that neither the GeoPack product nor the Jason Project poster qualify as fair use.

### 1. Purpose and Character of the Use

The first factor, purpose and character of the use, weighs against a finding of fair use, as to the GeoPack product. Defendants argue that this "educational game" has a "core didactic purpose." (Defs.' Mem. Opp'n

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

Summ. J. at 11.) In 1995, Defendant National Geographic and Defendant Educational Insights, Inc. published a "children's educational game," the GeoPack product. (Id. at 2.) National Geographic retained "primary responsibility for the editorial and art content" and "granted to Educational Insights an [*25] exclusive, perpetual license to distribute, display, and reproduce and sell copies of products prepared by the Society." (Pls.' Mem. Supp. Summ. J. at 4.) Defendants do not dispute the fact that Educational Insights is a for-profit company.

The Defendants' further assert that the GeoPack "serves to further [National Geographic's] mission for the increase and diffusion of geographic knowledge in its broadest sense." (Defs.' Mem. Opp'n Summ. J. at 11.) Notably, the Society, a respected non-profit institution, did not create or market this "educational toy" directly, but instead furnished "art content" to be incorporated into a commercial product marketed by Defendant Educational Insights, a for-profit company. See *Pacific & Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1496 (11th Cir. 1984)* ("commercial nature of the use militates quite strongly against a finding of fair use"). This "educational game" is marketed as a toy rather than as a classroom tool.

The same analysis of the Jason Project poster, however, weighs in favor of a finding of fair use. The Court agrees that the Jason Project "contribute[s] . . . to the public welfare," *Duncan, 744 F.2d at 1496,* [*26] because of its educational characteristics. National Geographic "produced a poster . . . in order to inform area educators of the 1996 Jason Project voyage." (Wheeler Decl. P 5.) As Mr. Wheeler explained:

> The Jason Project [is] an educational program whose goal is to excite and engage students in science and technology and to provide professional development for their teachers. . . . The [National Geographic] Society hosts an electronic theater with giant video screens and an interactive communications center that permits students to experience the thrill of exploration and research remotely, via telepresence -- live broadcasts incorporating technologies from robotics to satellite communications. At the time of the 1996 Jason Project voyage, the [National Geographic] Society invited teachers, students in grades 3-9, and parents to participate in the Jason Project free of charge.

(Id. at P 3.)

## 2. Nature of the Copyrighted Work

The nature of Plaintiffs' copyrighted work, The Living Reef, weighs against a finding of fair use. The individual photographs collected in this book reflect Jerry Greenberg's creative expression as a photographer. Defendants [*27] argue that Plaintiffs' photographs are primarily factual images of fishes/divers, and that Mr. Cutler's drawings copy only "factual" portions of Plaintiffs' photographs. (Defs.' Mem. Opp'n Summ. J. at 15.) The Court disagrees.

Rather than using Plaintiffs' photographs simply as "research references," the Court finds Mr. Cutler specifically copied the expressive elements of Plaintiffs' photographs. See *Harper & Row, 471 U.S. at 563-64* (Where the copy "excerpted subjective descriptions . . . whose power lies in the author's individualized expression . . . such use, focusing on the most expressive elements of the work, exceeds that necessary to disseminate the facts."). Mr. Cutler explained that National Geographic gave him a "stack of books" to use as research references, so that his drawings would be accurate. n8 Mr. Cutler never informed National Geographic that the research materials were inadequate. n9

n8 Mr. Cutler explained:

> A: . . . I was given a stack of books. That was -- go home and work.
> Q: What books were you given?
> A: I haven't the slightest idea which ones they were.
> Q: Was The Living Reef one of those books?
> A: No. That was one that I had in my library.
> Q: When you were given that stack of books, what were you told to do with them, if anything?
> Q: Like all projects, you are given a list of animals, and it's their responsibility to give you photographic references for each one of the animals or multiple references for each one of the animals or multiple images of the animal. And that was done by the researcher and . . . that pile of research was handed over to me.

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

(Cutler Dep. at 28.)

[*28]

n9 Mr. Cutler explained:

Q: Where it says [National Geographic's] book division will furnish whatever research is necessary. It becomes the artist's responsibility to notify the art director should the research material not be adequate.
A: Uh-huh.
Q: You have told us previously that you were given a stack of books.
A: Uh-huh.
Q: Did there come a time when you told the art director that the research material was not adequate?
A: No.

(Cutler Dep. at 56)

Mr. Cutler explained that he chose to copy Plaintiffs' photograph of a redband parrotfish because it was "pretty," or, in the alternative, that he "probably saw that fish" and "why [he] picked that fish," he didn't know. (Cutler Dep. at 60-61.) Mr. Cutler makes no statement that he referred to Plaintiffs' photograph of a redband parrotfish in order to verify the physical features of the fish.

Mr. Cutler's drawings -- of the redband parrotfish, the stoplight parrotfish, the green moray, and the divers -- track Plaintiffs' photographs completely, down to the angle of the shot and the body position of the fish/diver. The body [*29] position of a fish or diver, caught at a specific moment in time, does not constitute a "factual portion" of Plaintiffs' photograph.

Further, the Court finds that the GeoPack does not constitute a "transformative" use of Plaintiffs' photographs. See *Campbell v. Acuff-Rose, 510 U.S. 569, 578-79, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994)*. The Supreme Court has explained the concept of a transformative use: "whether the new work . . . adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id. at 579*. The target audience of Mr. Cutler's drawings overlaps with that of Plaintiffs' photographs in an appeal

to children. Furthermore, the drawings and photographs both show undersea life to those above ground, in the context of marketing a commercial product. And, as discussed above, the drawings at issue have almost identical expression to Plaintiffs' photographs.

Similarly, the Court finds that the Society's reprint of the Sea Fan photograph does not constitute a "transformative" use. Even though Plaintiffs' photograph of a sea fan has been "flopped," "cropped" and "surrounded by a [*30] school of fish" (see Defs.' Mem. Opp'n Summ. J. at 18), the sea fan image, as reprinted in the poster, has the same purpose as the original photograph printed in the July, 1990 National Geographic magazine: to illustrate examples of undersea life. Defendants essentially argue that any collection/bundle of otherwise infringing copies, or even the mere juxtaposition of an otherwise infringing copy with other images, constitutes fair use, because the choice to bundle the images is "transformative." Because the target audiences of the photograph and the illustration overlap, and because the Court finds the illustration adds "nothing new" in purpose or character, the Court finds that this second factor, weighs against a finding of fair use.

### 3. Amount and Substantiality of the Portion Used

Defendants argue that Plaintiffs' copyright attaches to their book, The Living Reef, as a whole, rather than to individual pictures, or to individual fishes/divers within each picture. (See Defs.' Mem. Opp'n Summ. J. at 16.) However, the Court finds that the "heart" of Plaintiffs' book is composed of the individual images of underwater life. Mr. Cutler's drawings of the stoplight parrotfish, [*31] the redband parrotfish, and the green moray copy the photographed images, almost identically. Because Mr. Cutler's drawings copy discrete images with near identity, and because these images constitute the heart of the copyrighted work, the Court concludes that Defendants' drawings infringe upon a substantial portion of Plaintiffs' work. See *Harper & Row, 471 U.S. at 564-65* (copying even a small portion of a copyrighted work may exceed the boundaries of fair use if the material taken is the "heart" of the work"); see also *Lamb v. Starks, 949 F. Supp. 753, 757 (N.D. Cal. 1996)* (third factor, amount and substantiality, weighs against defendant even though it is "undisputed that the [promotional] trailer copied [in its entirety] . . . contains only a small portion of the copyrighted full-length movie").

Plaintiffs have copyrighted the sea fan photograph. (See Pls.' Mem. Supp. Summ. J. Ex. A at 6.) The reprint in the Jason Project poster, though cropped, is a substantial portion of Plaintiffs' copyrighted photograph. Therefore, the Court finds this factor weighs against a finding of fair use, of both Mr. Cutler's drawings and the Jason Project [*32] poster.

1999 U.S. Dist. LEXIS 13874, *; 12 Fla. L. Weekly Fed. D 421

### 4. Potential Market for the Copyrighted Work

The final factor, the impact on the potential market for Plaintiffs' copyrighted works, weighs against a finding of fair use. "The fourth fair use factor . . . requires courts to consider . . . whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell, 510 U.S. at 590* (citations and quotation marks omitted) (emphasis added). Both the GeoPack product and the Jason Project poster fall within potential markets for Plaintiffs' product, original images of underwater sea life. As explained by Jerry Greenberg,

> In our 43 years of marriage, through a business known as Seahawk Press, we have published books, calendars, posters, coloring books, submersible field guides, and other products. All of our products feature only our original photographs and illustrations.

(Greenberg Aff. P 6.) The Court concludes that there is at least a potential market for licenses of Plaintiffs' photographs for use in children's educational toys, and that there is an existing market for [*33] Plaintiffs' photographs, such as the sea fan photograph, for use in posters promoting various undersea projects. n10

n10 "It was [National Geographic's] practice to pay $ 50 for the type of use involved in the Poster." (Wheeler Decl. P 7.)

In sum, the Court finds that, as to Mr. Cutler's drawings, all four statutory factors weigh against a finding of fair use. Only one of the four factors, the purpose and character of the copy, weighs in favor of a finding of fair use in regard to the Jason Project poster. Thus, the Court finds that neither the GeoPack product nor the Jason Project poster qualify as fair use. Defendants cannot assert a fair use defense, against any of the alleged infringing products at issue in this motion.

### IV. Conclusion

The Court finds that Defendants have improperly infringed the photographs at issue, and that the doctrine of fair use is not applicable to these facts. Therefore, there remains no genuine issue of material fact on the claims stated in Counts I and II of the Complaint. [*34] Based on the foregoing, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment on Liability for Counts I and II, filed September 30, 1998 is **GRANTED.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8 day of June, 1999.

**JOAN A. LENARD**

**UNITED STATES DISTRICT JUDGE**