SCHIFFER PUBLISHING, LTD., et al., Plaintiffs, v. CHRONICLE BOOKS, LLC, et al., Defendants.

CIVIL ACTION No. 03-4962

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2004 U.S. Dist. LEXIS 23052; 73 U.S.P.Q.2D (BNA) 1090; Copy. L. Rep. (CCH) P28,913

November 12, 2004, Decided

**SUBSEQUENT HISTORY:** Judgment entered by *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, 2005 U.S. Dist. LEXIS 416 (E.D. Pa., Jan. 11, 2005)

**PRIOR HISTORY:** *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, 350 F. Supp. 2d 613, 2004 U.S. Dist. LEXIS 16180 (E.D. Pa., Aug. 11, 2004)

**DISPOSITION:** Judgment entered in favor of plaintiffs and against defendants on plaintiffs' claims of copyright infringement. Judgment entered in favor of defendants and against plaintiffs on plaintiffs' *Digital Millennium Copyright Act* claims.

**COUNSEL:** [*1] For SCHIFFER PUBLISHING, LTD., LESLIE PINA, CONSTANCE KOROSEC, SHIRLEY FRIEDLAND, CONNECTICUT QUILT SEARCH PROJECT, Plaintiffs: CHERYL L. SLIPKSKI, DRINKER BIDDLE & REATH, PHILADELPHIA, PA. NANCY A. RUBNER-FRANDSEN, DRINKER BIDDLE & REATH, LLP, PHILADELPHIA, PA.

For CHRONICLE BOOKS, LLC, Defendant: DAVID A. SQUELLATI, JENNIFER L. SMALL, FENWICK & WEST LLP, MOUNTAIN VIEW, CA. KATHLEEN LAUBENSTEIN, HANGLEY ARONCHICK SEGAL & PUDLIN, PHILADELPHIA, PA. KATHRYN J. FRITZ, FENWICK & WEST LLP, SAN FRANCISCO, CA.

For THE IVY PRESS LIMITED, Defendant: KATHLEEN LAUBENSTEIN, HANGLEY ARONCHICK SEGAL & PUDLIN, PHILADELPHIA, PA.

**JUDGES:** Berle M. Schiller, J.

**OPINIONBY:** Berle M. Schiller

**OPINION:**

## MEMORANDUM AND ORDER

Schiller, J.

On September 3, 2003, Plaintiffs Schiffer Publishing, Ltd. ("Schiffer"), Connecticut Quilt Search Project ("CTQSP"), Shirley Friedland, Constance Korosec, and Leslie Pina ("Pina") commenced this action against Defendants Chronicle Books, LLC ("Chronicle") and The Ivy Press, Ltd. ("Ivy"), alleging, *inter alia*, that Defendants infringed Plaintiffs' copyrights in photographs of fabrics by including these photographs in Defendants' book, *1000 Patterns* [*2] , without permission or compensation. On August 23 and 24, 2004, this matter was tried without a jury. This Court now enters the following Findings of Fact and Conclusions of Law as required by *Federal Rule of Civil Procedure 52(a)*.

### I. FINDINGS OF FACT

#### A. The Parties

Schiffer, a book publisher based in Atglen, Pennsylvania, has issued over 2,900 titles on subjects ranging from arts and crafts to military history. (R. at 8-11 (Aug. 23, 2004); Pls.' Trial Ex. 70.) At issue in this case are 118 photographs included in thirteen Schiffer books about fabrics and textiles. n1 Plaintiffs created the photographs contained in these thirteen books. (R. at 106-7, 109-11, 158-60, 186-87, 246 (Aug. 23, 2004); Joint Pretrial Stmt. Ex. A PP 13, 21, 30, 38.)

---

n1 The books are: *Fun Fabrics of the 50's*; *Funky Fabrics of the 60's*; *Cool Hot Colors: Fabrics of the Late 1960's*; *Forties Fabric*; *Designer

EXHIBIT 21 (C)

Case 3:05-cv-00145-TFM  Document 30-5  Filed 06/20/2006  Page 2 of 11

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

Page 2

*Fabrics of the Early 60's*; *Paisley: A Visual Survey of Pattern and Color Variations*; *Stripes: A Survey of Fabric Designs*; *Abstract Textile Designs*; *Dots: A Pictorial Essay on Pointed Printed Patterns*; *Flower Power: Prints from the 1960's*; *Quilts and Quiltmakers Covering Connecticut*; *African Fabric Design*; and *Naturally 70's Fabrics*. (Pls.' Trial Exs. 20-32.) CTQSP claims the copyright rights to *Quilts and Quiltmakers Covering Connecticut* (Pls.' Trial Ex. 11); Friedland and Pina collectively claim the copyright rights to *African Fabric Design* (Pls.' Trial Ex. 12); Pina and Korosec collectively claim the copyright rights to *Naturally 70's Fabric* (Pls.' Trial Ex. 13); and Schiffer claims the copyright rights to the remaining ten books (Pls.' Trial Exs. 1-10).

[*3]

Ivy is a book "packager" based in the United Kingdom. (R. at 12 (Aug. 24, 2004).) Book packagers do not publish books themselves; rather, the packager creates books and then locates publishers to distribute and market the books in specific geographic regions. (*Id.* at 12, 141.) Between 2001 and 2002, Ivy packaged a book entitled *1000 Patterns*. (Joint Pretrial Stmt. Ex. B P 7.) On July 3, 2002, Ivy entered into a contract with Chronicle, a San Francisco book publisher, whereby Chronicle would market and distribute *1000 Patterns* in the United States, Canada, and other territories outside of the British Commonwealth. (R. at 142-44 (Aug. 24, 2004); Pls.' Trial Ex. 38 P 2(a); Joint Pretrial Stmt. Ex. B P 25.)

**B. The Photographs**

The Court will now examine the processes by which each of Plaintiffs' photographers took the 118 photographs at issue.

*1. Joy Shih* n2

n2 Joy Shih did not testify at trial. The Court therefore cites to her May 27, 2004 deposition, included in the parties' Joint Appendix of Deposition Transcripts.

[*4]

Joy Shih, a Schiffer employee, took the photographs which were depicted in four books relevant to this action. n3 After looking through books of fabric swatches, Shih selected which fabrics she wanted to photograph and on what kind of background the fabrics would be placed. (Shih Dep. at 143.) Using a medium format camera, Shih took all the relevant photographs in Schiffer's photography studio. (*Id.* at 66, 72.) Shih explained the reasons behind her camera and film choices. Shih used a medium format camera, instead of a thirty-five millimeter camera, not because it more accurately depicted the colors and details in the fabric's design; rather, "for me it was just a preference." (*Id.* at 77.) Shih chose to use transparencies, not slides, because she found they "take[] a better image." (*Id.* at 74.) Shih also preferred Kodak, as opposed to Fuji, film because in her opinion Kodak film has "warmer tints." (*Id.* at 75.) When photographing the fabrics, Shih utilized various lights because the Schiffer studio had no windows. (*Id.* at 79-82.) All the lighting in the studio is "movable so you can position every [*5] shot differently." (*Id.* at 70.) Moreover, Shih sometimes utilized devices to diffuse light and eliminate shadows, "shine," and glare on the fabrics' surfaces. (*Id.* at 69.)

n3 These are: *Fun Fabrics of the 50's*; *Funky Fabrics of the 60's*; *Cool Hot Colors of the Late 1960's*; and *Forties Fabrics*. (Joint Pretrial Stmt. Ex. A PP 13, 21, 30, 38).

Shih took three or four images of each piece of fabric because "I wanted it at different - I wanted one close enough to see the weave, one to see the - thinking that later on I'm going to have options to choose from." (*Id.* at 143-44.) After the film was developed, Shih chose one from among these multiple images based on "which image would project what I was trying to get it to look like." (*Id.*)

*2. Tina Skinner and Tammy Ward*

Tina Skinner is a Schiffer employee who has authored more than fifty books. (R. at 158 (Aug. 23, 2004).) Tammy Ward, also a Schiffer employee, assisted Skinner in creating the photographs [*6] for six books relevant to this action. n4 (*Id.* at 186-87.) Again, these photographs were taken in the Schiffer studio, and therefore required the use of artificial lighting. (*Id.* at 162-63.) Skinner and Ward adjusted the lighting for different photographs because proper lighting was essential "to portray the color and design of the fabric" as they wanted it to look. (*Id* at 163.) Skinner did not try to make her photography depict the fabric as accurately as possible; instead, "the goal was to find exciting images to put in the book.... And my own good taste would determine what to choose." (*Id.* at 163-64.)

n4 These are: *Designer Fabrics of the Early 60's*; *Paisley: A Visual Survey of Pattern and Color Variations*; *Stripes: A Survey of Fabric Designs*; *Abstract Textile Designs*; *Dots: A Pictorial Essay on Pointed Printed Patterns*; and *Flower Power: Prints from the 1960's*. (Pls.' Trial Exs. 5, 5A, 6, 7, 7A, 8, 9, 10).

Like Shih, Skinner and Ward chose a medium format camera, [*7] because "it gives you greater resolution, better quality." (*Id.* at 162.) Although Skinner and Ward used the same lens for all their photographs, the process required camera and lighting adjustments for every shot. (*Id.* at 164-65, 189.) Skinner and Ward took numerous photographs of each object. (*Id.* at 165.) Skinner examined all of the developed images and selected "the one that pleased me the best." (*Id.*) Skinner never compared her photographs to the actual swatch because "I was not trying to accurately portray how they looked, I was just trying to get a good picture for my book . . . . It wasn't our goal to make it look just like the swatch." (*Id.* at 165-66.) Similarly, Ward never compared the photographs to the actual fabrics depicted. (*Id.* at 192.) When shown several photographs from her books and asked to compare them to the actual swatches, Skinner pointed out numerous differences in the values and tones of the photographs' colors vis a vis those of the fabric swatches. (*Id.* at 168-70.)

*3. Bruce Waters*

Bruce Waters is a Schiffer employee who photographed the quilts included in *Quilts and Quiltmakers Covering Connecticut*.(*Id.* at 245-46; [*8] Pls.' Trial Ex. 11.) During the photography session in the Schiffer studio, Waters collaborated with members of the Connecticut Quilt Search Projectto "come up with the best way to represent those quilts."(R. at 247, 249-50 (Aug. 23, 2004).) As most of the quilts are large, Waters elected to lay them flat on the floor and photograph them from overhead. (*Id.* at 248.) For Waters, the "trick" to shooting a large subject area is "to get the light as even on that area as possible" and so he used multiple lights in different formations. (*Id.* at 248.) Moreover, Waters changed his lighting arrangements based on the type of quilt being photographed. (*Id.* at 249-50.) While patchwork quilts of many colors required a certain lighting formation, monochrome quilts that display variegated stitching patterns "use a completely different lighting setup in order to show the detail of the stitching." (*Id.* at 250.)

When photographing entire quilts, Waters chose a Hasselblad camera with a fifty millimeter lens so that he could keep a large area in focus and have a "large piece of film to work with so we don't lose quality when we enlarge it." (*Id.* at 248, 250.) However, when shooting [*9] either details from large quilts, or a small quilt, Waters used a thirty-five millimeter camera to better capture details. (*Id.* at 251.) Members of the Connecticut Quilt Search Project assisted Waters during the quilt photo shoot by "instructing Bruce as to where we wanted the photograph - you know, what we wanted photographed, if there was anything in particular, a closeup that we wanted to have shot." (*Id.* at 224.) Waters always took more than one photograph of each quilt and "made a choice based on judgment of which one I think is the best image." (*Id.* at 252.)

*4. Leslie Pina*

Professor Leslie Pina heads Ursuline College's program in historic preservation and teaches classes in art and cultural history. (*Id.* at 106.) Pina has authored or coauthored over sixty five books, including two at issue in this case. n5 (*Id.* at 106, 109, 140.) Pina took the photographs for these two books but does not have any technical training in photography. (*Id.* at 116, 118.) Instead, when taking photographs, Pina "uses the same design principles in photography that I would use in any other art form that I either teach or have done." (*Id.* at 116.)

---

n5 These are: *African Fabric Design* and *Naturally 70's Fabric*. (Pls.' Trial Exs. 12, 13.)

---

[*10]
Pina did not use Schiffer's studio to take her photographs. Instead, she borrowed a "portable studio" from Schiffer, which she described as "a mini-version of Schiffer's photography studio in a case," and was instructed on its use by a Schiffer employee. (*Id.* 116-18.) When taking the photographs for the two books at issue, Pina almost always used either a 50 millimeter or a 100 millimeter macrolens because it gave her "a lot of depth and detail." (*Id.* at 119, 121.)

Pina described her photographic process as "an improvisation." (*Id.* at 122.) For each piece of fabric she photographed, "I decided how I'd like to highlight or focus in order to make another design out of it . . . . So, it was a selection that I made . . . . Of what to focus on, what to leave out, you know, where to move [the camera]." (*Id.* at 125.) Pina made these selections to emphasize aspects of various fabrics that pleased her. (*Id.* at 127.) To achieve the desired image, Pina altered the composition and adjusted the lighting for various photographs. (*Id.* at 130.) Pina did not compare her photographs to the fabrics after photographing a swatch. (*Id.* at 132.)

**C. The Copying**

When [*11] Ivy first decided to create *1000 Patterns*, it expected that the book would be comprised of patterns found in preexisting material, and that the sources for the pattern examples would derive from items previously published. (R. at 109 (Aug. 24, 2004).) Ivy retained Drusilla Cole to be the general editor of *1000 Patterns*.(*Id.* at 22.) Ivy also hired a "picture researcher," Vanessa Fletcher, to gather source material

Case 3:05-cv-00145-TFM    Document 30-5    Filed 06/20/2006    Page 4 of 11

Page 4

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

and determine whether Ivy needed permission to use the images selected for *1000 Patterns*.(*Id.* at 11, 27.) Fletcher provided Cole with various sources, some of which were Schiffer books. (Joint Pretrial Stmt. Ex. B P 37.) From these sources, Cole then selected images that she wanted to include and, often, simply cut them out. n6 (*Id.* P 39; Pls.' Trial Ex. 100; (R. at 80-82 (Aug. 24, 2004).) Ivy then scanned the selected images and put them into digital form. (Joint Pretrial Stmt. Ex. B P 40.) At least some of the scanned images from Plaintiffs' books were included in *1000 Patterns*. (R. at 81 (Aug. 24, 2004).)

> n6 At trial, Plaintiffs presented several Schiffer books, taken from Defendants' possession, from which disputed photographs had been cut out. (R. at 79-82 (Aug. 24, 2004).)

[*12]

At trial, Plaintiffs presented clear visual evidence of the direct copying of Plaintiffs' photographs into *1000 Patterns*. For example, Plaintiffs introduced an original fabric swatch of a greenish-pink abstract design, and compared it to both a photograph of that swatch on page 23 of Plaintiffs' book *Abstract Textile Design* and plate number 931 of Defendants' *1000 Patterns*.(*Id.* at 108.) The tone and value of colors in the Schiffer photograph differed from those of the actual fabric swatch. (*Id.*) Moreover, plate 931 of *1000 Patterns* tracked the color value and tone of the photograph in *Abstract Textile Design*, and not those of the original swatch. (*Id.*) Sophie Collins, Ivy's publisher, agreed that the coloring of the swatch differed from the coloring in the photograph in *Abstract Textile Design*, and admitted that Ivy had scanned images from Schiffer books and used them in *1000 Patterns*. (*Id.* at 108, 111).

Internal Ivy memoranda also demonstrated that Defendants copied Plaintiffs' photographs into *1000 Patterns*. Early in the book's development, Fletcher advised Cole regarding the meaning of certain notations she had made to a list of [*13] sources for *1000 Patterns*:

> [checkmark] [-] means no problem -i.e. although they come from Dover books or similar they originally come from other "out of (c) sources which we can name as OUR source ! -means do not over use and mix up as much as possible as although any one of the images could easily have come from another sources [sic] or original collections of material etc if lots all used together it will become apparent we have ripped off books
>
> !!!! -means only use a few and mix up with others so no one can identify the source immediately.

(Pls.' Trial Ex. 50-D.) Eleven of the Schiffer books at issue in this case appeared on this memorandum with "!" next to their title. (*Id.*) One, *African Fabric Design*, had a "T" next to its name. (*Id.*) Only one book at issue in this case, *Quilts and Quiltmakers*, was not listed, although a book entitled "Quilts and Quilt making" was listed, with an "!". (*Id.*). Moreover, just above the titles of several Schiffer books is the admonishment: "Schiffer: TREAT AS ONE SOURCE SO TRY TO PUT IN SOME OTHER SOURCES AMONGST THESE." (*Id.*)

**D. Registration of Copyrights**

Between 1996 and 2001, Plaintiffs [*14] registered each of the thirteen books with the United States Copyright Office. n7 (Pls.' Trial Exs. 1-13.) The initial copyright registrations ("registrations") for ten of the books claimed copyright in text and photographs. (Pls.' Trial Exs. 1, 2, 4, 6, 8-13.) Although the initial registrations for three books claimed copyright protection solely in "text," these registrations were subsequently amended to include photographs as well. n8 (Pls.' Trial Exs. 3, 3A, 5, 5A, 7, 7A.) Each of the thirteen books includes a copyright notice at the beginning of the book, but there are no copyright notices on or near any the individual photographs. (R. at 84-85 (Aug. 23, 2004).)

> n7 The Registration for *Quilts and Quiltmakers Covering Connecticut* was completed by Robyn K. Stoltzfus of Schiffer Publishing as the "authorized agent" of the Connecticut Quilt Search Project. The Connecticut Quilt Search Project was listed as the author of *Quilts and Quiltmakers*, and the Registration stated that the book was a work for hire. (Pls.' Trial Ex. 11.) Stoltzfus similarly completed Registrations for *African Fabric Design* and *Naturally 70's Fabric* for Shirley Friedland and Leslie Pina and Constance Korosec and Leslie Pina, respectively. (Pls.' Trial Exs. 12, 13.) These two books, however, were not listed as works for hire. (*Id.*)

[*15]

> n8 The original registrations for *Cool Hot Colors, Designer Fabrics of the Early 60's* and *Stripes: A Survey of Fabric Designs* describe "na-

Case 3:05-cv-00145-TFM   Document 30-5   Filed 06/20/2006   Page 5 of 11

Page 5

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

ture of authorship" as "text." (Pls.' Trial Exs. 3, 5, 7.) The amended registrations state that "copyright is claimed in photographs as well as text. The word 'photographs' was inadvertently omitted from the original application for registration." (Pls.' Trial Ex. 3A, 5A, 7A.)

### E. The Current Dispute

Plaintiffs learned of *1000 Patterns* in June of 2003. (R. at 231-32 (Aug. 23, 2004).) Peter Schiffer, Schiffer's President, immediately contacted Chronicle and Ivy (R. at 86-87 (Aug. 23, 2004); Joint Pretrial Stmt. Ex. B P 143), and around June 12, 2003, wrote a letter to Jack Jensen, Chronicle's president and publisher, listing eight Schiffer books whose images appeared in *1000 Patterns* (R. at 159 (Aug. 24, 2004); Defs.' Trial Ex. 659). Christine Carswell, an associate publisher at Chronicle's Adult Trade Division, asked Ivy to investigate Plaintiffs' allegations. (R. at 175 (Aug. 24, 2004).) On June 18, 2003, after conversations with [*16] Peter Schiffer, Carswell put *1000 Patterns* "on hold." (*Id.* at 161; Defs.' Trial Ex. 660.) This meant that, although Chronicle would continue to take orders for *1000 Patterns*, it would not ship any more copies of the book. (R. at 177 (Aug. 24, 2004).) Carswell knew, however, that by June 18, 2003, all of the major customer orders for *1000Patterns* had been fulfilled. (*Id.* at 177-79; Pls.' Trial Ex. 40.) In December of 2003, Carswell directed that *1000 Patterns* be taken off hold because, although the reasoning is not clear to this Court, she felt that Chronicle "wasn't getting any resolution" regarding the Schiffer dispute. (R. at 180 (Aug. 24, 2004).) On September 3, 2003, Plaintiffs filed this action.

## II. CONCLUSIONS OF LAW

Plaintiffs claim that Defendants' actions constituted copyright infringement and violated the Digital Millennium Copyright Act ("DMCA"), n9 *17 U.S.C. 1201 et seq. (2004)*. In light of the evidence presented at trial, this Court now finds in favor of Plaintiffs on their copyright claims and in favor of Defendants on the Plaintiffs' DMCA claims.

n9 On August 11, 2004, this Court granted summary judgment in favor of Defendants on Plaintiffs' *Lanham Act* and state law claims. *See* Memorandum and Order of August 11, 2004 at 9-10.

[*17]

### A. Copyright

To prove copyright infringement, a plaintiff must establish both: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)* (citing *Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 548, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985))*; see also *Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 290 (3d Cir. 1991)*.

*1. The Registrations*

To bring an action for copyright infringement the plaintiff must have a copyright registration. *17 U.S.C. § 411 (2004)*. Such a registration is prima facie evidence that the holder owns a valid copyright to the work in question. *17 U.S.C. § 410(c)*; see also *Ford Motor, 930 F.2d at 290*. Defendant has the burden of overcoming this presumption of validity. *Williams Electronics, Inc. v. Artic Int'l, Inc., 685 F.2d 870, 873 (3d Cir. 1982)*.

Plaintiffs possess certificates of registration issued by the Copyright Office. (Pls.' Trial Exs. 1-13.) Defendants argue, however, that Plaintiffs' copyright [*18] registrations are invalid because Schiffer did not disclose to the Copyright Office that its books were compilations that included some preexisting photographs. According to Defendants, this means that Plaintiffs have committed fraud on the Copyright Office and are guilty of unclean hands. n10

n10 At trial, Defendants also raised a related argument that CTQSP lacks standing to bring an infringement action regarding *Quilts and Quiltmakers*. In November 2000, Schiffer and CTQSP entered into a contract to create and publish *Quilts and Quiltmakers*. (Pls.' Trial Ex. 69.) The contract stated that CTQSP was the "Author" and owner of "the Book." (*Id.*) The Book included, inter alia, "black and white and color photographs." (*Id.*) The contract further provided that Schiffer would "copyright the Book in the name of the Author." (*Id.*) An Option at the end of the contract provided that CTQSP could elect to have Schiffer "take photographs for Book" and repay Schiffer for this service through a portion of the book's royalties. (*Id.*) CTQSP exercised this option, and Bruce Waters, a Schiffer employee, took the photographs for *Quilts and Quiltmakers*. (8/23/04 Tr. at 226-27.) *Quilts and Quiltmakers's* copyright registration lists CTQSP as the copyright holder for "text, photographs, compilation of photographs." (Pls.' Trial Ex. 11.) Defendants assert that CTQSP does not own the copyrights to the photographs, and therefore lacks standing to claim infringement, because the con-

Case 3:05-cv-00145-TFM    Document 30-5    Filed 06/20/2006    Page 6 of 11

Page 6
2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

tract did not explicitly transfer these copyrights from Schiffer to CTQSP. A transfer of copyright requires a written "instrument of conveyance, or a note or a memorandum of the transfer." *17 U.S.C. § 204.*

The Court holds that CTQSP has standing to claim infringement of the photographs in *Quilts and Quiltmakers*. The written contract between Schiffer and CTQSP makes clear the parties' intention for CTQSP to own the copyright to the "Book," and the definition of the "Book" expressly includes the photographs to be included in *Quilts and Quiltmakers*. Both Schiffer and CTQSP assert that this was, indeed, their intention, and, in the absence of contrary evidence, this Court will not hold otherwise.

[*19]

To invalidate a copyright based on a deficiency in the certificate, Defendants must show that a material omission is the result of Plaintiffs' "knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application." *Masquerade Novelty v. Unique Indus., 912 F.2d 663, 667 (3d Cir. 1990)*. In this case, the Copyright Office instructed Schiffer to amend its registration for *Forties Fabrics* by adding a statement that the work was a compilation including preexisting photographs. (Defs.' Trial Ex. 524.) The Office stated, "the added reference to 'compilation' covers the copyright protection available for your discretionary selection of which particular preexisting photos . . . to use in a publication." (*Id.*) This action, however, does not concern preexisting photographs included in Schiffer books; rather, all 118 photographs at issue were taken by Plaintiffs. Moreover, in this action, Defendants are accused of infringing Plaintiffs' copyrights in individual photographs, not in Plaintiffs' copyrights to their books as compilations. Finally, Defendants have not introduced any evidence that the other twelve books [*20] in this case included preexisting photographs, such that the language suggested by the Copyright Office in reference to *Forties Fabrics* was even relevant to the other twelve books. Therefore, Defendants have not shown that Plaintiffs knowingly failed to include information that might have caused the Copyright Office to reject their applications for the books involved in this case, and this Court will not hold Plaintiffs' registrations invalid. *Masquerade, 912 F.2d at 667.*

The Third Circuit has also stated that "it may be that the correct approach in situations where there has been a material, but inadvertent omission, is to deprive the plaintiff of the benefits of § 410(c) and to require him to establish the copyrightability of the articles he claims are being infringed." *Id. at 668 n.5.* Defendants argue that because Plaintiffs failed to inform the Copyright Office that the subject matter of their photographs were separately copyrightable, preexisting fabric swatches that Plaintiffs did not create, Plaintiffs' copyright registrations should not invoke the ordinary rebuttable presumptions of validity. Whether or not the presumption applies is [*21] of little practical import here. The leading treatise states that "the most common pattern . . . is for courts adjudicating infringement actions simply to reach their own determination" regarding the copyrightability of the subject matter. 3 MELVIN B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.11[B][3] (2d ed. 1999). In the analysis that follows, the Court will therefore examine "all of the multitude of facts that underlie the validity of the copyright." *Masquerade, 912 F.2d at 667* (quotation omitted).

*2. Ownership of a Valid Copyright*

Copyright protects original works of authorship fixed in any tangible medium of expression. *17 U.S.C. § 102*. Photographs are a recognized category of "works of authorship." *17 U.S.C. § 101*. Moreover, the photographs in this case have been fixed in a tangible medium of expression, namely, the Shiffer books. Thus, Plaintiffs will own valid copyrights in the 118 photographs if the photographs are "original." Because Plaintiffs do not own the copyright to the fabric swatches themselves (Joint Pretrial Stmt. Ex. B P 86, 116), the issue is whether the [*22] photographs in Plaintiffs' books, apart from whatever creativity inheres in the fabric swatches, demonstrate sufficient originality to be copyrightable.

An original work is one that is both independently created (i.e., not copied) and creative. *Feist, 499 U.S. at 345, 113 L. Ed. 2d 358, 111 S. Ct. 1282.* "The requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* It has been said that "nothing in the Constitution commands that copyrighted matter be strikingly unique or novel." *Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99 (2d Cir. 1951).*

While there is no uniform test to determine a photograph's originality, several factors are often cited. *See, e.g., Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60, 28 L. Ed. 349, 4 S. Ct. 279, 1884 Dec. Comm'r Pat. 186 (1884)* (taking into account pose, arrangement of subject and accessories, disposition of light and shade, and evocation of desired expression); *Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 116 (2d Cir. 1998)* (emphasizing lighting [*23] and camera angle); *Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992)* (holding that "elements of originality in a photograph may include posing the subjects, lighting, angle, selec-

Page 7

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

tion of film and camera . . . and almost any other variant involved"); *United States v. Hamilton, 583 F.2d 448, 452 (9th Cir. 1978)* (noting that courts "have carefully delineated selection of subject, posture, background, lighting, and perhaps even perspective alone as protectible elements of a photographer's work"); *Edison v. Lubin, 122 F. 240, 242 (3d Cir. 1903)* (holding copyrightable a film made by Thomas Edison because "to obtain it requires a study of lights, shadows, general surroundings, and a vantage point adapted to securing the entire effect").

It is clear, then, that "decisions by the photographer - or, more precisely, the elements of photographs that result from these decisions-are worthy of copyright protection." *Ets-Hokin v. Skyy Spirits, 225 F.3d 1068, 1075 (9th Cir. 2000).* Indeed, Learned Hand stated that "no photograph, however simple, can be unaffected by the personal influence of the author." *Jewelers' Circular Pub. Co. v. Keystone Pub. Co., 274 F. 932, 934 (S.D.N.Y. 1921).* [*24] This approach "has become the prevailing view," and therefore "almost any[] photograph may claim the necessary originality to support a copyright merely by virtue of the photographer's personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken." 1 MELVIN B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 2.08[E][1], at 2-130 (2d ed. 1999).

This Court holds that Plaintiffs' photographs are sufficiently original to be copyrightable because they exhibit the requisite level of creativity. Plaintiffs' photographers made several creative decisions that are evident in these photographs. First, the photographers chose cameras which were better suited to their expressive goals, sometimes changing cameras to produce the desired result. (Shih Dep. at 72; R. at 162, 248-50 (Aug. 23, 2004).) Second, some of the photographers decided to use certain brands or types of film because of the film's particular qualities. (Shih Dep. at 75; R. at 250 (Aug. 23, 2004).) Third, some photographers chose specific lenses to achieve a desired outcome. (R. at 119-21, 248 (Aug. 23, 2004).) Fourth, each [*25] photographer arranged and changed lighting to produce desired effects, such as reducing shadows, portraying color, highlighting texture, or emphasizing stitching patterns. (Shih Dep. at 69; R. at 129-30, 163, 248-50 (Aug. 23, 2004).) Fifth, all of the photographers engaged in "bracketing" - taking multiple photographs of each piece of fabric and then choosing one based upon the expression they wanted to evoke. (Shih Dep. at 87-88, 143-44; R. at 165-66, 252 (Aug. 23, 2004).) In the words of Joy Shih, the decision of which picture to use was made according to "which image would project what I was trying to get [the fabric] to look like." (Shih Dep. at 87.) Moreover, the sum of these choices are reflected in the images that are at issue in this case. *Ets-Hokin, 225 F.3d at 1075.* Certain of the photographs evoke the texture of a particular fabric. Others have exaggerated or understated the tone and values of the colors in a pattern when compared to the original fabric swatches. Some photographs are more blurry than the patterns they represent, while others display an almost clinical sharpness.

Defendants argue, however, that these choices are more chimerical than real [*26] because they were usually dictated by functional concerns, and claim that Plaintiffs' images have failed to meet even the meager bar of originality required for a photograph to be copyrightable. According to Defendants, Plaintiffs' photographers were more mechanics than artists, as the photographers' main goal was simply to create accurate facsimiles of the fabric designs. In support of their argument, Defendants rely almost entirely on *Bridgeman Art Library, Ltd. v. Corel Corp., 25 F. Supp. 2d 421 (S.D.N.Y. 1998).* Their reliance is misplaced. Bridgeman, an English company, claimed copyright in color transparencies which reproduced famous public domain artworks. *Id. at 423.* Bridgeman attached a color correction strip to each image, ensuring that the transparency "was a genuine reflection of the original work." *Id. at 423-24.* The court held that Bridgeman's reproductions were not copyrightable, as they were "substantially exact reproductions . . . copied from the underlying works without any avoidable addition, alteration, or transformation. Indeed, Bridgeman strives to reproduce precisely those works of art." *Id. at 426.* [*27] Although the court stated that "much, perhaps almost all, photography is sufficiently original to be subject to copyright," it nevertheless decided that "a photograph which is no more than a copy of the work of another as exact as science and technology permit lacks originality." *Id. at 427.*

The instant case is distinguishable from *Bridgeman* in two important ways. First, the court in *Bridgeman* performed its copyrightability analysis in accordance with United Kingdom, not United States, law. *Id. at 426.* Second, Bridgeman's stated purpose was to "reproduce precisely" the underlying works of art. *Id. at 427.* Indeed, the goal of reproducing a famous work of art is an accurate replication that is faithful to the original artwork. There is no ulterior creative purpose - indeed, creativity is anathema to that goal. Plaintiffs, by contrast, did not attempt to replicate fabric swatches as precisely as possible. Rather, Plaintiffs' books were focused mainly on patterns, and Plaintiffs' photographers strove to create images that were visually interesting. In fact, several photographers clearly stated that they never compared the fabric [*28] swatches to their photographs, precisely because such a comparison was unimportant to their goals. (*See, e.g.*, R. at 125, 132, 165-66 (Aug. 23, 2004).)

Case 3:05-cv-00145-TFM    Document 30-5    Filed 06/20/2006    Page 8 of 11

Page 8

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

In sum, originality requires independent creation and creativity. The parties do not dispute that the 118 photographs at issue were independently created by Plaintiffs. Because Plaintiffs' photographs resulted from various creative decisions by the photographers, and because those creative decisions are reflected in the appearance of the photographs in the Schiffer books, the photographs meet the requirement of creativity necessary for the purposes of copyright law. Accordingly, this Court holds that as a matter of law, Plaintiffs' photographs possess sufficient originality to be copyrightable. As Plaintiffs are the authors of the photographs and the photographs are fixed in a tangible medium, Plaintiffs own a valid copyright in the 118 photographs at issue in this case.

### 3. Copying

The second element of copyright infringement is "copying of constituent elements of the work that are original." *Feist, 499 U.S. at 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282*. Copying is proven by showing: (1) access to the copyrighted work; and (2) substantial similarity, [*29] i.e., that the alleged infringer uses material substantially similar to the copyrightable elements of the copyrighted work. *Ford Motor, 930 F.2d at 291*. This Court holds that Defendants had access to the photographs at issue. (Pls.' Trial Ex. 50-D (listing of Schiffer books compiled by Defendants' picture researcher and sent to Defendants' editor for use as sources in *1000 Patterns*); (R. at 79-82 (Aug. 24, 2004)) (presenting Schiffer books taken from Ivy's offices with photographs cut out of books)). Therefore, the first prong of the copying test is met, leaving only the question of whether Plaintiffs have proven substantial similarity.

To meet the substantial similarity test, Plaintiffs must satisfy two requirements. *DamThings from Den. v. Russ Berrie & Co., 290 F.3d 548, 562 (3d Cir. 2002)*. The first consideration, sometimes called "actual copying," is met if "there is sufficient similarity between the two works in question to conclude that the alleged infringer used the copyrighted work in making his own." *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1232 (3d Cir. 1986)*. Actual copying can be established [*30] by direct evidence or inferred through "similarities that are probative of copying between the two works, and expert testimony." *DamThings, 290 F.3d at 562 (quoting Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992))*. Second, if there has been actual copying, then Plaintiff must establish that there has been "actionable copying." This standard is satisfied when the factfinder decides, using the perspective of the "ordinary layperson," that the "copying went so far as to constitute improper appropriation." *Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904, 907 (3d Cir. 1975)*. Improper appropriation occurs when the "substantial similarities relate to the protectible material." n11 *DamThings, 290 F.2d at 562*.

> n11 The Third Circuit discarded this bifurcated test "in copyright cases involving exceptionally difficult materials, like computer programs," *Whelan, 797 F.2d at 1233*, but has retained it for "easy" materials, like pudgy troll dolls, *DamThings, 290 F.3d at 562*. As these photographs to not constitute "exceptionally difficult materials," this Court will undertake the two-step analysis. *Cf. Whelan, 797 F.3d at 1233*.

[*31]

A two step test to determine substantial similarity is necessary because "not all copying . . . is copyright infringement." *Feist, 499 U.S. at 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282*. If the defendant copies only non-copyrightable parts of plaintiff's work, there is copying, but not copyright infringement. *See, e.g., DamThings, 290 F.3d at 562*. It follows that the less originality inherent in the underlying work, the closer the copy must be to the underlying work for the copying to be actionable. *See Salkeld, 511 F.2d at 908*. Such copyrights are sometimes described as "thin": when the unoriginal aspects of the work are subtracted from the work as a whole, the remaining copyright "protects against only virtually identical copying." *Satava v. Lowry, 323 F.3d 805, 812 (9th Cir. 2003) (citing Apple Computer v. Microsoft Corp., 35 F.3d 1435, 1439 (9th Cir. 1994)* ("When the range of protectible and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity.")).

This Court holds that Defendants actually copied the photographs at issue by scanning them into a computer and reproducing the scanned images [*32] in *1000 Patterns*. (R. at 81 (Aug. 24, 2004) (admitting that photographs cut out of Schiffer books were actually used in *1000 Patterns*), 111 (admitting that cut out images were scanned from Schiffer books and put into *1000 Patterns*)). Therefore, the first consideration of the substantial similarity test is met. *DamThings, 290 F.3d at 562* (noting that "test for actual copying can be established by direct evidence").

The only remaining question, then, is whether the actual copying of Plaintiffs' photographs amounted to actionable copying by being "so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Educ.Testing Servs. v. Katzman, 793 F.2d 533, 541 (3d Cir. 1986)* (quotation omitted). It is true that Plaintiffs' photographs will not be confused with the

Case 3:05-cv-00145-TFM   Document 30-5   Filed 06/20/2006   Page 9 of 11

Page 9

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

work of Alfred Stieglitz, Edward Steichen, Roberta Grobel, or the renowned Joel Sternfeld, photographers whose work, because of its high degree of originality, could be actionably copied even though the infringing images look somewhat [*33] different from their copyrighted works. Nevertheless, this Court holds that Defendants' copying was actionable. At trial, the Court examined fifty-three images that appeared both in Schiffer books and in *1000 Patterns*. (R. at 84-108 (Aug. 24, 2004).) For many of these images, the Court also examined the underlying fabric swatches, and compared the swatch, the Plaintiffs' photograph, and the *1000 Patterns* image. Discernable differences were often readily apparent between the swatch, as it appeared live, and the Plaintiffs' photograph of that swatch in a Schiffer book. These changes resulted from Plaintiffs' creative choices, and included: the highlighting of certain colors and the muting of others; an extra emphasis on a pattern's texture; and the heightened visibility of stitching in certain of the quilt photographs. When the swatch was then compared to the *1000 Patterns* image, and to the photograph in the Schiffer book, the *1000 Patterns* image invariably appeared identical to the photograph in the Schiffer book, not the fabric swatch. This Court thus concludes that the Defendants copied the protectible aspects of the Plaintiffs' photographs-those aspects that resulted [*34] from original contributions made by Plaintiffs' photographers, through the use of creative choices. Even though Plaintiffs' copyright in their photographs may be "thin," they are robust enough to offer protection here, in light of Defendants' exact replication of Plaintiffs' images. *Cf. Ets-Hokin v. Skyy Spirits, Inc., 323 F.3d 763 at 766*.

### 3. Fair Use

Notwithstanding their ostensibly infringing use of Plaintiffs' photographs, Defendants assert that they may avoid liability because their appropriation of Plaintiffs' work was a "fair use." A fair use is one made "for purposes such as criticism, comment, news reporting, teaching...,scholarship, or research." *17 U.S.C. § 107 (2004)*. Fair use is an affirmative defense upon which the alleged infringer has the burden of proof. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 197 (3d Cir. 2004)*. A court must take into account four factors when determining whether a use is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality [*35] of the portion used in relation to the copyrighted work as a whole;

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*17 U.S.C. § 107*. Each factor must be "explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994)* (citations omitted). Generally, "the analysis under each statutory factor concentrates on the copy and the original work from which it derives." *Video Pipeline, 342 F.3d at 198*. Thus, this Court will now examine each statutory factor in turn by comparing *1000 Patterns* with Plaintiffs' photographs.

#### a. Purpose and Character of Use

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." *17 U.S.C. § 107(1)*. When the new work is used commercially, "its use will less likely qualify as fair." *Video Pipeline, 342 F.3d at 198*. Here, it is undisputed that *1000 Patterns* is sold commercially. (Joint Pretrial Stmt. Ex A PP 302-03.) [*36] While this militates against a finding of fair use on the first factor, it is not the end of the inquiry. *Video Pipeline, 342 F.3d at 198*. The Court must also examine the character and purpose of the new work compared to that of the original. If the new work is "transformative," in that it alters the original "with new expression, meaning, or message," it is more likely to be deemed fair use than if it "merely supersedes the objects of the original creation." *Campbell, 510 U.S. at 579* (holding song parody adequately transformative to be fair use of original). Defendants claim that their book is transformative because while Plaintiffs' books concentrate on a class of collectible fabrics, *1000 Patterns* is an historical reference book of design patterns. This argument fails. Both Plaintiffs' books and Defendants' *1000 Patterns* are aimed at designers, artists, and art enthusiasts, and both share a common purpose - to inform this audience about patterns and fabrics. (*Compare* Pls.' Trial Ex. 18 (describing *1000 Patterns* as "an intriguing reference" for those with "an . . . interest in art and ornamentation") *with* Pls.' Trial Ex. 26 (calling [*37] *Stripes*, one of Plaintiffs' books, "an invaluable reference for artists of every medium").) Therefore, *1000 Patterns* "merely supersedes" the objects of Plaintiffs' books (and their photographs). *Campbell, 510 U.S. at 579*. Accordingly, the first fair use factor weighs in favor of Plaintiffs.

#### b. Nature of the Copyrighted Work

The second fair use factor instructs courts to consider "the nature of the copyrighted work." *17 U.S.C. § 107(2)*. Some works, such as fictional, creative works,

Case 3:05-cv-00145-TFM  Document 30-5  Filed 06/20/2006  Page 10 of 11

Page 10

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

are closer to the core of intended copyright protection than primarily factual works. *Campbell, 510 U.S. at 586*; *see also Harper & Row, 471 U.S. at 563*. In addition, one key factor tending to negate a finding of fair use on the second factor is whether the original work is unpublished. *See Harper & Row, 471 U.S. at 550-51* (reasoning that fair use is predicated on author's implied consent to "reasonable and customary" use when work released for public consumption; thus, fair use not traditionally recognized as defense to copying from unpublished works). Here, Schiffer has published all the books which contain [*38] the photographs at issue, which militates for fair use. (Pls.' Trial Exs. 19-32.) Moreover, while "photographs taken for aesthetic purposes[] are creative in nature and thus fit squarely within the core of copyright protection," *Elvis Presley Enters. v. Passport Video, 349 F.3d 622, 629 (9th Cir. 2003)*, the Plaintiffs' photographs here are taken less for aesthetic purposes than some other photographs might be. On the other hand, the photographs are certainly more creative than purely factual works such as a compilation of telephone numbers. *See, e.g., Feist, 499 U.S. at 358, 113 L. Ed. 2d 358, 111 S. Ct. 1282*. In sum, this Court cannot say that the second fair use factor militates strongly in either party's favor.

c. Amount and Substantiality of the Work Copied

The third factor requires the court to calculate "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *17 U.S.C. § 107(3)*. This factor entails both a quantitative and a qualitative analysis. *Campbell, 510 U.S. at 587*; *see also Video Pipeline, 342 F.3d at 201*. The quantitative inquiry simply examines how much of the copyrighted [*39] work was taken. *See, e.g., Video Pipeline, 342 F.3d at 201* (examining two minute clips taken from two hour movies (about one and a half percent) and concluding that "quantitatively . . . the portion taken is quite small"). The qualitative inquiry looks to whether the alleged infringer "took what was essentially the heart" of the original work. *Harper & Row, 471 U.S. at 564-65* (holding "heart" taken where most interesting and powerful parts of underlying work appropriated, "precisely because they qualitatively embodied . . . distinctive expression").

Both the quantitative and the qualitative inquiries favor Plaintiffs. Defendants argue that the "copyrighted work" should be measured in terms of each Schiffer book as a whole. Therefore, according to Defendants, as each of the thirteen Schiffer books contain at least 300 photographs, and Plaintiffs allege infringement of 118 photographs, *1000 Patterns* used only about four percent of this total. Defendants' argument, however, misapprehends the proper frame of reference. Each photograph is an individually copyrighted work, and it is the amount used of each one that must be analyzed. Defendants cut [*40] out and scanned the entirety of each of Plaintiffs' photographs. (R. at 111 (Aug. 24, 2004).) Although Defendants occasionally cropped Plaintiffs' photographs before including them in *1000 Patterns*, each photographs was scanned in its entirety. (*Id.*) Therefore, quantitatively, Defendants took all of Plaintiffs' work. Qualitatively, moreover, the Court concludes that the "heart" of Plaintiffs' work has been appropriated. Many of Plaintiffs' photographs are reproduced in *1000 Patterns* in their entirety. Thus, if these photographs have a "heart," that heart was necessarily taken by Defendants. Further, even those photographs which Defendants cropped before placing them into *1000 Patterns* had, at the least, one full repetition of the pattern appropriated by Defendants. Consequently, the Court holds that the third fair use factor favors Plaintiff.

d. Effect on Potential Market or Value

The last fair use factor calls on the court to evaluate "the effect of the use upon the potential market for or value of the copyrighted work." *17 U.S.C. § 107(4)*. Analysis of this factor requires courts to consider whether the allegedly infringing work is a "market [*41] substitute" for the original work, both in terms of "the extent of market harm caused by the particular actions of the alleged infringer" and also "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell, 510 U.S. at 590* (quotation omitted). The instant case is a quintessential example of an allegedly infringing work serving as a market substitute for the original. *Cf. Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 451, 78 L. Ed. 2d 574, 104 S. Ct. 774 (1984)* (finding no market substitution when copying done for purely non-commercial purpose). Defendants unerringly copied Plaintiffs' photographs from Plaintiffs' books on design and pattern and inserted them, without significant alteration, into their own book on design and pattern. Therefore, this "commercial use amounts to mere duplication of the entirety of an original," and thus "supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell, 510 U.S. at 591* [*42] (citation and quotation omitted).

e. Conclusion

In sum, Defendants' use of Plaintiffs' work was not a fair use. Because the first, third, and fourth fair use factors favor Plaintiffs, and because none of the factors strongly favor Defendants, this Court holds that Defendants have not met their burden of proving that their appropriation of Plaintiffs' works constitutes fair use.

**B. DMCA**

Case 3:05-cv-00145-TFM   Document 30-5   Filed 06/20/2006   Page 11 of 11

Page 11

2004 U.S. Dist. LEXIS 23052, *; 73 U.S.P.Q.2D (BNA) 1090;
Copy. L. Rep. (CCH) P28,913

In addition to claiming copyright infringement, Plaintiffs allege that Defendants violated two sections of the *DMCA*, § § *1202(a)* and *(b)*. *Section 1202* generally protects the integrity of copyright management information ("CMI"). CMI is information such as the title, name of author, and copyright owner, including the information set forth in a notice of copyright. *17 U.S.C. § 1202(c)(1)-(3)*. *Section 1202(a)* prohibits knowing falsification of CMI with the intent to aid copyright infringement. *Section 1202(b)* prohibits the intentional removal or alteration of CMI with reasonable grounds to know the removal or alteration will aid infringement.

Plaintiffs allege that Defendants violated the DMCA in two ways: First, by falsely naming Defendants as the copyright holders of [*43] the pictures published in *1000 Pattens*; and second, by "removing" Plaintiffs' copyright notices from those pictures. Defendants reply that they did not have the requisite intent necessary for a DMCA violation, and moreover, they did not remove any copyright management information from Plaintiffs' photographs. There is a dearth of caselaw on the application of *§ 1202*. The few cases that exist, however, together with the facts of this case, indicate that Plaintiffs cannot recover on their DMCA claims.

To recover for a violation of *§ 1202(a)*, a plaintiff must prove that the defendant who falsifies CMI knows that the CMI is false, and that the defendant provides, distributes, or imports the false CMI with the intent to aid infringement. *17 U.S.C. § 1202(a)*; see also S. REP. NO. 105-190, at 34-35 (1998); *Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002)*. Plaintiffs in this case have not shown that Defendants possessed the requisite knowledge or intent to violate the relevant copyrights as required by *§ 1202(a)*. Evidence was introduced at trial that Defendants tried to avoid using too many spreads (series of images [*44] as they appear on a page) from any single Schiffer book. (Pls.' Trial Ex. 50 (warning from *1000 Patterns's* picture researcher to *1000 Patterns's* editor, that with respect to Schiffer books, "do not overuse and mix up as much as possible . . . if lots all used together it will become apoparant [sic] we have ripped off books"); *id.* (stating for another category, "only use a few and mix up with others so no one can identify the source immediately").) This evidence, however, indicates only that Defendants knew Plaintiffs had copyrights in their books as compilations, not that Defendants knew the individual photographs contained therein were copyright protected. This conclusion is bolstered by another communication from *1000 Patterns's* picture editor, in which she stated, "there is no (c) in the photography of a flat piece (ruling against Bridgeheman [sic] in 2000) as there is no creativity in it so we are OK on that score." (Defs.' Trial Ex. 658.) Finally, Ivy's publisher testified at trial that, although it might be "a rude thing to do" or "bad manners" to take images from one of Ivy's books, rearrange the pictures and the text, and republish the ensuing compilation, [*45] "I don't think you'd be infringing on our copyright." (R. at 136 (Aug. 24, 2004).) Thus, while it is clear that Defendants knew Plaintiffs had a copyright in their books, it is also clear that Defendants (erroneously) believed Plaintiffs had no copyright in their individual photographs. Accordingly, because Defendants did not believe Plaintiffs had a copyright in their individual photographs, they could not have committed knowing misconduct as required by the DMCA. *See, e.g., Ward, 208 F. Supp. 2d at 450* (refusing to hold defendant liable under *§ 1202(a)* because evidence was "ambiguous" that defendant knew plaintiff held copyright to disputed work).

Next, this Court holds that Defendants did not remove CMI from Plaintiffs' photographs. To recover for a violation of *§ 1202(b)*, a plaintiff must demonstrate that the defendant intentionally removed or altered CMI knowing, or having reasonable grounds to know, that the removal will aid infringement. *17 U.S.C. § 1202(b)*. In this case, the only copyright management information that Plaintiffs included with their work were notices of copyright that appeared on the inside covers of the Schiffer [*46] books. The individual photographs, which are the subjects of this action, did not contain any copyright management information whatsoever, either on or near the images themselves. At least one court, when presented with a similar situation, held that the defendant had not "removed" copyright management information within the meaning of *§ 1202(b)*. *See Kelly v. Arriba Soft Corp., 77 F. Supp. 2d 1116, 1122 (C.D. Ca. 1999)* (holding that language and structure of statute commanded that *§ 1202 (b)* "applies only to the removal of copyright management information on a plaintiff's product or original work"). Plaintiffs have not presented any authority to the contrary, and thus, this Court holds that, to be actionable under *§ 1202(b)*, a defendant must remove copyright management information from the "body" of, or area around, plaintiff's work itself. Therefore, Plaintiffs have failed to demonstrate that Defendants violated the DMCA here by not reproducing Plaintiffs' notices of copyright.

## III. CONCLUSION

Accordingly, this Court enters judgment in favor of Plaintiffs and against Defendants on Plaintiffs' copyright infringement claims. Judgment is entered in favor [*47] of Defendants and against Plaintiffs on Plaintiffs' DMCA claims. An appropriate Order follows.

### ORDER

**AND NOW**, this **12th** day of **November, 2004**, upon consideration of the parties' Amended Findings of