1056HH

Print Request:    LEXSEE

Time of Request: August 10, 2005  04:04 PM EDT

Number of Lines: 1187
Job Number:      1822:56359689

Client ID/Project Name: mcclatchey

Research Information:

Lexsee 1998 U.S. Dist. LEXIS 10985

Send to:  SZPONDOWSKI, KARA
          NIRO SCAVONE HALLER & NIRO LTD
          181 W MADISON ST STE 4600
          CHICAGO, IL 60602-4583

**EXHIBIT**

21(E)

LEXSEE 1998 U.S. DIST. LEXIS 10985

UNITED STATES MEDIA CORPORATION, Plaintiff, -against- EDDE
ENTERTAINMENT CORPORATION et al., Defendants. EDDE
ENTERTAINMENT CORPORATION, Counter-Claim and Cross-Claim Plaintiff, -
against- STEVEN BRENNER et. ano., Counter- and Cross-Claim Defendants.

94 Civ. 4849 (MBM) (MHD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1998 U.S. Dist. LEXIS 10985*

July 16, 1998, Decided
July 17, 1998, Filed

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For UNITED STATES MEDIA
CORPORATION, INC., plaintiff: Lawrence A. Stanley,
Esq., New York, NY.

For EDDIE ENTERTAINMENT, INC., MANOJ
PEREKH, GUY ELAN, GEORGE W. ATKINSON,
RECORD EXPLOSION, INC., JOSEPH SHABOT,
JACK MISHAN, TRANS WORLD MUSIC CORP.,
LATE NIGHT VIDEO, INC., RKO WARNER VIDEO,
INC., 48TH RETAIL ASSOCIATES, PALMER
INVESTMENT CORPORATION, FLASH
ELECTRONICS, INC., CINEMA HOME VIDEO, INC.,
REPNET, PAUL PORRATA, defendants: Stanley J.
Yavner, New City, NY.

For MICHAEL CHRISTIAN, defendant: Sanford M.
Passman, Law Offices of Sanford M. Passman, Beverly
Hills, CA.

**JUDGES:** MICHAEL H. DOLINGER, UNITED
STATES MAGISTRATE JUDGE.

**OPINIONBY:** MICHAEL H. DOLINGER

**OPINION:**

MEMORANDUM & ORDER

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

Plaintiff United States Media Corporation ("US Me-
dia") commenced this lawsuit in July 1994, alleging that
defendant Edde Entertainment Corporation was distribut-
ing video cassettes for the home video market that con-
tained unauthorized copies of five films for which US
Media had the exclusive United States distribution rights
and on which it had copyrights. Among its legal theories,
plaintiff asserted claims for copyright and trademark
infringement, [*2] common-law unfair competition and
violations of the Racketeer Influenced and Corrupt Or-
ganizations Act, *18 U.S.C. § 1961* et seq.. ("RICO").
Plaintiff named as defendants (1) Edde, its two principals
as well as their personal companies, and Edde's Execu-
tive Vice President ("the Edde defendants"), (2) the indi-
vidual who allegedly supplied the bootlegged films to
Edde as well as his personal unincorporated business, (3)
a corporate and individual sales agent for Edde, and (4) a
host of retailers to whom Edde had allegedly sold copies
of the infringing films. After extended pretrial proceed-
ings, the Court entered summary judgment as to liability
against the Edde defendants and Edde's supplier on the
copyright, trademark and unfair competition claims. At
the same time the court dismissed the RICO claims and
certain other legal theories. See *United States Media
Corp. v. Edde Entertainment, Inc., 1996 U.S. Dist.
LEXIS 13389, 1996 WL 520901* (S.D.N.Y. Sept. 12,
1996).

During the course of pretrial proceedings, the parties
agreed to consolidate with this action a separate lawsuit
commenced by Edde in California against US Media and
its chief executive officer and principal owner, Steven
Brenner. That suit, now [*3] embodied in counterclaims
and third-party claims by Edde, is based on the conten-
tion that Brenner sought willfully to harm Edde's busi-
ness reputation and its ongoing business relations with a
variety of entities after the discovery of the alleged pirat-

1998 U.S. Dist. LEXIS 10985, *

ing of the US Media films. Edde therefore asserts claims of trade libel and libel.

We have now completed a bench trial of all remaining claims and issues in the case. Based on our assessment of the record, we award plaintiff $ 35,000.00 in lost profits on its copyright claims as well as $ 58,728.02 in profits that Edde earned as a result of its copyright infringements. We also award plaintiff $ 37,227.21 in infringing profits earned by five retailers and $ 1,380.42 earned by Edde's sales agent and his company.

Alternatively, plaintiff may recover $ 50,000.00 in statutory damages for copyright infringement of one of the five films and $ 112,760.38 in lost profits and infringing profits for the other four films. We further hold that plaintiff is entitled to an award of its reasonable attorney's fees incurred in prosecuting its copyright claim with respect to one of the films, as well as its full litigation expenses. Finally, we dismiss [*4] Edde's claims against Brenner and US Media.

A. The Pertinent Facts

As recounted in our summary judgment decision, familiarity with which is assumed, US Media acquired the rights to the five films at issue here between May 1988 and May 1991. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901*, at *1, 4 n.3. All are considered to be so-called grade "B" erotic movies, a characterization that applies to a category of lesser-quality films marketed principally for television or for home video viewing. (Tr. 130, 139, 566). They were all produced in Europe, and none features actors or directors of any reputation in the general film industry. (Tr. 238-39).

The first of these acquisitions, which was consummated on May 16, 1988, was of the film Intimo (later retitled Midnight Seduction). (Tr. 6). For $ 10,000.00, US Media acquired all theatrical, television, home video and ancillary distribution rights. (PX 2(e); Tr. 16). Plaintiff subsequently arranged for dubbing (Brenner Dep. at 85, 106) and English credits, and placed a copyright notice on the film itself. (Tr. 59-60). It registered the copyright on August 31, 1989 under the name Intimo. See *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL* [*5] *520901*, at *3 & n.3; Tr. 10; DX A.

Plaintiff's second acquisition, on October 28, 1988, was of a film titled Forbidden Passion. Plaintiff received theatrical, television, video and ancillary rights to this film, for a license fee of $ 15,000.00. (PX 2(d)). n1 Again, it arranged for dubbing and credits (Brenner Dep. at 132-33) and affixed a copyright notice to the film. (Tr. 59-60).

n1 According to the distribution agreement between plaintiff and the producer, the original title of this film was I Am A Nymphomaniac. (PX 2(d)).

The third film, acquired on March 9, 1989, was called Top Model (later retitled Hot Curves in the infringing version (see Christian Dep. at 27)). n2 In this transaction plaintiff acquired solely the television and ancillary rights and an exclusive option on the video rights. The license fee was $ 50,000.00. The contract did not specify a price for exercising the video option, and thus left that term for future negotiations. (PX 2(c); Tr. 17, 19). Plaintiff arranged once [*6] more for dubbing and credits and affixed a copyright notice on the film. (Brenner Dep. at 189-90, 204-05; Tr. 60). Plaintiff never negotiated a price for the video rights and never exercised that option. (Tr. 17-18; Brenner Dep. at 385).

n2 Although the parties during trial designated what they believed were pertinent portions of deposition testimony entered into evidence, in drafting this memorandum and order we have cited to both designated and undesignated deposition testimony because of confusion in some of the designations.

Plaintiff's fourth acquisition, of the film Desire, occurred on May 19, 1990. For a license fee of $ 37,500.00, US Media acquired the television distribution rights and an option for the home video rights, but again without any specification of the price in the event that plaintiff exercised this option. (PX 2(b); Tr. 17, 18-19). Once more, plaintiff arranged for dubbing and editing, and placed a copyright notice on the film. (Brenner Dep. at 158, 174; Tr. 60). As with Top Model, [*7] the other film on which it received a home video option, plaintiff did not negotiate a price or seek to exercise the option. (Tr. 18; Brenner Dep. at 385).

The last film, The Seductress (later retitled Naked Rage in the infringing version) (Christian Dep. at 27)), was acquired on May 23, 1991. n3 For $ 30,000.00, plaintiff obtained all pertinent rights to this film (PX 2(a); Tr. 16-17), did some editing and adding of titles and included a copyright notice on the film itself. (Brenner Dep. at 144; Tr. 60).

n3 According to the distribution agreement between plaintiff and the producer of the film, its original title was Appointment in Black. (PX 2(a)).

Of these five films, plaintiff timely registered the copyright only with respect to the first, titled Intimo. n4 That registration was effective as of August 31, 1989. (DX A). The other four films were not registered until February 18, 1994, after plaintiff had learned of the bootlegging of the five films. See *United States Media, 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901, [\*8]    at \*3 n.3; DX B-E; Tr. 430-32.*

> n4 As noted in the summary judgment opinion, registration within the first five years after initial publication is prima facie evidence of copyright validity. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901, at \*3; 17 U.S.C. § 410*(c). Registration is also a prerequisite to an infringement suit. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901, at \*5; 17 U.S.C. § 411*(a). The absence of a registration at the time of infringement does not, however, bar liability. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901, at \*4; 17 U.S.C. § 408*(a).

Plaintiff did not distribute the films for theatrical exhibition. (Tr. 118). Indeed, the expert witnesses who testified at trial seemed to agree that, although theoretically possible, it was unlikely that these films were marketable for theatrical release. (Tr. 528, 634). Instead, US Media arranged for their exhibition on cable television, receiving gross revenues for the five films that ranged from a low of $ 200,029.00 for The Seductress to a [\*9] high of $ 316,657.00 for Top Model. (Tr. 15). The largest fees were received from Viewers' Choice, a pay-per-view cable service. All five films were also purchased by Home Box Office, apparently for exhibition in off-hour periods, and several were also acquired by Showtime/The Movie Channel and by some less prominent programming services. When expenses are deducted, plaintiff earned net revenues ranging from $ 233,191.00, on Top Model, to $ 132,979.00 on The Seductress. (Tr. 12-17).

According to Mr. Brenner, all of these films were exhibited over an extended period of time on cable television, and one or more may still be viewed on television. (Tr. 87-90). Plaintiff did not, however, attempt to market these films for the home video market. (Tr. 18, 84-87).

Defendant Edde was organized in 1989 (Tr. 214) and conducts a large-scale business involving the distribution of films in videocassette form for the home video market. (Tr. 217). It sells the films to both wholesalers

and retailers (Tr. 217) and generates several million dollars in revenues on an annual basis. (Tr. 309, 311).

Although Edde has various suppliers of inventory, one major source is defendant Michael Christian. [\*10] Christian is an actor and producer, and also operates a film distribution business, informally known as Renaissance Productions, out of his apartment. (Tr. 232-34; Christian Dep. at 6-7). n5 He is well-known to the principals of Edde and particularly to Edde's then-Executive Vice President, George Atkinson. (Tr. 232). Indeed, over a period of time Christian acquired and then sold to Edde several hundred films for distribution in the home video market. (Tr. 234). Among these films were the five that are at issue in this case. (Tr. 235; Christian Dep. at 19-20).

> n5 According to Christian, Renaissance is not incorporated, and he personally handles all of the business of obtaining and selling films to distributors. (Christian Dep. at 6). It also appears that payments by Edde for the five films in question were made directly to Christian rather than to Renaissance. (Id. at 7).

Christian sold each of the five films to Edde for $ 1,100.00. (Tr. 235; Christian Dep. at 33, 57; PX 8(a)-(d)). In selling the films to [\*11] Edde, he offered no chain of title or other proof that he had any rights to the films. (Tr. 248, 264). The only provision concerning rights in the sales contracts was an ambiguous representation that, fairly construed, constituted a warranty that a copyright registration search had been conducted for the five films, and that none of the films had been found to be registered. (Tr. 248-49; PX 8A-D. See Christian Dep. at 28). n6

> n6 At the time that Christian sold his copies of these films to Edde, US Media had registered its copyright only for the film Intimo. Since the search conducted for Edde was under the name Midnight Seduction, the searching company did not locate this registration. (Tr. 284, 408-09; PX 9A).

According to Atkinson, who was responsible for film acquisitions for Edde, this mode of operation was standard for the company. Atkinson's only concern was to determine that the copyright for a film that he was acquiring had not been registered, even if the film was copyrighted. (Tr. 246-48, [\*12] 264-67, 283, 329-30). Atkinson conceded his understanding of the distinction between a copyright and its registration (Tr. 246), and

acknowledged that Edde would routinely purchase and sell copyrighted films if the copyrights were unregistered. (Tr. 246-48, 264-67, 329-30). Then, if the company received a complaint from the copyright holder -- which was apparently a common occurrence n7 -- the complaint would be referred to Edde's in-house counsel, who would demand proof of registration. (Tr. 268). According to Atkinson, most complainants never responded to this inquiry, but if they provided a copy of the registration, Edde would cease distribution and, in rare instances, pay something to the copyright holder, perhaps in the form of license fees. (Tr. 252-53, 268, 290).

n7 Plaintiff offered into evidence a host of so-called cease-and-desist letters addressed to Edde from a variety of copyright holders protesting Edde's distribution of infringing copies of their films. (Tr. 264, PX 13). All but four of these letters predated US Media's commencement of this litigation.

[*13]

The two principals of Edde, defendants Manoj Perekh and Guy Elan, did not testify at trial, but pertinent portions of their deposition testimony were introduced. n8 In that pretrial testimony they confirmed Atkinson's description of the company's modus operandi for acquisition and distribution of films. (Perekh Dep. at 9-10, 17, 20-21, 30; Elan Dep. at 31, 52). Moreover, both acknowledged their ultimate responsibility for business decisions by Edde, including authorization to pay for the purchase of these films. (Perekh Dep. at 7-8, 22-23, 25; Elan Dep. at 16-17).

n8 Defendants sought an indefinite delay of the trial on the eve of its start, on the ground that Perekh was being detained against his will in Dubai under obscure circumstances. We declined this request since the excuse appeared baseless, and there was no reason to believe that defendants in fact intended to supplement Perekh's deposition with live testimony. Evidence subsequently offered at trial strongly suggested the falsity of the representation about Perekh's unavailability (Tr. 648-50), and in any event we have been offered no reason to suspect that any trial testimony by Perekh would have differed from what he said at his deposition, the transcript of which was offered into evidence. (PX 23). We also note that Perekh's partner, defendant Guy Elan, did not appear at trial although he was concededly at liberty to do so.

[*14]

The original source of the five films provided to Edde by Christian is uncertain, although Christian reported purchasing them from an individual named Dale Verick in July 1992. (Christian Dep. at 21-22, 25-26). From the trial testimony, there is some reason to believe that they may have been copied, presumably by Verick, from their television exhibitions. (Tr. 54-56, 101, 343).

Once Edde received the films, its laboratory technicians reviewed them for technical quality. (Tr. 240). No one at the corporation reviewed the films to determine whether they contained a copyright notice -- three of the five did (Tr. 66) -- and the corporation simply relied on the warranties of non-registration contained in its contracts with Christian. (Tr. 288-89).

Apparently satisfied with the quality of the film tracks, Edde copied them in substantial volume, although it also added its own logo and that of TZ Video -- a division of Edde -- as well as an FBI warning against copying, to the leader of several of the films. (Tr. 345; PX 3A-E). Atkinson also arranged for the design and manufacture of cassette cases, on which Edde prominently placed its own name and that of TZ Video. (Tr. 243-44; PX 3A-E). [*15] It also placed a copyright notice in its name on each of the cassettes (Tr. 62-65; PX 3A-E), although there is no indication that it sought to register these copyrights.

Edde then proceeded to market these videocassettes to various retailers across the country. These sales were generally at strikingly low reported prices, presumably reflecting the inexpensive nature of the films' acquisition. Edde sold many of the cassettes to retailers for as little as $ 5.00 per cassette (e.g., PX 14A-D, 15A-D; Haney Dep. at 15-16), and some copies were sold for even less (Tr. 385; Haney Dep. at 15-16; Shabot Dep. at 26-27) -- assertedly as part of package transactions in which Edde bundled these films with others for which it charged more (Tr. 388-89) -- or were supplied gratis to some retailers as a sample, in order to entice follow-up sales. (Tr. 224-25, 227-28).

In all, Edde received revenues from the sale of these films totalling $ 130,728.75. (PX 5). Returns amounted to $ 11,435.73 (PX 6), although Edde reimbursed these customers through credit on other purchases rather by monetary payments. (Tr. 170; Balmer Dep. at 10; Mishan Dep. at 54). Edde also offered evidence intended to suggest [*16] that it had absorbed substantial costs in connection with the acquisition, production and marketing of these films. (Tr. 300-04). n9

n9 In the Joint Pre-Trial Order defendants contended that Edde's costs approximated $

115,000.00. (PTO at p. 29). Edde's proof at trial, even if credited, reflected significantly lower costs. (Tr. 300-04, 351). In any event, we reject a portion of that testimony for reasons that we describe below. See pp. 25-27, infra.

Brenner discovered in or about January 1994 that some or all of the five films to which US Media held the rights were being marketed in various retail outlets for public rental in video cassette format. (Brenner Dep. at 387). He then arranged for the registration of the copyrights for all five films in February 1994. (Tr. 10, 431). n10

n10 Having originally registered the Intimo copyright in 1989, Brenner filed a corrected registration in February 1994. (Tr. 431-32; DX A).

[*17]

In July 1994 US Media filed this lawsuit, asserting claims for copyright infringement, violations of section 43(a) of the Lanham Act *(15 U.S.C. § 1125(a))*, common-law trademark infringement, common-law unfair competition, tortious interference with contract and RICO violations. As defendants, it named Edde, Edde's two shareholders (Manoj Perekh and Guy Elan) n11, its Executive Vice President (George Atkinson), its alleged film supplier (Michael Christian and Renaissance Productions), its sales agent (Paul Porrata and Poratta's company, Repnet), and thirteen retailers, as well as the controlling shareholders of one of the retailers. n12

n11 In addition to naming Perekh and Elan as individual defendants, plaintiff also named their personal companies, "Romano Fashions, Inc." and "My Way International, Inc.", as defendants.

n12 The retailers included Record Explosion, Inc., Trans World Music Corporation (doing business as Coconuts), Late Night Video, Inc., RKO Warner Video, Inc., 48th Retail Associates (doing business as Palmer Video), Palmer Investment Corporation, Casablanca Distributors, Inc., Flash Electronics, Inc., Cinema Home Video, Inc., Blow Out Video, Inc., Movies Unlimited, The Musicland Group and Suncoast Video. Plaintiff also sued Joseph Shabot and Jack Mishan, who are the principals of Record Explosion.

[*18]

At the outset of the suit, plaintiff moved for a temporary restraining order and preliminary injunction, as well as a seizure order to stop the distribution of the infringing cassettes. The District Court granted the applications for temporary relief and seizure, and directed Edde to cease distribution and to request the return of infringing cassettes from the retailers. (Order dated July 1, 1994).

At the conclusion of discovery, plaintiff moved for summary judgment as to liability on all of its claims as against the Edde defendants, as well as Christian and Renaissance. In our September 12, 1996 decision, we granted plaintiff summary judgment against the targeted defendants on the copyright, Lanham Act, and unfair competition claims. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901*, at *2-6, 8-10, 11-12. At the same time we granted all defendants summary judgment on plaintiffs' claims of common-law trademark infringement, tortious interference with contract and RICO violations. Id. at *10-11, 12-13. We left for trial the question of whether defendants had acted willfully in infringing plaintiff's copyrights in the five films and the nature and extent of any relief to which plaintiff [*19] may be entitled. Id. at *7.

The Court has conducted a five-day bench trial on the open issues in this case. These concern principally (1) the liability of the retailer and sales agent defendants on the copyright claim, and (2) the damages and other relief to which plaintiff is entitled on all of its surviving claims. We also address the claims asserted by Edde against the plaintiff and its principal, Steven Brenner, for trade libel and libel.

ANALYSIS

We first consider the liability of the retailer and sales agent defendants and then address what relief is appropriate for plaintiff with respect to each of the defendants. Finally, we turn to Edde's claims.

I. Plaintiff's Claims

A. The Copyright Liability of the Retailer and Sales Agent Defendants

In its complaint plaintiff named thirteen retail companies as defendants, asserting that they had acquired infringing copies of one or more of the five films at issue from Edde and that they had either rented or sold those copies to the public, in violation of the Copyright Act. In addition to the companies, plaintiff joined as defendants two individuals who are principals of one of the retailers. Finally, plaintiff also [*20] included as defendants a company that served as a distribution agent of Edde, as well as the company's principal. According to plaintiff, that agent marketed at least some of the infringing films

to one of the retailers and earned commissions on these sales.

At trial, the parties stipulated that four of the defendant retailers had sold or rented copies of the infringing films to the public, and that they had earned specified profits through these transactions. Specifically, they agreed that defendant Musicland Group had sold 485 copies of Hot Curves and thereby earned net profits of $ 2,420.15. They further stipulated that Transworld Music had sold 1,974 cassettes of various of the infringing films, thereby earning net profits of $ 8,626.38. It is also agreed that defendant Movies Unlimited sold 93 such cassettes to its customers and garnered $ 1,394.07 in net profits. Finally, the parties stipulated that Record Explosion had earned net profits of $ 5,692.96 from the sale of 1,904 infringing units. (PX 18).

Apart from these retailers, the parties stipulated as to the earnings of Edde's sales agent in connection with the sale of infringing cassettes. According to the stipulation, [*21] based on a seven percent commission on sales to Transworld Music, defendant Repnet and its principal, Paul Porrata, earned $ 1,380.42. (Id.).

With respect to one remaining retailer, Palmer Video, the deposition of its president indicates that it acquired copies of the five films from Edde and that it earned some amount from the public rental of the infringing cassettes. A partial summary, reflecting revenues from some of the videocassette, shows rental income amounting to $ 5,665.00. (Balmer Dep. at 14 & PX 17). Palmer apparently no longer has records reflecting earnings on the remaining cassettes, and its witnesses were not asked to provide an estimate. (Balmer Dep. at 15-16, 18, 26).

From the foregoing stipulations and testimony, we conclude that the five identified retailers sold or rented to the public videocassettes obtained from Edde that infringed plaintiff's five copyrights. We further conclude that they profited by these infringing sales and rentals.

Plaintiff has also named Casablanca Distributors, Inc. as a defendant. It is a wholly-owned subsidiary of Palmer and is involved in the distribution of inventory to various retail outlets belonging to Palmer. (Balmer Dep. [*22] at 5-7). It bore some responsibility for the infringing sales by Palmer Video because it was the entity that procured and paid for at least some of the infringing cassettes obtained for Palmer Video. (PX 15(a)-(d)). Hence it is jointly and severally liable with Palmer Video.

As for the other seven defendant retailers, plaintiff did not carry its burden to demonstrate that they had actually distributed -- whether by sale, rental or otherwise -- any infringing copies of plaintiff's films. n13 Accord-ingly, plaintiff's claims against those other retailers must be dismissed.

n13 The names of other retailers appeared on a computer printout provided to plaintiff by Edde as reflecting those retailers to whom Edde had distributed copies of one or more of the five films. (PX 5). Plaintiff has not shown, however, that any of the other entities actually rented those cassettes and actually rented or sole them to others. In the absence of such proof, plaintiff cannot recover infringing profits or other compensation. Not surprisingly, plaintiff does not indicate in its post-trial brief that it is seeking any relief against those defendants.

[*23]

The remaining issue with regard to the retailer defendants concerns the asserted liability of two principals of Record Explosion -- Joseph Shabot and Jack Mishan -- both of whom are also named as defendants. Plaintiff seeks a ruling that both are personally liable for the infringing sales by the company, whereas defendants argue that at least Mishan has not been shown to have been so personally involved as to justify imposition of liability.

A corporate officer or principal shareholder may be held responsible for the corporation's copyright infringement in two circumstances. The plaintiff may demonstrate contributory infringement by proving that the individual defendant "authorized the [infringing] use." *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997), cert. denied, *140 L. Ed. 2d 466, 118 S. Ct. 1300 (1998)*(quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 437, 78 L. Ed. 2d 574, 104 S. Ct. 774, cert. denied, 465 U.S. 1112, 80 L. Ed. 2d 148, 104 S. Ct. 1619 (1984)). Alternatively, liability may be imposed on a theory of vicarious liability, which requires a showing that the individual defendant "had [*24] a 'right and ability to supervise [that] coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials." *118 F.3d at 971* (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)).

There is little question that Shabot may be held liable under either theory. He testified at his deposition that he is a fifty percent shareholder of Record Explosion, which owns five retail outlets, and that he is in charge of determining which films the company purchases. (Shabot Dep. at 3, 6, 12). He also conceded that he has dealt directly with both Atkinson and an Edde sales agent named Stephen Erickson in arranging for purchases of films supplied by Edde, including presuma-

bly the five infringing films that are at issue in this lawsuit. (Id. at 8-9).

This testimony suffices to demonstrate to our satisfaction that Shabot authorized the infringing use of the films by Record Explosion. It is equally apparent that he had the "right and ability to supervise" and, as the dominant shareholder, had a direct financial interest in the company's "exploitation of copyrighted materials." *Softel, 118 F.3d at 971.*

Mishan testified that [*25] he has a twenty-five percent ownership interest in Record Explosion. (Mishan Dep. at 9). He is paid on the basis of the company's profits. (Id.). Unlike Shabot, he is only involved in the decisions about what previously-viewed videos to acquire, and thus was not directly involved in the procurement of Edde's films. (Id. at 13; Shabot Dep. at 12). He was conversant with pricing, however, including the very low prices that Record Explosion charged for the Edde films. (Id. at 54).

The record does not demonstrate that Mishan authorized the infringements at issue here. Nonetheless, he conceded that he was paid based on the company's profits, which are unquestionably affected by the fact that it purchases suspect films very cheaply for resale or rental at low prices. Moreover, in view of Mishan's managerial position in the company and his substantial minority ownership, we infer that he has the ability to influence corporate policy relating to the purchase of films of this category, and that Shabot's specific decisions on film purchases represent a consensus with his fellow shareholder as to how the business of the company should be conducted. Under these circumstances, we view [*26] Mishan as vicariously liable for the infringements.

B. Copyright Damages

1. General Standards

The Copyright Act provides for two alternative measures of recovery by an injured plaintiff. Upon proof of infringement, the plaintiff may recover his own "actual damages" and "any additional profits of the infringer." *17 U.S.C. § 504(a)(1).* In establishing the defendant's profits, the plaintiff need only demonstrate the gross revenues generated by the infringing use, and the defendant bears the burden of proving deductible expenses and "the elements of profit attributable to factors other than the copyrighted work." *17 U.S.C. § 504(b).* See, e.g., In *Design v. K-Mart Apparel Corp., 13 F.3d 559, 563 (2d Cir. 1994).* n14

n14 In this case, defendants have not suggested that any portion of their proven profits are attributable to anything other than the copyrighted films. This is not surprising, since the defendants added no creative elements to the original copyrighted films.

Alternatively, at any time before [*27] entry of judgment the plaintiff may, if it satisfies certain preconditions, opt for statutory damages. *17 U.S.C. § 504(c).* The amount of such damages is discretionary with the court, subject to the proviso that it may not be less than $ 500.00 nor more than $ 20,000.00 per infringed work. *17 U.S.C. § 504(c)(1).* n15 Moreover, if the plaintiff demonstrates that the infringement was willful, the statutory award may by increased to a maximum of $ 100,000.00. *17 U.S.C. § 504(c)(2).*

n15 If the infringer demonstrates that he did not know, and had no reason to believe, that his conduct constituted an infringement, the court may reduce statutory damages to a sum no less than $ 200.00. *17 U.S.C. § 504(c)(2).* A further, though inapplicable, exception is provided in certain cases in which the infringer believed and had reason to believe that his use of the copyrighted work was a fair use, as defined in *15 U.S.C. § 107.* In those circumstances the court is required to remit any statutory damages. Id.

The pertinent [*28] limitation on the availability of such damages is that the court may not award them for

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

*17 U.S.C. § 412.* Plaintiff concedes that these statutory limitations preclude an award of statutory damages for any infringement by defendants except with respect to the film named Intimo. (Pl.'s Post-Trial Brief at 7). n16 The basis for that concession is that the copyrights on the other four films were infringed after their first publication and before registration of their copyrights, and the registrations did not take place until much later than three months after the initial publications.

n16 The court is also precluded from awarding attorney's fees for infringements that come

within either of these categories. *17 U.S.C. § 412.*

[*29]

In this case, because there are multiple defendants we also face a question as to how to allocate these monetary awards. If several defendants participate in a transaction or series of transactions that brings about an infringement, they will be held jointly and severally liable for plaintiff's lost profits. See, e.g., *Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 472 (2d Cir. 1985); MCA, Inc. v. Wilson, 677 F.2d 180, 186 (2d Cir. 1981).* As for disgorgement of the infringers' profits, each separate actor is responsible individually for its own profits, see, e.g., *Fitzgerald Pub. Co. v. Baylor Pub. Co., Inc., 807 F.2d 1110, 1116 (2d Cir. 1986),* unless the violations were willful or the defendants "'engaged in a partnership, joint venture or similar enterprise." *Abeshouse, 754 F.2d at 472* (quoting 3 M. Nimmer, *Nimmer on Copyright § 12.04*[C][3] at 12-50 to 51 (1984)).

**With regard to statutory damages, the proper resolution in a multi-defendant case is somewhat more complicated. As a general matter, if the parties were jointly responsible for a single infringement, they are held jointly and severally liable for a statutory award. See, e.g., Fitzgerald Pub. [*30] Co., 807 F.2d at 1116-17; Branch v. Ogilvy & Mather, Inc., 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991). If, however, one was guilty of willful infringement and the other was not, we assume that the non-willful infringer should not bear the burden of an award that has been enhanced above the statutory maximum for non-willful violations. See, e.g., Fitzgerald Pub. Co., 807 F.2d at 1116 (distinguishing Hospital for Sick Children v. Melody Fare Dinner Theatre, 516 F. Supp. 67, 72-73 (E.D.Va. 1980)); 4 M. Nimmer & D. Nimmer, Nimmer on Copyright § 14.04[E][2][d] at 14-78 n.168 (1993)("Nimmer on Copyright").**

2. Infringers' Profits

(a). Profits of Christian and Renaissance

There is no dispute that Christian and his company purchased each of the five films from Verick for $ 1,100.00 each. (Christian Dep. at 22, 33). Since Christian and Renaissance resold these films to Edde for $ 1,100.00 (Christian Dep. at 33, 57), plaintiff has failed to establish that these two defendants realized any profit from their participation in the infringements.

(b). Profits of Edde

We now turn to the question of Edde's profits. The record reflects essentially uncontested [*31] evidence that Edde received gross revenues of $ 130,728.75 from the sale of infringing cassettes (PX 5) and that it had

returns totalling $ 11,435.73. (PX 6). Although these returns may not have been for cash, we treat them as the functional equivalent of a lost sale since Edde apparently gave dollar-for-dollar credit on later sales. (Tr. 170; Brenner Dep. at 10; Mishan Dep. at 54). Thus, Edde's revenues, net of returns, totaled $ 119,293.02.

Edde also seeks to claim deductible expenses that, according to Edde's contentions in the Joint Pre-Trial Order, total approximately $ 115,000.00. (PTO at 29). Its efforts at proof in this regard consisted of the testimony of George Atkinson to the effect that Edde had absorbed specified expenses in connection with the production and distribution of the cassettes. According to Atkinson, who relied on a summary purportedly prepared by individuals from Edde's accounting department, Edde allocated an unstated percentage of certain overhead expenses, labelled general and administrative (or "G & A") costs, to these cassettes. He recited that these expenses totalled $ 19,436.00 (Tr. 300), although on cross-examination it became evident that he did [*32] not know how this figure had been derived. (Tr. 351-55).

The second item was the cost of acquisition of the films. There is no dispute that this totaled $ 5,500.00. (Tr. 300). The third listed expense was the cost of laboratory labor for the reproduction of the films. According to Atkinson, this cost amounted to $ 4,165.00. (Tr. 300-01). Edde reported, as a fourth item, expenses of $ 7,600.00 for packaging, which included boxes, printing, labels and shrink wrap. (Tr. 301). The next item was the cost of shipping, which amounted to $ 4,710.00, although an unspecified portion of that total involved the shipping expense for the return of cassettes pursuant to court order. (Tr. 301-02).

The remaining listed items consisted of commissions to sales agents, including Repnet and Paul Porrata, the cost of blank cassettes, and so-called "stock rotation". Atkinson testified that the commissions totalled $ 6,090.00 (Tr. 302), n17 and that Edde had purchased 25,000 cassettes, for a total of $ 32,500.00. (Tr. 303). As for stock rotation, Atkinson never indicated what expenses were separately attributed to this category or their amount. (See Tr. 303-04).

n17 At one point plaintiff argues that George Atkinson testified that the entire $ 6,090.00 in commissions was paid to Repnet and that this undercuts the stipulation in plaintiff's exhibit 18 as to Repnet's profits. (Pl.'s Post-Trial Brief at 10-11). A closer reading of that testimony suggests, however, that Atkinson was referring to the total earnings of several sales agents, some of whom had previously worked for Repnet. (Tr. 368-369; Porrata Dep. at 8-9). Although plaintiff suggests

that all of these individuals remained associated with Repnet, that assertion is not proven (or disproven) on the current record.

[*33]

The expenses testified to by Atkinson total $ 80,001.00. Of this amount, however, we are not prepared to credit Edde with its claimed G & A expenses.

Fixed and other overhead may be counted as a deductible expense provided that it "actually contributed to" supplying the product, even if the expense would still have been borne by the defendant absent the infringement. See, e.g., Kamar Int'l, Inc. v. Russ Berrie & Co., Inc., 752 F.2d 1326, 1333 (9th Cir. 1984); Wilkie v. Santly Bros., Inc., 139 F.2d 264, 265 (2d Cir. 1943), cert. denied, 322 U.S. 740, 88 L. Ed. 1574, 64 S. Ct. 1058 (1944). Nonetheless, Edde has not justified taking account of these claimed expenses.

Atkinson was entirely unable to explain how the claimed figure was derived. Indeed, he was uncertain as to which categories of overhead were included, as well as how the amounts had been calculated. This showing is patently inadequate.

The infringer bears "'the burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'" [*34] In Design, 13 F.3d at 565-66 (quoting Nimmer on Copyright § 14.03[B] at 14-34). As the Second Circuit has emphasized, "Any doubts resulting from an infringer's failure to present adequate proof of its costs are resolved in favor of the copyright holder." In Design, 13 F.3d at 563 (citing Gaste v. Kaiserman, 863 F.2d 1061, 1070-71 (2d Cir. 1988)).

Given the vagueness of Edde's showing, we cannot conclude that the claimed figure for overhead represents any operations that actually contributed to production or distribution of the cassettes, and even if we assumed that some amount might be attributable to such activities, in the absence of any specifics we would be entirely in the dark as to how to allocate some portion of the claimed amount to such functions. Compare, e.g., 13 F.3d at 566 (citing cases). This constitutes a fatal failure of proof. n18

n18 In view of this conclusion, we need not consider the question of whether Edde and its principals would be barred from deducting properly proven overhead because their infringements were willful. That proposition has been accepted by a number of circuit and other courts, see, e.g., Saxon v. Blann, 968 F.2d 676, 681 (8th Cir. 1992); Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 515 (9th Cir. 1985); Allen-Myland, Inc. v. IBM, 770 F. Supp. 1014, 1024-28 (E.D.Pa. 1991); see also Nimmer on Copyright, § 14.03[B] at 14-38 to 39 & n.21, but has not been adopted, or explicitly rejected, by the Second Circuit. See, e.g., Hamil America, Inc. v. SGS Studio, Inc., 1998 U.S. Dist. LEXIS 386, 1998 WL 19991, at *1 (S.D.N.Y. Jan. 21, 1998); Softel, Inc. v. Dragon Medical & Scientific Communications Ltd., 891 F. Supp. 935, 941-42 (S.D.N.Y. 1995), mod., 1995 U.S. Dist. LEXIS 15070, 1995 WL 606307 (S.D.N.Y. Oct. 16, 1995), aff'd in part & rev'd in part on other gds., 118 F.3d 955 (2d Cir. 1997), cert. denied, 118 S. Ct. 1300 (1998). See generally In Design, 13 F.3d at 564 (absent "bad faith", defendant may rely on "reasonable approximations" in proving its costs); Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 54 (2d Cir. 1939), aff'd, 309 U.S. 390, 84 L. Ed. 825, 60 S. Ct. 681 (1940). We address the question of willfulness below, in a somewhat different context, when we consider the appropriate ceiling for statutory damages. See generally Allen-Myland, 770 F. Supp. at 1026 (suggesting that standard of "willfulness" differs depending on whether question is deducibility of overhead expenses or applicability of enhanced statutory damages).

[*35]

Excluding the so-called G & A figure, we arrive at a sum of deductible expenses in the amount of $ 60,565.00. Subtracting that figure from Edde's revenues net of returns, we find that Edde's profits totaled $ 58,728.02.

(c). The Profits of Defendant Retailers and Sales Agent

Based on the trial evidence that we have summarized, we can readily determine that four of the retailer defendants may be held liable for infringers' profits in the following amounts, which represent their stipulated profits from sales or rentals of the infringing cassettes:

Musicland Group, Inc.                $ 2,420.15

| Transworld Music | $ 8,626.38 |
| Movies Unlimited | $ 1,394.07 |
| Record Explosion | $ 5,692.96 |

(PX 18).

The record is somewhat less straightforward with respect to Palmer Video. It produced documentation reflecting $ 5,665.00 in revenues from the date of acquisition of some of the infringing cassettes. (PX 17). Its president testified, however, that when cassettes were returned to Edde and thus removed from inventory -- as apparently occurred with respect to most of the cassettes in July 1994 -- the documentation reflecting the revenues earned by those cassettes was deleted from [*36] the company's computer system. (Balmer Dep. at 15-16, 18, 26; Haney Dep. at 22).

To recreate the amount of Palmer's profits, we start with the established revenues for the cassettes that remained in Palmer's inventory. These earnings consisted of $ 58.33 per cassette for Naked Rage; $ 63.25 per cassette for Hot Curves; $ 84.14 per cassette for Forbidden Passion; $ 50.70 per cassette for Midnight Seduction and $ 96.73 per cassette for Desire. (PX 17). Applying these figures to the total number of cassettes purchased by Palmer for each of these films, we arrive at a revenue total of $ 20,885.65, which is calculated as follows:

Naked Rage: 65 cassettes x $ 58.33 = $ 3,791.45

Hot Curves: 65 cassettes x $ 63.25 = $ 4,111.25

Forbidden Passion: 68 cassettes x 84.14 = $ 5,721.52

Midnight Seduction: 65 cassettes x $ 50.70 = $ 3,295.50

Desire: 41 cassettes x 96.73 = $ 3,965.93

(See PX 14A-D, 15A-D (Palmer Video purchase orders), PX 17). The only deductible expenses established by Palmer consist of the costs of the cassettes purchased from Edde. The acquisition cost was $ 1,792.00 (PX 14A-D, 15A-D), yielding a profit [*37] figure of $ 19,093.65.

As for the sales agent for Edde, the parties have stipulated that Repnet and Paul Porrata earned commissions in the amount of $ 1,380.42 based on the sale of infringing cassettes to Transworld. (PX 18 at PP 7-8). Plaintiff is entitled to an award from these two defendants in this amount.

3. Plaintiff's Actual Damages

(a). Amount of Damages

In addition to recovery of Edde's profits, plaintiff seeks a far more substantial award, suggested to be at least $ 350,000.00 and perhaps as high as $ 500,000.00 (PTO at 3, P 10; Pl.'s Post-Trial Brief at 13), representing what it contends are its provable lost profits resulting from defendants' infringing activities. For reasons to be noted, we conclude that plaintiff's proof, even liberally construed, does not justify the assertion that it suffered substantial lost profits as a result of the infringements. Instead, we conclude that plaintiff's otherwise uncompensated lost profits total, at most, $ 35,000.00. n19

n19 Section 504 refers to recovery of the plaintiff's "actual damages", the "primary measure" of which is "the extent to which the market value of the copyrighted work . . . has been injured or destroyed by such infringement." Nimmer on Copyright § 14.02[A] at 14-8 (footnote omitted). Because of the difficulty of proving such market value, the courts typically look to such surrogates as the profits lost because of the infringement. Id. at 14-9. See, e.g., Big Seven Music Corp. v. Lennon, 554 F.2d 504, 509-12 (2d Cir. 1977).

[*38]

Plaintiff's theory of lost profits is based on the contention that, but for Edde's mass distribution of infringing copies of US Media's films in videocassette form for home video, US Media would have entered into a lucrative arrangement to distribute those films for the home video market, either directly to retailers or through a distribution agent. (Brenner Dep. at 80). According to Brenner, Edde flooded the market with low-priced and low-quality copies of the films and thus prevented him from consummating such an arrangement. (Tr. 24; Brenner Dep. at 80). We find this analysis to be generally unpersuasive. n20

n20 We note that plaintiff never offered into evidence copies of the original films, only copies of the pirated versions. This omission is not crucial to our analysis, which relies in part on the characterization of the films by Brenner and plaintiff's experts. We further note, however, that even these experts did not see the films in their entirety. (Tr. 508, 132).

We start by noting that although US [*39] Media had been in business for some years before its acquisition of the five films at issue here, it offered no concrete evidence that it had any significant track record in the home video market. At trial the only reference to any prior experience by Brenner in licensing films for home video distribution was his indication that he had done so for between six and twelve films -- he could not be more precise -- all of which were allegedly licensed on unspecified terms at some unspecified period of time, apparently before his acquisition of the five films at issue in this case. (Tr. 26-27). n21

n21 The only specifics offered at all by Brenner were in the course of his deposition, when he identified one film -- acquired from his father's company -- that he had purportedly licensed to a distributor, albeit on unspecified terms, for home video distribution. (Brenner Dep. at 31-40). He made no suggestion at the time that he had any more experience in home video than his involvement in licensing that film. (Id. at 301-04).

[*40]

Still more significant is the conceded fact that although US Media acquired the five films at issue in this case between 1988 and 1991, Brenner took no concrete steps at any time to enter into any business arrangement that would have permitted their distribution for home video in the years that preceded his 1994 discovery of Edde's infringing activities. Indeed, for two of the five films US Media acquired only an option to obtain home video rights, subject to negotiation of a price, and it never sought to exercise that option or even to discuss a price with the European producers. (Tr. 18).

Brenner did testify that at various times before he discovered the infringements by Edde, he had held conversations with individuals in the home video business in order to explore the possibility of marketing these, and perhaps other, films for home video. Although he identified a number of individuals with whom he had discussed the matter (e.g., Tr. 37-38, 413, 419, 425-26; Brenner Dep. at 358, 360, 376-79, 386-88, 392-93, 396-

97, 400, 401, 411-14, 418), he was unable to cite any cost figures or other data gleaned from these contacts, and indeed was unable to describe any of the details of [*41] these talks. (Brenner Dep. at 260, 261-62, 330-32, 402, 533, 538-39, 543). Moreover, he was equally unable to locate any contemporaneous notes of these discussions. (Tr. 413-14). Although we do not question Brenner's assertion that he occasionally did mention to others the possibility of entering the home video market prior to learning of Edde's piracy, in the absence of any documentation or other concrete signs of efforts to enter the market, or even of any evidence that his discussions involved more than casual inquiries, we attach little significance to these contacts.

Our doubts in this regard are reinforced by a number of other considerations. US Media had in its inventory in 1994 as many as twenty films, and although Brenner had learned in approximately January of that year that five had been introduced into the home video market by Edde, he still had a substantial inventory of other films at the time (Tr. 33-34, 114-15, 422), and yet he concededly never placed any of them in home video channels. (Tr. 33).

Brenner's explanation at trial for his failure to enter the home video market in the wake of the discovery of Edde's infringement was that after the loss of the five pirated [*42] films for distribution purposes, he had too small a collection of movies to ensure a continuing supply for the market. (Tr. 34, 114-15, 422). In essence, he suggested that, with the five pirated films, he would have had a sufficient inventory, but that, once he was deprived of them, the company's supply was insufficient to permit it to penetrate the home video market in a permanent fashion.

This testimony was vague in the extreme, and neglected to address the fact that US Media was free at any time to expand its inventory for this purpose if it were truly interested in entering the market. Moreover, Brenner conceded that his company had in fact later acquired as many as five other films and yet it has never subsequently marketed any of its films for home video. (Tr. 423-24).

An insight into the reasons for plaintiff's inaction in this respect -- at least with regard to the five films in question -- may be gleaned from one piece of evidence, a letter addressed by Brenner to Ms. Patti Jackson at MCA-Universal in November 1994. (DX S). As explained by Brenner and reflected in the letter, he had contacted Ms. Jackson and solicited the interest of MCA in distributing his "R-rated erotic" [*43] films in the home video market. Brenner sent her some of the films for her review -- we are uncertain whether they included any of the films at issue here (but see Tr. 479) -- and she

reported back to him that "since the market for 'R' rated pictures is 'soft' at this time" (DX S), MCA could not distribute enough copies to make it economically worthwhile. n22

n22 The letter recited that Ms. Jackson had indicated that MCA could move only 20,000 units of each film rather than a more economically feasible 45,000 units. (Id.).

Brenner also noted in his letter that he was interested in learning from Ms. Jackson "which companies [she] would suggest that we contact with regard to releasing these pictures in the home video market." (Id.). There is no indication that MCA ever supplied Brenner with this information, and he apparently never pursued the matter.

This interchange is revealing in several respects. First, it confirms the testimony of a number of witnesses, including plaintiff's own experts, to [*44] the effect that by 1994 the home video market was contracting in terms of both number of independent retailers and opportunities to market these types of films. (Tr. 218-19, 417, 496, 543-44, 552, 609). n23 This alone suggests that, even absent the infringement by Edde, plaintiff would have had some difficulty starting a home video line featuring such "soft porn" films at that time. Moreover, a comment by plaintiff's own expert, Robert Baruc, that, as a distributor, he would not even have considered seeking the rights to handle more than one or two of Brenner's films (Tr. 550-51) reinforces our doubt as to whether, absent the infringements, plaintiff would have been able to sell all five films for home video and would have generated significant profits.

n23 As explained by plaintiff's expert, Robert Baruc, the smaller retailers were failing, and the large chain video establishments were less interested in sexually oriented films because they were seeking to appeal to the family trade. (Tr. 544).

Second, the letter [*45] to Ms. Jackson reflects that, contrary to one portion of Brenner's testimony, the infringements by Edde did not lead to a decision by him not to enter the home video market. The interchange with MCA occurred nearly one year after Brenner's discovery of the infringements and four months after US Media had filed this lawsuit. Since Brenner was seemingly still interested in entering the market, we cannot credit his contrary assertion that the infringements, by limiting his usable inventory, had led him to conclude that he could not do so. Rather, it appears that the more likely explanation for plaintiff's failure to exploit this market was that Brenner had not sought actively to do so before, presumably because the films were generating a good return on cable television, and by the time that he may have more seriously considered the home video alternative, the relevant market was less hospitable.

It also bears emphasis that even plaintiff's own experts offered minimal support for Brenner's contention that US Media had the opportunity for substantial profits in the home video market. As Mark Balsam recounted, US Media could not have undertaken direct marketing to retailers because it [*46] did not have any experience or contacts in the area, and hence it would have been required to use a distribution agent. (Tr. 145-46). According to Balsam, films similar in genre but of better quality than the five films at issue here generally garner guarantees of between $ 25,000.00 and $ 100,000.00 and the possibility of additional earnings if sales exceeded the guarantee. (Tr. 136). However, he doubted that plaintiff would have earned more than the basic guarantee (Tr. 145), and noted that "the video marketplace with the exception of an isolated independent movie, has been bludgeoned." (Tr. 532. See also Tr. 531 (market is "unkind" to these types of films), Tr. 544 (noting contraction of market for films of this genre)).

Confirming the general tenor of these comments, plaintiff's other expert, Robert Baruc, who is engaged in the distribution of videocassettes, suggested that he probably would not have been interested in negotiating for more than one, or perhaps two, of plaintiff's films if offered them, and he further estimated that the likelihood of his having proceeded to "serious negotiations" for any one of the films in such a circumstance was only "50/50". (Tr. 550-51; [*47] see also Tr. 571). Baruc also indicated that he doubted that any of these films, even if taken for home video distribution, would have attracted a guarantee by a distributor beyond the range of $ 25,000.00 to $ 50,000.00. (Tr. 549).

In later testimony Balsam opined that films such as these could well earn additional sums, above the guarantees, in the so-called sell-through market n24 and through Rent Track -- a commercial organization that purchases large quantities of cassettes and makes them available at low prices to small retailers (Tr. 142-43, 523) -- as well as by licensing for laser disk reproduction. (Tr. 522-23). This testimony yielded a somewhat speculative estimate by Balsam that such films could each earn up to $ 70,000.00 in total from these different sources (Tr. 147), a figure that was not particularly persuasive, since we were offered no specifics as to the frequency with which films of this quality were picked up by Rent Track or put in laser disk format. Cf. *Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 404 (2d Cir. 1989).

n24 The sell-through market, which involves sales of the video cassettes to the public, is less profitable than the rental market. (Tr. 214, 133).

[*48]

We recognize that an infringer's victim need not prove his lost profits with great precision. See, e.g., *Stevens Linen Assocs., Inc. v. Mastercraft Corp., 656 F.2d 11, 14-15 (2d Cir. 1981)*. Moreover, to the extent that the wrongdoer's misconduct has made such proof difficult or imprecise, it is the defendant who must bear the consequences of a somewhat speculative mode of proof of such losses. See *Lamborn v. Dittmer, 873 F.2d 522, 533 (2d Cir. 1989); Strobl v. New York Mercantile Exchange, 582 F. Supp. 770, 779 (S.D.N.Y. 1984)*, aff'd, *768 F.2d 22 (2d Cir.), cert. denied, 474 U.S. 1006 (1985)*. See generally *Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 90 L. Ed. 652, 66 S. Ct. 574 (1946)*. Nonetheless, we are not permitted to engage in pure speculation in assessing such compensatory damages, e.g., *Business Trends Analysts, 887 F.2d at 407; Childress v. Taylor, 798 F. Supp. 981, 991-92 (S.D.N.Y. 1992)*, and a plaintiff who is seeking such an award in the absence of a proven prior track record for his business in the field in which he claims his losses faces a particularly daunting task. See, e.g., *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* [*49] *1992 WL 584059*, at *5 (S.D.Ind. Aug. 13, 1992), aff'd, *18 F.3d 502 (7th Cir. 1994); Read v. Turner, 239 Cal. App. 2d 504, 514, 48 Cal. Rptr. 919, 926 (1966)*. See generally *International Telepassport Corp. v. USFI, Inc., 89 F.3d 82, 85 (2d Cir. 1996)*(applying New York law); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 436 (2d Cir. 1993); All- States Communications, Inc. v. N.Y. Telephone Co., 1997 U.S. Dist. LEXIS 18576, 1997 WL 729033*, at *6 (S.D.N.Y. Nov. 24, 1997).

On the basis of the trial record in this case, we are inclined to believe that, even absent the infringements, Brenner would not have pursued the home video market for these films with markedly greater energy or success than he demonstrated prior to his discovery of the infringements, at least through 1994. We base this conclusion on several considerations. First, as noted, the rental market for these films suffered a downturn beginning in 1994. Second, there is no indication that Brenner was aggressively pursuing the matter at any earlier time. Third, the films were still being exhibited on cable television in 1994, and that television exposure was yielding far more revenue than plaintiff was likely to earn at [*50] the time in home video. This circumstance alone counselled against distributing the same films for home video, since such simultaneous exhibition in a competing medium would undoubtedly have undercut the films' marketability for future television exhibition.

Because the video market opportunities for such films were diminishing in 1994, successful exploitation of these films in that medium became less likely. n25 Indeed, we view the failure of US Media to sell any of its film inventory in this market since then as a clear sign that Brenner had chosen, at least for the time being, to focus on other media than video cassettes. We also note that Brenner conceded at trial that he was reserving the option, following the completion of this lawsuit, to enter the home video market with the five films, as well as with others (Tr. 422), thus suggesting that the passage of time and perhaps an improvement in the market might persuade him to test the marketability of these films notwithstanding the earlier infringements.

n25 Mr. Baruc indicated that the process for actual release into the home video market would have taken six to eight months from the commencement of serious discussions. (Tr. 550-51). Giving plaintiff the benefit of the doubt, if we assume that, absent Edde's infringements, Brenner would have sought home video licensing as early as January 1994 -- the period when he first learned of Edde's infringements -- none of his films would have been ready for actual exploitation until late 1994 at the earliest. Moreover, this calculation ignores the fact that, as of January 1994, Brenner had not even begun to negotiate a price with the producers for the home video rights for two of the films, a process that presumably would have had to precede a licensing agreement with a home video distributor for those films.

[*51]

Under all of these circumstances, and indulging some liberality in viewing the trial record in favor of the plaintiff, we believe that US Media's likely losses caused by the defendants' infringements were small at best. Moreover, in estimating the profits that US Media might have earned from these films if Edde had not infringed, we must avoid awarding a sum that would, in whole or in part, duplicate the award already specified for Edde's actual profits. See *17 U.S.C. § 504*(b). Such an impermissible double recovery "may occur when an infringing seller has to disgorge profits on sales that a copyright holder might have made and for which he may therefore claim damages in the form of lost profits." *Abeshouse, 754 F.2d at 471*. See, e.g., *Nimmer on Copyright § 14.02*[A] at 14-10.

In this case it is fair to assume that at least some part of the revenue earned by Edde would have been garnered by US Media if it had entered the home video market with its five films and if Edde had refrained from marketing the infringing copies of those films. We make this inference because Edde was selling to the same general market as US Media would have been required to target if it had [*52] sought to sell its films for video rental. Specifically, we assume that some of the retailers who purchased from Edde would have bought the same films from plaintiff's distribution agent and that plaintiff would therefore have been satisfying, at least in some part, the same market demand as Edde was actually meeting. Hence, we conclude that the award of Edde's profits covers at least some part of the profits that US Media would have earned by distributing its films for home video. See, e.g., *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1014 (2d Cir. 1995)*.

Recognizing a degree of arbitrariness in the exercise, we find that, over time, US Media probably would have earned a modest amount on one or two of these five films in the home video market if Edde had not infringed. We further find that plaintiff will probably not realize any such earnings on those films because of Edde's infringement. Giving plaintiff the benefit of the doubt as to the likelihood that it would have undertaken such a venture after 1994 if Edde had not infringed, we conclude that a reasonable estimate of its total losses in this respect is $ 70,000.00, reflecting guarantees of $ 25,000.00 in rental [*53] income for each of two of its films plus a modest additional revenue stream from Rent Track and the sell-through market.

Adjusting this figure to avoid awarding monetary relief that duplicates the award of Edde's profits, we estimate -- again somewhat arbitrarily -- that half of plaintiff's loss is already embodied in the award of Edde's infringing profits. Accordingly, we award plaintiff $ 35,000.00 in non-duplicative lost profits.

(b). Joint and Several Liability for Plaintiff's Lost Profits

As noted, an award of plaintiff's lost profits is ordinarily made jointly and severally against all defendants who participated in or contributed to the infringement. Even if a party did not directly infringe, it may be held liable as a contributory infringer if it "was implicated in the acts constituting the direct infringement." *Ez-Tixz, Inc. v. Hit-Tix, Inc., 919 F. Supp. 728, 732 (S.D.N.Y. 1996)*. As summarized by the Second Circuit, "one who, with knowledge of the infringing activity, induces, causes, or materially contributes to the 'infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Pub. Corp. v. Columbia Artists Mgt., Inc., 443 F.2d [*54] 1159, 1162 (2d Cir. 1971)*.

Moreover, even "a party without actual knowledge of the particular instances of infringement may still be found liable as a contributory infringer; constructive knowledge is sufficient to establish liability." *Ez-Tixz, Inc., 919 F. Supp. at 732.*

The infringements in this case are of two kinds -- the copying of the protected works, *17 U.S.C. § § 106*(1), and their distribution to the public. *17 U.S.C. § 106*(3). The initial copying of plaintiff's films was presumably done by a non-party, probably Verick or some other, unnamed individual who transferred the copies to Verick. Edde then obtained the films through Christian and Renaissance, and copied the films before selling them to the retailers, either directly or through Porrata and Repnet. The retailers in turn distributed the infringing copies to the public.

Given this chain of distribution, we conclude that Christian and Renaissance knowingly facilitated the infringements by Edde, and that the Edde defendants and Edde's distribution agent knowingly facilitated the infringements by the retailers. Moreover, the evidence also supports the conclusion that these facilitators either acted with knowledge of [*55] the infringing activities that they were promoting or acted in reckless disregard of the fact that the cassettes supplied by Verick were infringing. n26 Such facilitation constitutes contributory infringement by Christian, Renaissance, the Edde defendants and its distribution agents. Under these circumstances all of these defendants are liable for plaintiff's actual damages, either as direct infringers or as contributory infringers. See, e.g., *Nimmer on Copyright § 14.04*[E][2][d] at 14-79 (distributor of film is contributory infringer, and therefore jointly and severally liable with theaters that undertook unauthorized public performance of film). See also *Costello Pub. Co. v. Rotelle, 216 U.S. App. D.C. 216, 670 F.2d 1035, 1043 (D.C. Cir. 1981)*(quoting *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd., 207 U.S. App. D.C. 375, 647 F.2d 200, 207 (D.C. Cir. 1980)*("any member of the distribution chain can be sued as an alleged joint tort-feasor")); *Picker Int'l Corp. v. Imaging Equip. Servs., Inc., 931 F. Supp. 18, 38 (D. Mass. 1995)*, aff'd, *1996 U.S. App. LEXIS 21955 (1st Cir. 1996)*; *ISC-Bunker Ramo Corp. v. Altech, Inc., 765 F. Supp. 1310, 1331-32 [*56] (N.D.Ill. 1990)*.

n26 Christian and Renaissance plainly were on notice that the films they acquired from Verick were protected, given both the circumstances of Verick's provision of the films and the prices that he charged, as well as the absence of any proof of title. The Edde defendants were similarly on notice, based on the hidden source of the

films, the absence of any chain of title, the prices charged by Christian, and the copyright notices on three of the films. We also infer at least constructive knowledge on the part of Repnet and Porrata, in view of the prices charged the retailers for the films, and Porrata's presumed knowledge of Edde's method of film acquisition.

Finally, the defendant retailers that rented or sold copies of plaintiff's films to the public are direct infringers. As such, they too are jointly and severally liable for plaintiff's lost profits.

4. Statutory Damages

(a). Availability

Since plaintiff is given the option, prior to entry of judgment, to choose between the award [*57] of actual losses plus infringer's profits, on the one hand, and statutory damages, on the other, e.g., *Twin Peaks Prods., Inc. v. Publications Int'l, Inc., 996 F.2d 1366, 1380 (2d Cir. 1993),* we now turn to the assessment of a statutory award. n27 As noted, the ceiling for such an award is $ 20,000.00 per infringed work, unless the court concludes that the infringement was willful, in which case the statutory maximum soars to $ 100,000.00. See *id. at 1381.*

n27 Under the 1909 Act, the court had discretion whether to make statutory damages available in lieu of an award for profits and losses, and that discretion turned on an assessment of whether the latter formula was adequate in the circumstances of the case. See generally *Nimmer on Copyright § 14.04[F][1].* Under the statute as amended in 1978, the plaintiff is entitled to an adjudication of statutory damages and thus the option to choose between that award and the measure of profits and losses, irrespective of the adequacy of evidence proffered in support of the latter formula. See id. § 14.04[A] at 14-49 to 50.

[*58]

We also note that plaintiff seeks statutory damages solely with respect to the film Intimo, since the copyrights for the other films were not registered until well after the commencement of the infringing conduct by Edde. As plaintiff recognizes, this delay precludes the award of such damages for the four remaining films. See, e.g., *Business Trends Analysts, 887 F.2d at 406.*

Before evaluating the appropriate size of a statutory damage award, we address an argument by defendants to the effect that even Intimo is not eligible for such a damage award. The basis for this argument is defendants'

contention that the infringement of that film commenced long before its publication and well before the effective date of registration of the copyright for the film.

With regard to publication, defendants point to a notation on the 1989 registration form that appears to be "PAU". (DX A). They further note that the plaintiff filed a corrected registration form for the film in February 1994 that contained the same notation. (Id.). Asserting that this designation indicates that the copyrighted work is unpublished, they imply that the film had therefore not been published as of February [*59] 1994, whereas Edde had acquired and distributed an infringing copy of the film as early as 1992. Defendants further contend that the version of the film that they distributed, titled Midnight Seduction, was never registered by plaintiff, since the registration filed by plaintiff was for the film titled Intimo.

Neither of these arguments is persuasive. The record is silent as to the meaning of the term "PAU", and the suggestion by defendants' counsel, both in his questioning of witnesses (Tr. 95) and in his post-trial briefing (Defts' Post-Trial Brief at 6 & n.5), that it means "unpublished" is not competent testimony. n28 In any event, we credit the testimony of Mr. Brenner that the film was distributed to various cable program suppliers and exhibited on cable television by 1989 (Tr. 89), before Edde's infringement. n29 As for the registration, the Intimo copyright was registered in 1989, albeit under its original title, and defendant was on notice of its protected status by virtue of the copyright notice and credits found on the film. Thus the film was protected, and defendants' infringement triggered the availability of statutory damages.

n28 Brenner did concede that neither registration noted any publication of the film. (Tr. 98). [*60]

n29 Indeed, as noted, it appears that all of the films may have been copied from their television exhibitions.

(b). Amount of Statutory Damages

We turn now to an assessment of the appropriate size of a statutory damage award. Such an award is designed to serve both compensatory and punitive purposes. See, e.g., *Fitzgerald Pub. Co., 807 F.2d at 1117* (citing *Lottie Joplin Thomas Trust v. Crown Pubs., Inc., 592 F.2d 651, 657 (2d Cir. 1978)).* Thus, the pertinent considerations in deciding the amount of such an award encompass both the degree of the defendant's culpability

and the extent of the injury caused. Among the relevant factors are the profits reaped and the expenses saved by the infringer, the revenues lost by the plaintiff, the value of the copyright, the need to deter potential infringers, the degree of willfulness or innocence of the defendant, the defendant's cooperativeness in providing information relevant to proof of profits and losses, and the need to deter the defendant from future misconduct. See, e.g., *807 F.2d at 1117.*

Because the amount of statutory damages may be [*61] substantially affected by whether the defendant acted willfully, we first address that question. Willfulness in this context depends upon whether the defendant had actual or constructive knowledge that its conduct was infringing. See, e.g., *id. at 1115.* Plaintiff need not demonstrate that the defendants actually knew at the time that their conduct was infringing, since the requisite knowledge may be constructive. Thus, the plaintiff may justify a willfulness finding on the basis that defendants acted with "reckless disregard for the copyright holder's rights". *Knitwaves, Inc., 71 F.3d at 1010* (quoting *N.A.S. Import Corp. v. Chenson Enterprises, Inc., 968 F.2d 250, 252 (2d Cir. 1992)); Twin Peaks, 996 F.2d at 1382.* Based on our assessment of the record, we readily conclude that the conduct of Edde and its officers was indeed willful, as so defined.

In this regard we note, based on the testimony of Atkinson and Perekh, that Edde routinely purchased and distributed unauthorized copies of copyrighted films, provided that the copyrights were not registered, and that it did so on the assumption that it could earn profits on such infringing performances. (Tr. 246-48; Perekh [*62] Dep. at 9-10, 20). The evidence strongly suggests that Perekh, Elan and Atkinson were fully aware that this mode of operation constituted a violation of the Copyright Act.

Both Atkinson and Perekh were experienced businessmen in the field of motion pictures and concededly understood the difference between copyrighting a film, by virtue of creating an original work n30, and registering that copyright with the Copyright Office. Indeed, Atkinson was responsible for supervising the copyrighting of materials for Edde, including the artwork created for the infringing films at issue in this case, and he made sure to place the necessary notices on the boxes and cassettes, as well as placing an FBI copyright warning on the leader of the copied films. It is also significant that, having assured such copyright protection for Edde, Atkinson and Perekh apparently did not arrange to register those copyrights, thus further evidencing their understanding that copyright protection flowed from the creation of the material, and not from registration. They thus understood that they had no right to purchase, copy or distribute the infringing cassettes provided by Christian.

n30 We note that two of the five films apparently did not have a US Media copyright notice on them in their infringing version. We infer that US Media did include such a notice on the original versions of the films (Tr. 60), but even if it had not done so, the result would not change. The Copyright Act contemplates that such a notice may be placed on protected works, but for works published after March 1, 1989 -- which apparently include the two films that, in their copied version, did not contain a copyright notice -- the Act does not exclude statutory protection if the notice is omitted, as long as the defendant is not misled. *17 U.S.C. § § 401(a) & (d).* See, e.g. *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc., 871 F. Supp. 709, 720 (S.D.N.Y. 1995).* Defendants here make no such claim, nor could they reasonably do so under the circumstances.

[*63]

It is also evident that they were on notice as to the protected nature of these films since even the bootlegged copies included copyright notices affixed by US Media or an identification of the original European producers of the films. As for Midnight Seduction in particular, it included a copyright notice from US Media on the film as well as on the cassette. (Tr. 66, 59-60). Although Edde required that each purchased film be reviewed by its staff to ensure the quality of the print, the company and its staff concededly ignored the plain evidence of the film itself that it was protected.

Defendants' knowledge that the films had been pirated was also evidenced by the nature of Edde's dealings with Christian. The company paid rock-bottom prices for the films to an individual with no known source of supply from legitimate film producers, and it did not seek any chain of title from him or indeed any other evidence of source n31, contenting itself with a warranty that a copyright search had unearthed no registration corresponding to the title of the film as supplied by Christian. This is not standard operating procedure among legitimate distributors (Tr. 155-60), and further indicates [*64] that Atkinson and Perekh fully understood that they were dealing with infringing copies.

n31 Atkinson never asked Christian where he had acquired his supply of films. (Tr. 341).

That Edde was operated in a manner designed to take financial advantage of evasions of the copyright

laws is further indicated by the frequency with which it received cease-and-desist letters from legitimate producers and distributors. Indeed, Atkinson admitted not only that it was standard operating procedure for Edde to ignore whether the films that it purchased were copyrighted, but that its only concern was whether a protesting copyright holder could establish that it had a registration for the copyright. (Tr. 268). If so, Edde would cease infringement, presumably because the registration permitted the immediate filing of an infringement lawsuit. If, however, there were no registration, Edde would ignore the protest, again presumably because it was protected from litigation until a registration was obtained. n32

n32 Since Edde employed an attorney to deal with copyright protests (Tr. 249-50), we can infer that Atkinson and the company's principals were accurately counselled as to the scope of the protection offered by the Copyright Act.

[*65]

In sum, the Edde defendants deliberately operated in a manner designed to obtain financial benefit from the copyrighted works of others and to do so in a way that avoided the necessity of paying for a license from the copyright holders. This amounted to deliberate plagiarism and willful infringement. n33

n33 An argument might be fashioned that the infringement of Intimo was not willful because Edde authorized a copyright search, which failed to locate the registration only because the search was conducted under the then-current title, Midnight Seduction. Under this reasoning, Edde did not knowingly infringe since the failure to locate the registration was innocent, and if the registration had been found, Edde would have refrained from distributing the film.

This argument misses the mark. As noted, the Copyright Act protects the film whether or not the copyright holder has registered with the Copyright Office. The infringement of Intimo, and of the other four films, was attributable to Edde's refusal to recognize or abide by this legal protection.

[*66]

As for the amount of a statutory award, application of the relevant factors gives us some guidance, although the ultimate decision is unavoidably arbitrary to a degree. The gross revenues realized by Edde from the film Mid-

night Seduction (the renamed pirated version of Intimo) amounted to $ 22,472.22. (PX 5). Less returns from this film totaling $ 2,171.85 (PX 6), net revenues were $ 20,300.37. If we subtract also a pro rata share of Edde's proven deductible expenses n34, the deduction amounts to $ 12,113.00, and thus Edde's profits from this film total $ 8,187.37.

n34 Since the expenses testified to by Atkinson were not allocated among the five films, we assume that one-fifth of those expenses are allocable to this one film.

In determining profits for this purpose, we are not limited to those earned by Edde. Under section 504, if statutory damages are awarded for infringement of Intimo, the award is to be made jointly and severally against all defendants who contributed to the infringement, [*67] at least up to the ceiling for non-willful violations. See, e.g., *Nimmer on Copyright § 14.04*[E][2][d] at 14-79; *Fitzgerald Pub. Corp., 807 F.2d at 1116.* Since Edde impermissibly distributed the film to some of the retailers, which in turn distributed them to the public, Edde and those retailers that handled the film would be jointly and severally liable for any statutory damage award, at least up to $ 20,000.00. To the extent that Christian and Renaissance also participated in this distribution operation, they too must be liable for any statutory damages, and hence their profits would also be relevant to our analysis. See, e.g., *Nimmer on Copyright § 14.04*[E][2][d] at 14-79; *Costello Pub. Co., 670 F.2d at 1043.* n35

n35 Repnet did not distribute Midnight Seduction (Porrata Dep. at 6), and accordingly neither it nor Porrata shares liability for statutory damages. Likewise, defendant retailers Musicland and Transworld Music did not purchase Midnight Seduction from Edde (PX 5), and are therefore not liable for statutory damages.

[*68]

The record reflects that Midnight Seduction was distributed only to Movies Unlimited, Record Explosion and Palmer Video. We have no breakdown of profits earned specifically on Midnight Seduction by these retailers other than Palmer Video. n36 A rough approximation is therefore called for. Under the circumstances we utilize a pro rata apportionment of those profits among the five films -- except with respect to Palmer Video -- an exercise justified not only by the absence of more precise data, but by the fact that the number of copies of

this film that were distributed from Edde to the retailers does not differ substantially from the average for the five films. (PX 5).

> n36 We note that Christian and Renaissance have not been shown to have earned any profits on this film.

Putting these numbers together, we arrive at an estimate of retailer profits attributable to Midnight Seduction in the amount of $ 4,387.90. When we include Edde's estimated profits on this film, $ 8,187.57, the total infringing [*69] profits swell to $ 12,575.47.

As for plaintiff's losses attributable to the infringement of Intimo, we confront a similar problem, in that we have estimated, on very thin evidence, a total of lost profits for all five films of $ 35,000.00. We have no information on which to base a reliable determination as to which, if any, of the five infringed films would have earned profits for plaintiff in the home video market if they had not been infringed. At best, then, for purposes of our statutory damages analysis, we can again utilize an arbitrary pro rata allocation of the losses among the five films -- although, for reasons noted, we doubt that each of these films would have garnered profits in this manner -- and thus assign to Intimo projected lost profits of $ 7,000.00.

As for the other relevant considerations in assessing a statutory damages award, we survey them briefly. For reasons noted, we conclude that Edde and its officers acted willfully in infringing plaintiff's copyrights. Moreover, since they have explicitly adopted a policy that treats such infringements of unregistered copyrights as a standard business practice, we infer that they have made a rational calculation [*70] that it is more profitable for them to proceed in this way than to avoid copyrighted films or to pay for a license. The size of a statutory award must necessarily take this deliberation into consideration in determining whether a given award for the one film will serve as a deterrent to future misconduct of this sort by Edde and by others in the business who may seek to pursue a similar course.

By the same token, defendant Edde has neither defaulted in this action nor notably resisted or stymied discovery as to its profits. We recognize that plaintiff complains about the completeness and credibility of the document production made by Edde, and particularly has protested that defendant failed to provide data relating to its costs. (E.g., Tr. 304-07). Plaintiff never raised this issue prior to trial, however, and we are not prepared to credit the unsupported contention by plaintiff that it made specific discovery requests for cost data and was

denied access to that information. See, e.g., *Maryland Casualty Co. v. W.R. Grace & Co.-Conn., 1998 U.S. Dist. LEXIS 14780, 1998 WL 171501*, at *2 (S.D.N.Y. April 10, 1998), on reconsideration, *1998 WL 272995* (S.D.N.Y. May 26, 1998). Had that been the case, we [*71] have no doubt that plaintiff's counsel would have raised the issue in a timely fashion before the court.

As for the value of the copyright and the costs avoided by defendants, we have little, if any, specific information. We note that the copyright apparently continues to have some value since, as of the time of the trial, US Media was apparently still earning some moneys on recent exhibitions of some of these films on late-night cable television. We lack any concrete information as to what plaintiff would have charged if Edde had sought a license for the home video market. Our best approximation is from the testimony of Messrs. Balsam and Baruc to the effect that if a distributor had agreed to enter into a contractual arrangement with US Media for distribution to the rental market, it would have been required to offer a guarantee of perhaps $ 25,000.00.

Having surveyed these various considerations, we lack any ready formula for determining a statutory award for the one film. Nonetheless, given both the apparent extent of the financial impact of Edde's infringement and the need to deter what appears to represent a deliberate and apparently profitable illegal course of conduct by [*72] Edde and its principals, we conclude that a statutory award of $ 50,000.00 is appropriate. See, e.g., *Odegard, Inc. v. Costikyan Classic Carpets, 963 F. Supp. 1328, 1341 (S.D.N.Y. 1997)*(despite absence of proof regarding lost profits, $ 25,000 statutory award ordered for purposes of deterrence and in light of evidence of willfulness).

(c). Joint and Several Liability

Because Christian, Renaissance and the retailers cooperated with Edde in this infringing conduct, we must next consider whether joint and several liability for this statutory damage award should extend to them. As noted, the principle of contributory infringement applies here, as it does to the award of the plaintiff's actual damages.

The assessment of the full amount of the statutory damage award against Movies Unlimited, Record Explosion, Palmer Video and Casablanca Distributors is somewhat problematic since we lack any evidence that they acted willfully. Absent such proof, the imposition on them of a statutory award that, in its magnitude, depends upon a determination of willfulness would be inappropriate, even if not statutorily impermissible. See, e.g., *Nimmer on Copyright § 14.04*[E][2][e] at [*73] 14-78 n.168. n37 The appropriate alternative is to impose on them joint and several liability with the Edde defendants

for only $ 20,000.00 of the $ 50,000.00 statutory damage award. Id..

n37 Under the circumstances we need not address that interpretive question.

Our conclusion on this question differs when we consider Christian and Renaissance. As the supplier of the films, Christian plainly was on notice that he was dealing in copyrighted films, and that he was purchasing and selling unauthorized copies. This conclusion follows from the nature of his very informal dealings with Verick (Christian Dep. 21-27), from the prices that he was paying and then charging Edde, and from the complete absence of any effort on his part to determine whether Verick had title to the films. At a minimum, he was acting in reckless disregard for the illegality of his conduct. Hence his infringements were willful, and he and Renaissance are therefore to be held jointly and severally liable with the Edde defendants for the full [*74] amount of the statutory damage award.

(d). Adjustment of Profits and Lost Profits Award if Plaintiff Elects Statutory Damages

As noted, we have addressed both the profits/lost profits analysis mandated by section 504(a) and the statutory damages assessment under section 504(c)(1) for Intimo because plaintiff is entitled to elect between these two alternatives awards at any time prior to entry of final judgment. See, e.g., *Twin Peaks, Inc., 996 F.2d at 1379.* Since plaintiff's claims cover the infringement of five works, only one of which is eligible for statutory damages, we must also undertake one further refinement of the damages assessment to ensure that plaintiff not recover duplicative damages for the five infringed works in the event that it elects to take statutory damages for one of them. Since our findings with regard to profits and lost profits encompass all five films, whereas the statutory damages analysis involves only one, an adjustment of the profits and lost-profits damages would be required in the event that plaintiff opts for statutory damages for the infringement of Intimo.

To avoid double counting, we must extract from both defendants' profits [*75] and plaintiff's lost profits an amount equal to the moneys, both gained and lost, that are attributable to Intimo and its pirated counterpart, Midnight Seduction. We first address Edde's profits, then those of the retailers n38, and conclude by adjusting plaintiff's lost profits.

n38 No adjustment is required in the figure for Repnet's profits, nor for those of the retailers Musicland or Record Explosion, because, as noted, these companies did not handle Midnight Seduction. (Porrata Dep. at 6; PX 5).

(i). Adjustment of Edde's Profits

We have specific figures in the record for the gross revenues garnered by Edde on Midnight Seduction, and they reflect a total of $ 20,300.37. (PX 5; PX 6). As for deductible expenses, these are not broken out by film, and we therefore take as a proper measure a pro rata share of the total expenses, or $ 12,113.00. Thus, we attribute to Midnight Seduction a profit earned by Edde of $ 8,187.37. Subtracting this figure from the previously calculated profits [*76] of Edde, we arrive at an adjusted profit, for purposes of the statutory damage election, of $ 50,540.65.

(ii). Adjustment of Retailers' Profits

With regard to two of the three retailers that earned profits on Midnight Seduction, the record does not include a breakdown of profits by film. Accordingly for those defendants -- Movies Unlimited and Record Explosion -- we make a pro rata deduction from their stipulated profits to account for their earnings attributable to Midnight Seduction. This results in adjusted profits as follows:

| | |
|---|---|
| Movies Unlimited | $ 1,115.26 |
| Record Explosion | $ 4,554.37 |

Palmer Video earned $ 3,295.50 in gross revenues from the sale or rental of 65 videocassette of this film. See p. 29, supra. Since Palmer paid five dollars for each cassette (PX 16), the net profits attributable to this film total

$ 2,970.50. Accordingly, Palmer's adjusted profits amount to $ 16,123.15.

(iii). Adjustment of Plaintiff's Actual Damages

As for the lost profits of the plaintiff, we have previously found a total of $ 35,000.00. For reasons already noted, in the absence of any meaningful basis to attribute

this figure to any one or [*77] more of the five films at issue, we utilize a pro rata deduction. Accordingly, for purposes of the statutory damage election, the lost profits award would be reduced to $ 28,000.00.

(e). Timing of Statutory Election

To ensure orderly closure on this matter, we direct that plaintiff make its election in writing within two weeks from the date of this Memorandum and Order. If plaintiff fails to do so, judgment will be entered on the basis of the profits/lost profits assessment.

5. Summary of Copyright Damages Findings

Based on the foregoing analysis, we determine that defendant Edde earned profits on its infringing films in the amount of $ 58,728.02. As for the retailer defendants, they earned profits, respectively, as follows: Musicland Group, Inc. -- $ 2,420.15; Transworld Music -- $ 8,626.38; Movies Unlimited -- $ 1,394.07; Record Explosion -- $ 5,692.96; and Palmer Video and Casablanca Distributors -- $ 19,093.65. Edde's sales agent, Repnet and its principal, Paul Porrata, earned $ 1,380.42 in commissions for infringing sales to Transworld. We further find that plaintiff suffered actual damages, in the form of lost profits, totaling $ 35,000.00.

If plaintiff wishes [*78] to opt for statutory damages for the infringement of its copyright on the film Intimo, it will be awarded $ 50,000.00 jointly and severally against the Edde defendants, Christian and Renaissance. Of that amount, $ 20,000.00 will also be awarded jointly and severally against Movies Unlimited, Record Explosion and its principals, Palmer Video and Casablanca Distributors. In that event, the award to plaintiff for its lost profits on the four other films will be reduced to $ 28,000.00 and the separate award for the profits earned by the various defendants on the remaining films will be reduced to the following: the Edde defendants -- $ 50,540.65; Movies Unlimited -- $ 1,115.26; Record Explosion -- $ 4,554.37; Palmer Video and Casablanca Distributors -- $ 16,123.15; Musicland Group, Inc. -- $ 2,420.15; Transworld Music -- $ 8,626.38; and Repnet and Porrata -- $ 1,380.42.

C. Lanham Act Damages

Prior to trial the court granted plaintiff summary judgment on its claim against the Edde defendants under section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, for false designation of origin. The premise for that claim was the conceded fact that Edde had obtained copies of plaintiff's [*79] films and placed its own logos -- both of Edde and of its operating division TZ -- on the boxes and the cassettes, thus falsely suggesting that the films had originated with Edde. *United States Media Corp., 1996 U.S. Dist. LEXIS 13389, 1996 WL 520901*, at *8-10.

Under the Lanham Act a plaintiff who prevails on a section 43(a) claim may recover, "subject to the principles of equity," an award of the defendant's profits and compensation for the plaintiff's damages. *15 U.S.C. § 1117*(a). As is the case under the Copyright Act, in establishing the defendant's profits the plaintiff need only prove the gross amount of defendant's sales, and the defendant bears the burden of establishing its deductible expenses. Id.

The Act also gives the court some discretion, in awarding damages, to assess an amount above actual damages, up to a ceiling of three times the actual damages. Id. As for defendant's profits, the court may award less or more than the proven profits, "according to the circumstances of the case." Id.

In this case we need not enter into an extended analysis of the scope of available Lanham Act remedies for plaintiff under the circumstances. First, there is nothing in the record to suggest that [*80] Edde's misrepresentation as to the source of the films augmented in any respect its sales of infringing cassettes or caused plaintiff any loss of sales. n39 Second, those sales were made in violation of plaintiff's copyrights, and our rulings on the copyright claims will fully compensate plaintiff for any loss to it of sales and will also award it the full amount of defendants' profits. Thus, any separate award of profits or damages under the Lanham Act would result in duplicative compensation, which is ordinarily impermissible in this context. See, e.g., *Knitwaves, 71 F.3d at 1009* (citing *Abeshouse, 754 F.2d at 470-71*); *Nimmer on Copyright § 14.02*[B] at 14-19 to 20. Third, although the Lanham Act authorizes the award of enhanced damages, plaintiff has not shown that the circumstances of this case, and particularly the defendants' violations of the Lanham Act, were so egregious as to justify such an award in addition to the copyright damages award. See *15 U.S.C. § 1117*(a) (award is for "compensation and not a penalty").

n39 In the Joint Pre-Trial Order, plaintiff seeks a finding that "[the] Principal Defendants' unlawful conduct under the Lanham Act, as a matter of law, caused actual consumer confusion and deception." (PTO at. p. 3, P 7). The record contains no evidence of "actual confusion and deception", which is not surprising since US Media has never suggested that it is well known to the public or the home video market.

[*81]

In sum, we decline to make any separate award either of profits or of actual damages under section 43(a) of the Lanham Act.

1998 U.S. Dist. LEXIS 10985, *

D. Common-Law Unfair Competition

Plaintiff's final surviving claim was for common-law unfair competition, based on defendants' misappropriation of plaintiff's films. As a practical matter, if plaintiff were to prevail on this claim, its potential recovery of compensatory damages would presumably mirror the recovery that we have already awarded under the copyright claims for plaintiff's lost profits and, perhaps, defendants' profits. Plaintiff's interest in this claim, however, is based on its potential as a basis for an award of punitive damages, which is not available under the Copyright Act. See, e.g., Budget Cinema, Inc. v. Watertower Assocs., 81 F.3d 729, 733 (7th Cir. 1996); Nintendo of America, Inc. v. Aeropower Co., 34 F.3d 246, 251 (4th Cir. 1994); Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir. 1983); Nimmer on Copyright § 14.02[B] at 14-23.

We need not assess the trial record to determine the availability of exemplary damages under this theory. Although neither party has raised the question, we note that the Copyright Act contains [*82] a preemption provision, 17 U.S.C. § 301(a), and its effect is to bar plaintiff's common-law claim since it is based on a theory of misappropriation, which is simply "a reformulation of plaintiff's copyright claims." Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 121 (8th Cir. 1987). See, e.g., Princess Fabrics, Inc. v. CHF, Inc., 922 F.2d 99, 104 (2d Cir. 1990)(distinguishing between misappropriation and "palming off" theories of unfair competition); Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 247 (2d Cir. 1983). n40

n40 As noted, plaintiff's claim rests on defendants' misappropriation of its films, and not on any form of "palming off." Thus, plaintiff asserts that the misconduct that warrants punitive damages is defendants' "stealing plaintiff's motion pictures and selling [them] for their own financial gain . . . ." (Pl.'s Post-Trial Brief at 24).

II. Edde's Claims for Trade Libel and Libel

Defendant Edde has asserted counterclaims against US Media and third-party claims against [*83] Steven Brenner for business injury assertedly caused when Brenner spoke to Guy Marom in 1995 and allegedly voiced his views about Edde and its principals and his intention to put that company out of business. (Defts' Post-Trial Brief at 28). Marom was the president of a company then known as ABC Home Video Corporation. (Marom Dep. at 6). In prior years ABC had done some duplicating work for Edde and had in turn given duplicating work to Edde, thus yielding some financial return to Edde. (Id. at 13, 17). Following the filing of this law-

suit and Brenner's brief conversation with Marom, ABC ceased to give any duplicating work to Edde. (Id. at 25, 76). Defendant alleges that Brenner acted maliciously in speaking to Marom, assertedly for the purpose of injuring Edde's business ties with ABC, and that as a result Edde lost substantial business and profits. (Defts' Post-Trial Brief at 29-30).

In assessing this claim we assume, as does Edde, that California law applies (see PTO at p.44), since ABC was located in California, Brenner contacted him there, and Marom made his business decisions in the same location. Trade libel has been defined by the California courts as "an intentional [*84] disparagement of the quality of property which results in pecuniary damage . . . ." Aetna Casualty & Sur. Co., Inc. v. Centennial Ins. Co., 838 F.2d 346, 351 (9th Cir. 1988)(quoting Erlich v. Etner, 224 Cal. App. 2d 69, 73, 36 Cal. Rptr. 256, 258 (1964)). See Matter of Kasler, 611 F.2d 308, 311 (9th Cir. 1979). To prevail on a trade libel claim, the plaintiff must demonstrate that the alleged wrongdoer made a false statement about him, that he published the statement to another person, that that publication induced others not to deal with the plaintiff, and that the plaintiff suffered special damages. Aetna Casualty & Sur. Co., 838 F.2d at 351 (citing Polygram Records, Inc. v. Superior Court, 170 Cal. App. 3d 543, 548-49, 216 Cal. Rptr. 252, 255 (1985)). See Vondran v. McLinn, 1995 WL 415153, at *5 (N.D.Cal. July 5, 1995). Edde has not met its burden on this claim.

Brenner telephoned Marom in early 1995, after the filing of this lawsuit, assertedly for the purpose of determining whether ABC had been duplicating the pirated copies of his films. (Tr. 458, 464; Brenner Dep. at 484-85; Marom Dep. at 18). Whatever Brenner's original intent, it is apparent that he complained [*85] to Marom that Edde and its principals had stolen or "pirated" his films, and insisted that he was determined to press his lawsuit against them. (Marom Dep. at 19-20). Marom also testified that Brenner had used some profanity concerning Perekh, Elan and Atkinson and that he had insisted that he intended to put Edde out of business. (Id.). This testimony is plausible and I credit it, although ultimately it does not materially affect the result.

According to Marom, he never gave any further business to Edde, and his decision not to do so was influenced by his own business calculations. (Marom Dep. at 26-29). Specifically, he reported that he was independently aware of the lawsuit and, most crucially, of the fact that the court had authorized the seizure of certain films and of duplicating equipment found on the premises of Edde. (Marom Dep. at 26, 79). Marom explained that he was concerned about being associated with a company that might be involved in such alleged film piracy, and was especially reluctant to give any of his films to Edde

for duplicating because of the fear that they might be encompassed in a seizure order or that, by virtue of Edde's legal entanglements, it would [*86] be unable to provide prompt and reliable duplicating services. (Marom Dep. at 26-29).

From the foregoing testimony, which is credible, it is evident that Brenner's comments to Marom, even if phrased in the most incendiary terms, did not involve any false statements about Edde and its principals. For reasons noted, we conclude that Edde indeed pirated plaintiff's films. Moreover, whatever Brenner's opinion may have been about the business ethics or moral character of Perekh, Elan and Atkinson, his expression of those opinions did not constitute untruthful representations concerning those individuals, but rather plainly involved the exasperated expression of Brenner's personal opinions, which he was entitled both to hold and to express.

Moreover, Edde fails to demonstrate that it suffered special damages as a result of the purported misconduct. Although Marom concededly decided not to do further business with Edde, as Marom himself noted, he did so based on his knowledge of US Media's lawsuit and the seizure order, both of which were facts made known to him independently of his conversation with Brenner, and in any event he did not choose to cut his ties with Edde because of Brenner's [*87] editorial comments, but rather because he viewed Edde's entanglement in infringement litigation of this sort as potentially detrimental to ABC's business interests if it continued to give duplicating work to Edde. n41

> n41 Although Marom testified that he cut off his dealings with Edde because of his fear of entanglement with that company's legal difficulties, of which he was independently aware, he also suggested that Brenner's statements during their brief conversation contributed in some unspecified respect to that decision. (Marom Dep. at 30-31). Even if we credit this assertion, it does not save Edde's claim, since there is no evidence that Brenner made any false statements to Marom, much less that such false statements caused Edde any injury.

Edde also has asserted a claim of common-law libel against Brenner and US Media. This claim is premised on the same conversation with Marom. As we have noted, the credible evidence does not reflect any false statement by Brenner in the course of that discussion. Because [*88] "truth . . . is an absolute defense to any libel action," *Campanelli v. Regents of University of California, 44 Cal. App. 4th 572, 581, 51 Cal. Rptr. 2d 891, 897 (1996); Lafayette Morehouse, Inc. v. Chronicle*

*Publishing Co., 37 Cal. App. 4th 855, 869, 44 Cal. Rptr. 2d 46 (1995),* cert. denied, *136 L. Ed. 2d 17, 117 S. Ct. 53 (1996),* this claim must also fail.

In sum, Edde has entirely failed to sustain its claims against Brenner and US Media. Accordingly, those claims must be dismissed. n42

> n42 Edde has made occasional reference to Brenner's contacts with some of the retailers as a possible basis for these claims against him and US Media. (Tr. 319-20; Defts' Post-Trial Brief at 30). This suggestion is baseless. The trial record contains no evidence that Brenner uttered any defamatory untruths to any of the retailers concerning Edde, and there is not a shred of evidence that any of those contacts injured Edde.

III. Costs (Including Attorney's Fees)

Plaintiff seeks an award of its attorney's fees and expenses [*89] incident to its successful pursuit of copyright liability against defendants. We agree in part.

Section 505 of the Copyright Act provides that

> the court in its discretion may allow the recovery of full costs by or against any party . . . . The court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Under this provision the determination whether to award costs and fees to a prevailing party is within the discretion of the trial court. See, e.g., *Fogerty v. Fantasy, Inc., 510 U.S. 517, 534-35, 127 L. Ed. 2d 455, 114 S. Ct. 1023 (1994).*

Plaintiff is the prevailing party in this litigation, notwithstanding the refusal of the court to award the full extent of the relief that it has sought. See, e.g., *Ogilvy & Mather, 772 F. Supp. at 1366.* Under the circumstances, including the willfulness of the conduct by Edde and its principals and officers, we view this as an appropriate case in which to award plaintiff its full costs. See *17 U.S.C. § 505; Bourne Co. v. Hunter Country Club, Inc., 990 F.2d 934, 938-39 (7th Cir. 1993),* cert. denied, *510 U.S. 916, 114 S. Ct. 308, 126 L. Ed. 2d 256 (1994); Love v. Kwitny, 772 [*90] F. Supp. 1367, 1374 (S.D.N.Y. 1991),* aff'd mem., *963 F.2d 1521 (2d Cir.),* cert. denied, *506 U.S. 862 (1992).*

As for plaintiff's request for an award of fees, the analysis is somewhat more extended. The relevant fac-

1998 U.S. Dist. LEXIS 10985, *

tors include the relative merit of the parties' respective positions, the bad faith or willfulness (or lack of it) of either side, and (in the case of prevailing plaintiffs) the need for deterrence of future infringements by the defendant and others. See, e.g., *Knitwaves, 71 F.3d at 1011* (quoting *Fogerty, 510 U.S. at 534 n.19*).

For reasons noted, we have concluded that plaintiff's copyright infringement claims are plainly well grounded, that the Edde defendants' resistance to a finding of liability was so wanting as to justify entry of summary judgment against them, and that the conduct of Edde and its officers and principals constituted willful infringement. Moreover, given the deliberate nature of Edde's defiance of the copyright protections afforded legitimate creators of protectible material, deterrence is a compelling need in this case. Moreover, the relatively modesty of the amounts awarded to plaintiff in damages suggests that such deterrence is appropriately [*91] served by an award of fees. See, e.g., *Magnuson v. Video Yesteryear, 85 F.3d 1424, 1432 (9th Cir. 1996); Love, 772 F. Supp. at 1374.*

Having so concluded, we note that the scope of an award of fees to plaintiff under the Copyright Act is significantly circumscribed by section 412(2) of the Act. That provision precludes a fee award to a prevailing plaintiff if the infringement commenced before the registration of the copyright of a published work unless the registration occurs within three months after first publication. See, e.g., *Knitwaves, 71 F.3d at 1012.* Since, as noted, the copyrights on four of the five films were not registered until February 1994, long after both initial publication and the commencement of defendants' infringing activities, plaintiff is eligible for a fee award only with respect to counsel's activities in pressing the copyright claim concerning the film Intimo.

Plaintiff may also be seeking a broader award of fees on the alternative basis of its Lanham Act claims. The difficulty with such an application is that a fee award under the Lanham Act is reserved for "exceptional cases." *15 U.S.C. § 1117(a).* Such exceptional circumstances are generally [*92] recognized when the trademark infringement was fraudulent or in bad faith. See, e.g., *Twin Peaks Prods., 996 F.2d at 1383* (distinguishing between copyright and trademark infringements in award of fees). The difficulty with meeting that standard in this case is that although the evidence suggests that the copyright infringement was willful, there is no persuasive indication that Edde's placement of its own mark or that of TZ Video on the cassettes or boxes was intended to deceive purchasers -- whether retailers or the consuming public -- as to the source of origin of the films. Plaintiff has not shown that it or Edde has created any public identification of their respective corporate names with their product, and we do not believe that Edde's princi-

pals were seeking any unfair commercial advantage by adding the company name to the product. We therefore do not view this case as exceptional for purposes of a fee award under the Lanham Act.

Plaintiff and Brenner also ask that we award them fees in connection with their defense against the counterclaims and third-party claims asserted by Edde. Although they do not specify the legal basis for their post-trial application, we infer that [*93] they are relying on *28 U.S.C. § 1927.* n43 That provision authorizes the award of sanctions against counsel for engaging in litigation conduct for the purpose of delay or for another bad-faith reason. See *Chambers v. NASCO, Inc., 501 U.S. 32, 62, 115 L. Ed. 2d 27, 111 S. Ct. 2123,* reh'g denied, *501 U.S. 1269, 115 L. Ed. 2d 1097, 112 S. Ct. 12 (1991); Sakon v. Andreo, 119 F.3d 109, 114 (2d Cir. 1997); Shafii v. British Airways, PLC, 83 F.3d 566, 571 (2d Cir. 1996).*

---

n43 Plaintiff and Brenner accuse Edde of pressing claims that it knew were baseless, and of doing so for harassment purposes. We do not engage in an analysis under *Fed. R. Civ. P. 11* because the movants make no showing that they have complied with the procedural requirements of that rule, and the record does not suggest that those preconditions have been satisfied here. Moreover, even if we ignored this failing, the result would be the same. As the Second Circuit has observed, "Rule 11 sanctions should be imposed with caution," *Knipe v. Skinner, 19 F.3d 72, 78 (2d Cir. 1994),* and we see no basis for them here.

---

[*94]

Although we view the trade libel and libel claims as extremely weak, we are not prepared to say that counsel chose to press those claims for an improper purpose. Edde concededly lost a significant amount of business in the wake of Brenner's contact with Guy Marom, and it is therefore not at all implausible to view its decision to press these claims, and counsel's acquiescence in that strategy, as born of the assumption that if Edde prevailed on the copyright claims, it might well have a viable claim on the basis of Brenner's arguably reckless conduct in dealing with ABC.

In sum, we limit the fee award to eligible fees under the Copyright Act. Because we are awarding fees, albeit for a limited portion of the case, plaintiff must provide the necessary documentation to sustain its application. This showing must include one or more affidavits by counsel detailing their work on relevant portions of the case and the submission of contemporaneous time records reflecting the nature of the work by date and

amount of time. See, e.g., *Fitzgerald, 807 F.2d at 1119; Cotillion Music, Inc. v. Smith, 1997 U.S. Dist. LEXIS 920, 1997 WL 40920*, at *2 (S.D.N.Y. Jan. 31, 1997). That submission is to be made within two [*95] weeks. Defendants may serve and file responding papers within one week thereafter. n44

n44 Defendants have also sought an award of fees, principally because they contend that plaintiff's claims are plainly meritless. We see no basis for the requested award.

CONCLUSION

For reasons noted, we dispose of plaintiff's and Edde's claims as follows:

1. On plaintiff's copyright claims against the Edde defendants, it may recover against them jointly and severally (a) infringers' profits of $ 58,728.02 and (b) lost profits of $ 35,000.00.

2. On plaintiff's copyright claims against the thirteen corporate retailer defendants, we find that plaintiff has established liability on the part of Musicland Group, Transworld Music, Movies Unlimited, Record Explosion and Palmer Video, and that it is entitled to an award against each of them for infringers' profits in the respective amounts of $ 2,420.15 against Musicland Group, $ 8,626.38 against Transworld Music, $ 1,394.07 against Movies Unlimited, $ 5,692.96 against Record [*96] Explosion, and $ 19,093.65 against Palmer Video. Moreover, Casablanca Distributors is jointly and severally liable with Palmer Video. These defendants are also jointly and severally liable with the Edde defendants for the $ 35,000.00 in lost profits awarded to plaintiff.

3. On plaintiff's copyright claims against individual retailer defendants Joseph Shabot and Jack Mishan, we find that plaintiff has established contributory and vicarious infringement liability against Shabot and vicarious infringement liability against Mishan, and that they are accordingly jointly and severally liable with Record Explosion for $ 5,692.96 in infringers' profits and for plaintiff's lost profits of $ 35,000.00.

4. On plaintiff's copyright claims against defendant Repnet and Paul Porrata, it is awarded $ 1,380.42 in infringers' profits against both defendants jointly and severally. Those defendants are also liable jointly and severally with the Edde defendants and the liable retailer defendants for plaintiff's lost profits of $ 35,000.00.

5. On plaintiff's copyright claims against Michael Christian and Renaissance Productions, we find that both are contributory infringers as to all five films, and [*97] are therefore jointly and severally liable with the Edde defendants, the retailer defendants and Repnet and Paul Porrata for plaintiff's lost profits.

6. As an alternative to the awards specified in paragraphs 1-5, plaintiff may opt for an award of statutory damages of $ 50,000.00 for the infringement of the film Intimo, together with lost profits on the other films of $ 28,000.00, and infringers' profits on those films in the following amounts: the Edde defendants -- $ 50,540.65; Musicland -- $ 2,420.15; Transworld Music -- $ 8,626.38; Movies Unlimited -- $ 1,115.26; Record Explosion, Shabot and Mishan -- $ 4,554.37; Palmer Video and Casablanca Distributors -- $ 16,123.15; and Repnet and Porrata -- $ 1,380.42. If plaintiff opts for the statutory award, liability for that sum will be imposed jointly and severally on the Edde defendants, Christian and Renaissance. Moreover, of that sum, Movies Unlimited, Record Explosion, Palmer Video, Casablanca Distributors, Shabot and Mishan would be jointly and severally liable for $ 20,000.

7. On plaintiff's claim under section 43(a) of the Lanham Act, no monetary award in made, as it would duplicate the awards made in favor of plaintiff [*98] on its copyright claims.

8. Plaintiff's common-law unfair competition claim is dismissed.

9. Plaintiff is awarded the expenses of this litigation, including the reasonable attorney's fees, in an amount to be decided, attributable to its infringement claim with respect to the film Intimo.

10. The complaint is dismissed as against defendants Late Night Video Inc., RKO Warner Video Inc., Palmer Investment Corporation, Flash Electronics Inc., Cinema Home Video Inc., Blow Out Video and Suncoast Video.

11. Defendant Edde's claims for trade libel and libel against Steven Brenner and US Media are dismissed.

12. Within two weeks plaintiff is to serve and file its application for costs and fees. Defendants may serve and file responding papers within one week thereafter.

Dated: New York, New York

July 16, 1998

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

1056HH

********** Print Completed **********

Time of Request:   August 10, 2005   04:04 PM EDT

Print Number:      1822:56359689
Number of Lines:   1187
Number of Pages:

Send To:   SZPONDOWSKI, KARA
           NIRO SCAVONE HALLER & NIRO LTD
           181 W MADISON ST STE 4600
           CHICAGO, IL 60602-4583