# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALENCIA M. MCCLATCHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-145J |
| v. | ) | |
| | ) | |
| THE ASSOCIATED PRESS, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1(D) & (E) of the Local Rules of the United States District Court for the Western District of Pennsylvania, Defendant The Associated Press ("AP"), by and through its undersigned counsel, hereby responds to the Statement of Undisputed Facts submitted by Plaintiff Valencia M. McClatchey ("McClatchey") as follows:

1.    On the morning of September 11, 2001, Valencia McClatchey looked out her front window in Shanksville, Pennsylvania and saw United Flight 93 crashing into a field near her house. (Hall Decl., Exh. 1, ¶ 7).

   **Response:** Admitted.

2.    She stepped outside her house as a white mushroom cloud was rising from the crash and took a compelling photograph of the mushroom cloud against a blue sky, with a red barn and the rolling hills of Pennsylvania in the foreground. (Hall Decl., Exh. 7).

   **Response:** Admitted.

Dockets.Justia.com

3.    In January 29, 2002, Ms. McClatchey received federal copyright registration for her photograph taken on 09-11-01, which she titled "End of Serenity." (Def's SMF ¶ 22; Hall Decl., Exh. 1, Exhibit A).

**Response:**  AP admits that McClatchey received federal copyright registration effective January 29, 2002, for her photograph taken on September 11, 2002, which she titled "End of Serenity." (Hall Decl., Ex. 1, Ex. A).

4.    The End of Serenity photograph has garnered widespread acclaim and has been used at exhibits and memorials throughout the world, including the Flight 93 Memorial, the Library of Congress, and the Smithsonian Institution. (Hall Decl, Exh. 2, McClatchey Dep., p. 8; ll. 7-10; p.13, ll. 13-21; p. 48, ll. 8-14).

**Response:**  AP admits that the End of Serenity photograph has been used at exhibits and memorials, including the Flight 93 Memorial, the Library of Congress, and the Smithsonian Institution.  AP notes that the cited references do not support the statement that the photograph was used at exhibits and memorials "throughout the world," and, in any event, this statement is not material to AP's pending motion for summary judgment.

5.    After taking the photograph, Ms. McClatchey was approached by various news organizations and magazines, including ABC News, Fox News, U.S. News and World Report, the Pittsburgh Post-Gazette, Newsweek, and the Washington Post, who wanted to license the use of her photograph. (Hall Decl., Exh. 2, McClatchey Dep. p. 16, ll. 18-25; p. 17, ll. 1-16; p. 36, ll. 7-13; p. 67, ll. 6-17; p. 75, ll. 6-14; p. 76, ll. 1-11).

**Response:**  Admitted.

2

6.    Ms. McClatchey generally agreed to license the photo for a one time use, charging a fee of approximately $250 to $350. McClatchey later learned that she was undercharging for use of her photograph. (Hall Decl., Exh. 2, McClatchey Dep. p. 12, ll. 9-17; p. 17, ll. 6-7; p. 22, ll. 18-25; p. 23, ll. 1-7).

**Response:**  AP admits that McClatchey charged some licensees fees of approximately $250 to $350 for a one time use.  AP takes issue with the characterization that this is what Ms. McClatchey "generally agreed to" because the cited deposition testimony does not support such a conclusion.  In her deposition, McClatchey testified that she "did not charge a fee" if the licensees "weren't really going to make money from it, if it [the use] was educational," or "[t]hey told a story that I had agreed with." (McClatchey Dep. 12). She also testified that "[i]n the first year" after she took the photograph she was paid "what they [licensees] offered" – "[m]ost of the time that was 150 to possibly $300." (*Id.* at 22). Then, a "freelance photographer . . . explained to me that a quarter page or less would be worth $250 for a freelance photographer." (*Id.* at 23). AP notes that, while objecting to the characterization described above, that characterization is not material to any issue raised by its pending motion for summary judgment.

7.    Ms. McClatchey was not a professional photographer and did not know how much freelance photographers generally charged for such use. (Hall Decl., Exh. 2, McClatchey Dep., p. 22, ll. 18-25; p. 23, ll. 1-7).

**Response:**  Admitted.  AP notes that this statement is not material to any issue raised by its pending motion for summary judgment.

8.    Ms. McClatchey also sold non-commercial, personal use hard copies locally and through the mail for $20, $18 of which she donated to the Todd Beamer Foundation. (Penchina Decl., Exh. F).

3

**Response:** AP admits that McClatchey sold hard copies locally and through the mail for $20, $18 of which she donated to the Todd Beamer Foundation. AP notes that the cited references do not indicate that such sales were limited to sales for non-commercial, personal use only.

9.    Ms. McClatchey used $2 of the $20 charge for hard copies of the photograph for paper and printing costs. (Def's SMF ¶ 37; Penchina Decl. Exhibit F).

**Response:** Admitted.

10.    Every hard copy of the End of Serenity photograph that Ms. McClatchey sold or gave out included her name, the word "copyright," and the year in the lower right hand corner, and the words "End of Serenity" and "September 11, 2001" in the top left of the photo across the blue sky. (Hall Decl., Exh. 2, McClatchey Dep., p. 19, ll. 7-15; p. 20, ll. 15-25; p. 21, ll. 1-7).

**Response:** AP denies that every hard copy of the End of Serenity photograph that Ms. McClatchey sold or gave out included her name, the word "copyright," and the year in the lower right hand corner, and the words "End of Serenity" and "September 11, 2001" in the top left of the photo across the blue sky. For example, a documentary entitled "Windsor Park Stories, Shanksville Episodes" contains a scene showing a copy of the End of Serenity photograph without any copyright notice emerging from what Ms. McClatchey testified is her printer. (Penchina Supp. Decl. Ex. L; McClatchey Dep. 104-05, Ex. 29). The documentary depicts copies of the photograph, including a copy which does not contain either a title or a copyright notice. (Penchina Supp. Decl. Ex. M). The record also contains depictions of the photograph displayed in the Smithsonian without a copyright notice or title on the photo. (Penchina Supp. Decl. Ex. I). The record is also replete with copies of the photograph published in various newspapers and magazines around the world, and distributed by the thousands, with Ms.

4

McClatchey's authorization and without any copyright notice or title appearing on the photograph. (*E.g.*, Penchina Decl. Exs. H, I, J; Penchina Supp. Decl. Exs. J & K). While AP disagrees with Plaintiff's statement of fact, AP notes that whether every copy of the photograph that Ms. McClatchey gave out contained a copyright notice is not material to any issue raised by AP's pending motion for summary judgment because, among other reasons, the record demonstrates that AP's photographer snapped a photograph of Ms. McClatchey's personal copy, which she admits does not contain any copyright notice or title.

11. Any news entity that Ms. McClatchey agreed to license the work to, she e-mailed a digital file of the photograph so that it would be the best possible depiction. (Hall Decl., Exh. 2, McClatchey Dep., p. 20, ll. 21-25; p. 21, ll. 1-7; p. 109, ll. 6-12). The digital copy did not bear a copyright notice. (Hall Decl., Exh. 2, McClatchey Dep., p. 109, ll. 6-12).

**Response:** AP admits that the digital copy of Ms. McClatchey's photograph that she provided to many news entities did not bear any copyright notice. AP denies that Ms. McClatchey emailed a digital file of the photograph to all news entities that she licensed to use the photograph because, for example, she did not email such a file to AP. While AP disagrees with Plaintiff's statement of fact, AP notes that whether Ms. McClatchey emailed a digital file to any news entity that she licensed is not material to any issue raised by AP's pending motion for summary judgment because that statement has no bearing on whether AP made fair use of the photograph.

12. The only entities which received a digital copy of the End of Serenity (with no copyright notice) were those entities which paid for and/or had <u>written</u> permission for a limited use. (Hall Decl., Exh. 2, McClatchey Dep., p. 20, ll. 21-25; p. 21, ll. 1-7; p. 109, ll. 6-12).

**Response:** AP denies that Ms. McClatchey provided digital copies only to entities who had written permission for limited use. The record reflects many instances in which Ms. McClatchey transmitted digital copies of her photos without a copyright notice and without any accompanying limitations on its use. For example, the record reflects Ms. McClatchey emailing the photo accompanied by the statement "I hope that it can be used in any way possible." (Penchina Supp. Decl. Ex. B). In another instance, Ms. McClatchey emailed the photograph to a television station, and the only written statement in connection with that transaction is: "Here is End of Serenity." (Penchina Supp. Decl. Ex. D). While AP disagrees with Plaintiff's statement of fact, AP notes that whether Ms. McClatchey only provided digital copies pursuant to limited written permission is not material to any issue raised by AP's pending motion for summary judgment because that statement has no bearing on whether AP made fair use of the photograph.

13.    Ms. McClatchey retains one framed copy of the End of Serenity in her home office. (Hall Decl., Exh. 2, McClatchey Dep., p. 21, ll. 20-25; p. 22, ll. 1-9).

**Response:** Admitted.

14.    All hard copies of the End of Serenity bear her copyright information. (Hall Decl., Exh. 2, McClatchey Dep., p. 20, ll. 15-20).

**Response:** AP denies that all hard copies of the End of Serenity bear her copyright information. Among other things, Ms. McClatchey testified during her deposition that "her personal copy does not have any copyright notice or title." (McClatchey Dep. 21; *accord id.* at 20-22). While AP disagrees with Plaintiff's statement of fact, AP notes that Plaintiff's statement does not create a genuine issue of fact in connection with AP's pending motion for summary judgment because that statement does not and cannot call into question Plaintiff's sworn

6

deposition testimony that AP's photographer copied Ms. McClatchey's personal copy of the photograph, which does not contain a copyright notice.

15.    Mr. Sheehan interviewed Ms. McClatchey on 09-11-02 and wrote a story about her for the AP, which was "a feature story about this lady who took this picture a year before." (Hall Decl., Exh. 2, McClatchey Dep., pp. 26-28; Hall Decl., Exh. 4, Puskar Dep., p. 60, ll. 20-22; Hall Decl., Exh. 14).

**Response:**  AP admits that Sheehan interviewed McClatchey on September 11, 2002 and wrote a story following the interview, which story carried the headline "Woman who captured searing Flight 93 image struggles a year later." AP objects to Plaintiff's characterization of the story, and notes that the story is part of the record and speaks for itself. AP further notes that, while objecting to the characterization described above, that characterization is not material to any issue raised by its pending motion for summary judgment.

16.    Gene Puskar, an employee and photographer for the Associated Press, went to Ms. McClatchey's home and informed her that he was there "to photograph her for the Charles Sheehan story." (Hall Decl., Exh. 4, Puskar Dep., p. 11, ll. 8-14; p. 14, ll. 6-12; p. 35, ll. 11-19).

**Response:**  AP admits that Puskar told McClatchey that he was there "to photograph her for the Charles Sheehan story," and notes that he also told her he was "going to photograph her photograph and use it in the story." (Puskar Dep. 14).

17.    His assignment was to "take pictures of a woman with a picture." (Hall Decl., Exh. 4, Puskar Dep., p. 29, ll. 22-25; p. 30, l. 31).

**Response:**  AP admits that the assignment might have included, but did not consist entirely of, taking "pictures of a woman with a picture." AP objects to Plaintiff's

7

characterization of the assignment to the extent the characterization seeks to preclude or deny

that, as part of the assignment, AP's photographer "went to her [Ms. McClatchey's] house to get

the picture [of her photo] for the AP," that the assignment was "to get pictures to go with

Charles' [Sheehan's] story," and the photographer was sent "to cover all the bases that needed to

be covered photographically for Charles' story [with] the specifics of what [the photographer]

shoots . . . left up to [the photographer]." (Puskar Dep. 32, 33, 39). AP notes that, while

objecting to the characterization described above, that characterization is not material to any

issue raised by its pending motion for summary judgment.

18.   Ms. McClatchey stood on the side of her home, holding a hard copy of the End of

Serenity photograph which bore her copyright information, and instead of taking a picture of Ms.

McClatchey with her photograph, Mr. Puskar took a picture of the End of Serenity photograph.

(Hall Decl., Exh. 4, Puskar Dep., p. 12, ll. 18-25; p. 27, ll. 2-4; p. 30, ll. 2-4; Hall Decl., Exh. 5,

McClatchey Decl. ¶¶ 1, 2).

**Response:**  AP admits that Ms. McClatchey stood on the side of her home, holding a

copy of the End of Serenity photograph and that Mr. Puskar took a picture of the photograph.

AP objects to Plaintiff's characterization that the photograph taken by Mr. Puskar was "instead

of" anything.  Mr. Puskar testified that he told Ms. McClatchey that he was "going to photograph

her photograph and use it in the story." (Puskar Dep. 14).  In addition, other than Plaintiff's

conclusory assertion, there is no evidence in the record that the hard copy photographed by Mr.

Puskar "bore her copyright information."  Ms. McClatchey's deposition testimony conclusively

establishes that the photograph with a copyright notice in Exhibit 7 to the Hall Declaration,

which Plaintiff argues (but does not adduce evidence to show) is the document AP

photographed, could *not* be a copy of the document photographed by AP in September 2002.

Ms. McClatchey testified that prior to 2004 or 2005, "*all of the printouts*" of Ms. McClatchey's photograph contained a "notation that says 'sept 11, 1600x1200[24b jpeg]'" "along the portion of the border that appears directly above the smoke." (McClatchey Dep. 89-90, Ex. 22 (emphasis added); Penchina Supp. Decl. Ex. P). This notation was automatically "printed from my [Ms. McClatchey's] computer." (McClatchey Dep. 89; *see* Penchina Supp. Decl. Ex. I (other examples of computer notation)). After Ms. McClatchey's computer crashed and she installed a "new program" in 2004 or 2005, that notation no longer showed up on newly printed copies. (McClatchey Dep. 89-90). Because Hall Exhibit 7 does not contain this notation, it was created no earlier than 2004 or 2005, years after AP photographed Ms. McClatchey's copy. Moreover, while Hall Ex. 7 contains a copyright date of "2002," Ms. McClatchey testified that (1) the copies of the photo she made contained a copyright notice date for the year in which it was printed, (2) she did not keep a large inventory of photos, and (3) she "would not have had any 2004s left in 2005," let alone any with earlier dates such as 2002. (*Id.* at 64). The copy of the photo in the record was produced in January 2006, well after Ms. McClatchey no longer possessed copies printed in 2002 with the 2002-dated notice. (*Id.*). In addition, the "binder" referred to in Ms. McClatchey's Declaration had "fallen apart" by "2003 or so" (*id.* at 23), and Ms. McClatchey's Declaration does not attest that the copy of the photo submitted to this Court is a copy of whatever document may have been in her binder. Despite repeated requests, Plaintiff failed to produce any other copies of the photo—specifically omitting to produce her personal copy or copies of the electronic version she emailed to publishers, none of which contained copyright notices. There simply is no concrete evidence that the picture photographed by AP bore Ms. McClatchey's copyright information. AP notes that, while objecting to the characterization and factual assertion described above, that characterization and assertion are not

material to any issue raised by its pending motion for summary judgment because that statement does not and cannot call into question Plaintiff's sworn deposition testimony that AP's photographer copied Ms. McClatchey's personal copy of the photograph that did not contain a copyright notice.

19.    Ms. McClatchey never gave Mr. Puskar or the AP consent to take a photograph of her photograph. Ms. McClatchey never gave Mr. Puskar or the AP consent to use her photograph in any manner. (Hall Decl., Exh. 2, McClatchey Dep., p. 41, ll. 9-17; p. 110, ll. 12-20; Hall Decl., Exh. 5, McClatchey Decl. ¶¶ 1, 2, 3, 5 and 6).

**Response:** Denied. Ms. McClatchey consented to Mr. Puskar taking a picture of the End of Serenity photograph and to AP using that picture. (Compl. ¶ 14; Puskar Dep. 12-14, 36-37). While AP disagrees with Plaintiff's statement of fact, AP notes that whether Ms. McClatchey gave either consent referred to above is not material to any issue raised by AP's pending motion for summary judgment because "[i]f the use is otherwise fair, then no permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994).

20.    Neither Mr. Puskar nor anyone from the AP asked Ms. McClatchey's permission to use her photograph to accompany the Sheehan article, nor did Mr. Puskar or the AP tell her the AP was also going to transmit her photograph to all its members and subscribers. (Hall Decl., Exh. 4, Puskar Dep., p. 32, ll. 20-25; p. 33, ll. 1-3; Hall Decl., Exh. 5, McClatchey Dec. ¶¶ 5, 6).

**Response:** Denied. Mr. Puskar testified that he told Ms. McClatchey that he was "going to photograph her photograph and use it in the story." (Puskar Dep. 14). Moreover, Ms. McClatchey consented to Mr. Puskar taking a picture of the End of Serenity photograph and to AP using that picture – indeed, Ms. McClatchey's complaint explicitly states that she "provided" AP with the photograph "to use in connection with the proposed article." (Compl. ¶ 14; Puskar

10

Dep. 12-14, 36-37). While AP disagrees with Plaintiff's statement of fact, AP notes that whether

Ms. McClatchey gave permission or was informed of the intended use is not material to any

issue raised by AP's pending motion for summary judgment because "[i]f the use is otherwise

fair, then no permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510

U.S. 569, 585 n.18 (1994).

21.    Mr. Puskar and Mr. Sheehan were the only persons from the AP to speak with Ms.

McClatchey. Mr. Sheehan did not seek permission to use her photograph. Likewise, "[T]here

[was] no rights talk at all" between Mr. Puskar and Ms. McClatchey. (Hall Decl., Exh. 4, Puskar

Dep., p. 37, ll. 18-23; Hall Decl., Exh. 5, McClatchey Dec. ¶¶ 5,6).

**Response:** AP admits that Mr. Puskar and Mr. Sheehan were the only persons from AP

to speak with Ms. McClatchey and that Mr. Sheehan did not seek permission to use her

photograph. The remaining statements are denied because Ms. McClatchey consented to Mr.

Puskar taking a picture of the End of Serenity photograph and to AP using that picture. (Compl.

¶ 14; Puskar Dep. 12-14, 36-37). While AP disagrees in part with Plaintiff's statement of fact,

AP notes that whether AP sought or received permission is not material to any issue raised by

AP's pending motion for summary judgment because "[i]f the use is otherwise fair, then no

permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585

n.18 (1994).

22.    Instead of asking Ms. McClatchey for a digital copy of the photograph, Mr. Puskar

elected to take a photograph of her End of Serenity photograph. (Hall Decl., Exh. 4, Puskar

Dep., p. 28, ll. 15-20; p. 29, ll. 7-10).

**Response:** Admitted.

11

23.    Ms. McClatchey did not realize what Mr. Puskar was doing – she thought he was taking pictures of her for the article, and not just focusing on the End of Serenity photograph. (Hall Decl., Exh. 5, McClatchey Decl. ¶ 1).

**Response:**  Denied. Ms. McClatchey consented to Mr. Puskar taking a picture of the End of Serenity photograph and to AP using that picture.  (Compl. ¶ 14; Puskar Dep. 12-14, 36-37). While AP disagrees with Plaintiff's statement of fact, AP notes that whether Ms. McClatchey thought that Mr. Puskar was focusing on the End of Serenity photograph is not material to any issue raised by AP's pending motion for summary judgment because "[i]f the use is otherwise fair, then no permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994).

24.    Mr. Puskar then cropped the edges off the End of Serenity photograph, which included the title and copyright information, and submitted it to the AP.  (Def's SMF ¶¶ 55, 57; Hall Decl., Exh. 3, ¶¶ 19-22; Hall Decl., Exh. 6).

**Response:**  AP admits that Mr. Puskar cropped the edges off of his picture of the End of Serenity photograph and submitted it to AP.  AP denies that the copy of the End of Serenity photograph photographed by Mr. Puskar included the title and copyright information.  Ms. McClatchey testified that the copy photographed by Mr. Puskar was her personal copy of the photograph (McClatchey Dep. 28-32), and that her personal copy of the photograph does *not* bear either a copyright notice or title (*id.* at 20-22). Ms. McClatchey testified that she was "certain" about that testimony, and that she did not confuse Mr. Puskar with other photographers who may have come to her home to photograph her.  (*Id.* at 32).  AP notes that, to the extent Ms. McClatchey's declaration cited above, submitted in opposition to AP's motion for summary judgment, contradicts her prior sworn testimony that Mr. Puskar photographed her personal copy

12

of the End of Serenity, that declaration may not be utilized to create a genuine issue of material

fact, and the Court should disregard it. *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.

1991); *Clark v. Hess Trucking Co.*, 879 F. Supp. 524, 532 (W.D. Pa. 1995).

25.    The AP's procedures were that the editor who received the photograph cleared all

copyright issues. (Hall Decl., Exh. 8, Ake Dep., p. 46, ll. 15-24; p. 47, ll. 1-13).

**Response:**  Admitted.

26.    As the editor, it was Mr. Puskar's responsibility to clear the copyright issues, but he

failed to do so, and no one double checked him. (Hall Decl., Exh. 9, Gerberich Dep., p. 47; ll.

11-18; Hall Decl., Exh. 8, Ake Dep., p. 46, ll. 15-24; p. 47, ll. 1-13; Hall Decl., Exh. 4, Puskar

Dep. p. 57, ll. 13-19).

**Response:**  AP admits that it was Mr. Puskar's responsibility to clear the copyright issues

to the extent there were any, and no one double checked him. The remaining statement in

Paragraph 26 is denied. Mr. Puskar told Ms. McClatchey that he was "going to photograph her

photograph and use it in the story," (Puskar Dep. 14), and Ms. McClatchey consented to Mr.

Puskar taking a picture of the End of Serenity photograph and to AP using that picture (Compl. ¶

14; Puskar Dep. 12-14, 36-37). While AP disagrees with Plaintiff's statement of fact, AP notes

that whether Mr. Puskar cleared copyright issues with Ms. McClatchey is not material to any

issue raised by AP's pending motion for summary judgment because "[i]f the use is otherwise

fair, then no permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510

U.S. 569, 585 n.18 (1994).

27.    In fact, Mr. Puskar "[didn't] know" what rights the AP had in her End of Serenity

photograph. (Hall Decl., Exh. 4, Puskar Dep., p. 57, ll. 13-19).

**Response:** AP admits that Mr. Puskar testified that he did not know what legal rights AP had in the End of Serenity photograph, but notes that he also testified that Ms. McClatchey consented to his taking a picture of the photograph and AP using it in connection with the story. Specifically, Mr. Puskar testified that he told Ms. McClatchey that he was "going to photograph her photograph and use it in the story," that she "knew I was taking a picture of her picture," "that by standing there holding [the photograph], knowing I was an AP photographer, it's implied to me that she is agreeing to what I am doing," and that she "willingly participat[ed] in what I was doing." (Puskar Dep. 14, 33, 37). AP further notes that what Mr. Puskar "kn[e]w" about AP's legal rights is not material to any issue raised by AP's pending motion for summary judgment because one need not possess any rights in a work in order to make a fair use of that work, and Mr. Puskar's knowledge of AP's legal rights cannot alter whether AP's use of the photograph was a fair use or that AP believed its use was in fact fair.

28.    Mr. Sheehan's article, and Mr. Puskar's copy of the End of Serenity photograph were then distributed as separate items, at different times, to the AP's 1,147 US and 800 foreign PhotoStream members and subscribers, which included AOL, the Chicago Tribune, and the Washington Post. (Hall Decl., Exh. 8, Ake Dep., p. 36, ll. 9-13; p. 40, ll. 21-24; p. 41, ll. 1-10; Ake Decl. ¶ 4; Hall Decl., Exh. 10).

**Response:** AP admits that the textual report and photograph, being in different formats, each were transmitted via the means applicable to their respective formats (the photograph was transmitted via PhotoStream, the text via AP's Basic service), but denies that they were transmitted as separate items. As is explained in the Ake Declaration:

> [N]ews reports distributed by AP are comprised of both textual and photographic components. However, because AP utilizes different delivery mechanisms for textual and photographic content, the components are not delivered as a single unit. Rather, the text is included as part of the Basic

service, and the photograph is included as part of the PhotoStream service. When photographs transmitted by AP are intended to be part of a particular report and/or accompany particular text, AP's practice is to identify the photograph by its identification member in the "slug" of the text. The "slug" is a data field that is part of the text report. AP members and subscribers understand that when a photograph is identified in the slug of a text report, that photograph is part of or intended to accompany that report.

On September 12, 2002, AP distributed a news report about plaintiff Val McClatchey, the photograph she had taken from her front porch of the aftermath of the crash of Flight 93, and how her life had changed after she had taken that photograph. AP's news report was comprised of text written by AP reporter Charles Sheehan, and a copy of Ms. McClatchey's photograph that AP photographer Gene Puskar had made by taking a photograph of Ms. McClatchey's photograph. The text portion of the report was transmitted to AP members and subscribers via AP's Basic service. The photographic portion of the report was distributed by AP via PhotoStream to subscribers to the PhotoStream service. . . .

[T]he text report about Ms. McClatchey and her photograph included a "slug" identifying a photograph designated as "AP Photo GJP101" for use with the report. . . . AP's copy of Ms. McClatchey's photograph was identified by the designation "GJP101."

(Ake Decl. ¶¶ 12, 13, 14.) While AP disagrees with Plaintiff's characterization of the facts, AP

notes that Plaintiff's mischaracterization of AP's report and photograph as separate items is not

material to any issue raised by AP's pending motion for summary judgment because the record

does not evidence any instance in which a subscriber receiving the photograph via PhotoStream

used the photograph apart from the text.

29.    Although the Sheehan article references the End of Serenity photograph, there is no

requirement that the photograph be used solely with the article. (Exhibit of the screen shot.)

(Hall Decl., Exh. 8, Ake Dep., p. 39, ll. 18-23; p. 42, ll. 17-22; p. 45, ll. 5-7; Hall Decl., Exh. 6).

**Response:**  Admitted.  While AP admits this statement, it notes that the statement is not

material to any issue raised by AP's pending motion for summary judgment because whether or

not AP had a written requirement that the photograph be used solely with the article, there is no

evidence in the record that anyone who received the photo from AP used the photograph apart from a fair use.

30.    The "meta data" on the End of Serenity indicated that Ms. McClatchey was a "stringer," which is another word for a freelancer. (Hall Decl., Exh. 8, Ake Dep. p. 32, ll. 8-12; p. 33, ll. 9-14; Hall Decl., Exh. 6).

**Response:**  Admitted.

31.    Freelance photographers for the AP have contracts with the AP which provides that the AP owns the copyright for any photographs taken for the AP. (Hall Decl., Exh. 8, Ake Dep. p. 23, ll. 6-13).

**Response:**  AP admits that the statement currently is correct, but notes that there is no evidence in the record with respect to whether that statement would have been correct in 2002 at the time the term "stringer" was included in the metadata associated with Ms. McClatchey's photograph.

32.    Therefore, the AP's members and subscribers received the photograph thinking the AP owned the copyright. The AP admits that this was "incorrect." (Hall Decl., Exh. 8, Ake Dep., p. 32, ll. 20-24).

**Response:**  AP admits that the "meta data" referring to Ms. McClatchey as a "stringer" is incorrect, which is what Mr. Ake actually testified in the cited lines of his deposition. AP notes that there is no evidence in the record indicating that members and subscribers believed that AP owned the copyright. In fact, members and subscribers sought and obtained rights in the photograph from Ms. McClatchey after AP had distributed it, indicating that the members and subscribers did not believe AP owned the copyright. (McClatchey Dep. Ex. 12; Penchina Decl.

16

Ex. C, D; Ake Decl. ¶ 21). Moreover, it is uncontested that (1) the "meta data" reflects that the photograph was a "handout," signifying that the photograph was *not* created by AP, (Ake Decl. ¶ 7, Ex. B); (2) "looking at this [the 'handout' reference in the 'meta data'], a member or subscriber would know that it's not AP's picture," (Gerberich Dep. 54); and (3) the "NO SALES," "WIDE WORLD PHOTOS OUT," and "handout" references in the "meta data" accompanying the End of Serenity photograph "are all flags that create, or in this particular instance, the most severe restrictions we can put on an image and its capability for access in viewing it," (*id.*). While AP disagrees with Plaintiff's characterization of the facts, AP notes that what AP's members and subscribers believed is not material to any issue raised by AP's pending motion for summary judgment because the record does not evidence any instance in which a subscriber receiving the photograph via PhotoStream used the photograph apart from the text or declined to purchase rights from Ms. McClatchey.

33.    All of the AP's 1,147 US and 800 foreign PhotoStream members and subscribers received a digital copy of Ms. McClatchey's End of Serenity photograph via the AP's distribution on approximately September 11, 2002. (Hall Decl., Exh. 8, Ake Dep., p. 36, ll. 9-13; p. 40, ll. 21-24; p. 41, ll. 1-10; Hall Decl., Exh. 9, Gerberich Dep., p. 77, ll. 10-21; Hall Decl., Exh. 10).

   **Response:**  Admitted.

34.    After the initial distribution, and once the photograph was made available to all members and subscribers with access to the PhotoArchive, at least three entities downloaded the photograph again. (Hall Decl., Exh. 11; Hall Decl., Exh. 9, Gerberich Dep., p. 133, ll. 11-18).

   **Response:**  AP admits that three, and only three, entities downloaded the photograph from AP's PhotoArchive.  (Gerberich Decl. ¶ 5, Ex. A; Hall Decl. Ex. 11).

35.   In approximately August 2003, Ms. McClatchey was informed that her photograph

being used on AOL's home page, in connection with a conspiracy story on Flight 93.  (Hall

Decl., Exh. 2, McClatchey Dep., p. 35, ll. 6-20; p. 36, ll. 14-25; p. 37, ll. 1-5; Hall Decl., Exh. 1,

Exhibit D; Hall Decl., Exh. 12).

**Response:**  Admitted.

36.   Ms. McClatchey had never given AOL permission to use the photograph.  (Hall

Decl., Exh. 2, McClatchey Dep., p. 36, ll. 14-25).

**Response:**  The statement of fact in Paragraph 36 is admitted, although AP notes that

whether Ms. McClatchey gave AOL permission is not material to any issue raised by AP's

pending motion for summary judgment because "[i]f the use is otherwise fair, then no permission

need be sought or granted."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994)..

37.   Ms. McClatchey contacted AOL, found out they had gotten the image through the

AP, and requested that the AP remove her photograph from their database.  (Hall Decl., Exh. 2,

McClatchey Dep., p. 37, ll. 1-5; p. 42, ll. 11-19; Hall Decl., Exh. 12).

**Response:**  Admitted.

38.   Ms. McClatchey later found additional unauthorized uses in newspapers, such as

the Washington Post and Philadelphia Daily News, magazines, and in connection with various

Flight 93 conspiracy web sites.  (Hall Decl., Exh. 2, McClatchey Dep., p. 35, ll. 6-20; p. 36, ll.

14-25; p. 37, ll. 1-5; p. 42, ll. 3-7; p. 69, ll. 2-10; p. 71, ll. 24-25; 79, ll. 18-25; p.

80, ll. 1-9; Hall Decl., Exh. 20, Sheehan Dep., p. 35, ll. 21-24; 36, ll. 1-18).

**Response:**  AP admits that Ms. McClatchey found an unauthorized use by a single Flight

93 conspiracy website, and notes that this fact is not material to any issue raised by AP's pending

motion for summary judgment because the record demonstrates without contradiction that the conspiracy website did *not* obtain the photograph from AP. (Penchina Supp. Decl. Ex. F. *Compare id.* Ex. E (photograph posted on conspiracy website that includes all of the image captured in McClatchey's End of Serenity photograph), *with* Ake Decl. Ex. B (AP copy of photograph, which is cropped)). In fact, Ms. McClatchey has admitted that the conspiracy website downloaded the photograph from the Federal Emergency Management Agency's website, where it was posted without copyright information embedded on the image. (Penchina Supp. Decl. Ex. F). The statement in Paragraph 38 concerning "web sites" and the citations to Ms. McClatchey's deposition testimony concerning use by websites refers to only one other website, an educational site that provided a timeline of the events on September 11, 2001. (McClatchey Dep. 68-71; Penchina Supp. Decl. Ex. G). Ms. McClatchey expressly granted permission to that website to publish her photograph. (McClatchey Dep. 70; Penchina Supp. Decl. Ex. C).

The record also indisputably establishes that Ms. McClatchey expressly authorized the uses in the Philadelphia Daily News and Washington Post. Ms. McClatchey agreed to allow the Philadelphia Daily News to publish her photograph *before* AP published her photograph, (Penchina Decl. Ex. C.); the only time the Philadelphia Daily News published the photograph it credited "VAL MCCLATCHEY/For the Daily News," (Penchina Supp. Decl., Ex. H); the image that the Philadelphia Daily News published could not have come from AP because it includes portions of the photograph that were cropped out by AP (*compare id.* (image published by Philadelphia Daily News), *with* Ake Decl. Ex. Ex. B (AP copy of photograph)); and the Philadelphia Daily News paid McClatchey *after* AP distributed the photograph, (Penchina Decl. Ex. D). With respect to the Washington Post, Ms. McClatchey signed a contract granting it

unlimited use of the photograph. (Penchina Supp. Decl. Ex. O (contract agreeing to give the

Washington Post "the subsequent non-exclusive right to reproduce, distribute, adapt or display

the Work for any purpose and in any manner or medium worldwide during the copyright term of

the Work, without additional compensation"). Not only does the record contain no evidence that

the Washington Post republished the photograph, but during this litigation, the Washington Post

made it clear that Ms. McClatchey agreed to its unlimited use of the photograph but that it had

never republished the photograph after the initial use. As the newspaper explained in a letter to

Plaintiff's lawyer:

> We have not discovered any other publication of the photograph in The
> Washington Post. The photograph in question was downloaded from the AP
> wire into our internal photo archive on September 13, 2002. While we have
> no evidence that the photo was subsequently published in the newspaper, we
> purchased the right to do so in accordance with the March 11, 2002 freelance
> agreement.

(Penchina Supp. Decl. Ex. A).

There is no evidence in the record of any alleged "unauthorized uses" by "magazines" as

stated in Paragraph 38. Indeed, Ms. McClatchey's testimony does not support this statement at

all.

Finally, the pages of the Mr. Sheehan deposition transcript cited in Paragraph 38 do not

support any of the facts alleged in that paragraph. Mr. Sheehan merely testified that after he

interviewed Ms. McClatchey and returned to his office in Pittsburgh, he searched for and found

the End of Serenity photograph online. (Sheehan Dep. 35-38). He testified the images were

"freestanding" and "unassociated" with any website. (*Id.* at 36-37). Mr. Sheehan did not testify

the uses he saw were unauthorized and never suggested they had any connection to AP. (*Id.* at

35-38.)

39.    Ms. McClatchey initially licensed the Washington Post for a limited use of her photograph. (Hall Decl., Exh. 2, McClatchey Dep., p. 26, ll. 7-13). After receiving a copy from the AP, the Washington Post again used her photograph, but failed to pay a license fee. (Hall Decl., Exh. 2, McClatchey Dep., p. 35, ll. 9-25; p. 71, ll. 16-25; p. 72, ll. 1-4).

**Response:**    Denied. Not only is there no evidence in the record of any use made of Ms. McClatchey's photograph by the Washington Post other than the single use for which she admits she granted permission, the record reflects that the Washington Post advised Ms. McClatchey's attorneys that it was unable to find any evidence in its own records of the second publication she alleges here. (Penchina Supp. Decl. Ex. A). Moreover, Ms. McClatchey signed a "Freelance Contributors" agreement with the Washington Post expressly granting the Washington Post *unlimited* use of the photograph. (Penchina Supp. Decl. Ex. O (contract agreeing to give the Washington Post "the subsequent non-exclusive right to reproduce, distribute, adapt or display the Work for any purpose and in any manner or medium worldwide during the copyright term of the Work, without additional compensation"); *see also* Penchina Supp. Decl. Ex. A (letter from Washington Post stating that in its contract with McClatchey it had "purchased the right" to publish the photograph again)).

40.    After Ms. McClatchey notified the AP of its unauthorized use, the AP did not inform its members and subscribers that it had no rights to the End of Serenity photograph and that they should destroy any copies of it. (Hall Decl., Exh. 9, Gerberich Dep., p. 24; ll. 16-23).

**Response:**    AP admits that it did not inform its members and subscribers that it had no rights to the End of Serenity photograph or that they should destroy any copies of it after Ms. McClatchey's attorneys contacted AP. AP takes issue with Plaintiff's characterization to the extent that Plaintiff seeks to imply that Ms. McClatchey notified AP that its use of the

photograph in connection with its report about Ms. McClatchey and her photo was unauthorized

(in contrast to contacting AP about AP having made the photo available for the fair use made by

AOL). There is no evidence in the record that, prior to discovery in this case, Ms. McClatchey

notified AP that she objected to its use of the photograph as part of its news report. To the

contrary, Ms. McClatchey gave the following testimony: "Q. Is your problem with the

Associated Press that they use[d] the photo with that story? A. No. My problem is, as I had

found out, that it had been distributed to other entities that I had no control over where it went."

(McClatchey Dep. 40-41). Even in her complaint in this action, Ms. McClatchey acknowledged

that she "provided" AP with the photograph "to use in connection with the proposed article."

(Compl. ¶ 14). Moreover, AP informed its members and subscribers that the photograph was

"not AP's picture" by marking it as a "handout" in the "meta data" included in AP's transmission

of the image to them. (Gerberich Dep. 54; Ake Decl. Ex. B). While AP disagrees with

Plaintiff's characterization of the facts, AP notes that whether AP informed its members and

subscribers to destroy any copies of Ms. McClatchey's photo is not material to any issue raised

by AP's pending motion for summary judgment because the record contains no evidence of any

improper use of the photo by those members and subscribers and because courts cannot find

secondary copyright liability "merely based on a failure to take affirmative steps to prevent

infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2781 n.12

(2005).

    41.    To this day the AP has not informed its members and subscribers that they should

destroy any copies of the End of Serenity photograph. (Hall Decl., Exh. 8, Ake Dep., p. 35, ll.

10-22).

**Response:** The statement of fact in Paragraph 41 is admitted. However, AP notes that whether AP informed its members and subscribers to destroy any copies of Ms. McClatchey's photo is not material to any issue raised by AP's pending motion for summary judgment because the record contains no evidence of any improper use of the photo by those members and subscribers and because courts cannot find secondary copyright liability "merely based on a failure to take affirmative steps to prevent infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2781 n.12 (2005).

42.    In fact, the AP did nothing but restrict access to the photograph in the PhotoArchive on approximately November 3, 2004. (Hall Decl., Exh. 9, Gerberich Dep., p. 22, l. 24; p. 23, ll. 1-8; p. 26, ll. 20-23, p. 123, ll. 11-19; Hall Decl., Exh. 13).

**Response:** Denied. In the cited pages from Gerberich's deposition transcript, Gerberich testified that AP "removed," "deleted," and "struck" the photograph from the PhotoArchive, not that AP "restrict[ed] access to the photograph in the PhotoArchive" as Paragraph 42 incorrectly states. (Gerberich Dep. 22; *see also* Gerberich Decl. ¶ 4 (stating that the photograph was "removed" on November 4, 2003)). While AP disagrees with Plaintiff's statement of fact, AP notes that whether AP removed the photograph from its archive or merely restricted access to the photograph is not material to any issue raised by AP's pending motion for summary judgment because the record contains no evidence of any improper use of the photo by those members and subscribers having access to AP's PhotoArchive.

43.    At his deposition, Mr. Puskar stated that he "did not recall" whether the picture he photographed had a copyright notice on it. (Hall Decl., Exh. 4, Puskar Dep., p. 18, ll. 9-25; p. 19, ll. 1-3; p. 37, ll. 10-13).

**Response:** AP admits that Mr. Puskar testified that he "did not recall" whether the picture he photographed had a copyright notice; however, at her deposition, Ms. McClatchey repeatedly admitted that Mr. Puskar photographed her personal copy of the picture, which does *not* contain a copyright notice. (McClatchey Dep. 20-22, 28-32). There is thus no dispute concerning whether Puskar photographed a copy of the picture containing a copyright notice. Moreover, Mr. Puskar's recollection is not material to any issue raised by AP's motion for summary judgment. Ms. McClatchey's admissions that the picture did not contain a copyright notice indisputably establishes that her claim for removing copyright management information must fail.

Dated:  June 29, 2006              Respectfully submitted,

                                   LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


                                   _____/s/ Robert Penchina_____

                                   Robert Penchina (*Pro Hac Vice*)
                                   230 Park Avenue, Suite 1160
                                   New York, NY 10169
                                   (212) 850-6100
                                   (212) 850-6299 (Fax)

                                   Gayle C. Sproul (I.D. No. 38833)
                                   Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
                                   2112 Walnut Street, Third Floor
                                   Philadelphia, Pennsylvania 19103
                                   (215) 988-9778
                                   (215) 988-9750 (Fax)

                                   *Attorneys for The Associated Press*

## CERTIFICATE OF SERVICE

I, Michael Berry, hereby certify that on this 29th day of June, 2006, I caused to be served

a true and correct copy of the foregoing Defendant's Response to Plaintiff's Statement of

Undisputed Material Facts and the Appendix thereto via the Court's ECF system, upon the

following counsel of record:

> Douglas M. Hall
> Kara L. Szpondowski
> Niro, Scavone, Haller & Niro
> 181 West Madison, Suite 4600
> Chicago, Illinois 60602-4515
>
> John E. Hall
> Eckert Seamans Cherin & Mellott, LLC
> USX Tower
> 600 Grant Street, 44th Floor
> Pittsburgh, Pennsylvania 15219

> _/s/ Michael Berry_
> Michael Berry