# Tab 2

# Deposition of James R. Gerberich

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Civil Action  No. 05-145J


------------------------------------------ x

VALENCIA M. McCLATCHEY,

                              Plaintiff,

     vs.

THE ASSOCIATED PRESS,

                              Defendant.

------------------------------------------ x



           DEPOSITION OF: JAMES R. GERBERICH

             January 19, 2006, 9:10 a.m.

1    Q.    You think that's plausible?

2    A.    I do think that's plausible.

3    Q.    You think it's plausible for a woman

4  who is financially strapped, had a history of

5  selling the image to news outlets, has been donating

6  money to the foundation for the children affected by

7  the terrorist attacks, to give the right, to give to

8  all of The Associated Press news outlet members and

9  subscribers unrestricted use to use the photograph

10  for no compensation?

11                    MR. PENCHINA:    Objection.    Asked

12            and answered.

13                    MR. HALL:    That's fine.    First

14            I've asked.

15    A.    I believe it's very plausible that that

16  may have taken place.    From reading the article from

17  the beginning to the end, yes, I think so.

18    Q.    Do you think it's plausible that Ms.

19  McClatchey would sell or license her photograph to

20  news outlets for a fee prior to The Associated Press

21  showing up and subsequent to The Associated Press

22  leaving, but in the one instance with The Associated

23  Press not charge a fee for the distribution of her

24  photograph to the majority of the news outlets in

# Tab 3

# Deposition of Gene J. Puskar

1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA
2

VALENCIA M. McCLATCHEY,          )
3                                )
                Plaintiff,       )
4                                )
                vs.              )
5                                )
THE ASSOCIATED PRESS,            )       Civil Action
6                                )       No. 05-145J
                Defendant.       )
7

8

9

10

11                      - - - -

12          DEPOSITION OF:  GENE J. PUSKAR

13                      - - - -

14

                DATE:    March 15, 2006
15                       Wednesday, 9:30

16

                LOCATION:    Eckert Seamans Cherin &
17                           Mellott
                           44th Floor - US Steel Tower
18                         Pittsburgh, PA 15219

19              TAKEN BY:    Plaintiff

20

                REPORTED BY:    Keith G. Shreckengast, RPR
21                              Notary Public
                              AKF Reference No. KS93223
22

23

24                                    CERTIFIED TRANSCRIPT

25

1      going to Ms. McClatchey's house?

2  A.   No, I discussed where she lived and why I was

3      going there, which is not what his -- I have

4      not seen his article to this day.

5  Q.   But if you're discussing why you were going

6      there, what was that discussion?

7  A.   Woman shot a picture in her backyard of Flight

8      93 crashing.

9  Q.   That was the extent of it?

10  A.   Yes.

11  Q.   And so you went to her house to get the

12      picture; is that correct?

13  A.   Yes.

14  Q.   And you went to the house to get the picture

15      for the AP; is that correct?

16  A.   That's correct.

17  Q.   Did you offer Ms. McClatchey any money for the

18      picture?

19  A.   No.

20  Q.   Did you tell Ms. McClatchey that you would

21      transmit the picture to the AP and then in turn

22      transmit it to all the members and subscribers

23      of the AP?

24  A.   I did not tell her that.

25  Q.   Did you ask Ms. McClatchey whether or not she

```
 1           time did you tell Ms. McClatchey the extent to
 2           which the Associated Press would use her
 3           photograph?
 4    A.     I can't recall.
 5                         - - - -
 6           (There was a brief pause in the proceedings.)
 7                         - - - -
 8    BY MR. HALL:
 9    Q.     Where did you stay when you were covering the
10           one year anniversary?
11    A.     The Holiday Inn at the Somerset exit, in
12           Somerset.
13    Q.     At what point in time did you determine that it
14           would -- your best course of action was to take
15           a photograph of her photograph?
16    A.     Probably made that decision after discussing
17           with her -- well, not discussing with her.  On
18           the spot.
19    Q.     So you were sent there to photograph her?
20    A.     I was sent there -- I was sent there to
21           cover -- to cover all the bases that needed to
22           be covered photographically for Charles' story.
23           And the specifics of what I shoot are left up
24           to me.  Whatever I discern from talking to
25           Charles, from the little I knew about the
```

# Tab 4

# Deposition of Charles Sheehan

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


VALENCIA M. McCLATCHEY,            )
                                   )
                  Plaintiff,       )
                                   )    CIVIL ACTION
          -vs-                     )    No. 05-145J
                                   )
THE ASSOCIATED PRESS,              )
                                   )
                  Defendant.       )


DEPOSITION OF CHARLES SHEEHAN

MARCH 9, 2006 -  2:00 P.M.



        The deposition of CHARLES SHEEHAN, taken
pursuant to the Rules of Civil Procedure for the
United States District Courts pertaining to the
taking of depositions, taken before Jerry
Satterlee, a Certified Shorthand Reporter duly

qualified in the State of Illinois, at 181 West

Madison Street, Suite 4500, Chicago, Illinios.

1          Q.    You mentioned two articles that you

2     wrote for the AP in '99 and 2000.  Was that -- or

3     that you were compensated for outside of a salary.

4     Correct?

5          A.    Yeah.  I think it was 2000.  Around

6     that time.

7          Q.    Do you remember what the amount of

8     compensation was?

9          A.    No.

10         Q.    Can you give me an approximation?

11         A.    Several hundred dollars.

12         Q.    Do you recall specifically who Ms.

13    McClatchey told you she sold the "End of Serenity"

14    photograph to?

15         A.    No.  Other than what she had told me

16    and I included in the article.

17         Q.    I believe you mentioned you hadn't

18    seen the photograph before you met her, is that

19    correct?

20         A.    Correct.

21         Q.    Did you see it anywhere after you met

22    her?

23         A.    I did search for the image after I

24    had returned from Shanksville to the Pittsburgh

1  bureau.

2      Q.    Where did you search for the image at?

3      A.    Online in the internet.

4      Q.    Did you find it anywhere?

5      A.    I did.

6      Q.    Do you remember where it was at?

7      A.    I don't remember the site.

8      Q.    Do you remember what type of web site

9  it was?

10     A.    No.  If I remember correctly, I

11 searched for articles about the crash that day

12 and then searched images.

13     Q.    Was the photograph associated with an

14 article?

15     A.    No.

16     Q.    And you don't remember what type of

17 web site it was on?

18     A.    No.

19     Q.    Was it a news web site?

20     MR. BERRY:   Objection.

21 BY THE WITNESS:

22     A.    I searched for several keywords on

23 the Shanksville Flight 93 and then searched the

24 images tab, and the images that appeared were

1    unassociated with any news web site.  They were

2    just freestanding images.

3    BY MS. SZPONDOWSKI:

4        Q.    Do you remember what search engine you

5    used?

6        A.    I don't.

7        Q.    Do you remember if it was Google or

8    Yahoo?

9        A.    I don't remember.

10       Q.    Which search engine did you normally

11   use?

12       A.    I use -- This year, this past year, I

13   have used Google.

14       Q.    What did you use before Google?

15   Generally?

16       A.    Alta --

17       Q.    Alta Vista?

18       A.    Alta Vista.  Netscape.  A number of

19   different search engines.

20       Q.    Was McClatchey one of your keywords?

21       A.    No.

22       Q.    Why did you search for the photograph

23   on the internet after you met her?

24       A.    Curiosity.

1    Q.    What were you looking for?

2    A.    The image itself.

3    Q.    Any reason why?

4    A.    Curiosity.

5    Q.    What do you mean by curiosity?

6    A.    I hadn't seen -- I had seen one image

7    of the incident and looked at it a couple days

8    later to see if I remembered correctly.

9    Q.    But she did show you the photograph

10   when you met her, correct?

11   A.    Yes.

12   Q.    The notes that you took in your

13   notebook, do you recall if you used pen or pencil?

14   A.    I used a pen.

15   Q.    How many years have you been writing

16   articles for newspapers and news organizations?

17   A.    Fifteen years.

18   Q.    And in those fifteen years, how often

19   has a notebook with your notes in it been

20   destroyed?

21   A.    Three times that I can remember.

22         Four times.

23   Q.    Let's talk about those four times.

24   Can you describe for me how they were destroyed,

# Tab 5

# Deposition of Valencia M. McClatchey

1

1       IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA

2

3   VALENCIA M. McCLATCHEY,          )
                                     )
            Plaintiff,               )
                                     )
4                                    )
            vs.                      )
                                     )
5                                    )
    THE ASSOCIATED PRESS,            )       Civil Action
                                     )       No. 05-145J
6                                    )
            Defendant.               )

7

8

9

10

11                      - - - -

12       DEPOSITION OF:  VALENCIA M. McCLATCHEY

13                      - - - -

14

15              DATE:     March 14, 2006
                          Tuesday, 9:30

16

17           LOCATION:    Eckert Seamans Cherin &
                             Mellott
18                        44th Floor - US Steel Tower
                          Pittsburgh, PA 15219

19           TAKEN BY:    Defendant

20

21        REPORTED BY:    Keith G. Shreckengast, RPR
                          Notary Public
22                        AKF Reference No. KS93222

23

24                                          ORIGINAL

25



1   losing, being in bankruptcy at the time.  And

2   how the area in general has changed.  How we're

3   all reacting to being thrown into the

4   spotlight.

5 Q. Did you understand that Mr. Sheehan would be

6   writing something for publication by the AP

7   based on your conversations with him?

8 A. Yes, I did understand that.

9 Q. Did you have any further conversations with

10   Mr. Sheehan beyond those that we already

11   discussed?

12 A. No.

13 Q. Did you have any conversations with any other

14   representative of the Associated Press?

15 A. The only other representative of the Associated

16   Press would have been the photographer who was

17   present and took a photo of me holding the

18   photo in my living room.

19 Q. Where you say the photographer was present, the

20   photographer was present when Mr. Sheehan came

21   to your house?

22 A. Yes, he was.

23 Q. Do you have an absolute recollection of

24   Mr. Sheehan and the photographer being present

25   together at your house?

1  A.    Yes, I do.

2  Q.    Why did you or what did you understand the

3        photographer to be doing and why was he

4        present?

5  A.    He was taking a photo of me holding my photo,

6        and the camera that I took the photo with, I

7        was sitting on my sofa, in relation to the

8        article.

9  Q.    Are you familiar with the complaint in this

10       action?

11  A.   Can you explain what you mean?

12  Q.   Sure, you are the plaintiff in a case against

13       the Associated Press.

14  A.   Yes, I am.

15  Q.   Is that correct?

16  A.   That is correct.

17  Q.   And as plaintiff, are you aware that a document

18       called a complaint was filed to initiate the

19       action?

20  A.   I understand that.

21  Q.   And are you aware that there were attachments

22       to the complaint when it was filed, and those

23       attachments included some pictures and certain

24       other things, do you recall that?

25  A.   I'm not sure what you mean.



 1                    MR. PENCHINA:  This is the complaint,

 2          counsel.  I'm not going to mark this as an

 3          exhibit.  I'm just going to show it to her for

 4          references.

 5    BY MR. PENCHINA:

 6    Q.    Do you, Ms. McClatchey, recognize the complaint

 7          that was filed?

 8    A.    May I take a look?

 9    Q.    Sure.  And for the record, I'm not going to be

10          asking you any questions about the pleadings, I

11          just wanted to know if this is familiar, and in

12          particular if you can turn to the attachments,

13          one of the attachments to this is a newspaper

14          article.  Do you recall that newspaper article

15          being attached to the complaint?

16    A.    Yes, this is the photo, the article that I had

17          agreed to.

18    Q.    So attached to the complaint is an article, and

19          I think you said that this is the article that

20          you agreed to?

21    A.    This is the article that I had agreed to.  This

22          particular --

23    Q.    And by agreed to meaning this is what Charles

24          Sheehan had interviewed you for?

25    A.    Yes, this is the one.



1    Q.    Is that picture the one that appears attached

2          to the complaint as part of this article the

3          photo of you holding your photo that you

4          testified about before?

5    A.    This is my personal copy of the photo, yes.

6                    MS. SZPONDOWSKI:  Just for the

7          record, we're talking about Exhibit C to the

8          complaint.

9                    MR. PENCHINA:  Correct, thank you.

10   BY MR. PENCHINA:

11   Q.    Exhibit C attached to the complaint contains

12         this photo, and just to be clear, you testified

13         that the AP photographer took a picture of you

14         sitting on the couch holding the photo?

15   A.    Yes.

16   Q.    Is this that picture?

17   A.    This is that picture.

18   Q.    Did any other photographers besides those

19         affiliated with AP come to your house to take

20         your picture holding the photo?

21   A.    Yes.

22   Q.    Which other photographers came to your house to

23         take your picture holding the photo?

24   A.    Those photographers related to the news

25         stations, KDKA, WTAE-TV, Fox, WJAC-TV.

```
 1   Q.   So in each of those instances a photographer
 2        came out and took a picture of you holding the
 3        photo?
 4   A.   Yes.
 5   Q.   Did any of the photographers come out and not
 6        take a picture of you holding the photo?
 7   A.   They took photos of me outside, with the same
 8        background and so forth.
 9   Q.   Did any of the photographers take a photo of
10        just the photo?
11   A.   Not that I am aware of, no.
12   Q.   With all of those photographers coming out and
13        taking your picture holding the photo, is there
14        any chance that you have confused some of them
15        for each other?
16   A.   I don't believe so.
17   Q.   And just to ask this one more time, you're
18        certain that the AP photographer came out with
19        the AP reporter and came into your house to
20        take the photo that was attached to the
21        complaint?
22   A.   Yes, I am certain.
23   Q.   Did an AP representative ever contact you
24        following the three occasions on which you
25        conversed with Mr. Sheehan?
```



| 1 | | copyright 2003? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | Do you currently have, or have you had during |
| 4 | | the pendency of this lawsuit any copies of a |
| 5 | | printout which would have a 2003 date in the |
| 6 | | copyright notice? |
| 7 | A. | At this time no, I don't. |
| 8 | Q. | What about during anytime since the lawsuit has |
| 9 | | been filed? |
| 10 | A. | Most likely not. |
| 11 | Q. | What about any printouts with a 2004 or 2005 |
| 12 | | copyright notice? |
| 13 | A. | I currently do not have any printouts, because |
| 14 | | I have given them out or sold them. |
| 15 | Q. | When was the last time that you had a 2004 or |
| 16 | | 2005 dated copyright notice printout in your |
| 17 | | possession? |
| 18 | A. | I could not answer an exact date. |
| 19 | Q. | Approximately in the last year would you have |
| 20 | | still had some of those around? |
| 21 | A. | I would not have had any 2004s left in 2005.  I |
| 22 | | have begun to just print out as needed, so I |
| 23 | | don't have a backup.  I don't keep a large |
| 24 | | inventory. |
| 25 | Q. | Has the typeface or the font that appears in |

68

1   Q.   But as we sit here, you don't remember whether

2       it ran in September, October, November?

3   A.   No.  It would be in the records.

4   Q.   I'm actually not sure that it is.  I believe

5       these were the only records, Exhibit 11 and 12

6       are the only records that relate to U.S. News.

7       Do you remember having --

8   A.   There should be a physical copy of the

9       magazine.

10   Q.   Do you, in your collection, have copies of all

11       of the instances in which you've licensed the

12       photo?

13   A.   Most of them.  Some have not sent me.

14   Q.   But you do have one for U.S. News?

15   A.   Yes, I do believe I do.

16          MR. PENCHINA:  Counsel, it may be

17       there, I just don't recall, so I --

18          MS. SZPONDOWSKI:  I don't recall

19       either.  But we'll double check.

20 BY MR. PENCHINA:

21   Q.   Ms. McClatchey, would you please look at the

22       document the reporter has marked as Exhibit 13,

23       which is a single page with production number

24       MC 66.  And when you've had a chance, please

25       tell me if Exhibit 13 is familiar to you.

Pittsburgh, PA
412-261-2323  /  Greensburg, PA
724-853-7700  /  Erie, PA
814-453-5700        AKF

1   A.    Yes, it is familiar.

2   Q.    What is Exhibit 13?

3   A.    I was looking to find out, I had looked in my

4         pursuit of seeing unauthorized use of my photo,

5         that a Paul Thompson had done a timeline on a

6         website, and he did not have my permission to

7         use the photo.  It was used, and I wanted to

8         know where, why, and have it removed.

9   Q.    Was it removed?

10  A.    Yes, it was.  To my knowledge it was removed.

11  Q.    Exhibit 13 appears to be conveying your consent

12        to use the photo in the timeline.

13  A.    If they would have asked prior to, and

14        explained to me, I would not have a problem

15        with that, if they had asked prior to.  If they

16        wanted to discuss it, I would have no problems

17        using it for an educational purpose.

18  Q.    But look at the text of the message that you

19        sent that appears on the top half of Exhibit

20        13.  Two lines up from your name the text says:

21        This can be used as record that I fully consent

22        to its use in the timeline of events.  Does

23        that indicate to you that at least at the time

24        that Exhibit 13 was created you were giving

25        consent?

1   A.    I had given them consent at that time, once we
2         had discussed, you know -- because I had not
3         recalled Mr. Thompson, giving him permission.
4         And when I found that it was still online, I
5         had contacted to find out, you know, where --
6         how he had, why he put it on there without my
7         consent.
8   Q.    And previously you testified that after you
9         contacted them, the photo came down from that
10        site; is that correct?
11  A.    They had said they were going to take it down.
12        I did not follow up at this time unfortunately.
13  Q.    But didn't you tell them that they could leave
14        it up?
15  A.    I told them if they wished to, they could leave
16        it up.  I don't know, it may be on, it may be
17        off.  I have not checked lately.
18  Q.    And whether it's on or off, do you know what
19        your definitive response to them was, and by
20        that I mean did you tell them to take it down
21        or did you tell them they could leave it up?
22  A.    If they were not making a profit from it, and
23        it was solely for education, they could leave
24        it up.
25  Q.    And that's what you indicated to them?



1   A.   That's what I believe I indicated to them.

2   Q.   Going back to Exhibit 13, in the first

3        paragraph of your message you indicate that it

4        has been used without my permission lately.

5   A.   Uh-huh.

6   Q.   What specifically were you referring to?

7   A.   That was right after the discovery of AOL

8        earlier that month, a couple weeks prior to,

9        that it was on AOL without my knowledge or

10       consent.  And I was going through, looking to

11       see who had my permission to use it and who

12       didn't.  I had spoken with a Paul Thompson.  He

13       was discussing doing a timeline, but nothing

14       had been discussed as to using the photo at the

15       time.

16   Q.   As of August 19th, 2003, which is the date that

17       appears in Exhibit 13, in addition to AOL, what

18       other unauthorized uses of the photo were you

19       aware of?

20   A.   That was AOL, and this was one of the first

21       ones that I had come across.

22   Q.   So --

23   A.   This was the early stages of my investigating.

24   Q.   And following up in your later stages of

25       investigating, who, in addition to AOL and the

Pittsburgh, PA
412-261-2323  /  Greensburg, PA
724-853-7700  /  Erie, PA
814-453-5700

AKF

1    A.    It appears to be so.

2    Q.    Are the attachments the attachments that you

3          received?

4    A.    I did not receive the attachments.  I had

5          copies of them myself.

6    Q.    Is the third page of Exhibit 22 the use in AOL,

7          or on AOL that you had noticed and were upset

8          about?

9    A.    Yes, it is.  It appears to be.

10   Q.    Is the last page of Exhibit 22 a copy of your

11         photograph?

12   A.    Yes, it is.

13   Q.    If you look along the portion of the border

14         that appears directly above the smoke on the

15         photograph, do you see a notation that says

16         September 11, 1600 x 1200, et cetera?

17   A.    Yes, that's my tag.

18   Q.    What does that notation mean?

19   A.    That was on -- printed from my computer from my

20         JPG, from my camera, from the file.

21   Q.    Does that notation appear everytime you print a

22         copy?

23   A.    Not since my new program, no.

24   Q.    When was your new program first used?

25   A.    In 2005, 2004, I'm not sure of the exact time.



```
 1   Q.   Were all of the printouts that you created
 2        prior to 2004 or '5, whenever you started the
 3        new program, did all of those printouts have
 4        this notation?
 5   A.   Yes, they did.
 6   Q.   In the top left-hand corner of the picture that
 7        is Exhibit 22 is the notation End of Serenity,
 8        September 11, 2001.  Do you see that?
 9   A.   Yes, I do.
10   Q.   Is that the title of the photograph?
11   A.   End of Serenity, yes, it is.
12   Q.   And how, while using the old system prior to
13        2004, or whenever you got the new system, how
14        was that title affixed to the picture?
15   A.   The title affixed to the picture in the same
16        way, I printed it out on the photo paper prior
17        to sending it back through the printer with the
18        photo.
19   Q.   There does not appear to be a copyright notice
20        on this last page of Exhibit 22.  Is there?
21   A.   The copyright has been cut off at the bottom.
22   Q.   Where would the copyright notice have appeared?
23   A.   It would have been -- there should be a road
24        and a piece of grass, which is the front
25        portion of my yard.  That is where I attach the
```

1  Q.  Did the folks producing the Windsor Park

2      Stories come to your house to film the video

3      that they did?

4  A.  No, we met at a church in Shanksville.  It was

5      filmed in the church in Shanksville.

6  Q.  Was it filmed entirely in the church in

7      Shanksville?

8  A.  Yes.

9  Q.  There are some scenes in the video that appear

10     to have been filmed in an office.  Do you

11     recall them visiting your office?

12 A.  Yes, they did come to my office and took

13     photos.

14 Q.  Was that your home office or your work office?

15 A.  That was when I was working at Coldwell Banker

16     Rita Halverson.  They have been to my home, but

17     the actual film that was taken was taken in the

18     church.

19 Q.  Did you provide copies of the photo that was

20     used in connection with Windsor Park Stories?

21 A.  Yes, I did.

22 Q.  The seventh page in of Exhibit 29, and the

23     eighth page in, which are difficult to see, I

24     will grant you, appear to depict a copy of your

25     photo coming out of a printer.  Do you see

1       that?

2   A.  That is at my home, yes.

3   Q.  Is that something that they filmed?

4   A.  Yes.

5   Q.  And is that your printer shown particularly on

6       I guess it's the ninth page, where you can

7       slightly make out an HP logo?

8   A.  It appears to be mine, yes.

9   Q.  Did you provide the folks making the Windsor

10      Park Stories both a hard copy printout and a

11      JPG?

12  A.  I provided them a JPG.  This was done purely

13      for, you know, the photo use, as far as in the

14      story.  They did not get the hard copy.  I was

15      just printing out photos.  They just wanted to

16      see how -- that I actually do print them out at

17      my home.

18  Q.  If you turn to the sixth page of Exhibit 29, in

19      the upper left-hand corner of the screen you

20      can barely make it out, but does that look like

21      the title to you?

22  A.  I had put a Flight 93, when we were doing our

23      photos.  I identified it as being Flight 93.

24  Q.  So was this a hard copy?

25  A.  This was a hard copy at one time.