# EXHIBIT A

Dockets.Justia.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| VALENCIA M. MCCLATCHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-145J |
| v. | ) | |
| | ) | |
| THE ASSOCIATED PRESS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY MEMORANDUM OF THE ASSOCIATED PRESS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

Robert Penchina (*Pro Hac Vice*)
230 Park Avenue, Suite 1160
New York, NY 10169
(212) 850-6100
(212) 850-6299 (Fax)

Gayle C. Sproul (I.D. No. 38833)
Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778
(215) 988-9750 (Fax)

*Attorneys for The Associated Press*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.    PLAINTIFF HAS IDENTIFIED NO GENUINE ISSUES OF MATERIAL
      FACT .............................................................................................................. 1

      A.    Plaintiff's Submissions Focus on Immaterial Facts ................................ 1

      B.    There is No Evidence That Infringing Use Was Made of the Photo ........ 2

      C.    There is No Evidence That the Photo Copied by AP Had a Copyright
            Notice ...................................................................................................... 4

II.   AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING ALL OF
      PLAINTIFF'S CLAIMS ................................................................................... 7

      A.    Plaintiff's Direct Infringement Claim Should be Dismissed ................... 7

      B.    Plaintiff's Contributory and Vicarious Infringement Claims Should be
            Dismissed ............................................................................................... 12

      C.    Plaintiff's DMCA Claims Should be Dismissed .................................... 14

CONCLUSION ......................................................................................................... 15

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Baer v. Chase*, 392 F.3d 609 (3d Cir. 2004) ................................................................................6

*Batesville Servs., Inc. v. Funeral Depot, Inc.*, 2004 U.S. Dist. LEXIS 24336
(S.D. Ind. 2004) .......................................................................................................................10

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ....................11, 12

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................................................2, 8, 10

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132
(2d Cir. 1998)............................................................................................................................11

*Clark v. Hess Trucking Co.*, 879 F. Supp. 524 (W.D. Pa. 1995) ....................................................6

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)........................................................11

*Hackman v. Valley Fair*, 932 F.2d 239 (3d Cir. 1991) ...................................................................6

*Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .............................................9

*Hofheinz v. Discovery Commc'ns, Inc.*, 2001 WL 1111970 (S.D.N.Y. 2001) ................................9

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996) .....................................1

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) .................................................10

*IQ Group, Ltd. v. Wiesner Publ'g, LLC*, 409 F. Supp. 2d 587 (D.N.J. 2006)................................15

*Mathieson v. Associated Press*, 1992 WL 164447 (S.D.N.Y. 1992).............................................7

*Metropolitan-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764 (2005)................13

*Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490 (S.D.N.Y. 1996) ............10

*Parker v. Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006) ......................................................13

*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584 (3d Cir. 2005) ..........................................................1

*Ringgold v. Black Entm't Television,* 126 F.3d 70 (2d Cir. 1997).................................................9

*Sega Enters Ltd. v. Maphia*, 857 F. Supp. 679 (N.D. Cal. 1994) .................................................10

*World Wrestling Federal Entm't, Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413
   (W.D. Pa. 2003) ...................................................................................................................11

*Wright v. Warner Books, Inc.*, 953 F.2d 731(2d Cir. 1991)............................................................8

## PRELIMINARY STATEMENT

Defendant The Associated Press ("AP") respectfully submits this memorandum in reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response").

Plaintiff's Response attempts to conjure issues to avoid summary judgment by raising factual matters that are not material to the pending motion or which are wholly unsupported by the record. Moreover, Plaintiff's Response misconstrues the applicable law. As demonstrated below, because Plaintiff has failed to identify any genuine issues of material fact sufficient to avoid summary judgment on any of her claims, AP's motion should be granted in its entirety.

## ARGUMENT

## I.     PLAINTIFF HAS IDENTIFIED NO GENUINE ISSUES OF MATERIAL FACT

It is fundamental that, to avoid summary judgment, "the nonmoving party 'must come forward with specific facts showing there is a *genuine issue for trial*.'" *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). To do so, "[t]he non-movant must present *concrete evidence* supporting each element of its claim." *Id.* (emphasis added). "[A] party must present more than 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation omitted). Here, Plaintiff has presented no genuine issues of material fact.

### A.    Plaintiff's Submissions Focus on Immaterial Facts

Plaintiff's Response seeks to convey that AP used Ms. McClatchey's photograph without permission. (Pl. Mem. 1, 8). If necessary, at the appropriate procedural juncture, AP will demonstrate the falsity of Plaintiff's assertion.[1] However, for purposes of the pending motion for

---

[1]   For example, although Plaintiff's own Complaint asserts that Ms. McClatchey provided to AP a "copy of the photograph to use in connection with the proposed article" (Compl. ¶ 14), that fact

summary judgment, whether Ms. McClatchey actually gave permission to AP (in contrast to whether AP believed she consented) is immaterial. As the Supreme Court has made clear: "If the use is otherwise fair, then no permission need be sought or granted." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994).

### B.  There is No Evidence That Infringing Use Was Made of the Photo

To oppose AP's motion, Plaintiff asserts that she found "unauthorized and infringing uses of her photograph in newspapers, such as the Washington Post and Philadelphia Daily News, magazines, and in connection with several Flight 93 conspiracy web sites." (Pl. Mem. 7). However, there is *no evidence* to back up Plaintiff's conclusory assertion.

Plaintiff argues, without identifying what her evidence might be, that "[t]here is sufficient evidence in the record to show" the Washington Post "directly infringed Ms. McClatchey's copyright." (Pl. Mem. 20). However, the only evidence adduced in discovery demonstrates the opposite. The record indisputably shows that Ms. McClatchey provided her photograph to and entered into a "Freelance Contributors" agreement dated March 11, 2002 with the Washington Post, pursuant to which she received a fee and granted to the Post

> exclusive first-time print publication rights to the [Photo], as well as the subsequent non-exclusive right to reproduce, distribute, adapt or display the [Photo] for any purpose and in any manner or medium worldwide during the copyright term of the [Photo], without additional compensation.

(Penchina Supp. Decl. O). Despite having granted the Washington Post the right to republish her photograph, Plaintiff argues here that:

> The Washington Post initially paid Ms. McClatchey for a first, one-time use of her photograph . . . . Then, after receiving it from the AP, the Washington Post made a second published use of the

---

now is "denied" in Plaintiff's Objections and Responses to Defendant's Statement of Undisputed Facts. (Pl. Resp. to AP Statement of Facts ¶ 50).

> photograph, this time without paying a fee or taking a license from
> Ms. McClatchey.

(Pl. Mem. 18). However, Plaintiff has neither attempted to explain why the Post's use of the

photo in accordance with the license granted by her would be evidence of infringement by AP,

nor cited to any evidence of that purported second use made by the Washington Post.

Rather, the record reflects that Plaintiff well knows that there was no second publication

in the Post. In response to a subpoena issued by Plaintiff in this case, her attorney received a

letter from the Washington Post's attorney stating:

> We [the Washington Post] have not discovered any other
> publication of the photograph in The Washington Post. The
> photograph in question was downloaded from the AP wire into our
> internal photo archive on September 13, 2002. While we have no
> evidence that the photo was subsequently published in the
> newspaper, we purchased the right to do so in accordance with the
> March 11, 2002 freelance agreement.

(Penchina Supp. Decl. Ex. A). Thus, notwithstanding Plaintiff's repeated unsubstantiated

assertions, the record contains *no* evidence that the Washington Post made unauthorized use of

the photograph provided to it by AP.

Plaintiff contends that, like the Washington Post, the Philadelphia Daily News "also used

the photograph without Ms. McClatchey's permission." (Pl. Mem. 20). But, more like the

Washington Post, the record reflects that Ms. McClatchey licensed the Philadelphia Daily News

to publish her photograph, and she was paid a fee for that use. (Penchina Decl. Exs. C & D).

Although she refers to a second, supposedly unauthorized, use of the photo by the Daily News,

Plaintiff has not identified and the record contains *no* evidence of such a second use.

Plaintiff also argues her photograph was infringed by "Flight 93 conspiracy web sites"

(Pl. Mem. 7), but she failed to provide any evidence of a connection between any such web site

and AP. Indeed, the only "conspiracy web site" identified in the record could not have obtained

the photograph it ran from AP because the image on the site depicts portions of the photograph

3

that were cropped off before the photograph was entered into AP's system. (*Compare* Penchina Supp. Decl. Exs. E & F, *with* Ake Decl. Ex. B, *and* Pl. Mem. 27). Indeed, the record contains correspondence between Ms. McClatchey and the proprietor of that web site, as well as with the site's host and the Federal Emergency Management Agency ("FEMA"), clearly indicating that the site obtained the photograph from FEMA, not AP. (Penchina Supp. Decl. Ex. F).

Finally, Plaintiff asserts her photograph was infringed by "untold others." (Pl. Mem. 21). However, Plaintiff's submissions leave the identity of such others untold and without any evidence of their existence.

The record shows that after downloading the photograph from AP's PhotoArchive, AOL published a thumbnail version in connection with its news report about a Flight 93 conspiracy, which was itself a fair use. (Compl. ¶ 20, Ex. D). Thus, Plaintiff has failed to provide any concrete evidence of the infringements about which she made repeated conclusory assertions.

## C. There is No Evidence That the Photo Copied by AP Had a Copyright Notice

Plaintiff contends that AP "cropped off the copyright notice" on her photograph, and Plaintiff's counsel even created a graphic demonstration to show how a copyright notice could be removed from a print of her photograph. (Pl. Mem. 26-27). However, in contrast to Plaintiff's unsupported argument, the actual evidence demonstrates that the photograph copied by Mr. Puskar *did not* contain a title or copyright notice.

Ms. McClatchey's deposition testimony on this point was unequivocal. Ms. McClatchey testified that the photograph taken by AP's photographer was of "my [her] personal copy of the photo." (McClatchey Dep. 30-31; *see id.* at 29 (the AP photographer "was taking a photo of me holding my photo")). Moreover, Ms. McClatchey's testimony repeatedly confirmed that "her personal copy does not have any copyright notice or title." (*Id.* at 21). For example, Ms. McClatchey gave the following sworn testimony:

4

Q.    So the personal copy at home or in your home office does not have a title or copyright notice?

A.    No, it does not.

Q.    Do you have multiple copies at home?

A.    No, I do not.

Q.    And just to clarify, do you currently have multiple copies at home?

A.    No, I do not.

Q.    Have you ever had multiple personal copies at home?

A.    No, I do not.

(*Id.* at 22). Ms. McClatchey's testimony left no room to doubt that AP's photographer took a photo of her personal copy of the photograph—the one that has no copyright notice or title. Thus, she responded "Yes, I am certain" when asked whether she was sure about which photograph was taken by the AP photographer. (*Id.* at 32). She also denied that she might have confused the AP photographer with any of the other photographers who visited her. (*Id.*).

While Plaintiff's testimony was clear that AP's photographer took a picture of her personal copy that contained no title or copyright notice, Plaintiff's memorandum declares that the print depicted in the memorandum is the "photograph that Mr. Puskar photographed." (Pl. Mem. 27). There is no evidentiary support for this argumentative sleight of hand.

Rather, the print used in the Response is identified in a lawyer's declaration merely as "a true and correct copy of the End of Serenity photograph bearing production number MC 00434, which Plaintiff produced in this action." (Hall Decl. ¶ 7). In her own declaration, Ms. McClatchey nowhere affirms that the copy attached to her lawyer's declaration and depicted in her memorandum is a copy of the specific document that actually was photographed by AP.[2]

---

[2] Indeed, she could not so affirm. Ms. McClatchey's deposition testimony conclusively establishes the photograph in Exhibit 7 to the Hall Declaration could *not* be a copy of the document photographed by AP in September 2002. Ms. McClatchey testified that prior to 2004 or 2005, "*all of the printouts*" of her photograph contained a "notation that says 'sept 11, 1600x1200[24b jpeg]'" "along the portion of the border that appears directly above the smoke."

Ms. McClatchey's declaration also does not deny that AP's photographer took a photograph of

her own personal copy, which admittedly contained no copyright notice. Instead, giving all

appropriate inferences to Plaintiff, her declaration suggests that additional photographs may have

been taken. To the extent that Ms. McClatchey's declaration seeks to convey that AP's

photographer did not take a picture of Ms. McClatchey's personal copy (which bore no title or

copyright notice), her declaration may not be considered in opposition to AP's motion. *Baer v.*

*Chase*, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to

defeat summary judgment by filing an affidavit disputing his or her own sworn testimony

without demonstrating a plausible explanation for the conflict."); *Hackman v. Valley Fair*, 932

F.2d 239, 241 (3d Cir. 1991) (affirming summary judgment where plaintiff submitted affidavit

that contradicted deposition testimony); *Clark v. Hess Trucking Co.*, 879 F. Supp. 524, 532

(W.D. Pa. 1995) (granting summary judgment where court disregarded affidavit that "directly

contradicts" deposition testimony). On the other hand, to the extent that the declaration seeks to

convey that AP may have snapped photographs in addition to the one it took of her personal

---

(McClatchey Dep. 89-90 (emphasis added), Ex. 22; Penchina Supp. Decl. Ex. P). This notation
was automatically "printed from my [Ms. McClatchey's] computer." (McClatchey Dep. 89; *see*
Penchina Supp. Decl. Ex. I (other examples of computer notation)). After Ms. McClatchey's
computer crashed and she installed a "new program" in 2004 or 2005, that notation no longer
showed up on newly printed copies. (McClatchey Dep. 89-90). Because Hall Exhibit 7 does not
contain this notation, it was created no earlier than 2004 or 2005, years after AP photographed
Ms. McClatchey's copy. Moreover, while Hall Ex. 7 contains a copyright date of "2002," Ms.
McClatchey testified that (1) the copies of the photo she made contained a copyright notice date
for the year in which it was printed, (2) she did not keep a large inventory of photos, and (3) she
"would not have had any 2004s left in 2005," let alone any with earlier dates such as 2002. (*Id.*
at 64). The copy of the photo in the record was produced in January 2006, well after Ms.
McClatchey no longer possessed copies printed in 2002 with the 2002-dated notice. (*Id.*). In
addition, the "binder" referred to in Ms. McClatchey's Declaration had "fallen apart" by "2003
or so" (*id.* at 23), and Ms. McClatchey's Declaration does not attest that the copy of the photo
submitted to this Court is a copy of whatever document may have been in her binder. Despite
repeated requests, Plaintiff failed to produce any other copies of the photo—specifically omitting
to produce her personal copy or copies of the electronic version she emailed to publishers, none
of which contained copyright notices.

copy, the declaration does not create a genuine issue of material fact as it is undisputed that AP obtained a copy of the photograph that did not bear a copyright notice.

In short, there is no genuine issue concerning whether the photo copied by AP contained a copyright notice and title: It did not.

## II.    AP IS ENTITLED TO SUMMARY JUDGMENT DISMISSING ALL OF PLAINTIFF'S CLAIMS

In addition to failing to present genuine issues of material fact, Plaintiff's Response fails to overcome the clear import of the applicable law, which demonstrates that summary judgment should be granted against Plaintiff on all of her claims.

### A.  Plaintiff's Direct Infringement Claim Should be Dismissed

As Plaintiff concedes, AP used the photograph at issue "in connection with the Sheehan article about Val McClatchey." (Pl. Mem. 9). Nevertheless, Plaintiff appears to be arguing that AP's use should not be considered to be fair because AP "transmit[ted] the photograph to its roughly 2000 members and subscribers without any reference or connection to any particular article" (Pl. Mem. 9-10) and provided the photograph "with no restriction or guidance." (*Id.* at 6). The record is clear, however, that AP's transmission was made only as part of AP's report about Ms. McClatchey and the End of Serenity photograph. The photo was transmitted by AP via its PhotoStream service in the same manner as all AP photos which accompany a particular article, and the photo was never separately transmitted on a stand-alone basis. (Ake Decl. ¶¶ 12-14). The mere possibility that some subscriber to PhotoStream had the capability of using the photograph separately from AP's report is immaterial—the record reflects no instance in which that happened. *See, e.g., Mathieson v. Associated Press*, 1992 WL 164447, at *4 (S.D.N.Y. 1992) ("To the extent the plaintiff highlights the potential and capability of AP and/or its customers to use plaintiff's two copyrighted photographs in an infringing manner, the allegations

are purely speculative and demonstrate neither a likelihood of actual infringement nor an intent on the part of AP to infringe or to facilitate infringement by others.").[3]

Similarly, Plaintiff's arguments that AP's use was not a fair use are wrong. Plaintiff strains to try to classify AP's publication as a "commercial use" (Pl. Mem. 10), ignoring that AP's use was for the statutorily favored purpose of news reporting. *Compare Wright v. Warner Books, Inc.*, 953 F.2d 731, 736-37 (2d Cir. 1991) (when a work falls into one of the statutory examples, "'assessment of the first fair use factor should be at an end, even though, as will often be the case, the [defendants] anticipate profits'" (citation omitted)), *with Campbell*, 510 U.S. at 585 ("The use, for example, of a copyrighted work to advertise a product . . . will be entitled to less indulgence under the first factor."). However, even if AP's use could be deemed to be for "commercial" purposes, its nature as a fair use would not be diminished. Contrary to Plaintiff's incorrect statement that "any commercial use . . . tends to cut against a fair use defense" (Pl. Mem. 10), the Supreme Court has instructed that:

> If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship and research, since these activities "are generally conducted for profit in this country." Congress could not have intended such a rule . . . .

*Campbell*, 510 U.S. at 584 (citations omitted).

Plaintiff also is wrong in her assertion that AP's report was not "transformative" because "the Sheehan article was *about Ms. McClatchey*," not the photograph. (Pl. Mem. 12 (emphasis added)). With all due respect to Ms. McClatchey, the only reason she was newsworthy was

---

[3]    The record reflects a single use by AOL, who obtained the photo from AP's PhotoArchive, not from AP's transmission. That use was a fair use because AOL used a thumbnail copy of Ms. McClatchey's previously published, historical photo for the purpose of news reporting on a conspiracy theory relating to Flight 93—a use which Ms. McClatchey testified that she would not license and thus a use which did not supplant any actual market for the photo.

8

because of the photograph, and any rational reading of the report makes plain that the photograph

was an integral part of the story. In any event, even if the report was entirely about Ms.

McClatchey, use of the photograph in connection with such a report would constitute a

transformative fair use, as *Ringgold v. Black Entertainment Television*, the case relied upon by

Plaintiff (Pl. Mem. 12), makes clear: "If a TV news program produced a feature on Faith

Ringgold and included camera shots of her story quilts, the case for a fair use defense would be

extremely strong." 126 F.3d 70, 79 (2d Cir. 1997); *see also Hofheinz v. Discovery Commc'ns,*

*Inc.*, 2001 WL 1111970, at *3 (S.D.N.Y. 2001) ("There is a strong presumption that the use of a

copyrighted work is transformative when the allegedly infringing work falls within one of

several categories described in § 107, 'criticism, comment, news reporting . . . .'").

Plaintiff misapprehends the second fair use factor in arguing that Ms. McClatchey's

photograph is not a factual work because it "was honored through awards and exhibits, and is on

permanent display at the Smithsonian." (Pl. Mem. 15). In addition to considering whether the

work at issue previously had been published, the second factor examines whether the work is

informational in nature or a work of fiction or fantasy. Works of an informational nature are

more susceptible to fair use. *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 563

(1985) ("The law generally recognizes a greater need to disseminate factual works than works of

fiction or fantasy."). Having been honored with awards or displayed in the Smithsonian says

nothing about whether the work is creative; if anything it suggests that the work conveys

information of historical importance. As one court explained:

> [P]hotographic images of actual people, places and events may be
> as creative and deserving of protection as purely fanciful creations.
> Nevertheless, history has its demands. There is a public interest in
> receiving information concerning the world in which we live. The
> more newsworthy the person or event depicted, the greater the
> concern that too narrow a view of the fair use defense will deprive

the public of significant information. . . . This of course is not to
say that historical film footage looses all copyright protection, only
that its character as historical film footage may strengthen
somewhat the hand of a fair use defendant as compared with an
alleged infringer of a fanciful work . . . .

*Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996).

The informational nature of Plaintiff's work, coupled with the fact that it had been published

prior to AP's use weighs the second factor heavily toward fair use.

With respect to the third fair use factor, Plaintiff's argument ignores that the amount of

the underlying work used is to be assessed "in relation to the purpose of the copying" and the

"extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510

U.S. at 586-87. Thus, Plaintiff's reliance on cases such as *Batesville Services, Inc. v. Funeral

Depot, Inc.*, 2004 U.S. Dist. LEXIS 24336, at *25 (S.D. Ind. 2004), in which copying of an entire

photograph for use in an advertisement was found to weigh against fair use is inapposite. (Pl.

Mem. 16). *See also Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998)

(providing "access to every radio station in the cities Kirkwood serves, 24 hours a day, seven

days a week" weighed against fair use); *Sega Enters. Ltd. v. Maphia*, 857 F. Supp. 679, 687

(N.D. Cal. 1994) (factor weighed against fair use when "the *entire* game programs are copied").

Using any less of Plaintiff's photograph in connection with the AP report would make the

photograph unrecognizable and render it useless to the report.

Contrary to Plaintiff's arguments with respect to the fourth factor, AP's transformative

use of Ms. McClatchey's photograph did not diminish or prejudice the potential sale of, interfere

with the marketability of, or fulfill the demand for, her work. Previously, Plaintiff had argued

that Ms. McClatchey was able to "sell or license her photograph to news outlets for a fee prior to

The Associated Press showing up and subsequent to The Associated Press leaving." (Gerberich

Dep. 157). The record does not identify a single licensing transaction that Ms. McClatchey was

10

unable to conclude as a result of AP's use of the photograph. To the contrary, the record

demonstrates that, subsequent to AP's use of the photograph, Ms. McClatchey entered into

license agreements with and was paid licensing fees for use of the photograph by members and

subscribers of AP who had access to the photo from AP, and otherwise continued to sell her

photograph to news outlets—the market she contends was usurped by AP. (*E.g.*, McClatchey

Dep. Ex. 12; Penchina Decl. Exs. B, C, D; Ake Decl. ¶ 21).

Plaintiff argues that the market for her work was harmed because "AP, a potential

licensee itself, used the photograph for free." (Pl. Mem. 19). However, the law is clear that a

copyright holder "is not entitled to a licensing fee for a work that otherwise qualifies for the fair

use defense." *World Wrestling Fed. Entm't., Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d

413, 430 (W.D. Pa. 2003); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1121 n.9 (D. Nev. 2006)

(rejecting market harm where user did not pay fee because "[u]nder this view, the market for a

copyrighted work is always harmed by the fair use of the work because it deprives the copyright

holder of the revenue it could have obtained by licensing that very use. The Supreme Court has

explained that the fourth fair use factor is not concerned with such syllogisms.").

Instead, the fourth factor analysis "requires a balancing of 'the benefit the public will

derive if the use is permitted and the personal gain the copyright owner will receive if the use is

denied.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006)

(citation omitted). "The more transformative the secondary use, the less likelihood that the

secondary use substitutes for the original." *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,

150 F.3d 132, 145 (2d Cir. 1998). And, "a copyright holder cannot prevent others from entering

fair use markets merely 'by developing or licensing a market for parody, news reporting,

educational or other transformative uses of its own creative work.'" *Bill Graham*, 448 F.3d at

614-15 (citation omitted). Thus, when the "use of [the copyright holder's] images falls within a transformative market, [the copyright holder] does not suffer market harm." *Id.* at 615.

Here, AP made a transformative use of the photograph at issue in connection with a news report about Ms. McClatchey and her photo, Ms. McClatchey lost no sales, continued to license and give away her photo without impairment in the news market, and continued to sell prints of the photo.[4] The fourth factor, like the others, militates in favor of fair use.

### B. Plaintiff's Contributory and Vicarious Infringement Claims Should be Dismissed

As discussed above, Plaintiff has failed to submit any evidence of any third-party infringement of her photograph connected to AP. For that reason alone, Plaintiff's claims for secondary copyright liability should be dismissed.

Plaintiff's contributory infringement claim also must fail because Plaintiff has failed to provide any evidence that AP intended to encourage or induce third parties to infringe. Plaintiff attempts to create a question of fact relating to the issue of intent by inaccurately stating that AP's own position "rests entirely on the AP's mistaken, and unsupported, 'belief' that it had Ms. McClatchey's permission to distribute the photograph." (Pl. Mem. 22). Leaving aside the issue of consent (for which, contrary to Plaintiff's statement, there is substantial support), the record reflects that AP believed its use of Ms. McClatchey's photograph was privileged as a fair use. (Ake Decl. ¶¶ 16, 22; Def. Interrog. Resp. 14). The record is devoid of any evidence that AP

---

[4] Plaintiff seeks to have it both ways by belittling AP's argument "that it never sold copies of Ms. McClatchey's photograph," stating both that "Ms. McClatchey never accused AP of doing so" (Pl. Mem. 17), *and* arguing that there is a market for her work because "[o]n its Website, the AP sells historical photographs for personal use." (*Id.* at 19 n.2). The Response's reference to AP's web site appears to be a cynical attempt to get into the record a higher price for the sale of photos to contrast with the $20 Plaintiff charged. Plaintiff, however, has simply identified a market not affected, much less usurped, by AP's conduct. She omits to mention that the AP's quoted price is for museum quality, limited edition, "hand-numbered and embossed with The Associated Press or Pulitzer Prize-winner limited edition seal" and are "printed directly from the original camera negative." (Penchina Supp. Decl. Ex. N).

encouraged anyone to use the photograph other than in connection with the fair use news report distributed by AP. Moreover, even if "AP did not insist that its members use the photograph only in connection with the article about Ms. McClatchey" (Pl. Mem. 21) as Plaintiff argues, the record still would not present any basis upon which to find that AP intended its members to infringe. *See, e.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2781 n.12 (2005) (courts cannot "find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement.").

Plaintiff also did not provide the evidence required to sustain her claim for vicarious infringement. "'A defendant is vicariously liable for copyright infringement if he enjoys a *direct financial benefit from another's infringing activity . . . .'" Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 499 (E.D. Pa. 2006) (emphasis added) (citation omitted). Here, Plaintiff merely asserts that "[m]embers and subscribers pay . . . fees to have access to the AP's articles and photographs," while conceding that those fees "are not based on the content that [the] member[s] or subscriber[s] use." (Pl. Mem. 22). There simply is no evidence that AP gained any new members or subscribers or otherwise reaped any additional fees as a result of including Plaintiff's photograph among the many thousands of photographs and news reports made available each day by AP. (*E.g.*, Ake Decl. ¶¶ 3, 4, 19). Thus, Plaintiff did not demonstrate

> any actual relationship between infringing activity and the number of users and thus does not [show] obvious and direct financial interest sufficient to maintain this claim of vicarious infringement. *See Ellison* [*v. Robertson*], 357 F.3d [1072,] 1079 [(9th Cir. 2004)] (vicarious copyright infringement claim fails where "record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement").

*Parker*, 422 F. Supp. 2d at 500. For this among other reasons, Plaintiff's vicarious liability claim should be dismissed.

13

## C. **Plaintiff's DMCA Claims Should be Dismissed**

As discussed above, the photograph copied by AP did not contain a copyright notice and accordingly, Plaintiff's DMCA claims should be dismissed. *See supra* at 4-7.

Plaintiff strains to argue that AP distributed "false" copyright information because the metadata accompanying the photo indicated that she was a "stringer," that "stringer" means "freelance photographer," that "[f]reelancers have contracts with AP," and AP "owns the copyright" to freelance photographs. (Pl. Mem. 24). However, Plaintiff's struggle to contort herself into an AP "freelancer" for this argument proves nothing. The metadata reflects that the photograph was a "handout," and "looking at this, a member or subscriber would know that it's not AP's picture." (Gerberich Dep. 54; *see also* Ake Decl. ¶ 7, Ex. B).[5] Moreover, Plaintiff failed to provide any evidence that AP intended to facilitate infringement. Whether or not Ms. McClatchey consented to AP's distribution of the photograph (AP believed that she did), AP believed that its distribution and its subscribers' use of the photograph was a fair use, not an infringement. (*E.g.*, Ake Decl. ¶¶ 16, 22).

AP clearly did not remove any copyright notice, but even if it had, such removal does not evidence any knowledge that such removal would aid infringement. Ms. McClatchey herself provided countless electronic copies of her photo—none of which contained a copyright notice— for publication by third parties, and thus cannot be heard to argue that providing a copy without a notice *per se* means the provider intended to facilitate infringement or knew infringement would result. (*See, e.g.*, McClatchey Dep. 20-21, 109, Exs. 27, 28; Penchina Decl. Exs. H, I, J).

Moreover, Plaintiff has presented no evidence the copyright notices allegedly appearing on hard copy prints of her photograph constitute "copyright management information" ("CMI")

---

[5] Even if AP's metadata could be construed to indicate that Ms. McClatchey was a "freelancer," that no more signifies AP owns the copyright in the photo than her actual "Freelance Contributor" agreement with the Washington Post signifies the Post owns the copyright.

14

within the meaning of the DMCA. In place of evidence, Plaintiff merely terms AP's argument as "[n]onsense" (Pl. Mem. 28), as if that incantation somehow transforms Plaintiff's simple printed copyright notice into the "automated copyright protection or management system" required by the statute and the courts. *See IQ Group, Ltd. v. Wiesner Publ'g, LLC*, 409 F. Supp. 2d 587, 597-98 (D.N.J. 2006). In *IQ Group*, the court rejected the plaintiff's markings as CMI because:

> There is no evidence that IQ intended that an automated system would use the logo or hyperlink to manage copyrights, nor that the logo or hyperlink performed such a function, nor that [defendant's] actions otherwise impeded or circumvented the effective functioning of an automated copyright protection system. Because the IQ logo removed by [defendant] did not function as a component of an automated copyright protection or management system, it does not fall within the meaning of "copyright management information" in 17 U.S.C. § 1202(c).

*Id.* The result should be no different here.

## CONCLUSION

For the foregoing reasons, AP respectfully requests that the Court grant its motion for summary judgment, dismiss each of Plaintiffs' claims, and enter judgment in favor of AP.

Dated: June 29, 2006

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

_____/s/ Robert Penchina_____

Robert Penchina (*Pro Hac Vice*)
230 Park Avenue, Suite 1160
New York, NY 10169
(212) 850-6100
(212) 850-6299 (Fax)

Gayle C. Sproul (I.D. No. 38833)
Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778
(215) 988-9750 (Fax)

*Attorneys for The Associated Press*

15