## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| VALENCIA M. MCCLATCHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:05-145J |
| v. | ) | |
| | ) | |
| THE ASSOCIATED PRESS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PRETRIAL STATEMENT OF THE ASSOCIATED PRESS

Defendant The Associated Press ("AP") respectfully submits this Pretrial Statement in

accordance with Local Rule 16.1.4B and the Order entered by the Court on March 9, 2007.

## STATEMENT OF MATERIAL FACTS

### I.    The Associated Press and Its Operations

AP is a not-for-profit mutual news cooperative that collects and distributes news to its

members and subscribers, including newspapers, magazines, radio and television broadcasters,

and electronic news publishers. AP offers its members and subscribers services that provide

news content in many forms, such as text, photographs, video, and audio.

### A.    AP's Process for Handling Photographs

AP obtains photographs from several sources. First, it employs photographers around the

world who take pictures for distribution by AP. Second, AP gathers and distributes photographs

created by its members' photographers. Finally, people and organizations frequently provide

photographs to AP, particularly when they are seeking news coverage. (For example, companies

frequently issue press releases that are accompanied by a photograph, and family members of

individuals who are in the news sometimes provide photographs to AP.) When a photograph is

Dockets.Justia.com

provided to AP by a third party, the photograph is designated as a "Handout" or "HO" in AP's system – signifying that the photograph was not created by AP.

AP's photographers use digital cameras and submit their photographs to AP digitally. Before sending a photograph to AP, the photographer adds a caption describing the photograph and provides various other information (known as "metadata") about the photograph. The metadata includes such information as the name of the person who created the image, the date the image was created, any restrictions on the use of the photograph, and the source of the photograph (such as whether it was provided as a handout or created by an AP photographer). The AP's computer system automatically generates additional metadata. For example, each photograph is assigned a unique identification number. In AP's computer system, a photograph's metadata always is displayed with that photograph and accompanies the photograph whenever AP provides it to any of its members and subscribers.

AP's primary service for providing photographs to members is called PhotoStream. The PhotoStream service delivers photographs by satellite transmission to those members who subscribe to the service. Each photograph has a unique identification number and is sent simultaneously to all PhotoStream subscribers in a single satellite transmission. Since 2000, AP has provided at least 500 photographs per day via PhotoStream.[1]

Once a photograph is transmitted as part of the PhotoStream service, it automatically becomes part of AP's electronic photo archive, which is known as the "PhotoArchive" and which can be accessed by AP, subscribers to the PhotoStream service, and members who separately subscribe to the PhotoArchive service. When a photograph becomes part of the

---

[1] AP members and subscribers do not pay fees based upon their receipt or use of specific photographs provided by AP. Rather, they pay an annual assessment to cover AP's actual costs in collecting and distributing photos.

PhotoArchive, the metadata continues to accompany it.  Although AP tracks who downloads

photographs from the PhotoArchive, AP does not know, and cannot keep track of, whether

anyone actually publishes or otherwise uses a photograph obtained through the PhotoArchive.

A separate division of AP, Wide World Photos ("WWP"), licenses and sells AP photos.

When a photograph's metadata contains the restriction "Wide World Photos Out," the

photograph is not made available to WWP or its customers.

**B.    AP's Process for Delivering News to its Members and Subscribers**

AP's Basic Service provides news in the form of textual reports.  These reports are

transmitted electronically to all AP members.  AP transmits thousands of news reports each day.

Frequently, AP distributes photographs that AP intends to accompany specific textual

reports.  Because AP delivers textual reports and photographs through different mechanisms, the

text and photos cannot be transmitted to subscribers as a single unit.  Thus, the text is sent

electronically through the Basic service, and the photograph is transmitted as part of the

PhotoStream service.  When a photograph is intended to accompany a news report, AP informs

its subscribers by specifying the photograph's unique identification number in the textual

report's "slug," a data field designed to provide essential information about the report.  AP

instructs its members and subscribers about this process so that they understand that when a

photograph is identified in the slug of a text report, the photograph is intended to accompany that

specific report.

Once AP delivers news reports and photographs to its members and subscribers, each

member and subscriber has the editorial discretion to determine which, if any, of the reports or

photographs will be included in their publications.[2]  Nevertheless, AP can and does restrict its members and subscribers' ability to use photographs for commercial purposes.  For example, if a photograph's metadata contains the restriction "No Sales," the photograph may not be sold to third parties or used for commercial purposes; it only can be used for news and editorial purposes.

## II.    <u>Val McClatchey's "End of Serenity" Photograph</u>

Within seconds after the tragic crash of Flight 93 in Shanksville, Pennsylvania on September 11, 2001, Plaintiff Val McClatchey snapped a photograph of the large cloud of smoke caused by the crash as it ascended over the barns and fields outside her home.  It is the only known photograph of the immediate aftermath of Flight 93's crash, and, as a result, Ms. McClatchey and the photograph, which Ms. McClatchey titled the "End of Serenity," have attracted substantial attention.  The FBI collected the original digital photograph in connection with its investigation of the crash, and various newspapers, magazines and broadcasters have published the photograph with Ms. McClatchey's consent.  Although some publishers paid Ms. McClatchey $250 or $350 in connection with the photograph, Ms. McClatchey allowed other publishers to use her photograph for free – particularly if they "told a story" she "agreed with" or if she wanted a particular story to be told.  Ms. McClatchey also distributed copies of her photograph to individuals.  She sold hundreds of copies of the photograph for $20 each, donating the proceeds from those sales to the Todd Beamer Foundation.  In other cases, she gave people copies of her photograph for free.  Ms. McClatchey enjoyed the notoriety the photograph generated for her and sought to draw more attention to herself and the photograph.

---

[2] AP does not, and cannot, record the number or identity of publications that actually publish particular photographs.

Ms. McClatchey registered the photograph with the United States Copyright Office effective January 29, 2002.  Although Ms. McClatchey frequently included a copyright notice on copies of the photograph, the notice did not appear on all copies.  In fact, Ms. McClatchey distributed many electronic copies of the photograph without the copyright notice, published it on her own web site without a copyright notice, and did not place a copyright notice on her personal copy of the photograph, which she showed to members of the media including AP.

III.    **Ms. McClatchey Introduces Herself to an AP Reporter and Consents to the Publication of Her Photograph.**

On the one year anniversary of the crash of Flight 93, Ms. McClatchey attended a memorial service held at the Flight 93 crash site and introduced herself to AP reporter Charles Sheehan after noticing his press badge.  Ms. McClatchey told Mr. Sheehan that she was the person who had taken the only photograph of Flight 93's crash.  She then proceeded to tell him about how her life had changed since taking the photograph.  Mr. Sheehan talked with Ms. McClatchey at the memorial service for about ten minutes and then followed up their conversation by conducting a telephone interview with her later in the day.

That same day, following the second conversation between Ms. McClatchey and Mr. Sheehan about AP doing a story on her and her photograph, AP photographer Gene Puskar went to Ms. McClatchey's house to obtain a photograph to accompany the story.  Ms. McClatchey understood the purpose of Mr. Puskar's visit and allowed him to take a picture of her personal copy of the "End of Serenity" photograph, which did not include any copyright notice.  Although Mr. Puskar and Ms. McClatchey did not specifically discuss whether Ms. McClatchey held the copyright in the "End of Serenity" photograph, Ms. McClatchey consented to AP publishing her photograph and distributing it in connection with Mr. Sheehan's story about her and the photograph.  Indeed, she wanted AP to have a "copy of the photograph to use in connection with

the proposed article." Thus, she held the photograph for Mr. Puskar as he photographed it. Mr.

Puskar believed then – and continues to believe today – that Ms. McClatchey granted AP

permission to reprint and distribute her photograph based on their conversation, her conduct, and,

importantly, the fact that she held the photograph as Mr. Puskar photographed it.

Because of differences in the aspect ratio between Ms. McClatchey's hard copy of the

photograph and the field of view of Mr. Puskar's camera (i.e., the camera field was more

rectangular than the print), Mr. Puskar's photographed captured only the center of the "End of

Serenity" photograph (capturing the image of the mushroom cloud, the two barns, and the hills),

effectively cropping out portions of the top, bottom, and sides of the picture, which contained

only sky, grass, and trees. Mr. Puskar did not crop out any copyright notice, as Ms. McClatchey

now claims, and could not have done so because the copy of the photograph that she permitted

him to shoot did not contain a copyright notice or title.

## IV.    The AP Story about Ms. McClatchey and Her Photograph

On September 12, 2002, AP distributed a news report titled "Woman who captured

searing Flight 93 image struggles a year later." The report distributed by AP included the text

written by Mr. Sheehan and the copy of Ms. McClatchey's photograph made by Mr. Puskar.

(Copies of the text and photograph are attached hereto as Exhibits A and B respectively.) The

report focused on the "End of Serenity" photograph and how Ms. McClatchey's life had changed

since she took the picture. The article began by recounting how Ms. McClatchey took the

photograph, writing that she "captured with a digital camera the moment that the terrorist attacks,

once hundreds of miles away, came to this western Pennsylvania town of 245 people. The time

and date recorded on the image, however, marked the beginning of a tumultuous year for

McClatchey." The article described the photograph as depicting "a sinister black, mushroom-

shape cloud ris[ing] from an otherwise peaceful view of a farm with a painted red barn" and reported that the photograph had "brought news crews to the front door and a limited amount of fame to McClatchey." The report discussed Ms. McClatchey's subsequent health problems and the collapse of her husband's business, noting that the "images McClatchey said she sold for $250 to $350 have not done much to help the couple financially." According to the AP report, in addition to selling the photograph to certain media outlets, Ms. McClatchey sold copies to individuals and "donated almost all of that money to the Todd M. Beamer Foundation."

AP included the photograph as part of its news report because the photograph was the critical element in the story. In fact, it was the story. Neither AP nor the public at large would have been interested in Ms. McClatchey except that she had taken the photograph and had gained some notoriety because of the photograph.

The text of the report was transmitted via AP's Basic service, as are all textual reports, and the photograph was transmitted as part of PhotoStream, as are all photos intended to accompany particular news stories. The textual report distributed to AP members and subscribers contained the following instruction (known as a "slug"): "AP Photo GJP101." This instruction identified AP's copy of Ms. McClatchey's photograph and informed AP subscribers that AP intended for that photo to accompany Mr. Sheehan's textual report. The photograph included a caption, which specifically acknowledged Ms. McClatchey as the photographer and the fact that she had taken the photograph:

> This image of the smoke cloud left by United Flight 93 after it crashed in a field in Shanksville, Pa., on September 11, 2001 was taken by Val McClatchey from the porch of her nearby home. (AP Photo/File/Val McClatchey).

The photograph was assigned the unique photo identification number "GJP101," which identifies that specific photo for AP and its members and subscribers. In addition, the "metadata" that

accompanied the photo in AP's system, and which accompanied the photo whenever it was provided to anyone by AP, identified the photograph as a "handout image," meaning that the work was not original to AP but provided to AP by a third party.[3]  The metadata also contained the restrictions "No Sales" and "Wide World Photos Out," which meant that the photograph could not be sold or used for commercial purposes, and would not be sold or licensed to publications that are not AP members.  These are the most severe restrictions AP can put on an image.

At all times, AP believed that Ms. McClatchey had granted it permission to publish a copy of her photograph in connection with Mr. Sheehan's story, which Ms. McClatchey acknowledges was the "type of story which [she] approve[s] in connection with using [her] photo."  Additionally, AP believed then – and continues to believe today – that its publication of the photograph in conjunction with the story is a classic fair use, protected by federal copyright law.  AP simply never intended to infringe Ms. McClatchey's copyright and does not believe that it has done so.  And, AP did not receive any financial benefit from any member or subscriber's use of the photograph.[4]

---

[3] Although the photograph listed Val McClatchey as a "stringer," the metadata makes clear to AP subscribers that the photograph was not taken by an AP employee or contractor.  For example, the metadata notes that the image was a "handout," that the "photographer was Val McClatchey," and that the picture was "taken by Val McClatchey from the porch of her nearby home."  This information indicates to AP subscribers that this is not an AP photograph, and is reinforced because AP instructed its members not to sell the photograph and informed them that AP would not license or sell the photo for commercial purposes or to non-members.

[4] *The Progress*, a newspaper serving Clearfield, Curwensville, Philipsburg and Moshannon Valley, Pennsylvania, carried AP's report about Ms. McClatchey and her photograph, including both the text written by Mr. Sheehan and AP's copy of Ms. McClatchey's photograph.  This publication is the only evidence in the record that any AP member or subscriber published AP's copy of the photograph as distributed with the news report.

**V.    The Photograph and the PhotoArchive**

Once the photograph of Ms. McClatchey's photo was transmitted via PhotoStream, it was automatically stored in the PhotoArchive, just like all other photos transmitted via PhotoStream. In the PhotoArchive, the photograph continued to include all of the same metadata, reflecting that it was a handout image and could not be used or sold for commercial purposes.  Moreover, the agreement governing use of the PhotoArchive limits members' use of the photograph, expressly stating that photographs in the archive "may be incorporated in materials for editorial publication only."

After AP transmitted its copy of the photograph as part of the news report, Ms. McClatchey continued to make the photograph available for publication, both for free and on a fee basis.  U.S. News & World Report and Philadelphia Newspapers, Inc., among other entities, paid Ms. McClatchey to publish her photograph, even though (i) each company is a member and subscriber of AP, (ii) each received the photograph from AP through PhotoStream, and (iii) each had access to the photo in AP's PhotoArchive.

During the entire time the photograph was present in the PhotoArchive, only three entities accessed and downloaded the photo – AOL, Canadian Press, and the Huntsville Times. The record reflects only a single use of the image obtained from the PhotoArchive:  a thumbnail image that appeared on AOL's web site under the words "AOL News" illustrating the headline "New Theory on Flight 93 As Revolt Began, Data Shows Hijacker Crashed on Purpose."  No other use of the photograph traceable to AP is evidenced in the record, and there is no evidence

that either AP or any of its members or subscribers ever sold the photo or used it for commercial purposes.[5]

Before Ms. McClatchey's attorney complained to AOL, AP did not know that any of its members or subscribers (including AOL) had used the photograph. After AP learned that Ms. McClatchey objected to AOL's use of the photograph, AP removed its copy from the PhotoArchive on November 4, 2003. The photograph is no longer accessible to AP members or subscribers, or anyone else who may have access to the PhotoArchive.

## VI.    **Ms. McClatchey's Has Changed Her Story Over and Over Again**

Although Ms. McClatchey has vigorously prosecuted her claims against AP in the hopes of obtaining a windfall monetary judgment, her version of the key factual event – what happened when the AP photographer came to her home – has changed repeatedly throughout the case. Indeed, Ms. McClatchey's story has changed every time AP has highlighted the legal and factual deficiencies in her current story.

First, in her complaint, Ms. McClatchey admitted that she "provided to the AP a courtesy copy of the photograph *to use in connection with the proposed article*." Compl. ¶ 14 (emphasis added). After AP agreed in its answer that Ms. McClatchey had provided the photo for use with

---

[5] Although Ms. McClatchey now claims that she found "additional unauthorized and infringing uses of her photograph in newspapers, such as the Washington Post and Philadelphia Daily News, magazines, and in connection with several Flight 93 conspiracy web sites," Pl.'s Pretrial Statement at 5, there is no evidence in the record that any of these alleged infringements has anything to do with AP. To the contrary, the record establishes that (1) Ms. McClatchey herself granted the Washington Post an unlimited non-exclusive license to use and republish her photograph, and (2) Ms. McClatchey herself granted Philadelphia Newspapers, Inc. (the former owner of the Philadelphia Daily News), and was paid by it for, the right to publish her photograph. The evidence also establishes that the only "Flight 93 conspiracy web site" identified by Ms. McClatchey obtained her photograph from the Federal Emergency Management Agency, not AP, as Ms. McClatchey herself has admitted.

Mr. Sheehan's article and noted in discovery that Ms. McClatchey's admission defeated her claims, Ms. McClatchey switched to a new story.

At her deposition, Ms. McClatchey testified that the AP photographer had taken a picture of her holding her personal copy of the "End of Serenity" photograph while she was sitting on her sofa in her living room. She even said the photograph published by *The Tribune-Democrat* in connection with Mr. Sheehan's article and which she attached to her complaint, *see* Compl. Ex. C, was the photograph the AP photographer took in her living room. Moreover, Ms. McClatchey repeatedly testified that her personal copy of the photograph – the one she displayed for AP's photographer – does not contain a copyright notice.

Then, after AP's summary judgment motion pointed out that Ms. McClatchey admitted that the photograph in question did not contain a copyright notice, her story changed again. This time, Ms. McClatchey submitted a declaration stating that the AP photographer took a different picture of her and that she was holding a different copy of the "End of Serenity," which contained a copyright notice.

It hardly seems coincidental that Ms. McClatchey's testimony on this issue has changed at each critical stage of the litigation. No matter how often her story changes, however, the fact remains that she gave AP permission to publish her photograph in connection with its report. Even if she did not consent to the publication, AP's use was a fair use and absolutely permissible under long-standing doctrines of copyright law, with or without her permission.

## DEFENSES TO DAMAGES CLAIMED BY PLAINTIFF

Ms. McClatchey is not entitled to collect any damages because AP is not liable to her on any of her claims. Nevertheless, assuming that Ms. McClatchey can meet her burden of proof *and* defeat AP's affirmative defenses, AP maintains substantial defenses to her damages theories.

Ms. McClatchey has essentially conceded that, even if AP infringed her copyright or violated the Digital Millennium Copyright Act (DMCA), she did not suffer any material actual damages.  Indeed, "there is not a huge market for the photograph" at issue.  Mem. Op. & Order at 6, *McClatchey v. Associated Press*, No. 3:05-cv-145 (W.D. Pa. Mar. 9, 2007) (hereinafter cited as "Mem. Op.").  Rather than pursue her nominal actual damages, Ms. McClatchey has elected to pursue statutory damages and, in doing so, seeks substantial awards, potentially totaling nearly $30 million.  Ms. McClatchey cannot collect on her outlandish damages theories as a matter of fact or as a matter of law.

1.      *Assuming AP infringed Ms. McClatchey's copyright, its alleged infringement was innocent, and Ms. McClatchey is entitled to collect only $200 in statutory damages*.  When a plaintiff elects to seek a statutory damage award under the Copyright Act, her award is generally limited to "a sum of not less than $750 or more than $30,000 as the court considers just."  17 U.S.C. § 504(c)(1).  However, if the defendant establishes that it was "not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." § 504(c)(2).  In this case, AP did not know, and had no reason to know, that its actions allegedly infringed Ms. McClatchey's copyright.

AP has always believed that Ms. McClatchey consented to AP's use of the photograph in connection with Mr. Sheehan's news report.  Indeed, Mr. Puskar testified that Ms. McClatchey consented to its use, and Ms. McClatchey's complaint itself unambiguously states that she consented, admitting that she "provided" the photograph to AP for "use in connection with the proposed article."  Compl. ¶ 14.  Moreover, Ms. McClatchey herself confirmed that she had no problem with AP's use of the photograph as part of the story it ran, and never complained about

AP's distribution of the photograph in connection with the article.   Instead, Ms. McClatchey was upset by the uses made by third-party conspiracy theorists who had no connection whatsoever to AP.  In any event, no one at AP knew that she objected to *any* use of her photograph until AOL notified AP that Ms. McClatchey's lawyer had written a letter to AOL complaining that AOL had published the photo on its website.

AP also believes that its use of the photograph to illustrate Mr. Sheehan's report and the other uses in the record are protected fair uses.  AP has even taken steps to ensure that the only uses of the photograph are fair uses – instructing PhotoStream subscribers that the photograph was intended for publication with Mr. Sheehan's article, prohibiting AP members from selling the photograph, and restricting members who obtain the photograph from the PhotoArchive (such as AOL) to uses that "incorporate[] [the photograph] in materials for editorial publication only."  Thus, any alleged violation of the Copyright Act was an innocent infringement, and Ms. McClatchey should be limited to recovering only $200.

2.       *If AP is found liable and the Court declines to exercise its discretion to award $200, Ms. McClatchey should collect only $750 on her copyright claims.*  In assessing statutory damages, courts consider several factors:  "'(i) the expenses saved and profits reaped by defendants in connection with the infringement; (ii) revenues lost by the plaintiffs; and (iii) whether the infringement was willful and knowing, or whether it was accidental and innocent.'" *A & N Music Corp. v. Venezia*, 733 F. Supp. 955, 958 (E.D. Pa. 1990) (citation omitted).  Even if Ms. McClatchey prevails on her claim and the Court decides not to exercise its discretion to award her the statutory minimum, any award she might ultimately collect should be limited to $750 because:  (1) AP did not reap any profits from the alleged infringement and did not save any expenses because Ms. McClatchey has admitted that she "provided" the photograph for AP

13

to "use in connection with the proposed article," Compl. ¶ 14; (2) Ms. McClatchey did not lose any revenue as a result of AP's alleged violation; and (3) any infringement by AP was accidental and innocent. A $750 award would be particularly justified in this case (if AP is even liable) because that figure represents more than twice the amount news publications typically paid to license the photograph, and Ms. McClatchey has produced evidence of only two instances where AP's copy of her photograph was published – and the photograph was not published in connection with Mr. Sheehan's article in only one of those instances. *See A & N Music*, 733 F. Supp. at 958 (declining to award statutory damages of $12,500, which would have been "nearly ten times the licensing fees" plaintiff lost as a result of defendant's infringing conduct).

3.  *Ms. McClatchey is not entitled to a $150,000 statutory award under any circumstances.* Plaintiff is seeking an award "in the amount of $150,000 for the willful infringement by AP." Pl.'s Pretrial Statement at 6. The Copyright Act provides that if the plaintiff is able to prove that "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). To sustain this burden, Ms. McClatchey must establish that AP knew that its "'conduct constitute[d] copyright infringement.'" *Bly v. Banbury Books, Inc.*, 638 F. Supp. 983, 986 (E.D. Pa. 1986) (citation omitted). Ms. McClatchey cannot sustain that burden.

When AP distributed its copy of Ms. McClatchey's photograph, it believed she had consented to the distribution. AP did not even know that AOL had used the photo until weeks after AOL posted it online. In addition, AP believes that its use and the other uses of the photograph in the record (including AOL) are fair uses protected by federal copyright law. *See Branch v. Ogilvy & Mather, Inc.*, 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991) ("One defense to an

allegation of willfulness is the defendant's reasonable and good faith belief that its actions do not constitute copyright infringement.").

Contrary to Ms. McClatchey's assertions, AP did not "remove McClatchey's copyright management information" and did not "falsely identify[] the AP as the owner." Pl.'s Pretrial Statement at 6. AP could not have removed any copyright information because the copy of the photograph Ms. McClatchey displayed for AP's photographer did not contain a copyright notice. AP also made clear that Ms. McClatchey ultimately owned the photograph itself, specifically informing subscribers that Ms. McClatchey took the photograph and identifying the photograph as a "handout" image received from a third party. AP took the additional steps of informing subscribers that the photograph could not be sold or used for commercial purposes, and did not make the photograph available to the AP division that sells and licenses photographs to non-members. These are the most restrictive limitations AP can place on a photograph. Simply put, AP did not willfully infringe Ms. McClatchey's copyright, and plaintiff cannot meet her burden of proving otherwise. *See Digital Filing Sys., L.L.C. v. Agarwal*, 2005 WL 1702954, at *2 (E.D. Mich. July 20, 2005) (no willful infringement where person "has been notified that his conduct constitutes copyright infringement," but "reasonably and in good faith believes the contrary") (internal quotation and citation omitted).

4.     *If AP is found liable Ms. McClatchey is entitled to collect only a single award under the Copyright Act.* The Copyright Act plainly provides that a prevailing plaintiff may collect "an award of statutory damages *for all infringements* involved in the action, *with respect to any one work*, for which any one infringer is liable individually, or *for which any two or more infringers are liable* jointly and severally." § 504(c)(1) (emphasis added). Notwithstanding that provision and this Court's admonition that "Plaintiff is entitled to recover only a single award,"

Mem. Op. at 10, Ms. McClatchey persists in pursuing three separate damage awards – one for alleged direct infringement and two for alleged secondary infringements, *see* Pl.'s Pretrial Statement at 6-7.  Her position is flatly incorrect as a matter of law.  Because she alleges that only one work was infringed, she can collect only one statutory award.  *See Daley v. Firetree, Ltd.*, 2006 WL 148879, at *7 (M.D. Pa. Jan. 19, 2006) (a plaintiff may recover only "one award of statutory damages for each work proved to be infringed"); *see also Bouchat v. Champion Products, Inc.*, 327 F. Supp. 2d 537, 553 (D. Md. 2003) (concluding that plaintiff would be "entitled to a single statutory damage award for which the primary infringer . . . would be jointly liable with the derivative infringers").

     5.     *If AP is found liable, Ms. McClatchey is entitled to collect, at most, $5,000 on her DMCA claims.*  In her complaint, Ms. McClatchey alleges that AP committed two violations of the DMCA:  (1) it allegedly distributed false copyright management information in violation of 17 U.S.C. § 1202(a), Compl. ¶¶ 48-50; and (2) it removed copyright management information from Ms. McClatchey's photograph in violation of 17 U.S.C. § 1202(b), *id.* ¶¶ 55-56.  In lieu of seeking her actual damages for these supposed violations – she admittedly suffered no actual injury – Ms. McClatchey has elected to pursue statutory damages under § 1203(c)(3)(B).  *See* Pl.'s Pretrial Statement at 8.  That section provides that a prevailing plaintiff may collect "an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000."  17 U.S.C. § 1203(c)(3)(B).  Because Ms. McClatchey alleges two violations of § 1202, she is entitled to collect only two statutory awards.  For the same reasons that Ms. McClatchey should be awarded a minimal amount for AP's alleged copyright infringement, she should recover only the statutory minimum for AP's alleged DMCA violations.  *See supra* at 12-15.  Indeed, if it is found liable for violating the DMCA, AP intends

to ask the Court to reduce or remit any damages award because AP "was not aware and had no reason to believe that its acts constituted a violation." *Id.* § 1203(c)(5)(A).

Ms. McClatchey seeks to collect 1,147 separate statutory damage awards for AP's alleged DMCA violation. *See* Pl.'s Pretrial Statement at 8. In making her claim to a multi-million-dollar judgment, Ms. McClatchey's Pretrial Statement attempts to rewrite the DMCA, misreads the authority on which it relies, and seeks to end-run well-established copyright law. First, Ms. McClatchey's Statement asserts that "17 U.S.C. § 1203 authorizes statutory damages for each *act* of distribution." *Id.* at 7-8 (emphasis added). It says no such thing. The relevant section provides for a statutory award "for each *violation* of section 1202." 17 U.S.C. § 1203(c)(3)(B). Section 1202 lists several violations, including "distribut[ing] . . . copyright management information that is false" and "intentionally remov[ing] or alter[ing] any copyright management information." §§ 1202(a)(1), (b)(1). At most, AP committed two violations of § 1202, distributing false copyright management information and removing copyright management information. Consequently, under the plain language of the statute, Ms. McClatchey is entitled to two awards, if she is entitled to collect damages at all.

Second, the only case cited in plaintiff's Pretrial Statement, *Sony Computer Entertainment America, Inc. v. Filipiak*, 406 F. Supp. 2d 1068 (N.D. Cal. 2005) (cited in Pl.'s Pretrial Statement at 8), addresses a separate damages provision dealing with violations of a different section of the DMCA. In that case, the plaintiff "sold *devices* used to . . . circumvent copyright protection mechanisms" in certain videogames in violation of § 1201(a)(2). *Id.* at 1070 (emphasis added). That section of the DMCA prohibits a person from providing a device "primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a" copyrighted work. § 1201(a)(2)(A). The DMCA provides that,

in contrast to the damages available for § 1202 violations, a prevailing party may "recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 *per* act of circumvention, *device*, product, component, offer, or performance of service, as the court considers just."  § 1203(c)(3)(A) (emphasis added).  Interpreting this provision, the court in *Sony Computer* awarded the plaintiff "a separate award of statutory damages for each device sold."  *Sony Computer Entm't Am.*, 406 F. Supp. 2d at 1074.  Given the different language and different measure of damages in the two sections, *Sony Entertainment* provides no guidance – and, if anything, demonstrates the fallacy in Ms. McClatchey's damages theory.

The other authority cited in plaintiff's Pretrial Statement – 3 *Nimmer on Copyright* § 2A.13 (cited in Pl.'s Pretrial Statement at 8) – offers no support for her position either.  That treatise simply parrots the language of the statute stating that a prevailing party may collect awards "'for each violation of section 1202,'" and for § 1201 violations may collect a separate damage award "'per act of circumvention, device, product, component, offer, or performance of service.'"  3 NIMMER ON COPYRIGHT § 12A.13[B] (quoting 17 U.S.C. §§ 1203(c)(3)(A), (B)).

Third, Ms. McClatchey's DMCA damages theory runs afoul of the law governing traditional copyright damages, which, as plaintiff's Pretrial Statement suggests, inform the interpretation of the DMCA's damages provisions.  *See* Pl.'s Pretrial Statement at 8 (citing *Controversy Music v. Shifferaw*, 2003 WL 22048519 (N.D. Cal. July 7, 2003), to explain what "factors the Court can consider in determining the amount of damages for each violation within" the statutory range).  As is explained above, courts have rejected the argument that a single transmission to multiple recipients constitutes a separate copyright violation for purposes of calculating statutory damages.  *See supra* at 15-16.  Similarly, this Court should reject Ms. McClatchey's effort to receive a windfall award of $2.8 million to $28.6 million for a single

transmission of a single photograph – particularly when Ms. McClatchey herself sold the photograph without any copyright management information to publications for only $250 to $350.

6.    *Even if Ms. McClatchey prevails on her claims, she is not entitled to recover her attorney's fees.*  Ms. McClatchey cannot meet the criteria for an attorney's fee award under Third Circuit precedent.  *See Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d. Cir. 1986) (listing factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence").  Likewise, she cannot articulate how an award of attorney's fees in this case would be "faithful to the purposes of the Copyright Act."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994).  Indeed, Ms. McClatchey did not even attempt to justify her claim for attorney's fees in her pretrial statement, and, quite simply, she is not entitled to collect them even if she prevails.  *See* Pl.'s Pretrial Statement at 8 (merely noting that Ms. McClatchey seeks attorney's fees).

7.    *If AP prevails, it is entitled to recover its attorney's fees and costs.*  Under 17 U.S.C. § 505, the Court may "award a reasonable attorney's fee to the prevailing party," as well as its costs.  *See Fogerty*, 510 U.S. at 534 (noting that "[p]revailing plaintiffs and prevailing defendants are to be treated alike" in awarding attorney's fees); *see also Lieb*, 788 F.2d at 156 (identifying factors).  A fee award in this case is appropriate to compensate AP and to deter similar claims in the future.  AP's use of the photograph was for "news reporting" – a statutorily protected fair use.  *See* 17 U.S.C. § 107.  If AP prevails on its claims, an award of reasonable attorney's fees not only would compensate it for engaging in protected activity, it would deter similarly unfounded claims in the future.  Moreover, from the outset, Ms. McClatchey

19

acknowledged that she "provided" a "copy of the photograph to use in connection with the proposed article." Compl. ¶ 14. An attorney's fee award is particularly appropriate in this case given the plaintiff's apparent motivation of pursuing this case through discovery and to trial to secure a windfall seven-figure judgment, when she has suffered little, if any, actual damage. Indeed, plaintiff's story concerning the AP photographer and her theory on statutory damages have changed at every juncture of the litigation as she continues to pursue an astronomical and unwarranted judgment.

## WITNESSES

**I.**     **Witnesses AP Expects to Present**

> J. David Ake
> c/o Levine Sullivan Koch & Schulz, L.L.P.
> 321 West 44th Street, Suite 510
> New York, NY 10036
> (212) 850-6100
>
> James R. Gerberich
> c/o Levine Sullivan Koch & Schulz, L.L.P.
> 321 West 44th Street, Suite 510
> New York, NY 10036
> (212) 850-6100
>
> Gene J. Puskar
> c/o Levine Sullivan Koch & Schulz, L.L.P.
> 321 West 44th Street, Suite 510
> New York, NY 10036
> (212) 850-6100
>
> Charles Sheehan
> c/o Levine Sullivan Koch & Schulz, L.L.P.
> 321 West 44th Street, Suite 510
> New York, NY 10036
> (212) 850-6100

II.    <u>**Witnesses AP May Call if the Need Arises**</u>

George Galt
c/o Levine Sullivan Koch & Schulz, L.L.P.
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100

Eric N. Lieberman
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071
(202) 334-6000

Valencia M. McClatchey
107 Osage Path
Stoystown, PA 15563
(814) 754-4796

III.    <u>**Witnesses AP Expects to Present by Means of a Deposition**</u>

AP does not expect to present any witness's testimony by means of a deposition at this

time.  AP reserves the right to present witnesses' testimony by means of a deposition if the need

arises and will designate the pages and line numbers of that testimony as soon as that need arises.

## DOCUMENTS AND OTHER EVIDENCE

I.    <u>**Documents and Other Evidence AP Expects to Offer**</u>

A complete list of documents and other evidence AP expects to offer is attached hereto as

Exhibit C.

II.    <u>**Documents and Other Evidence AP May Offer if the Need Arises**</u>

A complete list of documents and other evidence AP may offer if the need arises is

attached hereto as Exhibit D.

## LEGAL ISSUES

At this time, AP believes that the following legal issues should be addressed at the final

pretrial conference and prior to trial.  Additional legal issues may arise that merit the Court's

attention before trial, and AP reserves its right to raise those issues as necessary at the appropriate time[6]:

1.      *Whether plaintiff may introduce evidence that any person or entity other than The Progress and AOL published AP's copy of the photograph.*  In discovery, Ms. McClatchey did not produce evidence of any other uses of the photograph, and plaintiff therefore should be precluded from seeking to offer evidence of additional uses.

2.      *Whether a plaintiff seeking to hold a defendant liable for vicarious copyright infringement must prove that the defendant benefited financially from the direct infringement.* The Supreme Court has instructed that a person "infringes vicariously by profiting from direct infringement," *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005), and this Court has held that vicarious liability requires "an obvious and direct financial interest" in the "infringing activities of another," *Metzke v. May Dep't Stores Co.*, 878 F. Supp. 756, 760 (W.D. Pa. 1995).  Thus, to satisfy the "financial interest" requirement, Ms. McClatchey must show either (i) AP actually profited from the alleged infringement or (ii) an "actual relationship between infringing activity and the number of users" of AP's services.  *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500 (E.D. Pa. 2006).  Any other standard runs counter to the fundamental legal principles underlying the doctrine of vicarious liability.  *See, e.g., Am. Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1441 (3d Cir. 1994) (explaining that the purpose of vicarious copyright infringement is to hold liable the "entity that profits from

---

[6] In her Pretrial Statement, plaintiff used the "legal issues" section of the Statement to articulate her view of the law governing her claims and the reasons she believes her claims will prevail. Her statement was improper under the local rules, which require a party to include "[a] list of legal issues that the party believes should be addressed at the final pretrial conference."  LR 16.1.4A(6).  AP has refrained from responding to plaintiffs' misstatements of the law and facts in its pretrial statement.  AP looks forward to correcting these misstatements in its pretrial brief, its proposed jury instructions, or at any time the Court invites submissions concerning the relevant law and its application to the facts of this case.

infringement," and in the trademark context, rejecting the same argument Ms. McClatchey makes in her pretrial statement concerning vicarious infringement).

3.    *Whether AOL's publication of the photograph is a fair use*.  AOL used the photograph to illustrate a headline stating "New Theory On Flight 93:  As Revolt Began, Data Shows Hijacker Crashed On Purpose."  AOL's publication of the photo was for a use expressly protected by the Copyright Act – "news reporting" – and otherwise meets each of the criteria for protection under the fair use doctrine.  *See* 17 U.S.C. §107; *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 197-98 (3d Cir. 2003).

4.    *Whether Ms. McClatchey can demonstrate liability or collect statutory damages for the alleged infringement by The Washington Post*.  In her agreement with The Washington Post, Ms. McClatchey granted the newspaper a "non-exclusive right to reproduce, distribute, adapt or display the Work for any purpose and in any manner or medium worldwide during the copyright term of the Work, without additional compensation."  Because this agreement covers all subsequent publications of her photograph, Ms. McClatchey cannot collect against AP for any alleged infringement involving The Washington Post as a matter of law.

5.    *Whether a plaintiff is permitted to collect more than one statutory damage award for alleged secondary infringements of a single copyrighted work*.  Under 17 U.S.C. § 504(c)(1), a prevailing plaintiff may collect a single award for "all infringements involved in the action, with respect to any one work."  *Accord* Mem. Op. at 10 ("Plaintiff is entitled to recover only a single award.").

6.    *Whether Ms. McClatchey is entitled to collect multiple statutory awards if she prevails on her DMCA claim*.  Under 17 U.S.C. § 1203(c)(3)(B), a prevailing plaintiff may recover "an award of statutory damages for each violation of section 1202."  Ms. McClatchey

23

has only alleged two violations of § 1202:  (i) AP's alleged removal of her copyright

management information, and (ii) AP's alleged distribution of the photograph after removing her

copyright management information.  Compl. ¶¶ 48-50, 52, 55-57.  Therefore, if Ms. McClatchey

prevails on both claims, she is entitled to two statutory awards not 1,147 as she claims.  *See* Pl.'s

Pretrial Statement at 8.

## EXPERT DISCLOSURES

Neither party has retained any experts.  Accordingly, there are no expert disclosures nor

expert reports to attach.

Dated:  April 18, 2007                    Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


By:    */s/ Robert Penchina*

Robert Penchina (*Pro Hac Vice*)
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100
(212) 850-6299 (Fax)

Gayle C. Sproul (I.D. No. 38833)
Michael Berry, I.D. No. 86351 (*Pro Hac Vice*)
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778
(215) 988-9750 (Fax)

*Attorneys for The Associated Press*

<u>**CERTIFICATE OF SERVICE**</u>

I, Michael Berry, hereby certify that on this 18th day of April, 2007, I caused to be served

a true and correct copy of the foregoing Pretrial Statement of The Associated Press via the

Court's ECF system, upon the following counsel of record:

> Paul K. Vickrey
> Douglas M. Hall
> Kara L. Szpondowski
> Niro, Scavone, Haller & Niro
> 181 West Madison, Suite 4600
> Chicago, Illinois 60602-4515
>
> John E. Hall
> Eckert Seamans Cherin & Mellott, LLC
> USX Tower
> 600 Grant Street, 44th Floor
> Pittsburgh, Pennsylvania 15219

_____*/s/ Michael Berry*_____
Michael Berry