**EXHIBIT C
TO
PLAINTIFF'S MOTION FOR RECONSIDERATION,
OR IN THE ALTERNATIVE, MOTION FOR CERTIFICATION
OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

**Westlaw.**

Slip Copy
Slip Copy, 2006 WL 2265039 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 1

C
Garden City Boxing Club, Inc. v. Perez
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
GARDEN CITY BOXING CLUB, INC., Plaintiff,
v.
Rafael PEREZ and El Vitalina Restaurant, Defendants.
No. 05CV3713(FB)(CLP).

Aug. 8, 2006.

Julie Cohen Lonstein, Lonstein Law Office, P.C., Ellenville, NY, for the Plaintiff.

*MEMORANDUM & ORDER*
BLOCK, Senior District Judge:
*1 On February 24, 2006, Magistrate Judge Pollak issued a Report and Recommendation ("R & R") on the amount of damages to which plaintiff was entitled. The R & R stated that "[a]ny objections to this [R & R] must be filed ... within ten (10) days of receipt of this report[,]" and that "[f]ailure to file objections within the specified time waives the right to appeal the District Court's order ." See R & R at 18; see also 28 U.S.C. § 636(b)(1). None of the parties has objected to the R & R.

If clear notice has been given of the consequences of failure to object, and there are no objections, the Court may adopt the R & R without *de novo* review. See Thomas v. Arn, 474 U.S. 140, 149-50 (1985); Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir.2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."). Plaintiff served a copy of the R & R on the defendants on July 11, 2006, via regular mail, thereby providing them with notice of the R & R and informing them of their rights to object and the consequences of not so doing. See Docket No. 14.

The Court will excuse the failure to object and conduct *de novo* review if it appears that the magistrate judge may have committed plain error in ruling against the defaulting party. See Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir.2000). Here, nothing on the face of the R & R suggests plain error. Accordingly, the Court adopts the R & R without *de novo* review.

SO ORDERED.

*REPORT AND RECOMMENDATION*
POLLAK, Magistrate J.
On August 4, 2005, plaintiff Garden City Boxing Club, Inc. ("plaintiff") filed this action against defendants Rafael Perez, individually, and El Vitalina Restaurant, a/k/a Vitalina Restaurant (collectively, "El Vitalina"), alleging that defendants had engaged in the illegal theft of cable television services through the use of an electronically modified cable television decoder device to broadcast the November 27, 2004 boxing match between Marco Antonio Barrera and Erik Morales, in violation of the Federal Communications Act of 1934, as amended, 47 U.S.C. § 605.

Despite proper service, defendants failed to answer or otherwise respond to the complaint, and plaintiff filed an application for entry of default judgment. On December 15, 2005, a default was entered and the action was referred to the undersigned to conduct an inquest on damages and prepare a Report and Recommendation.

For the reasons set forth below, this Court respectfully recommends that, pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i)(II), 605(e)(3)(C)(ii) and 605(e)(3)(B)(iii), plaintiff be awarded statutory damages of $12,000, attorneys' fees of $1,000, costs of $450, and interest, for a total of $13,450 plus interest.

*FACTUAL BACKGROUND*

According to the Complaint filed with the court, plaintiff owned the commercial rights to distribute the November 27, 2004 boxing match between Marco Antonio Barrera and Erik Morales, including all undercard bouts (the "Barrera/Morales match" or the "Event"), via closed circuit television and encrypted satellite signal, to commercial establishments for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

C

a licensing fee. (Compl. ¶¶ 12-13; Plaintiff's Inquest Memorandum dated January 27, 2006 ("Pl.'s Inquest Mem." at 2). The defendants did not purchase the rights to intercept and exhibit this encrypted boxing match from the plaintiff, but intercepted and exhibited the same without legal authorization. (Compl.¶¶ 15-16).

*2 To ensure that only licensed establishments were broadcasting the Event, plaintiff hired private auditors to identify commercial locations not authorized to broadcast the Event. (Gagliardi Aff.[FN1] ¶ 4). Prior to visiting various locations, auditors were provided with a list of establishments that had been licensed to broadcast the Event, and visited establishments not on the list during the time of the broadcast. (*Id.* ¶¶ 5-7).

> FN1. Citations to "Gagliardi Aff." refer to the Affidavit of Joseph Gagliardi, President of Garden City Boxing Club, dated November 22, 2005.

On November 27, 2004, defendants broadcast the Barrera/Morales boxing match to patrons within El Vitalina, a commercial establishment located at 2693 Atlantic Avenue, Brooklyn, New York. (Compl.¶ 7). An auditor visited El Vitalina on that night at approximately 9:53 p.m. (Gagliardi Aff. ¶ 7; Descovich Aff.[FN2] at 1). According to the auditor, there was one television set in the bar on which he observed one of the undercard matches. (*Id.*) According to the auditor, he observed approximately 15 patrons in El Vitalina at that time watching the Event. (*Id.*) In light of the fact that the defendants never entered into a contract with plaintiff to broadcast the Barrera/Morales boxing match and were not authorized in any way to intercept, receive or transmit the boxing match, plaintiff filed this action seeking damages pursuant to 47 U.S.C. § 605(a).

> FN2. Citations to "Descovich Aff." refer to the Piracy Affidavit of Joseph Descovich, Auditor, dated November 30, 2004, attached as Exhibit C to Gagliardi Affidavit.

According to Julie Cohen Lonstein, Esq., counsel for plaintiff, the summons and complaint were served on the defendants or an agent of the defendants. (Pl.'s Mem.[FN3] ¶ 3). Defendants failed to answer or otherwise move with respect to the complaint. Plaintiff thereafter moved for entry of default judgment against defendants, seeking statutory damages, attorneys' fees, and costs.

> FN3. Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum of Law, dated December 1, 2005, submitted by Julie Cohen Lonstein, Esq., attorney for plaintiff.

By Order dated January 4, 2006, the plaintiff's motion for entry of default judgment was referred to the undersigned to conduct a damages inquest and to issue a Report and Recommendation. On January 9, 2006, this Court issued an Order directing the parties to submit the necessary papers in support of their damages calculations.

Plaintiff has requested the maximum award of statutory fees in the following amounts: statutory damages of $10,000.00, pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II), an additional award of $100,000.00 for defendants' willful violation, pursuant to 47 U.S.C. § 605(e)(3)(C)(ii), for a total of $110,000.00, plus attorneys' fees and investigative fees and costs.

*DISCUSSION*

A. *Default Judgment*

Rule 55 sets forth a two-step process in which first a default, and then a default judgment, is entered. See *Enron Oil Corp. v.. Diakuhara*, 10 F.3d 90, 95 (2d Cir.1993). The court clerk automatically enters the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by noting the party's default on the clerk's record of the case. See *id.;* Fed.R.Civ.P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default").

*3 After a default has been entered against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), a default

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment may be entered. *See* Fed.R.Civ.P. 55(b). If the amount of damages must be ascertained in order for default judgment to be entered, the court may conduct a hearing. *See* Fed.R.Civ.P. 55(b)(2); *Enron Oil Corp. v. Diakuhara*, 10 F.3d at 95. Here, plaintiff submitted a request for entry of default and default judgment on December 14, 2005. The clerk of the court entered a default on January 4, 2006.

In determining whether a default judgment should enter, courts have cautioned that a default judgment is an extreme remedy that should only be granted as a last resort. *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir.1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] ... delay and clog its calendar," it has held that the district court must balance the interest in expediting cases with the court's responsibility to "[afford] litigants a reasonable chance to be heard." *Enron Oil Corp. v. Diakuhara*, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored" and doubts should be resolved in favor of the defaulting party. *Id. at 96.* Accordingly, the plaintiff is not entitled to a default judgment as a matter of right, simply because the defendants are in default. *See Erwin DeMarino Trucking Co. v. Jackson*, 838 F.Supp. 160, 162 (S.D.N.Y.1993) (stating that courts are required to "supervise default judgments with extreme care to avoid miscarriages of justice," and ordering an inquest to determine damages).

The court possesses significant discretion and may consider a number of factors in deciding whether or not to grant a default judgment, including whether the grounds for default are clearly established, and the amount of money potentially involved. *See Hirsch v. Innovation Int'l, Inc.*, No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). The greater the amount of money involved, the less justification there is for entering the default judgment. *Id.* Additionally, a court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981) (discussing factors); Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 10A *Fed. Practice & Procedure,* §§ 2685, 2688 (3d ed.1998).

When a default judgment is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.1992), *cert. denied,* 506 U.S. 1080 (1993). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. *Id.; Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981).

*4 Here, plaintiff alleges that the defendants violated 47 U.S.C. § 605(a) through the unauthorized reception of plaintiff's satellite communications. The allegations do indeed establish the elements of liability necessary to state a claim under Section 605. Section 605(a) provides, *inter alia,* that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the ... contents ... of such intercepted communication to any person." 47 U.S.C. § 605(a). Section 605(a) has been held to apply to the interception of cable communications originating as a satellite or radio transmission.[FN4] *See Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir.), *cert. denied,* 519 U.S. 929 (1996). Here, defendants' alleged conduct-the interception, receipt and broadcast of the Event derived from satellite communications-violates Section 605(a) of the Federal Communications Act.

> FN4. Not all programming transmitted by a cable television provider originates as a radio communication. *See Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131 n. 5 (2d Cir.), *cert. denied,* 519 U.S. 929 (1996). Thus, if the defendant can prove that the interception of a signal did not involve any radio originated communications, then only Section 553, and not Section 605, would apply. Since the defendants in this case have failed to appear and present any defense, liability under Sections 605 and 553 has been estab-

lished. Consequently, the defense enunciated in *Sykes* is inapplicable.

Secondly, plaintiff alleges that defendants also violated 47 U.S.C. § 553, which applies to the "unauthorized reception of cable services." *Id.* Section 553 provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). On its face, defendants' alleged conduct appears to violate Section 553 as well.

Moreover, it is beyond dispute that defendants are in default. Both the corporate defendant, El Vitalina, and the individual defendant, Rafael Perez, are in default because neither has responded to the Complaint. *See Hirsch v. Innovation Int'l, Inc.*, 1992 WL 316143 at *2 (holding that "[the defendant's] default is crystal clear-it does not even oppose this motion"). Nor has the corporate defendant obtained counsel. Failure to obtain counsel constitutes a failure to defend because corporations cannot proceed in federal court *pro se*. *See Shapiro, Bernstein & Co. v. Cont'l Record Co.*, 386 F.2d 426, 427 (2d Cir.1967) (per curiam) (stating that "it is settled law that a corporation cannot appear other than by its attorney"); *see also Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir.1983) (discussing the rationale for requiring corporations, as "artificial" entities, to appear through counsel only). Further, the amount of money involved in this case is not great, unlike a case in which there are potentially millions of dollars involved. *See Hirsch v. Innovation Int'l, Inc.*, 1992 WL 316143, at *2 (declining to enter default judgment, as plaintiff's damages request ran well into the millions of dollars, and giving defendant an opportunity to contest the default judgment).

Here, defendants have not only failed to file an answer or otherwise move with respect to the complaint, but they have also failed to respond either to plaintiff's motion for entry of a default judgment or to the Order from this Court relating to the calculation of damages and thus the plaintiff's evidence on damages is unrefuted. Given the opportunities afforded defendants and their apparent lack of interest in participating in these proceedings, there seems to be no compelling reason to delay further.

*5 Accordingly, it is respectfully recommended that plaintiff's motion for entry of a default judgment be granted.

B. *Damages*

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish its entitlement to recovery. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d at 158. Defendants who default are entitled to discovery regarding unliquidated damages. *See U.S. v. Crichlow*, No. 02 CV 6774, 2004 WL 1157406, at *4 (E.D.N.Y. April 9, 2004); *Clague v. Bednarski*, 105 F.R.D. 552 (E.D.N.Y.1985). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not make the determination through a hearing." *Fustok v. Conticommodity Servs., Inc.*, 122 F.R.D. 151, 156 (S.D.N.Y.1988) (citing *Transportes Aeroes De Angola v. Jet Traders Inv. Corp.*, 624 F.Supp. 264, 266 (D.Del.1985)), *aff'd*, 873 F.2d 38 (2d Cir.1989). Here, where the plaintiff has filed reasonably detailed affidavits and exhibits pertaining to the damages incurred and defendants have failed to make an appearance, or respond and present evidence on the issue of damages, the Court can make an informed recommendation regarding damages without an evidentiary hearing.

Where, as here, a violation of both Section 605 and Section 553 has been established, the Second Circuit has held that the court should award damages pursuant to Section 605. *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d at 1007. Under Section 605, plaintiff is entitled to elect either statutory damages or actual damages. 47 U.S.C. § 605(e)(3)(C)(i). Here, plaintiff requests statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II), and enhanced damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii). (Pl.'s Mem. at 6-7; Pl.'s Inquest Mem. at 5).

1) *Statutory Damages*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 605 provides for penalties "for *each* violation of subsection (a) of this section ... in a sum of not less than $1,000 or more than $10,000, as the court considers just...." 47 U.S.C. § 605(e)(3)(C)(i)(II) (emphasis added). Although Section 605 requires the court to assess damages based on each "violation" of the statute, there is no statutory definition of "violation." See *Garden City Boxing Club, Inc. v. Rosado*, No. 05 CV 1037, 2005 WL 3018704, at *3 (E.D.N.Y. Oct. 6, 2005). Moreover, in cases such as this, involving the theft of services by a commercial establishment, it is often difficult to assess a precise figure. However, most cases applying this statute in a commercial context have interpreted the showing of an event on a single night as one violation. See, e.g., *id.*; *Time Warner Cable v. Taco Rapido Rest.*, 998 F.Supp. 107, 111 (E.D.N.Y.1997).

In determining the amount of damages that can be imposed for each violation within the range of $1,000 to $10,000 per violation, Section 605 leaves the decision within the sound discretion of the court. See 47 U.S.C. § 605(e)(3)(C)(i)(II); see also *Home Box Office v. Champs of New Haven, Inc.*, 837 F.Supp. 480, 484 (D.Conn.1993) (reducing an award from $250,000 to $10,000 for commercial broadcast of a boxing match); *Time Warner Cable v. Taco Rapido Rest.*, 998 F.Supp. at 111 (citing cases). The factors to be considered in determining the appropriate amount of damages include the " 'pecuniary loss sustained by the victim as a result of the offense, the financial resources of the defendant, ... the financial needs and earning ability of the defendant ... as well as the burden that a damage award would impose on the defendant relative to the burden alternative relief would impose." ' *Cablevision Sys. Corp. v. De Palma*, No. 87 CV 3528, 1989 WL 8165, at *6 (E.D.N.Y. Jan. 17, 1989) (quoting *Cablevision Sys. Dev. Co. v. Cohen*, No. 84 CV 1155, slip. op. at 4-5 (E.D.N.Y. May 20, 1988) (interpreting 47 U.S.C. § 553)); see also *Entm't by J & J, Inc. v. Ramsarran*, No. 01 CV 5223, 2002 WL 720480, at *2 (E.D.N.Y. Mar. 11, 2002).

*6 In calculating lost profits, some courts have awarded a flat damage amount that they have "consider[ed] just" when dealing with the unauthorized receipt and broadcast of a cable program by a commercial establishment. See, e.g., *Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp.*, No. 88 CV 2834, 1991 WL 58350, at *2 (E.D.N.Y. March 20, 1991) (awarding damages "based on the Court's view of the equities and not on the estimate of the number of patrons"); *Home Box Office v. Gee-Co, Inc.*, 838 F.Supp. 436, 440 (E.D.Mo.1993); *Home Box Office v. Champs of New Haven, Inc.*, 837 F.Supp. at 484. Others have assessed damages based on the number of patrons in the commercial establishment during the broadcast. See, e.g., *Garden City Boxing Club, Inc. v. Rosado*, 2005 WL 3018704, at *4 (awarding $54.95 FN5 per patron); *Entm't by J & J, Inc. v. Mama Zee Rest.*, No. 01 CV 3945, 2002 WL 2022522, at *4 (E.D.N.Y. May 21, 2002) (awarding $50 per patron); *New Contenders, Inc. v. Diaz Seafood Corp.*, No. 96 CV 4701, 1997 WL 538827, at *2 (S.D.N.Y. Sept. 2, 1997) (awarding $300 per patron); *Time Warner Cable v. Taco Rapido Rest.*, 988 F.Supp. at 111 (awarding $50 per patron); *Cablevision Sys. Corp. v. 45 Midland Enters., Inc.*, 858 F.Supp. 42, 45 (S.D.N.Y.1994) (awarding $50 per patron). Plaintiff contends that the maximum amount of statutory damages ought to be awarded in this case. (Pl.'s Mem. at 6-8).

> FN5. This amount was presumably derived from the fee that an individual would have paid to watch the match at home, and thus is a measure of the income that plaintiff lost by virtue of defendant's unauthorized broadcast. See *Garden City Boxing Club, Inc. v. Santacruz*, No. 05 CV 63, 2005 WL 2806251, at *3 n. 1 (E.D.N.Y. Sept. 20, 2005).

In particular, plaintiff argues that the appropriate measure of damages is the capacity of the restaurant, rather than the number of patrons present, as this is how plaintiff sets the cost when customers legitimately purchase an event. (Pl.'s Inquest Mem. at 2). If the Court were to take this measure of damages, the Court would multiply the damages per patron by the restaurant's capacity, here estimated as 40, rather than by the actual number of people watching the Event, here 15. (Descovich Aff. at 2). Plaintiff cites to *Garden City Boxing Club v. Bello*, No. 05 CV 1300, 2005 WL 2496062 (E.D.N.Y. Sept. 20, 2005), and

*Garden City Boxing Club v. Santacruz,* No. 05 CV 63, Slip Op. (E.D.N.Y. Sept. 20, 2005) in support of this argument. Quoting *Garden City Boxing Club v. Bello,* 2005 WL 2496062, at *3, plaintiff argues that although the auditor witnessed only 15 people watching the Event, that it " 'is entirely possible that at some point in the evening the restaurant did indeed hold that maximum number, if not more." ' (Pl.'s Inquest Mem. at 2).

The Court agrees that it is indeed possible that the restaurant held more patrons than the auditor witnessed during his visit. However, although it is entirely possible that more patrons were there before or after the auditor's visit, it is also entirely possible that there were not. In this case, the auditor visited the restaurant for approximately one minute, from 9:53 p.m. to 9:54 p.m. The auditor did not return later in the night to count the patrons, and did not personally observe the restaurant filled to capacity. In addition, plaintiff has not submitted any evidence as to the official capacity of the restaurant, other than an estimate by the auditor. The Court is hesitant to extrapolate damage awards without such actual evidence.

*7 There are a number of other components to the pecuniary loss suffered here, including lost sub-license fees, lost admission charges, and loss of good will. Apart from the sub-license and admission fees from the restaurant, defendants' patrons probably purchased meals and/or drinks while viewing the Event. Thus, defendants received profits from the food or drinks sold to the patrons as an indirect result of the defendants' unlawful theft of services. (Pl.'s Inquest Mem. at 2). In addition, plaintiff argues that this theft deprives plaintiff of its good will, reputation, and business investment and, as a result, has caused and continues to cause plaintiff to lose as customers those establishments who cannot attract paying patrons when the Event is broadcast in establishments that charge no fee or charge a fee that is considerably less than the fees demanded by plaintiff. (Gagliardi Aff. ¶¶ 11, 12). Plaintiff argues that this type of theft has an impact not only on the goodwill of plaintiff, but also on the satellite and cable industries in general. (*Id.* ¶ 15). According to Joseph Gagliardi, the President of Garden City Boxing Club, "such acts of piracy have cost [his] company millions of dollars in the last few years." (*Id.* ¶ 16). Accordingly, plaintiff argues that all of these factors should be considered by the court in fixing damages at the maximum statutory amount of $10,000.00.

2) *Enhanced Damages*

Plaintiff also seeks enhanced damages pursuant to Section 605(e)(3)(C)(ii), which provides for additional awards of up to a maximum of $100,000 for all violations. The statute permits enhanced damages where the violation was committed willfully and for purposes of private financial gain. *See Entm't by J & J, Inc. v. Mama Zee Rest.,* 2002 WL 2022522, at *4 (awarding $1,680 in statutory damages under § 605(e)(3)(C)(i)(II), plus an additional $10,000 in enhanced damages in order to both redress the harm and deter future violations, where a boxing match was shown to thirty restaurant patrons); *Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp.,* 1991 WL 58350, at *2 (awarding statutory damages of $5,000 and enhanced damages of $25,000, where defendants showed the Tyson/Spinks championship fight in a large sports bar); *Time Warner Cable v. Taco Rapido Rest.,* 988 F.Supp. at 111-12 (awarding enhanced damages of $5,000, where court found that defendant's unauthorized showing of the event likely led to "an increased number of patrons and thus to an increase in profits," but that defendant did not "charge a cover fee or show the Event on multiple televisions").

Willful behavior under this statute has been interpreted to include " 'disregard for the governing statute and an indifference to its requirements." ' *ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir.1985) (quoting *TransWorld Airlines, Inc. v. Thurston,* 469 U.S. 111, 127 (1985) (defining willfulness in the context of a different civil statute)). Here, it is clear that defendants intercepted and broadcast the Event without entering into a licensing agreement with plaintiff or paying fees to plaintiff. To do so, defendants must have utilized an unauthorized decoder, illegally transferred an authorized decoder to the location, or illegally altered cable service to bring the signal to the restaurant. (Gagliardi Aff. ¶ 10). The defendants then broadcast the Event to patrons who were not required to pay the admittance fee custom-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arily charged by plaintiff under its sublicense agreement, but who purchased meals or drinks from defendants while viewing the Event.

**\*8** In addition, plaintiff has submitted evidence that defendants have intercepted plaintiff's Events and broadcast them without authorization on more than one occasion. In addition to the violation which forms the basis of this suit, plaintiff submitted an affidavit asserting that an auditor visited defendants' establishment a second time, on December 11, 2004, and observed the unauthorized broadcast of the Klichtko/Williams boxing match. (Delvecchio Aff. FN6 at 1). Plaintiff contends that this evidence of repeated willful violations of the statute for private financial gain confirms the need for enhanced damages in this case.

> FN6. Citations to "Delvecchio Aff." refer to the Affidavit of Joseph Delvecchio, an independent auditor hired by plaintiff, attached as Exhibit B to the Attorney's Affidavit of Costs and Fees ("Lonstein Aff."), submitted by Julie Cohen Lonstein, Esq., attorney for plaintiff, dated December 1, 2005.

### 3) *Application*

If statutory damages were assessed at the rate of $50 per patron, this would result in an award of $750 in lost revenue based on the 15 patrons actually observed at the Event. This Court finds that this amount understates the seriousness and willfulness of defendants' conduct here, particularly since, as plaintiff contends, it has suffered intangible losses in the form of "business investment, business opportunities and goodwill." *Am. Television & Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462, 1466 (M .D. Fla.1986). In *Cablevision Systems v. Faschitti,* the court stated:

it is likely that [defendant's] interception cost Cablevision more than simply the fees it would have received if those in the tavern had purchased right to view the fight legitimately. Many non-subscribers may feel no need to subscribe to Cablevision when they can access programming such as pay-per-view at commercial establishments.

38 U.S.P.Q.2d 1156, 1158 (S.D.N.Y.1996). In addition, plaintiff fears that legitimate commercial establishments will be unwilling and unable to compete financially with establishments such as defendants' that offer the stolen programming to their customers for no fee or a reduced fee. Defendants' acts similarly damage plaintiff's goodwill and ability to control and negotiate for the rights to transmit the Event. Finally, plaintiff has demonstrated that defendant has illegally intercepted and broadcast plaintiff's events on more than one occasion.

Given all of these factors and the fact that the evidence demonstrates that defendants acted willfully in illegally intercepting the Event under circumstances that warrant imposition of enhanced damages under Section 605(e)(3)(C)(ii), it is respectfully recommended that plaintiff be awarded statutory damages of $1,000, plus an additional $12,000 in enhanced damages, for a total of $13,000, for which defendants are jointly and severally liable.

### C. *Attorney's Fees and Costs*

Pursuant to Section 605(e)(3)(B)(iii), plaintiff is also entitled to costs and reasonable attorney's fees. *See* 47 U.S.C. § 605(e)(3)(B)(iii). Here, plaintiff's counsel requests an order awarding plaintiff $1,000 in attorney's fees. In support of that application, plaintiff has submitted counsel's affidavit, specifying the nature of the services rendered, the hourly rate charged, the date and amount of time spent on each task, and the experience of the individual performing the services. *See Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). Specifically, the plaintiff's affidavit lists eight entries totaling 4.25 hours of work by an attorney with a billing rate of $200 per hour, and 2 hours of work by a paralegal with a billing rate of $75 per hour. (Lonstein Aff. ¶ 4). Based on a review of counsel's affidavit and this Court's knowledge of similar fee applications, the Court finds both the rates charged and the work performed to be reasonable.

**\*9** The taxable costs for which a party may seek reimbursement include service of process fees and filing fees. *See* 28 U.S.C. § 1920; Fed.R.Civ.P. 54. Counsel has requested filing fees in the amount of

$250 and a service of process fee of $200. (Lonstein Aff. ¶ 3). Courts have typically awarded reasonable filing and service fees to prevailing parties. *See* 28 U.S.C.1920; Fed.R.Civ.P. 54.

In addition, counsel argues that investigation costs should be awarded. Investigative fees are specifically authorized by the legislative history of Section 605, the governing federal statute in this case. *See* 130 Cong. Rec. § 14288 (daily ed. Oct. 4, 1984), *reprinted in* 1984 U.S.C.C.A.N. 4742, 4750 (stating that "[i]t is the intent of the committee that the power to direct the recovery of all costs under (3)(b)(iii) shall include reasonable investigative fees (related to the action brought) of an aggrieved party"). Although the Court may direct that investigative costs be awarded, it is not obliged to. *See Int'l Cablevision, Inc. v. Noel,* 982 F.Supp. at 917 (stating that the "legislative history for § 605(e) instructs that the court has the power to direct the recovery of investigative fees, not that the court is required to order such an award"). The court in *Noel* suggests that the party requesting investigative costs must "supply contemporaneous time records to substantiate the fee request," as "a request for investigative fees pursuant to § 605(e)(3)(B)(iii) should be subject to the same level of scrutiny to which requests for attorneys' fees are subjected." *Id.* at 917-18.

Here, however, plaintiff has failed to submit any documentation in support of its request for the cost of investigation. Thus, the Court respectfully recommends that plaintiff's request for investigative fees be denied. However, based on the supporting affidavits, this Court finds the amount requested for service of process and filing fees to be reasonable and respectfully recommends that plaintiff be awarded $450 in costs for service of process and filing fees from defendant.

D. *Interest*

Plaintiff requests pre- and post-judgment interest on their award. (Pl.'s Mem. at 10). Section 605 is silent as to the amount of a pre-judgment interest rate. In such cases, the " 'common practice' among courts within the Second Circuit is to grant interest at the rate of prejudgment interest under New York State law." *Serv. Employees Int'l, Union, Local 32BJ v. Stone Park Assoc., LLC,* 326 F.Supp.2d 550 (S.D.N.Y.2004). Under New York State law, pre-judgment interest here accrues at the rate of nine percent from the date of the violation until the entry of judgment. N.Y. C.P.L.R § 5004 (McKinney 1992); *see also Garden City Boxing Club, Inc. v. Morales,* No. 05 CV 0064, 2005 WL 2476264, at *2 (E.D.N.Y. Oct 7, 2005).

Under New York State law, the judgment also accrues interest from the date that the entry is docketed until the judgment is paid. N.Y. C.P.L.R § 5003 (McKinney 1992); *see also Banda v. Haro,* No. 01 CV 5552, 2001 WL 1702205, at *3 (S.D.N.Y. Jan. 10, 2001). Thus, post-judgment interest accrues at the rate of nine percent per year. N.Y. C.P.L.R. § 5004; *Banda v. Haro,* 2001 WL 1702205, at *3.

*10 It is respectfully recommended that plaintiff be awarded pre- and post-judgment interest at the rate of nine percent per annum, running from November 27, 2004, the date of the violation, until the date the judgment is paid.

*CONCLUSION*

Accordingly, this Court respectfully recommends that plaintiff be awarded $12,000.00 in damages, plus $1,000 in attorneys' fees, $450 in costs, plus interest, for a total of $13,450, plus interest.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

SO ORDERED.

E.D.N.Y.,2006.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.